# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 8700
Washington, DC 20530,

        *Plaintiff*,

     v.

BOOZ ALLEN HAMILTON HOLDING
CORPORATION
8283 Greensboro Drive
McLean, VA 22102,

BOOZ ALLEN HAMILTON INC.
8283 Greensboro Drive
McLean, VA 22102,

EVERWATCH CORP.
11180 Sunrise Valley Drive, Suite 220
Reston, VA 20191,

EC DEFENSE HOLDINGS, LLC
4445 Willard Avenue, Suite 950
Chevy Chase, MD 20815,
(Montgomery County)

and

ANALYSIS, COMPUTING & ENGINEERING
SOLUTIONS, INC.
302 Sentinel Drive, Suite 570
Annapolis Junction, MD 20701,
(Anne Arundel County)

        *Defendants*.

Case No. ___:2022-cv-_____
**(REDACTED VERSION)[1]**

---

[1]    This Complaint is being publicly filed and has been redacted to remove sensitive information. A motion to seal the unredacted Complaint will be filed separately; the unredacted Complaint will be filed as an attachment to that motion and will be filed under seal.

## COMPLAINT

1.      The United States of America brings this antitrust lawsuit to prevent Booz Allen

Hamilton Holding Corporation ("Booz Allen") from acquiring EverWatch Corp. ("EverWatch").

For the last three years, Booz Allen and EverWatch have been locked in a winner-takes-all

competition to provide operational modeling and simulation services to the National Security

Agency ("NSA"), which is a part of the Department of Defense, and is headquartered at Ft.

George G. Meade in Anne Arundel County Maryland.  The two companies are the only

competitors for this project, and if the merger is not quickly blocked, NSA and American

taxpayers likely will be harmed in the form of higher prices, lower quality, and less innovation

for this crucial service.

2.      NSA is the United States' leader in cryptology, signals intelligence, and

cybersecurity, and is responsible for providing foreign signals intelligence to our nation's

policymakers and armed forces.  Signals intelligence, which is derived from electronic signals

and emissions in communications systems, plays a vital role in our national security by providing

America's leaders with critical information needed to defend our country, save lives, and

advance U.S. goals and alliances globally.  NSA periodically issues a contract for modeling and

simulation services to support its signals intelligence mission.  The next such contract NSA plans

to issue is known by the unclassified name OPTIMAL DECISION.

3.      Booz Allen and EverWatch have spent years analyzing NSA's needs, designing

solutions, and recruiting highly skilled personnel for OPTIMAL DECISION.  According to the

companies' own documents and NSA outreach preparing for the contract bidding, they were (and

currently still are) the only competitors for the contract.  But on March 15, 2022, just a few

months before NSA was scheduled to release the request for proposals ("RFP") that would

formally begin the selection process, Booz Allen decided to stop competing with EverWatch and instead chose to buy the company.  That merger agreement immediately reduced the incentive each company has to submit a competitive bid, and, if completed, would eliminate the competition between the two altogether, leaving NSA to face a monopolist.

4.      Before they agreed to merge, Booz Allen and EverWatch were competing vigorously to win this contract.  Competitors for service contracts like OPTIMAL DECISION invest significant time and resources to assemble their teams, develop their concepts, and present their proposals.  Companies distinguish their proposals by offering more-talented personnel, lower costs, a reduced markup for the prime contractor, and additional services.  Competitors have an incentive to bid aggressively for NSA's business because losing would mean the loss of all of the revenue and profit stream of the project and earning nothing on the investment made by the company.  But the merger agreement stripped the companies of the incentive to bid aggressively against each other to win the contract and replaced it with an incentive to reduce their investments and increase their prices to NSA.  Aggressive bidding would serve only to reduce the profits of the post-merger Booz Allen, while higher prices or lower investment would increase those profits.

5.      The merger agreement created a "heads Booz Allen wins, tails American taxpayers lose" situation.  Booz Allen and EverWatch now are motivated not to prepare the most competitive proposals for the project, but rather to push forward aggressively with their merger plans, safe in the knowledge that no matter which company NSA selects, ultimately it will be the merged firm that owns the contract and reaps the rewards.

6.      The merger must be blocked in order to restore the competition that NSA—and the Americans that it defends—rely on for innovative and high-quality signals intelligence

modeling and simulation support services at fair prices.  Therefore, the United States of America brings this civil action to enjoin the agreement between Booz Allen and EC Defense Holdings, LLC, which has already reduced Defendants' incentives to compete in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  If consummated, the proposed transaction would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.  In support of this action, the United States alleges as follows:

## I.      JURISDICTION AND VENUE

7.      The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, and Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1.

8.      As such, this matter presents a federal question, and this Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

9.      Defendants are engaged in, and their activities substantially affect, interstate commerce.  Defendants sell services to NSA, which is headquartered at Ft. Meade, and located in Anne Arundel County Maryland.  NSA is a component organization of the U.S. Department of Defense and a member of the United States intelligence community.

10.      This Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22, and F.R.C.P 4(h), (k).  Booz Allen Hamilton Inc., EC Defense Holdings, LLC, EverWatch and ACES, Inc. have offices in Maryland, and Defendants regularly transact business with NSA in Maryland.

11.     Defendants Booz Allen Hamilton, EverWatch and ACES all have offices in Annapolis Junction in Anne Arundel County Maryland, and the essential events described in the Complaint took place at NSA and/or at Defendants' offices in Anne Arundel County, Maryland.

12.     Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).

## II.     INTRODUCTION

13.     For over two decades, Booz Allen has been the sole provider of operational modeling and simulation services to support NSA's signals intelligence mission.  Booz Allen so thoroughly dominated this market that its only competitor for the last contract, which was awarded in 2014, exited the market.  This departure left Booz Allen with what appeared to be a lock on NSA's successor project, which is now known as OPTIMAL DECISION.

14.     But in 2019, EverWatch, an agile and innovative competitor, identified weaknesses in Booz Allen's work and decided to challenge the incumbent.  Over the years that followed, EverWatch pulled together two dozen highly-skilled intelligence technology companies to form a team to dethrone Booz Allen.  As of early 2022, according to Booz Allen deal documents, EverWatch's management "project[ed] having a ▮▮▮▮"[2] chance of winning the next bid and displacing Booz Allen from its decades-long incumbency.  Even Booz Allen

---

[2] As described in Plaintiff's Motion For Permission To File Sensitive Information In Plaintiff's Complaint Under Seal, the Complaint contains, or refers to, business plans, sales and revenue information, and other competitively sensitive information produced by Booz Allen and EverWatch to the Department of Justice as a result of their pre-merger notification filing.  Booz Allen and EverWatch provided the information to DOJ in confidence and such information has been protected from public disclosure during the Department's investigation.  Public disclosure of this competitively sensitive information could impact the integrity of the bidding for the OPTIMAL DECISION contract at issue in the Complaint, undermine the National Security Agency's ability to negotiate future contracts with prospective bidders, and facilitate anticompetitive coordination between the parties.

acknowledged that EverWatch posed a significant threat.  Booz Allen's internal documents gave EverWatch a ▮ percent chance of winning the bid.  On March 15, 2022, only weeks before NSA planned to release an RFP for the next project, Booz Allen terminated this rivalry with an agreement to purchase EverWatch.

15.     This merger-to-monopoly, preceding an imminent RFP for an NSA project that is vital to our nation's security, is a unique situation that merits this immediate action by the United States of America.  Before the merger agreement, each company had been recruiting top talent and sharpening its pencils to offer NSA the best value for this important project.  When the companies agreed to merge, it no longer made sense to bid aggressively against each other.  No matter which company NSA awards the contract to, the post-merger Booz Allen ultimately would provide the services and earn the profits.  As a result, neither company has an incentive to offer its best terms, most-talented personnel, or highest-quality service.  The robust competition between Booz Allen and EverWatch effectively ended on the date of the merger agreement.  That agreement therefore violates Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits agreements that unreasonably restrain trade.

16.     The merger would also violate Section 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits mergers that are likely to substantially lessen competition and "tend to create a monopoly."  While the merger agreement alone has reduced the companies' incentives to compete in anticipation of the merger, the transaction itself would allow the merged firm to more directly and permanently end the rivalry.  Booz Allen's acquisition of EverWatch would result in the combined entity possessing monopoly power in the sale of services for the NSA project.  Once the merger is completed, Booz Allen need submit only one bid the for the NSA project.  If the bids have already been submitted, it can withdraw the less profitable of the two bids.  Either

way, following the transaction, NSA would have no choice but to award the contract—yet

again—to Booz Allen.

17.     The Defendants know that their merger, as proposed, cannot survive antitrust

scrutiny.  To evade that scrutiny and prevent the Court from restoring competition to its state

before March 2022, EverWatch engaged in a last-minute scramble to withdraw from its team

leadership role by assigning it to a subcontractor one-tenth its own size.  But that small company

cannot recreate overnight EverWatch's multi-year effort to prepare for this project.  Instead, for

the team to be competitive against Booz Allen, EverWatch would need to continue its team

leadership role in all but name and fully support the putative team leader as it prepares to submit

its proposal.  Even if it makes this transition, EverWatch has no incentive to offer a competitive

price for its own services as a subcontractor. The prime contractor/subcontractor shell game that

EverWatch is playing will thus do nothing to restore the competition that has already been lost as

a result of this transaction.

18.     The proposed merger agreement violates Section 1 of the Sherman Act,

15 U.S.C. § 1, and the merger agreement itself violates Section 7 of the Clayton Act,

15 U.S.C. § 18.  Both should be enjoined.

### III.     DEFENDANTS AND THE TRANSACTION

19.     Defendant Booz Allen Hamilton Holding Corp. is a publicly traded professional

services holding company and parent company of Defendant Booz Allen Hamilton, Inc.  The

Booz Allen Defendants are incorporated in the State of Delaware.  Booz Allen Hamilton, Inc. is

headquartered in McLean, Virginia, and has several offices in Maryland, including in Annapolis

Junction which is in Anne Arundel County, Maryland.  Defendant Booz Allen has almost 30,000

employees who provide a broad range of services and solutions in management, technology,

consulting, and engineering.  Defense and intelligence community customers account for two-thirds of its 2021 revenues of approximately $7.9 billion.

20.     Defendant EverWatch is a Delaware Corporation, headquartered in Reston, Virginia with offices in Annapolis Junction, in Anne Arundel County Maryland.  EverWatch provides a range of services to the defense and intelligence community focused on data science, intelligence, and cybersecurity.  The company has ███ employees and forecasts revenues of ███ ███ in 2022.

21.     Defendant Analysis, Computing & Engineering Solutions, Inc. ("ACES, Inc.") is a Corporation in Maryland and a subsidiary of EverWatch, with a principal office in Annapolis Junction, in Anne Arundel County Maryland.

22.     Defendant EC Defense Holdings, LLC, is a Delaware Limited-Liability Company, and owner of Defendant EverWatch.  EC Defense Holdings has offices in Chevy Chase, in Montgomery County, Maryland, and it is owned by the private equity firm Enlightenment Capital.

23.     Defendants Booz Allen and ACES, Inc. were the only companies to submit intent to prime letters to NSA regarding the OPTIMAL DECISION contract.

24.     On March 15, 2022, pursuant to a merger agreement, Booz Allen agreed to acquire EverWatch for ███████ effectively bringing the competition for the NSA contract to a halt.  The merger agreement was signed and executed by representatives of Defendants Booz Allen Hamilton, Inc., EC Defense Holdings, LLC, and EverWatch Corp.

## IV.     SIGNALS INTELLIGENCE MODELING AND SIMULATION SUPPORT SERVICES

25.     Signals intelligence involves collecting foreign intelligence from communications and information systems and providing it to customers across the U.S. government, including

senior civilian and military officials.  To meet the challenges of today's fast-changing communications and information environment, NSA relies on companies that are sophisticated in a wide range of highly technical fields to develop and employ state-of-the-art tools to address these critical requirements.

26.     One service these technologically advanced companies provide to NSA is operational modeling and simulation to support NSA's signals intelligence mission.  The company selected to provide this service applies its knowledge of signals intelligence, computing, and communication networks to solve problems related to the efficient movement of signals intelligence between collection points, processing platforms, and end users.

27.     NSA's signals intelligence modeling and simulation projects require a wide variety of skills, so it is common for companies pursuing contracts for those projects to assemble a group of subcontractors with specialized capabilities.  The company that assembles the team, manages the project, and ultimately controls the bid process is referred to as the "prime contractor."  Each of the corporate teammates have subcontract agreements with the prime contractor that set the prices for services provided by skilled engineers and technologists, as well as the cost of materials and other services.  The prime contractor generally provides skilled labor from its own workforce as well, and applies a markup to the customer.

28.     Companies compete for service contracts by recruiting and offering more-talented personnel who, by virtue of education, experience, or both, are able to provide the customer with higher-quality, more efficient, and more innovative solutions.  Companies also compete for service contracts by offering lower markups and overhead rates, both of which result in a lower cost to the customer.

29.     Booz Allen's agreement to buy EverWatch effectively terminated the competition

between the companies for OPTIMAL DECISION, which is expected to be a ████████, five-

year project.  NSA expects to release OPTIMAL DECISION for bid imminently.  Booz Allen

and EverWatch are, by their own estimation and NSA outreach, the only competitors for this

project.

## V.     RELEVANT MARKET

30.     The definition of a relevant antitrust market is an analytical tool for understanding

the potential anticompetitive effects of an acquisition or agreement.  A relevant antitrust market

has both a product and a geographic component.

31.     The sale of signals intelligence modeling and simulation services to NSA through

the OPTIMAL DECISION contract constitutes a relevant product market and line of commerce

under Section 1 of the Sherman Act and Section 7 of the Clayton Act.  NSA is a sophisticated

customer that knows what signals intelligence modeling and simulation services it requires and

has specified those services in the upcoming RFP for the OPTIMAL DECISION contract.  No

other reasonably interchangeable substitutes exist for the services that will be required under the

OPTIMAL DECISION contract.

32.     For example, while there are commercial applications for modeling and

simulation services, NSA cannot purchase these alternative services to support its signals

intelligence mission, which is highly specialized.  Companies providing modeling and simulation

services for NSA must understand signals intelligence, including its collection, processing, and

analysis.  They must understand the technology, including software and hardware, that is used to

gather signals intelligence information; the nature of the data itself, including data formats and

volume; and the many ways in which the data may be processed to provide useful information to

end users.  The companies also must understand the needs of signals intelligence analysts and other end users in order to anticipate their future requirements.  In addition, unlike personnel providing other types of modeling and simulation services, the individuals who provide these services to NSA must have high-level security clearances, as they need access to classified information and often work in NSA facilities.  As a result, NSA cannot simply replace signals intelligence modeling and simulation services with modeling and simulation services used in other environments.

33.     NSA is the intelligence community agency with responsibility for collecting, managing, analyzing, and distributing signals intelligence, and therefore it is the nation's primary consumer of signals intelligence modeling and simulation services.  Other agencies that need this service usually obtain it through the NSA contract.  NSA signs a new contract for signals intelligence modeling and simulation services once every five to seven years, and currently obtains those services through a contract with Booz Allen.  That contract will be replaced in the immediate future by the OPTIMAL DECISION contract, which Booz Allen and EverWatch have been preparing to bid on for years.  No other significant contract for signals intelligence modeling and simulation services is expected in the next five to seven years.

34.     A useful approach to testing a candidate relevant antitrust market is known as the "hypothetical monopolist" test.  This test asks whether a firm that is the only provider of a service (a hypothetical monopolist) could profitably impose a price increase—specifically, a small but significant and non-transitory increase in price ("SSNIP")—on a service sold by the merging firms in the relevant market.  Signals intelligence modeling and simulation services sold to NSA through the OPTIMAL DECISION contract satisfies this hypothetical monopolist test.

35.     There is no substitute for signals intelligence modeling and simulation services

for the OPTIMAL DECISION project.  NSA could not turn to some other service in response to a SSNIP on these services, could not replace OPTIMAL DECISION with another contract vehicle in a timely manner, and would not so significantly reduce its purchases such that the SSNIP would be unprofitable for the hypothetical monopolist.

36.     The United States is the relevant geographic market for the OPTIMAL DECISION contract under Section 1 of the Sherman Act and Section 7 of the Clayton Act.  The relevant product is sold to NSA, the OPTIMAL DECISION customer, which is located in the United States.

37.     Accordingly, the sale of signals intelligence modeling and simulation services under the OPTIMAL DECISION contract to NSA, a customer in the United States, constitutes a relevant market and line of commerce under Section 1 of the Sherman Act and Section 7 of the Clayton Act.

## VI.     THE PROPOSED MERGER AGREEMENT HAS REDUCED COMPETITION FOR OPTIMAL DECISION AND IF PERMITTED TO PROCEED THE MERGER WOULD EXTINGUISH IT COMPLETELY

### A.     Booz Allen has Been NSA's Sole Supplier of Signals Intelligence Modeling and Simulation Services for Over Two Decades

38.     The OPTIMAL DECISION contract is the latest in a series of NSA contracts for signals intelligence modeling and simulation services.  The previous contracts, named MASON I, MASON II, and MASON III, were awarded in 2002, 2007, and 2014, respectively.  Booz Allen has been the prime contractor for all of these contracts.

39.     For each of the three MASON contracts, Booz Allen faced competition from only one competitor.  After losing the most recent contract—MASON III, which was awarded in 2014—Booz Allen's competitor lost its signals intelligence modeling and simulation capabilities

as key personnel retired and others transferred to more profitable ventures.  That company no longer has the expertise to pursue contracts like OPTIMAL DECISION and will not submit a proposal for OPTIMAL DECISION.

        **B.**     **EverWatch Has Been Vigorously Competing Against**
              **Booz Allen for the OPTIMAL DECISION Contract**

40.    Following the exit of its sole competitor, Booz Allen appeared to have a lock on NSA's signals intelligence modeling and simulation business.  But in 2019, EverWatch, an agile and innovative defense and intelligence technology services company, hired several key individuals from Booz Allen who were aware of weaknesses in Booz Allen's work on MASON III.  Sensing an opportunity to unseat the incumbent, EverWatch began assembling a group of two dozen highly skilled intelligence services and systems engineering companies to compete against Booz Allen for the OPTIMAL DECISION contract.  By 2021, EverWatch assessed that it had a ██████ chance of unseating Booz Allen and winning the contract.

41.    EverWatch gave itself ██████ of defeating Booz Allen because it has positioned itself as the "premier analytics capability developer for the Intelligence Community" and focused its business strategy on unseating incumbent prime contractors for signals-intelligence-related products and services.  At a meeting with Booz Allen executives on December 14, 2021, EverWatch leaders advised Booz Allen that it had succeeded in overthrowing CACI Technologies as prime contractor on a major U.S. Navy contract because EverWatch offered "unique tech."  They also told Booz Allen that the company was aggressively targeting "[o]ther primes," including ████████████████████ in 2022.

42.    EverWatch's skill and efficiency poses a threat to Booz Allen.  EverWatch prides itself on "no bloat" staffing, in part because it follows a "high/low" staffing model for projects involving classified information, in which employees without security clearances do some of the

work, and then turn the project over to cleared personnel for completion.  During its due diligence for the purchase of EverWatch, Booz Allen executives recognized that the company was more efficient than Booz Allen, so much so that they warned others not to "Booz Allen-ize" EverWatch following the merger.

<b>C.     Booz Allen and EverWatch Are the Only Competitors<br>for the OPTIMAL DECISION Contract</b>

43.     In October 2021, as the time for initiating the competition was drawing closer, NSA surveyed the industry to determine which companies might be interested in pursuing the OPTIMAL DECISION prime contract.  NSA contacted 14 companies to gauge their interest, but on October 14, it received only two letters of intent to pursue the prime contract, one from Booz Allen and one from EverWatch's subsidiary ACES, Inc.  No other firms responded.

44.     NSA repeated the survey in early 2022, with identical results.  On April 13, it again received two letters of intent to pursue the prime contract, one from Booz Allen and one from EverWatch's subsidiary ACES, Inc.  No other companies submitted letters.

45.     Based on these surveys and its understanding of industry participants and their plans, NSA does not expect to receive proposals for OPTIMAL DECISION from any companies other than Booz Allen and EverWatch.

46.     The parties recognize that they are the only competitors for OPTIMAL DECISION.  In the due diligence process preceding the merger agreement, Booz Allen noted that EverWatch management "projects having a ▮▮ pWin [win probability] given only one other competitor in the mix (Booz Allen)" and noted that it had "▮▮▮▮▮▮▮▮ pWin to reflect Booz Allen's ▮▮ pWin."  Booz Allen's corporate development staff told the consultants assisting with the due diligence process that EverWatch is the only other competitor.  Earlier, the EverWatch manager leading the effort to win OPTIMAL DECISION had made clear to a key

14

subcontractor that Booz Allen is the competition.

47.     Other companies in the industry agree that there will be no competitors for

OPTIMAL DECISION other than Booz Allen and EverWatch.  One member of the EverWatch

team noted that "we have team meetings and we discuss are there any competitors, you know, try

to collect market information.  I haven't heard any data from anyone that anyone else is bidding

it."

> **D.      The Merger Agreement Has Already Reduced the
> Defendants' Incentives to Compete for OPTIMAL
> DECISION**

48.     The merger would result in a monopoly on the OPTIMAL DECISION project

because, if the merger proceeds, Booz Allen will ultimately hold the contract regardless of what

happens in the bidding process.  The expectation that the companies would merge—an

expectation that was created by the merger agreement—therefore immediately reduced the

incentives of the companies to compete aggressively for OPTIMAL DECISION.

49.     Before they agreed to merge, and based on a draft RFP released by the NSA, the

companies were preparing for the proposal drafting and submission process, the most intense

phase of competition.  The final RFP is expected to be released in the immediate future, and as

the companies wait for it they are gathering information, negotiating with their subcontractors,

preparing rough drafts of their proposals, assembling materials for presentations, and developing

sample questions that might be asked in the oral examinations that will follow submission of the

proposals.  These steps require significant investments of time and resources, but these

investments are necessary to be able to prepare a competitive proposal that will secure the five-

year contract and its ███████████ revenue stream.

50.     Booz Allen's agreement to acquire EverWatch eliminated almost all incentive for

either company to compete vigorously for OPTIMAL DECISION.  No matter how competitive

or uncompetitive the bids are, it is the merged firm that would own the contract and derive the

profits from it.  Even if Booz Allen loses the bid, it knows the merged firm will win the contract;

aggressive bidding at this point would serve only to reduce the profits of the merged firm.

Higher prices, on the other hand, will increase those profits.  EverWatch has an additional

incentive to avoid aggressive bidding, as it may embarrass and upset its future owner and

employer.  Because of this proposed merger, both companies now are incentivized to reduce

their investments and other terms and increase prices to NSA, whether they bid separately or

together.

51.     In practice, NSA may not even receive two bids.  If the merger is completed

before bids are submitted, Booz Allen can decide to submit only one bid.  And if the merger is

only completed after the bids are submitted, the merged firm can withdraw the less profitable

bid.  NSA's review of the bids is expected to take several months, so the post-merger Booz Allen

will have ample opportunity to withdraw one bid.  As a result, even if the merger is not

completed by the time bids are awarded, Booz Allen can effectively veto EverWatch's bid,

should it prove too competitive.  In addition, the merger agreement provided to the United States

by the companies requires EverWatch to seek Booz Allen's approval before entering into any

contract with a value of $500,000 or greater.  Assuming the materials provided by the companies

accurately reflect their agreement, Booz Allen can effectively veto EverWatch's bid, should it

prove too competitive.

52.     The merger agreement therefore already has substantially lessened competition

and is likely to result in higher prices, lower-quality services, and less innovation for NSA's

OPTIMAL DECISION project.  The merger agreement therefore constitutes an unlawful

restraint of trade and is illegal under Section 1 of the Sherman Act.  Moreover, the substantial

lessening of competition that is likely to result from the merger itself would violate Section 7 of

the Clayton Act and is sufficient for the Court to enjoin the proposed merger.

## VII.    ABSENCE OF COUNTERVAILING FACTORS

53.     New competitors will not join the competition for OPTIMAL DECISION in

response to the proposed merger.  NSA is expected to release the RFP in the immediate future

and to require proposals to be submitted within 30 to 45 days, with oral presentations by the

teams beginning immediately afterward.  As noted above, EverWatch spent years assembling its

team and developing its proposal.  No new competitor would have sufficient time to assemble a

team, negotiate subcontract terms, develop a draft proposal, and prepare for oral examinations in

time to meet NSA's schedule.

54.     Delaying the OPTIMAL DECISION project is not an option. NSA has set the

schedule for OPTIMAL DECISION based on a number of factors, not the least of which is the

national security of the United States, which depends in part on NSA's ability to effectively

utilize signals intelligence.  Moreover, NSA cannot forego these services, so a delay in

OPTIMAL DECISION would require it to extend the current MASON III contract, which is held

by Booz Allen.  NSA would have little choice but to agree to Booz Allen's terms for that

extension, as the agency would have no other options.

55.      The proposed merger is unlikely to generate verifiable, merger-specific

efficiencies sufficient to reverse or outweigh the anticompetitive effects that are likely to occur.

## VIII.   THE PROPOSED REMEDY DOES NOT ELIMINATE THE
## MERGER'S ANTICOMPETITIVE EFFECTS

56.     In response to the antitrust investigation and facing the looming release of the

OPTIMAL DECISION RFP, EverWatch engaged in a last-minute scramble to transfer its team

leadership role to a much smaller corporate teammate.  This transparent attempt to evade antitrust scrutiny does not restore the competition lost when the Defendants agreed to merge. More likely, as EverWatch steps back from this competition in an attempt to avoid antitrust scrutiny, the effect of this "remedy" will be to diminish the quality of the planned bid while still giving EverWatch an opportunity to charge higher prices for its contributions, thus enabling the very effects that the United States seeks to avoid in challenging this transaction.  In any case, in order for the team to submit a bid, EverWatch would need to continue the work it has been doing, so it would remain the prime contractor in all but name.

57.     The chosen subcontractor is approximately one-tenth the size of EverWatch, in terms of both personnel and revenue.  The largest prime contract managed by the company to date is worth ██████ and has ██████ employees on it.  In contrast, OPTIMAL DECISION is valued at ██████ and is expected to employ ██████ people.  EverWatch is well-prepared for such a project, as it holds prime contracts as large as ██████, employing ██████.

58.     In practice, EverWatch effectively would need to "ghost prime" the project in order for the team to submit a bid, continuing to do all the work it is presently doing.  A senior manager of the subcontractor selected by EverWatch stated that:

> The program manager [EverWatch] would have more information than any single teammate because he would be the point where all the program execution comes together.  So there is a knowledge base that the program manager would develop that he would know that others would not . . . . [I]n the end all the data that's been collected, all the slides that have been completed, all the investment that's been made, that's owned by EverWatch.  It's not owned by the team.  So if – if that left, there's no way that information could be recreated if the RFP came out tomorrow.

Put simply, without the full support of EverWatch, the team would not be able to submit a proposal on NSA's schedule for the OPTIMAL DECISION project.  The prime contractor/subcontractor shell game thus does not change the fact that it is EverWatch that will

determine how competitive its team is, and EverWatch has little incentive to help a Booz Allen rival win this bid.

## IX.   VIOLATIONS ALLEGED

59.     The United States hereby incorporates the allegations of paragraphs 1 through 58 above as if set forth fully herein.

60.     The merger agreement has sharply reduced incentives for the Defendants to compete vigorously for OPTIMAL DECISION and therefore constitutes an unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

61.     Unless enjoined, completion of the merger is likely to substantially lessen competition and tend to create a monopoly in interstate trade and commerce for the OPTIMAL DECISION contract, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

62.     Among other things, the proposed acquisition would:

a.      eliminate significant present and future head-to-head competition between Booz Allen and EverWatch;

b.      reduce competition generally in the relevant market;

c.      cause prices to rise for the customer in the relevant market;

d.      cause a reduction in quality in the relevant market; and

e.      reduce innovation in the relevant market.

## X.     REQUEST FOR RELIEF

63.     Plaintiff requests that the Court:

a.     adjudge and decree that the merger agreement between Booz Allen and EverWatch is unlawful and violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.     adjudge and decree that the proposed merger of Booz Allen and EverWatch would be unlawful and violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

c.     permanently enjoin and restrain Defendants and all persons acting on their behalf from consummating the proposed merger or from entering into or carrying out any other contract, agreement, plan, or understanding, the effect of which would be to combine Booz Allen and EverWatch;

d.     permanently enjoin and restrain Defendants and all persons acting on their behalf from effectuating any provision of the Stock Purchase Agreement among Booz Allen, EverWatch, and EC Defense Holdings, LLC dated March 15, 2022;

e.     award the United States the costs of this action; and

f.     award the United States such other relief that the Court deems just and proper.

Dated this 29th day of June, 2022.

Respectfully submitted,


**FOR PLAINTIFF UNITED STATES OF AMERICA**:


JONATHAN S. KANTER                         EREK L. BARRON
Assistant Attorney General for Antitrust   United States Attorney

DOHA MEKKI                                 _____/s/_____
Principal Deputy Assistant Attorney General   ARIANA WRIGHT ARNOLD
for Antitrust                              USDC Md Bar No. 23000
                                           Assistant United States Attorney
ANDREW FORMAN                              36 S. Charles Street, Fourth Floor
Deputy Assistant Attorney General          Baltimore, Maryland 21201
                                           Telephone: 410-209-4813
CRAIG W. CONRATH                           Facsimile: 410-962-2310
Director of Civil Litigation               Email: Ariana.Arnold@usdoj.gov

RYAN DANKS                                 KEVIN QUIN
Acting Director of Civil Enforcement       ALEXANDER ANDRESIAN
                                           THOMAS GREENE
KATRINA ROUSE                              NATALIE HAYES
Chief, Defense, Industrials, and Aerospace   MIRANDA ISAACS
Section                                    ARIANNA MARKEL
                                           CATHERINE MONTEZUMA
JAY D. OWEN                                BRYN WILLIAMS
Assistant Chief, Defense, Industrials, and   **Special Appearances Pending**
Aerospace Section                          Trial Attorneys
                                           United States Department of Justice
                                           Antitrust Division
                                           Defense, Industrials, and Aerospace Section
                                           450 Fifth Street N.W., Suite 8700
                                           Washington, DC 20530
                                           Telephone: (202) 476-0251
                                           Facsimile: (202) 514-9033
                                           Email: Kevin.Quin@usdoj.gov