# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> BOOZ ALLEN HAMILTON HOLDING CORP., *et al.*, <br><br> *Defendants*. | Civil Action No. 1:22-cv-01603-CCB <br> **(PUBLIC / REDACTED VERSION)** |

## DEFENDANTS BOOZ ALLEN HAMILTON HOLDING CORP. AND BOOZ ALLEN HAMILTON INC.'S ANSWER TO COMPLAINT

Defendants Booz Allen Hamilton Holding Corp. and Booz Allen Hamilton Inc. (collectively, "Booz Allen") respond to the allegations of the Complaint as set forth below. Any allegation not specifically and expressly admitted is denied.

## GENERAL RESPONSE TO PLAINTIFF'S ALLEGATIONS

1.    Far from preserving competition, the Department of Justice's ("DOJ") attempt to block Booz Allen's acquisition of EverWatch Corporation (the "Transaction") is a product of overreach that will harm competition, the United States government, and the American public. The Transaction would combine the parties' complementary skills and assets so they can (1) deliver more innovative, more effective, and more efficient solutions to numerous government agencies, including the Department of Defense, the National Security Agency ("NSA"), and the broader intelligence community, and (2) inject needed competition into the procurements for many government contracts where longstanding incumbents are entrenched. This strategic rationale - not the sinister notion that Booz Allen is attempting to "monopolize" a purported "market" for a

single procurement called "OPTIMAL DECISION" - is clearly laid out in the documents Booz Allen provided DOJ outlining its strategy and business case for this Transaction.

2.        Nevertheless, DOJ seeks to thwart all these government benefits by inexplicably focusing on just one, relatively small NSA procurement (OPTIMAL DECISION) and imagining competitive concerns where none exist.  To get there, DOJ stacks together a series of novel antitrust theories and baseless assumptions – none of which is plausible and, when taken together, are plainly wrong.  Among the many false premises underlying DOJ's case:

   i.  A "market" consists of a single, yet-to-be issued Request for Proposals ("RFP") by NSA (OPTIMAL DECISION);

   ii.  Booz Allen and EverWatch are the only competitors for the OPTIMAL DECISION RFP, and are therefore attempting to "monopolize" this "market," even though the RFP has not been finalized, numerous companies previously expressed interest in bidding on the procurement, and the ultimate bidders will be determined at a future date;

   iii.  While Booz Allen and EverWatch are competing separately, as required by standard "gun-jumping" principles and antitrust law, they are "incentivized" to reduce their competitive zeal because of the *possibility* this Transaction *might* close at some point in the future over DOJ's objection;

   iv.  Booz Allen's employees, many of whom have dedicated years of their professional careers working with NSA colleagues on predecessor projects to OPTIMAL DECISION, would harm their own careers, their NSA colleagues, and the important government mission by giving less than their best effort on OPTIMAL DECISION;

   v.  Booz Allen would risk its longstanding reputation and relationship with the United States government, which accounts for almost all of Booz Allen's business, by taking advantage

of the NSA on this contract and artificially inflating its costs on OPTIMAL DECISION; and

vi. NSA would allow itself to be victimized, despite its ability to impose various requirements and cost limitations and its ability to dictate any profit it deems fit.

3. In contrast to DOJ's imaginative tale, the reality is much different and consistent with normal, procompetitive business practices. Booz Allen made a strategic decision to leverage acquisitions to better serve the NSA Capabilities Directorate and other government customers and to increase its competitiveness. As part of that broader effort, Booz Allen sought to combine with companies, like EverWatch, that provide complimentary technical capabilities. Specifically, the combination of Booz Allen and EverWatch's IT and software development capabilities and capacity with Booz Allen's deep operations insights at scale would create an even more credible competitor to challenge the small set of Large Systems Integrators ("LSIs") that currently dominate the NSA space – companies like Lockheed Martin, Raytheon, Peraton, and General Dynamics Information Technology. The enhanced competition and capabilities this Transaction would deliver come at a critical time, as new and innovative approaches are needed to support the broader intelligence and cyber analyst communities and ultimately to protect the American public.

4. In fact, in deciding to acquire EverWatch, Booz Allen identified at least fifteen specific National Cyber, Classified Digital, and IC/Defense Technology opportunities for which a combined Booz Allen-EverWatch would be positioned to compete. Collectively, the full value of these opportunities is in the billions. OPTIMAL DECISION was not on that list and would be worth a small fraction of that. DOJ does not deny that a combination with EverWatch would bring needed competition to these procurements and deliver enhanced capabilities across multiple government contracts.

5.      Nevertheless, DOJ wants the parties' agreement immediately "abrogated" because of the lone forthcoming RFP from NSA, OPTIMAL DECISION.  To be clear, nowhere does DOJ allege the parties are violating ordinary "gun-jumping" rules ensuring they remain independent competitors before closing.  Those rules, which have existed for years to ensure that competition remains intact before any deal is closed, continue to apply here.  Nor does DOJ allege that Booz Allen and EverWatch agreed to coordinate their efforts on OPTIMAL DECISION.  Booz Allen submitted its own letter of intent to compete for OPTIMAL DECISION months ago and has competed separately and aggressively since then.  Instead, DOJ's unsubstantiated theory is that while pursuing OPTIMAL DECISION separately, Booz Allen and EverWatch have reduced "incentives" to compete aggressively because they *might* combine *if* the Transaction closes.  That theory is untenable for multiple reasons, including:

6.      First, Booz Allen is the 21-year incumbent for a series of highly-specialized, mission-critical modeling and simulation contracts of which the forthcoming OPTIMAL DECISION procurement is the latest iteration.  Booz Allen competed for and won the prior projects because of its superior capabilities, substantial knowledge of the projects' requirements, deep expertise in implementing solutions, client feedback, and exceptional award fee scores.  The Booz Allen personnel working on these projects – some for over a decade – are extremely proud of their success and service.  They have every incentive (professional and financial) to compete aggressively to win the next project, OPTIMAL DECISION, so they can continue working alongside their NSA colleagues.  Suggesting these employees might give NSA something less than their very best proposal and effort in light of this Transaction is an affront to their dedication and commitment to their mission.

7.     Second, this Transaction is far from consummated – and DOJ's challenge renders it even further in doubt.  It would make no sense for Booz Allen to risk its 21-year incumbency in this space based on the possibility a potential competitor for this single contract might at some point become part of the Company, over the objection of DOJ.   Notably, the Complaint identifies no facts to plausibly suggest Booz Allen's competitive zeal has in any way been reduced.

8.     Third, the OPTIMAL DECISION RFP has not even been released, and despite DOJ repeatedly representing over the last several weeks its arrival is "imminent," its timing remains highly uncertain.  It is likewise unclear what the final competitive parameters of the RFP will be, much less who the final competitors will be.  As DOJ's own filings recognize, at least 14 companies indicated initial interest in competing to be named prime contractor on this procurement, even if only two companies have submitted a letter of intent.  Competition is not static, and, depending on what the RFP ultimately entails, the competitive dynamics could change.  By alleging that Booz Allen and EverWatch are the only competitors for OPTIMAL DECISION, DOJ has created its own speculative outcome of the yet-to-be-released RFP to support its invented narrative.

9.     Fourth, DOJ ignores that Booz Allen's valuable, long-term relationship with the United States government generally, and the NSA specifically, would be undermined if it deliberately stifled competition for an NSA contract.  In the government contracting business, reputation is critical – both to gain renewal of a contract and to be selected for future ones.  Booz Allen has built a stellar reputation through eighty-plus years of working successfully with the United States government.  Booz Allen would not put its longstanding reputation at risk over *any* procurement, much less one that accounts for a tiny portion of its overall revenue.

10.     Fifth, DOJ's unsupported theory is at odds with the realities of government contracting principles and rules.  The very idea that Booz Allen *could* exploit the NSA – something it would not do – ignores the significant control that NSA exerts over how contractors like Booz Allen are compensated and how contracts are managed.  That is particularly true in a "cost-type" contract like that anticipated for OPTIMAL DECISION, in which the government reimburses the contractor only for its actual costs incurred to perform the contract, and any profit paid is in accordance with the award fee that is determined at the government's discretion based on its own subjective evaluation of specific factors of the contractor's performance, including the contractor's cost, schedule, and technical performance.  Unlike fixed price contracts, cost-type contracts require contractors to fully share the exact costs of performing the contract and the award fee contract gives the government direct control over the contractor's ability to obtain additional profits.  Moreover, because Booz Allen will be competing for work that it has performed for decades, NSA already generally knows how much it will cost Booz Allen to perform OPTIMAL DECISION and any obvious increase in Booz Allen's labor costs would instantly sound alarm bells.  NSA wields significant authority to use this information in its evaluation and/or to negotiate a better price.  Further, in evaluating such a proposal, the government is required by well-settled law and regulation to undertake certain steps to ensure that the government is obtaining a fair price.  These protections demonstrate the absurdity of any suggestion that Booz Allen's acquisition of EverWatch is motivated by an ability to inflate its bid for OPTIMAL DECISION.

11.     In sum, the Complaint imagines that Booz Allen paid EverWatch $440 million to eliminate competition in a single contract worth a small percentage of that purchase price and is now exploiting its important government customer, NSA.  This theory defies both the facts and common sense.  This Transaction is not about OPTIMAL DECISION.  Booz Allen acquired

EverWatch to enhance competition and service to multiple government customers across multiple government opportunities.  The Transaction will benefit the NSA, other government customers, and taxpayers alike.  It does not violate Section 1 of the Sherman Act or Section 7 of the Clayton Act.

## RESPONSE TO SPECIFIC ALLEGATIONS

1.      The United States of America brings this antitrust lawsuit to prevent Booz Allen Hamilton Holding Corporation ("Booz Allen") from acquiring EverWatch Corp. ("EverWatch"). For the last three years, Booz Allen and EverWatch have been locked in a winner-takes-all competition to provide operational modeling and simulation services to the National Security Agency ("NSA"), which is a part of the Department of Defense, and is headquartered at Ft. George G. Meade in Anne Arundel County Maryland.  The two companies are the only competitors for this project, and if the merger is not quickly blocked, NSA and American taxpayers likely will be harmed in the form of higher prices, lower quality, and less innovation for this crucial service.

**ANSWER**:  Booz Allen admits that Plaintiff ("DOJ") purports to bring an antitrust lawsuit. Booz Allen denies that it has been locked in a "winner-takes-all competition" with EverWatch to provide operational modeling and simulation services to the NSA because Booz Allen is not actually aware of EverWatch ever submitting a bid for the work described herein.  Booz Allen also admits that the NSA is a part of the Department of Defense and is headquartered at Ft. George G. Meade in Anne Arundel County, Maryland.  Booz Allen denies that it and EverWatch are the only competitors for this project.  No matter what the competition may turn out to be, Booz Allen believes it is well-positioned to win the OPTIMAL DECISION procurement based on its credentials, past performance as an incumbent on this program, and client feedback via exceptional award fee scores.  Booz Allen also denies that the NSA and American taxpayers will be harmed in any way by the Transaction.

2.      NSA is the United States' leader in cryptology, signals intelligence, and cybersecurity, and is responsible for providing foreign signals intelligence to our nation's policymakers and armed forces.  Signals intelligence, which is derived from electronic signals and emissions in communications systems, plays a vital role in our national security by providing America's leaders with critical information needed to defend our country, save lives, and advance

U.S. goals and alliances globally.  NSA periodically issues a contract for modeling and simulation services to support its signals intelligence mission.  The next such contract NSA plans to issue is known by the unclassified name OPTIMAL DECISION.

**ANSWER**:  Booz Allen admits that NSA is the United States' leader in cryptology, signals intelligence, and cybersecurity, and is responsible for providing foreign signals intelligence to our nation's policymakers and armed forces.  Booz Allen further admits that signals intelligence plays a vital role in the United States' national security and that for more than twenty years, Booz Allen has proudly supported the NSA's mission through its superior SIGINT capabilities and deep expertise in implementing solutions.  Booz Allen admits that it intends to continue this vital national security work for the NSA long into the future working under the future OPTIMAL DECISION procurement.

3.      Booz Allen and EverWatch have spent years analyzing NSA's needs, designing solutions, and recruiting highly skilled personnel for OPTIMAL DECISION.  According to the companies' own documents and NSA outreach preparing for the contract bidding, they were (and currently still are) the only competitors for the contract.  But on March 15, 2022, just a few months before NSA was scheduled to release the request for proposals ("RFP") that would formally begin the selection process, Booz Allen decided to stop competing with EverWatch and instead chose to buy the company.  That merger agreement immediately reduced the incentive each company has to submit a competitive bid, and, if completed, would eliminate the competition between the two altogether, leaving NSA to face a monopolist.

**ANSWER**:  Booz Allen admits that it has spent more than two decades serving as the NSA's prime contractor for signals intelligence modeling, and during that time has continuously satisfied the NSA's needs by designing solutions, recruiting highly skilled personnel, and providing world-class SIGINT services to help the NSA protect the American people.  Booz Allen denies that there are only two competitors for the allegedly "imminent" OPTIMAL DECISION procurement.  Neither DOJ nor Booz Allen know how many parties will bid on the OPTIMAL DECISION RFP until the RFP responses are received.  Booz Allen lacks knowledge or information sufficient to admit or deny that the NSA was allegedly scheduled to release the OPTIMAL

DECISION RFP within a few weeks or months of March 15, 2022.  However, it is now July 22,

2022—more than four months later—and this RFP has not been issued.  Booz Allen denies that

the agreement in any way reduces the incentive for either company to submit a competitive bid or

that Booz Allen has stopped competing with EverWatch.  There is no guarantee that the

Transaction will close.  Any prospective acquisition is inherently uncertain, which is why

acquisition agreements contain dozens of pages detailing obligations prior to closing, the

requirements for closing, and the rights and responsibilities of the parties if closing does not occur.

The Booz Allen team responsible for the Transaction (including conducting due diligence

activities for the Transaction) is walled off from the Booz Allen OPTIMAL DECISION bid team,

and the bid team is motivated to win the OPTIMAL DECISION procurement.  With regard to

allegations related to other Defendants, Booz Allen has insufficient information to admit or deny

the allegations.

      4.     Before they agreed to merge, Booz Allen and EverWatch were competing vigorously to win this contract.  Competitors for service contracts like OPTIMAL DECISION invest significant time and resources to assemble their teams, develop their concepts, and present their proposals.  Companies distinguish their proposals by offering more-talented personnel, lower costs, a reduced markup for the prime contractor, and additional services.  Competitors have an incentive to bid aggressively for NSA's business because losing would mean the loss of all of the revenue and profit stream of the project and earning nothing on the investment made by the company.  But the merger agreement stripped the companies of the incentive to bid aggressively against each other to win the contract and replaced it with an incentive to reduce their investments and increase their prices to NSA.  Aggressive bidding would serve only to reduce the profits of the post-merger Booz Allen, while higher prices or lower investment would increase those profits.

     **ANSWER**:  Booz Allen denies that the "merger agreement stripped the companies of the

incentive to bid aggressively" for the OPTIMAL DECISION contract.  Booz Allen will vigorously

compete on the OPTIMAL DECISION bid against all competition (including EverWatch) if the

NSA ever issues this RFP.  With regard to allegations related to other Defendants, Booz Allen has

insufficient information to admit or deny the allegations.

5.     The merger agreement created a "heads Booz Allen wins, tails American taxpayers lose" situation.  Booz Allen and EverWatch now are motivated not to prepare the most competitive proposals for the project, but rather to push forward aggressively with their merger plans, safe in the knowledge that no matter which company NSA selects, ultimately it will be the merged firm that owns the contract and reaps the rewards.

**ANSWER**:  Booz Allen denies the allegations in paragraph 5.  Among other things, DOJ

assumes that the Transaction will close and that Booz Allen and EverWatch will, in fact, be the

only two bidders on OPTIMAL DECISION.  DOJ also myopically focuses on the single, yet to be

released procurement of a contract that Booz Allen has held for more than two-decades, while

ignoring the overwhelming benefits of the Transaction.  With regard to allegations related to other

Defendants, Booz Allen has insufficient information to admit or deny the allegations.

6.     The merger must be blocked in order to restore the competition that NSA—and the Americans that it defends—rely on for innovative and high-quality signals intelligence modeling and simulation support services at fair prices.  Therefore, the United States of America brings this civil action to enjoin the agreement between Booz Allen and EC Defense Holdings, LLC, which has already reduced Defendants' incentives to compete in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  If consummated, the proposed transaction would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.  In support of this action, the United States alleges as follows:

**ANSWER**:  Booz Allen denies that competition has in any way been removed by the

agreement such that it must be "restored."  This paragraph contains legal conclusions to which no

response is required; if a response is deemed required, Booz Allen denies the allegations.  Booz

Allen denies the allegations that the agreement has reduced Booz Allen's incentives to compete.

With regard to the allegations related to the other Defendants, Booz Allen has insufficient

information to admit or deny the allegations.

7.     The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, and Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER**: This paragraph contains legal conclusions to which no response is required; but if a response is required, Booz Allen denies the allegations.  With regard to the allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.

8.      As such, this matter presents a federal question, and this Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if a response is deemed required, Booz Allen denies the allegations.

9.      Defendants are engaged in, and their activities substantially affect, interstate commerce.  Defendants sell services to NSA, which is headquartered at Ft. Meade, and located in Anne Arundel County Maryland.  NSA is a component organization of the U.S. Department of Defense and a member of the United States intelligence community.

**ANSWER**:  Booz Allen admits the allegations in this paragraph.

10.      This Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22, and F.R.C.P 4(h), (k).  Booz Allen Hamilton Inc., EC Defense Holdings, LLC, EverWatch and ACES, Inc. have offices in Maryland, and Defendants regularly transact business with NSA in Maryland.

**ANSWER**: This paragraph contains legal conclusions to which no response is required; if a response is deemed required, Booz Allen denies the allegations.  Booz Allen states that it is not challenging this Court's jurisdiction over it in this case.

11.      Defendants Booz Allen Hamilton, EverWatch and ACES all have offices in Annapolis Junction in Anne Arundel County Maryland, and the essential events described in the Complaint took place at NSA and/or at Defendants' offices in Anne Arundel County, Maryland.

**ANSWER**:  Booz Allen admits to having offices in Annapolis Junction in Anne Arundel County Maryland, but otherwise denies the remainder of this paragraph.  With regard to the

allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.

12.     Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §§ 1391(b) and (c).

**<u>ANSWER</u>**:  This paragraph contains legal conclusions to which no response is required; if a response is deemed required, Booz Allen denies the allegations.  Booz Allen states that it is not challenging venue in this case.

13.     For over two decades, Booz Allen has been the sole provider of operational modeling and simulation services to support NSA's signals intelligence mission.  Booz Allen so thoroughly dominated this market that its only competitor for the last contract, which was awarded in 2014, exited the market.  This departure left Booz Allen with what appeared to be a lock on NSA's successor project, which is now known as OPTIMAL DECISION.

**<u>ANSWER</u>**:  Booz Allen admits that it has spent more than two decades serving as the NSA's prime contractor for signals intelligence, providing world-class signals intelligence services of the highest quality to help the NSA protect the American people.  Booz Allen is aware of several other companies that have competed in prior bids but lack knowledge or information sufficient to admit or deny why any competitor has exited the market.  Booz Allen denies the remaining allegations in this paragraph.

14.     But in 2019, EverWatch, an agile and innovative competitor, identified weaknesses in Booz Allen's work and decided to challenge the incumbent.  Over the years that followed, EverWatch pulled together two dozen highly-skilled intelligence technology companies to form a team to dethrone Booz Allen.  As of early 2022, according to Booz Allen deal documents, EverWatch's management "project[ed] having a ▮▮ chance of winning the next bid and displacing Booz Allen from its decades-long incumbency.  Even Booz Allen acknowledged that EverWatch posed a significant threat.  Booz Allen's internal documents gave EverWatch a ▮ percent chance of winning the bid.  On March 15, 2022, only weeks before NSA planned to release an RFP for the next project, Booz Allen terminated this rivalry with an agreement to purchase EverWatch.

**ANSWER**:  Defendants respond that DOJ's selective quotations in the third and fifth sentences are taken out of context and refer the Court to the documents themselves.  Booz Allen denies the categorization of a "rivalry" with EverWatch—or that they were ever a significant threat—and denies terminating said alleged rivalry.  Booz Allen is unaware of any instance where EverWatch has ever even competed with Booz Allen on a signals intelligence modeling contract, let alone an instance where EverWatch won a signals intelligence contract in a head-to-head competition with Booz Allen.  With regard to the allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.  Booz Allen denies the remaining allegations in this paragraph.

15.    This merger-to-monopoly, preceding an imminent RFP for an NSA project that is vital to our nation's security, is a unique situation that merits this immediate action by the United States of America.  Before the merger agreement, each company had been recruiting top talent and sharpening its pencils to offer NSA the best value for this important project.  When the companies agreed to merge, it no longer made sense to bid aggressively against each other.  No matter which company NSA awards the contract to, the post-merger Booz Allen ultimately would provide the services and earn the profits.  As a result, neither company has an incentive to offer its best terms, most-talented personnel, or highest-quality service.  The robust competition between Booz Allen and EverWatch effectively ended on the date of the merger agreement.  That agreement therefore violates Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits agreements that unreasonably restrain trade.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if a response is deemed required, Booz Allen denies the allegations.  Booz Allen lacks knowledge or information sufficient to admit or deny that the RFP is "imminent."  However, on March 15, 2022—now more than four months ago—the government indicated the RFP would be issued in a "few" months.  The same day, it indicated the RFP was only a few "weeks" away.  In this paragraph of its Complaint, filed on June 30—more than three weeks ago—the issuance of the NSA RFP was "imminent."  Imminent generally means, "about to happen."  Booz Allen has always—and will continue to always—offer the NSA innovative solutions, using highly skilled personnel, and

providing world-class SIGINT services, to help the NSA protect the American people.  Booz Allen

further denies there was ever a robust competition with EverWatch.  Booz Allen is unaware of any

instance to date where EverWatch has ever even competed with Booz Allen on a SIGINT contract,

let alone an instance where EverWatch won a SIGINT contract in a head-to-head competition with

Booz Allen.  With regard to the allegations related to the other Defendants, Booz Allen has

insufficient information to admit or deny the allegations.  Booz Allen denies the remaining

allegations in this paragraph.


16.     The merger would also violate Section 7 of the Clayton Act, 15 U.S.C. § 18, which
prohibits mergers that are likely to substantially lessen competition and "tend to create a
monopoly."  While the merger agreement alone has reduced the companies' incentives to compete
in anticipation of the merger, the transaction itself would allow the merged firm to more directly
and permanently end the rivalry.  Booz Allen's acquisition of EverWatch would result in the
combined entity possessing monopoly power in the sale of services for the NSA project.  Once the
merger is completed, Booz Allen need submit only one bid the for the NSA project.  If the bids
have already been submitted, it can withdraw the less profitable of the two bids.  Either way,
following the transaction, NSA would have no choice but to award the contract—yet again—to
Booz Allen.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if

a response is deemed required, Booz Allen denies the allegations.  Booz Allen admits that it offered

to DOJ that the parties would delay closing until the bids had been submitted (and agree not to

withdraw any submitted bids).  Booz Allen also admits that it offered to wall-off proposal teams

so that the NSA could receive two separate bids for OPTIMAL DECISION, even post-Transaction

close.  Booz Allen denies the implication that there will be no competition, including potentially

from EverWatch.  Booz Allen denies that the agreement has reduced the companies' incentives to

compete, or that EverWatch has ever been a rival to Booz Allen.  Booz Allen further denies that

the NSA would have no choice but to award the contract to Booz Allen.  With regard to the

allegations related to the other Defendants, Booz Allen has insufficient information to admit or

deny the allegations.  Booz Allen denies the remaining allegations in this paragraph.

17.     The Defendants know that their merger, as proposed, cannot survive antitrust scrutiny.  To evade that scrutiny and prevent the Court from restoring competition to its state before March 2022, EverWatch engaged in a last-minute scramble to withdraw from its team leadership role by assigning it to a subcontractor one-tenth its own size.  But that small company cannot recreate overnight EverWatch's multi-year effort to prepare for this project.  Instead, for the team to be competitive against Booz Allen, EverWatch would need to continue its team leadership role in all but name and fully support the putative team leader as it prepares to submit its proposal. Even if it makes this transition, EverWatch has no incentive to offer a competitive price for its own services as a subcontractor.  The prime contractor/subcontractor shell game that EverWatch is playing will thus do nothing to restore the competition that has already been lost as a result of this transaction.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if a response is deemed required, Booz Allen denies the allegations.  Booz Allen denies that the proposed Transaction cannot survive antitrust scrutiny, as the proposed Transaction offers significant pro-competitive benefits.  With regard to the allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.  Booz Allen denies the remaining allegations in this paragraph.

18.     The proposed merger agreement violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and the merger agreement itself violates Section 7 of the Clayton Act, 15 U.S.C. § 18.  Both should be enjoined.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if a response is deemed required, Booz Allen denies the allegations.  Booz Allen further denies that the Transaction should be enjoined.

19.     Defendant Booz Allen Hamilton Holding Corp. is a publicly traded professional services holding company and parent company of Defendant Booz Allen Hamilton, Inc.  The Booz Allen Defendants are incorporated in the State of Delaware.  Booz Allen Hamilton, Inc. is headquartered in McLean, Virginia, and has several offices in Maryland, including in Annapolis Junction which is in Anne Arundel County, Maryland.  Defendant Booz Allen has almost 30,000 employees who provide a broad range of services and solutions in management, technology, consulting, and engineering.  Defense and intelligence community customers account for two-thirds of its 2021 revenues of approximately $7.9 billion.

**ANSWER**:  Booz Allen admits the allegations in this paragraph.

20.     Defendant EverWatch is a Delaware Corporation, headquartered in Reston, Virginia with offices in Annapolis Junction, in Anne Arundel County Maryland.  EverWatch provides a range of services to the defense and intelligence community focused on data science, intelligence, and cybersecurity.  The company has ███ employees and forecasts revenues of ███ ███ in 2022.

**ANSWER**:  Booz Allen admits the allegations in this paragraph.

21.     Defendant Analysis, Computing & Engineering Solutions, Inc. ("ACES, Inc.") is a Corporation in Maryland and a subsidiary of EverWatch, with a principal office in Annapolis Junction, in Anne Arundel County Maryland.

**ANSWER**:  Booz Allen admits the allegations in this paragraph.

22.     Defendant EC Defense Holdings, LLC, is a Delaware Limited-Liability Company, and owner of Defendant EverWatch.  EC Defense Holdings has offices in Chevy Chase, in Montgomery County, Maryland, and it is owned by the private equity firm Enlightenment Capital.

**ANSWER**:  With regard to the allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.

23.     Defendants Booz Allen and ACES, Inc. were the only companies to submit intent to prime letters to NSA regarding the OPTIMAL DECISION contract.

**ANSWER**:  Booz Allen denies that it knew with certainty that Booz Allen and ACES, Inc. were the only companies to submit prime letters regarding the OPTIMAL DECISION contract until the DOJ provided that information to Booz Allen.

24.     On March 15, 2022, pursuant to a merger agreement, Booz Allen agreed to acquire EverWatch for $440 million, effectively bringing the competition for the NSA contract to a halt. The merger agreement was signed and executed by representatives of Defendants Booz Allen Hamilton, Inc., EC Defense Holdings, LLC, and EverWatch Corp.

**ANSWER**:  Booz Allen admits that an agreement for $440 million was signed on March 15, 2022, with the parties listed.  Booz Allen denies, however, that the agreement brought competition for the NSA contracts to a halt.

16

25.     Signals intelligence involves collecting foreign intelligence from communications and information systems and providing it to customers across the U.S. government, including senior civilian and military officials.   To meet the challenges of today's fast-changing communications and information environment, NSA relies on companies that are sophisticated in a wide range of highly technical fields to develop and employ state-of-the-art tools to address these critical requirements.

**ANSWER**:  Booz Allen admits to being aware of signal intelligence; its sophistication, and importance to U.S. national security interests.  Booz Allen further admits that the NSA relies on Booz Allen, a sophisticated company with a wide range of state-of-the-art tools that it has proudly been deploying in support of the NSA's SIGINT mission for the last 21 years.

26.     One service these technologically advanced companies provide to NSA is operational modeling and simulation to support NSA's signals intelligence mission. The company selected to provide this service applies its knowledge of signals intelligence, computing, and communication networks to solve problems related to the efficient movement of signals intelligence between collection points, processing platforms, and end users.

**ANSWER**:  Booz Allen admits the allegations in this paragraph.  Booz Allen further admits that for 21 years, it has been the technologically-advanced company proudly providing the NSA with operational modelling and simulation to support the NSA's signals intelligence mission and that it intends to continue to provide this vital support to the NSA for the foreseeable future.

27.     NSA's signals intelligence modeling and simulation projects require a wide variety of skills, so it is common for companies pursuing contracts for those projects to assemble a group of subcontractors with specialized capabilities.  The company that assembles the team, manages the project, and ultimately controls the bid process is referred to as the "prime contractor."  Each of the corporate teammates have subcontract agreements with the prime contractor that set the prices for services provided by skilled engineers and technologists, as well as the cost of materials and other services.  The prime contractor generally provides skilled labor from its own workforce as well, and applies a markup to the customer.

**ANSWER**:  Booz Allen admits the process described in this paragraph except Booz Allen denies the description of a markup to the customer.  At least since 2007 (MASON II), the NSA's signals intelligence contract has been a cost-type contract, with the NSA setting the specific fee award.

17

28.     Companies compete for service contracts by recruiting and offering more-talented personnel who, by virtue of education, experience, or both, are able to provide the customer with higher-quality, more efficient, and more innovative solutions.  Companies also compete for service contracts by offering lower markups and overhead rates, both of which result in a lower cost to the customer.

**ANSWER**:  Booz Allen admits that there is significant and fierce competition for NSA

service contracts and that many factors go into providing NSA and the American people the best

capabilities for SIGINT, and talented personnel is one component in that equation for which

companies compete; however Booz Allen lacks the knowledge or information sufficient to admit

or deny the particulars of this paragraph which are vague and not tied to a specific procurement.

29.     Booz Allen's agreement to buy EverWatch effectively terminated the competition between the companies for OPTIMAL DECISION, which is expected to be a ███████ five-year project.  NSA expects to release OPTIMAL DECISION for bid imminently.  Booz Allen and EverWatch are, by their own estimation and NSA outreach, the only competitors for this project.

**ANSWER**:  Booz Allen denies that the agreement terminated competition between the

parties for OPTIMAL DECISION because there is no guarantee the Transaction will close or that

both companies would submit a bid.  While Booz Allen fully intends to bid for and win the

OPTIMAL DECISION RFP, until the RFP is released, no company can say with certainly that it

will bid on a procurement.

30.     The definition of a relevant antitrust market is an analytical tool for understanding the potential anticompetitive effects of an acquisition or agreement.  A relevant antitrust market has both a product and a geographic component.

**ANSWER**:  Booz Allen denies that DOJ has identified a relevant market and that

competition will be harmed in the appropriate relevant market.  Booz Allen admits that defining a

relevant market correctly is necessary to assess whether there is harm to competition from a

merger.  Booz Allen denies the remaining allegations in this paragraph.

31.     The sale of signals intelligence modeling and simulation services to NSA through the OPTIMAL DECISION contract constitutes a relevant product market and line of commerce under Section 1 of the Sherman Act and Section 7 of the Clayton Act.  NSA is a sophisticated customer that knows what signals intelligence modeling and simulation services it requires and has specified those services in the upcoming RFP for the OPTIMAL DECISION contract.  No other reasonably interchangeable substitutes exist for the services that will be required under the OPTIMAL DECISION contract.

**ANSWER**:  Booz Allen denies that the sale of signals intelligence modeling and simulation

services to NSA through the OPTIMAL DECISION contract constitutes a relevant product market.

32.     For example, while there are commercial applications for modeling and simulation services, NSA cannot purchase these alternative services to support its signals intelligence mission, which is highly specialized.  Companies providing modeling and simulation services for NSA must understand signals intelligence, including its collection, processing, and analysis.  They must understand the technology, including software and hardware, that is used to gather signals intelligence information; the nature of the data itself, including data formats and volume; and the many ways in which the data may be processed to provide useful information to end users.  The companies also must understand the needs of signals intelligence analysts and other end users in order to anticipate their future requirements.  In addition, unlike personnel providing other types of modeling and simulation services, the individuals who provide these services to NSA must have high-level security clearances, as they need access to classified information and often work in NSA facilities.  As a result, NSA cannot simply replace signals intelligence modeling and simulation services with modeling and simulation services used in other environments.

**ANSWER**:  Booz Allen lacks knowledge or information sufficient to admit or deny the

remaining allegations in this paragraph.

33.     NSA is the intelligence community agency with responsibility for collecting, managing, analyzing, and distributing signals intelligence, and therefore it is the nation's primary consumer of signals intelligence modeling and simulation services.  Other agencies that need this service usually obtain it through the NSA contract.  NSA signs a new contract for signals intelligence modeling and simulation services once every five to seven years, and currently obtains those services through a contract with Booz Allen.  That contract will be replaced in the immediate future by the OPTIMAL DECISION contract, which Booz Allen and EverWatch have been preparing to bid on for years.  No other significant contract for signals intelligence modeling and simulation services is expected in the next five to seven years.

**ANSWER**:  Booz Allen admits that it provides the NSA signals intelligence modeling and

simulation services.  Booz Allen lacks knowledge or information sufficient to admit or deny the

remaining allegations of this paragraph.

34.     A useful approach to testing a candidate relevant antitrust market is known as the "hypothetical monopolist" test.  This test asks whether a firm that is the only provider of a service (a hypothetical monopolist), could profitably impose a price increase—specifically, a small but significant and non-transitory increase in price ("SSNIP")—on a service sold by the merging firms in the relevant market.  Signals intelligence modeling and simulation services sold to NSA through the OPTIMAL DECISION contract satisfies this hypothetical monopolist test.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if

a response is deemed required, Booz Allen denies the allegations.

35.     There is no substitute for signals intelligence modeling and simulation services for the OPTIMAL DECISION project.  NSA could not turn to some other service in response to a SSNIP on these services, could not replace OPTIMAL DECISION with another contract vehicle in a timely manner, and would not so significantly reduce its purchases such that the SSNIP would be unprofitable for the hypothetical monopolist.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if

a response is deemed required, Booz Allen denies the allegations.

36.     The United States is the relevant geographic market for the OPTIMAL DECISION contract under Section 1 of the Sherman Act and Section 7 of the Clayton Act.  The relevant product is sold to NSA, the OPTIMAL DECISION customer, which is located in the United States.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if

a response is deemed required, Booz Allen denies the allegations.  Booz Allen denies that DOJ has

identified a relevant market and that competition will be harmed in the appropriate relevant market.

Defendants admit that defining a relevant market correctly is necessary to assess whether there is

harm to competition from a merger.

37.     Accordingly, the sale of signals intelligence modeling and simulation services under the OPTIMAL DECISION contract to NSA, a customer in the United States, constitutes a relevant market and line of commerce under Section 1 of the Sherman Act and Section 7 of the Clayton Act.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if

a response is deemed required, Booz Allen denies the allegations.  Booz Allen denies that DOJ has

identified a relevant market and that competition will be harmed in the appropriate relevant market. Booz Allen admits that defining a relevant market correctly is necessary to assess whether there is harm to competition from a merger.

38.     The OPTIMAL DECISION contract is the latest in a series of NSA contracts for signals intelligence modeling and simulation services.  The previous contracts, named MASON I, MASON II, and MASON III, were awarded in 2002, 2007, and 2014, respectively.  Booz Allen has been the prime contractor for all of these contracts.

**ANSWER**:  Booz Allen denies that the RFP for OPTIMAL DECISION has been released, and therefore cannot be the latest NSA contract for signals intelligence modeling and simulation services.  Booz Allen admits that it was awarded, as the prime contractor, the MASON I, MASON II, and MASON III contracts and has continuously provided the NSA with high quality, innovative services during this time, which is supported by exceptional award fee scores.

39.     For each of the three MASON contracts, Booz Allen faced competition from only one competitor.  After losing the most recent contract—MASON III, which was awarded in 2014—Booz Allen's competitor lost its signals intelligence modeling and simulation capabilities as key personnel retired and others transferred to more profitable ventures.  That company no longer has the expertise to pursue contracts like OPTIMAL DECISION and will not submit a proposal for OPTIMAL DECISION.

**ANSWER**:  Booz Allen lacks knowledge or information to admit or deny the allegations in this paragraph, but Booz Allen had understood several companies had been identified over the years as prospective bidders, including SAIC, BTG, Inc., SRI International, TASC, Inc., and Leidos, Inc.

40.     Following the exit of its sole competitor, Booz Allen appeared to have a lock on NSA's signals intelligence modeling and simulation business.  But in 2019, EverWatch, an agile and innovative defense and intelligence technology services company, hired several key individuals from Booz Allen who were aware of weaknesses in Booz Allen's work on MASON III.  Sensing an opportunity to unseat the incumbent, EverWatch began assembling a group of two dozen highly skilled intelligence services and systems engineering companies to compete against Booz Allen for the OPTIMAL DECISION contract.  By 2021, EverWatch assessed that it had a ███ chance of unseating Booz Allen and winning the contract.

**ANSWER**:  Booz Allen denies the allegations in this paragraph except to note that Booz Allen believed EverWatch's chance of winning the next NSA signals intelligence and modeling contract was significantly less than ▮▮▮▮.  With regard to the allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.

41.    EverWatch gave itself ▮▮▮▮▮▮ of defeating Booz Allen because it has positioned itself as the "premier analytics capability developer for the Intelligence Community" and focused its business strategy on unseating incumbent prime contractors for signals- intelligence-related products and services.  At a meeting with Booz Allen executives on December 14, 2021, EverWatch leaders advised Booz Allen that it had succeeded in overthrowing CACI Technologies as prime contractor on a major U.S. Navy contract because EverWatch offered "unique tech." They also told Booz Allen that the company was aggressively targeting "[o]ther primes," including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in 2022.

**ANSWER**:  With regard to the allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.  Although Booz Allen lacks sufficient information to admit or deny EverWatch's own estimation of its ability to win OPTIMAL DECISION, Booz Allen has a high success rate as an incumbent recompeting for a contract, has won the predecessor contracts to OPTIMAL DECISION, and has received very high award fee scores from the NSA on these legacy contracts.  Similarly, Booz Allen lacks sufficient information to admit or deny EverWatch's alleged statements with respect to CACI, but the strengths of EverWatch cited in this allegation are consistent with Booz Allen's rationale for seeking to acquire EverWatch and suggest the combined company will more vigorously compete against CACI and many other firms operating in this sector.

42.    EverWatch's skill and efficiency poses a threat to Booz Allen.  EverWatch prides itself on "no bloat" staffing, in part because it follows a "high/low" staffing model for projects involving classified information, in which employees without security clearances do some of the work, and then turn the project over to cleared personnel for completion.  During its due diligence for the purchase of EverWatch, Booz Allen executives recognized that the company was more efficient than Booz Allen, so much so that they warned others not to "Booz Allen-ize" EverWatch following the merger.

**ANSWER**:  With regard to the allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.  Booz Allen views EverWatch as having a "no bloat" staffing and use of a "high/low" staffing model for certain projects, which again is among the many reasons that the Transaction between Booz Allen and EverWatch provides synergies that will facilitate additional competition for a range of government projects that neither Booz Allen or EverWatch currently performs.

43.    In October 2021, as the time for initiating the competition was drawing closer, NSA surveyed the industry to determine which companies might be interested in pursuing the OPTIMAL DECISION prime contract.  NSA contacted 14 companies to gauge their interest, but on October 14, it received only two letters of intent to pursue the prime contract, one from Booz Allen and one from EverWatch's subsidiary ACES, Inc.  No other firms responded.

**ANSWER**:  Booz Allen lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, other than to admit it had received a survey from the NSA and had submitted a letter of intent to bid.  With regard to the allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.

44.    NSA repeated the survey in early 2022, with identical results.  On April 13, it again received two letters of intent to pursue the prime contract, one from Booz Allen and one from EverWatch's subsidiary ACES, Inc.  No other companies submitted letters.

**ANSWER**:  Booz Allen lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, other than to admit it had received a survey from the NSA and had submitted a letter of intent to bid.  With regard to the allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.

45.    Based on these surveys and its understanding of industry participants and their plans, NSA does not expect to receive proposals for OPTIMAL DECISION from any companies other than Booz Allen and EverWatch.

**ANSWER**:  Booz Allen lacks knowledge or information sufficient to admit or deny the allegations in this paragraph.

46.     The parties recognize that they are the only competitors for OPTIMAL DECISION. In the due diligence process preceding the merger agreement, Booz Allen noted that EverWatch management "projects having a ▮ pWin [win probability] given only one other competitor in the mix (Booz Allen)" and noted that it had "▮▮▮▮▮▮▮▮ pWin to reflect Booz Allen's ▮" pWin."  Booz Allen's corporate development staff told the consultants assisting with the due diligence process that EverWatch is the only other competitor.  Earlier, the EverWatch manager leading the effort to win OPTIMAL DECISION had made clear to a key subcontractor that Booz Allen is the competition.

**ANSWER**:  Through limited due diligence, Booz Allen admits that its clean team for the

Transaction became aware that EverWatch had expressed an interest in bidding on the OPTIMAL

DECISION procurement.  Booz Allen admits that its clean team also learned that EverWatch

management projected a ▮ pWin; but this was in sharp contrast to Booz Allen's assessment of

its own likelihood of winning the procurement for the fourth consecutive time.  Booz Allen denies

that any of the information alleged in this paragraph was ever shared with members of the Booz

Allen OPTIMAL DECISION team.   To the extent members of the Booz Allen OPTIMAL

DECISION bid team have confirmation of this information, it is a result of DOJ's decision to

publicly disclose this competitively sensitive information in this litigation.  With regard to the

allegations related to the other Defendants, Booz Allen has insufficient information to admit or

deny the allegations.  Booz Allen denies all remaining allegations.

47.     Other companies in the industry agree that there will be no competitors for OPTIMAL DECISION other than Booz Allen and EverWatch.  One member of the EverWatch team noted that "we have team meetings and we discuss are there any competitors, you know, try to collect market information.  I haven't heard any data from anyone that anyone else is bidding it."

**ANSWER**:  Booz Allen lacks knowledge or information sufficient to admit or deny the allegations in this paragraph.

48.     The merger would result in a monopoly on the OPTIMAL DECISION project because, if the merger proceeds, Booz Allen will ultimately hold the contract regardless of what happens in the bidding process.  The expectation that the companies would merge—an expectation that was created by the merger agreement—therefore immediately reduced the incentives of the companies to compete aggressively for OPTIMAL DECISION.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if a response is deemed required, Booz Allen denies the allegations.  Booz Allen denies that DOJ has identified a relevant market, that the Transaction would create a monopoly, that its incentives to compete have been in any way reduced, or that competition will be harmed in the appropriate relevant market.  Booz Allen further denies that it will ultimately hold the OPTIMAL DECISION contract regardless of what happens in the bidding process.  With regard to the allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.

49.     Before they agreed to merge, and based on a draft RFP released by the NSA, the companies were preparing for the proposal drafting and submission process, the most intense phase of competition.  The final RFP is expected to be released in the immediate future, and as the companies wait for it they are gathering information, negotiating with their subcontractors, preparing rough drafts of their proposals, assembling materials for presentations, and developing sample questions that might be asked in the oral examinations that will follow submission of the proposals.  These steps require significant investments of time and resources, but these investments are necessary to be able to prepare a competitive proposal that will secure the five- year contract and its █████████ revenue stream.

**ANSWER**:  Booz Allen denies that it has changed its approach to the OPTIMAL DECISION RFP since the announcement of the Transaction.  Booz Allen lacks knowledge or information sufficient to admit or deny the remaining allegations of this paragraph.

50.     Booz Allen's agreement to acquire EverWatch eliminated almost all incentive for either company to compete vigorously for OPTIMAL DECISION.  No matter how competitive or uncompetitive the bids are, it is the merged firm that would own the contract and derive the profits from it.  Even if Booz Allen loses the bid, it knows the merged firm will win the contract;

aggressive bidding at this point would serve only to reduce the profits of the merged firm.  Higher prices, on the other hand, will increase those profits.  EverWatch has an additional incentive to avoid aggressive bidding, as it may embarrass and upset its future owner and employer.  Because of this proposed merger, both companies now are incentivized to reduce their investments and other terms and increase prices to NSA, whether they bid separately or together.

**ANSWER**:  Booz Allen denies the agreement eliminated any incentive to vigorously

compete for OPTIMAL DECISION.  With regard to allegations related to the other Defendants,

Booz Allen has insufficient information to admit or deny the allegations.  Booz Allen denies the

remaining allegations in this paragraph.

51.     In practice, NSA may not even receive two bids.  If the merger is completed before bids are submitted, Booz Allen can decide to submit only one bid.  And if the merger is only completed after the bids are submitted, the merged firm can withdraw the less profitable bid.  NSA's review of the bids is expected to take several months, so the post-merger Booz Allen will have ample opportunity to withdraw one bid.  As a result, even if the merger is not completed by the time bids are awarded, Booz Allen can effectively veto EverWatch's bid, should it prove too competitive.  In addition, the merger agreement provided to the United States by the companies requires EverWatch to seek Booz Allen's approval before entering into any contract with a value of $500,000 or greater.  Assuming the materials provided by the companies accurately reflect their agreement, Booz Allen can effectively veto EverWatch's bid, should it prove too competitive.

**ANSWER**:  Booz Allen lacks knowledge or information sufficient to admit or deny the

allegations with respect to the number of bids the NSA may receive on an RFP that has not even

been issued.  Booz Allen denies that the agreement requires EverWatch to seek Booz Allen's

approval before entering into any contract with a value of $500,000 or greater or that Booz Allen

has any veto rights pertaining to any EverWatch bid for Optimal Decision.  DOJ glosses right over

█████████████  of the agreement that states, ██████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████  Nevertheless, when DOJ raised its concern about its reading of the agreement, the

parties promptly amended the agreement to clarify that was never intended to be read as in any way limiting or restricting EverWatch's ability to aggressively bid on any government contract (including on the still yet to be released OPTIMAL DECISION RFP).  It was never intended that Booz Allen would have approval rights in EverWatch's day-to-day operations.  This type of standard provision is found in nearly every acquisition agreement.  This type of provision is intended to (i) ensure that the target company can continue operating the business responsibly and independently of the acquiring party, and (ii) prevent the acquiring party from taking operational control of the target company, while minimizing the risk that the target company will take actions that may reduce the value of the target company between the signing and closing of a transaction.

52.     The merger agreement therefore already has substantially lessened competition and is likely to result in higher prices, lower-quality services, and less innovation for NSA's OPTIMAL DECISION project.  The merger agreement therefore constitutes an unlawful restraint of trade and is illegal under Section 1 of the Sherman Act.  Moreover, the substantial lessening of competition that is likely to result from the merger itself would violate Section 7 of the Clayton Act and is sufficient for the Court to enjoin the proposed merger.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if a response is deemed required, Booz Allen denies the allegations.  Booz Allen denies that the agreement has lessened competition or raised prices, lowered the quality of services, or decreased innovation on a contract that has never been issued and does not exist.

53.     New competitors will not join the competition for OPTIMAL DECISION in response to the proposed merger.  NSA is expected to release the RFP in the immediate future and to require proposals to be submitted within 30 to 45 days, with oral presentations by the teams beginning immediately afterward.  As noted above, EverWatch spent years assembling its team and developing its proposal.  No new competitor would have sufficient time to assemble a team, negotiate subcontract terms, develop a draft proposal, and prepare for oral examinations in time to meet NSA's schedule.

**ANSWER**:  Booz Allen lacks knowledge or information sufficient to admit or deny that new competitors will not join the competition for OPTIMAL DECISION because the RFP has not

yet been issued.  Booz Allen lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.  With regard to allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.

54.     Delaying the OPTIMAL DECISION project is not an option.  NSA has set the schedule for OPTIMAL DECISION based on a number of factors, not the least of which is the national security of the United States, which depends in part on NSA's ability to effectively utilize signals intelligence.  Moreover, NSA cannot forego these services, so a delay in OPTIMAL DECISION would require it to extend the current MASON III contract, which is held by Booz Allen.  NSA would have little choice but to agree to Booz Allen's terms for that extension, as the agency would have no other options.

**ANSWER**:  Booz Allen denies any implication by DOJ that it could or would hold the NSA to unreasonable terms if the NSA sought an extension of MASON III.  Booz Allen will continue to provide the NSA superior signals intelligence and modeling capabilities and deep expertise in implementing solutions in support of the NSA's mission.  Booz Allen lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph.

55.     The proposed merger is unlikely to generate verifiable, merger-specific efficiencies sufficient to reverse or outweigh the anticompetitive effects that are likely to occur.

**ANSWER**:  Booz Allen denies the Transaction is unlikely to generate pro-competitive effects that outweigh any possible effect it would have on this single, cost-type contract because this allegation belies the facts and ignores the mountain of evidence of the competitive effects of this proposed Transaction.

56.     In response to the antitrust investigation and facing the looming release of the OPTIMAL DECISION RFP, EverWatch engaged in a last-minute scramble to transfer its team leadership role to a much smaller corporate teammate.  This transparent attempt to evade antitrust scrutiny does not restore the competition lost when the Defendants agreed to merge.  More likely, as EverWatch steps back from this competition in an attempt to avoid antitrust scrutiny, the effect of this "remedy" will be to diminish the quality of the planned bid while still giving EverWatch an opportunity to charge higher prices for its contributions, thus enabling the very effects that the United States seeks to avoid in challenging this transaction.  In any case, in order for the team to

submit a bid, EverWatch would need to continue the work it has been doing, so it would remain the prime contractor in all but name.

**ANSWER**:  With regard to allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.

57.    The chosen subcontractor is approximately one-tenth the size of EverWatch, in terms of both personnel and revenue.  The largest prime contract managed by the company to date is worth ▮▮▮▮ and has ▮▮▮ employees on it.  In contrast, OPTIMAL DECISION is valued at ▮▮▮▮▮ and is expected to employ ▮▮▮ people.  EverWatch is well-prepared for such a project, as it holds prime contracts as large as ▮▮▮▮▮, employing ▮▮▮.

**ANSWER**:  Booz Allen lacks knowledge or information sufficient to admit or deny the allegations in this paragraph.  With regard to allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.

58.    In practice, EverWatch effectively would need to "ghost prime" the project in order for the team to submit a bid, continuing to do all the work it is presently doing.  A senior manager of the subcontractor selected by EverWatch stated that:

> The program manager [EverWatch] would have more information than any single teammate because he would be the point where all of the program execution comes together.  So there is a knowledge base that the program manager would develop that he would know that others would not . . . . [I]n the end all the data that's been collected, all the slides that have been completed, all the investment that's been made, that's owned by EverWatch.  It's not owned by the team.  So if – if that left, there's no way that information could be recreated if the RFP came out tomorrow.

> Put simply, without the full support of EverWatch, the team would not be able to submit a proposal on NSA's schedule for the OPTIMAL DECISION project.  The prime contractor/ subcontractor shell game thus does not change the fact that it is EverWatch that will determine how competitive its team is, and EverWatch has little incentive to help a Booz Allen rival win this bid.

**ANSWER**:  With regard to allegations related to the other Defendants, Booz Allen has insufficient information to admit or deny the allegations.

59.    The United States hereby incorporates the allegations of paragraphs 1 through 58 above as if set forth fully herein.

**ANSWER**:  Booz Allen incorporates its responses to the allegations of paragraphs 1 through 58 above as if set forth fully herein.

60.    The merger agreement has sharply reduced incentives for the Defendants to compete vigorously for OPTIMAL DECISION and therefore constitutes an unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if a response is deemed required, Booz Allen denies the allegations.  Booz Allen denies the agreement reduced its incentives to compete vigorously for OPTIMAL DECISION.

61.    Unless enjoined, completion of the merger is likely to substantially lessen competition and tend to create a monopoly in interstate trade and commerce for the OPTIMAL DECISION contract, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

**ANSWER**:  This paragraph contains legal conclusions to which no response is required; if a response is deemed required, Booz Allen denies the allegations.  Booz Allen also denies that the agreement alone has reduced competition or incentives to vigorously compete.

62.    Among other things, the proposed acquisition would:

a.    eliminate significant present and future head-to-head competition between Booz Allen and EverWatch;

b.    reduce competition generally in the relevant market;

c.    cause prices to rise for the customer in the relevant market;

d.    cause a reduction in quality in the relevant market; and

e.    reduce innovation in the relevant market.

**ANSWER**:  Booz Allen denies this paragraph and sub-sections in their entirety and specifically incorporates its General Response and Specific Responses to paragraphs 1 – 61.

63.    Plaintiff requests that the Court:

a.      adjudge and decree that the merger agreement between Booz Allen and EverWatch is unlawful and violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.      adjudge and decree that the proposed merger of Booz Allen and EverWatch would be unlawful and violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

c.      permanently enjoin and restrain Defendants and all persons acting on their behalf from consummating the proposed merger or from entering into or carrying out any other contract, agreement, plan, or understanding, the effect of which would be to combine Booz Allen and EverWatch;

d.      permanently enjoin and restrain Defendants and all persons acting on their behalf from effectuating any provision of the Stock Purchase Agreement among Booz Allen, EverWatch, and EC Defense Holdings, LLC dated March 15, 2022;

e.      award the United States the costs of this action; and

f.      award the United States such other relief that the Court deems just and proper.

**__ANSWER__**:  Booz Allen denies that DOJ is entitled to any of the relief requested and requests that the Court find in favor of Defendants and permit the Defendants to immediately close the Transaction, if it has not already done so.  Defendants further request all other relief the Court may deem just and proper.

## AFFIRMATIVE DEFENSES

Booz Allen expressly reserves the right to plead additional affirmative or other defenses should discovery reveal any such defenses in this case.  Booz Allen asserts the following defenses, without assuming the burden of proof on such defenses that would otherwise rest with the DOJ.

1.      The Complaint fails to state a claim upon which relief can be granted.

2.      The harm DOJ alleges is not the type of harm that the antitrust laws are designed to prevent.

3.      DOJ's claims are too speculative to support any claim on which relief can be granted.

4.      DOJ has failed to establish that the agreement underlying the parties' Transaction constitutes an agreement in restraint of trade.

5.      DOJ has failed to allege any appropriate market or market power in any market.

6.      DOJ has failed to establish that the Transaction is likely to have any anticompetitive effect in any relevant market.

7.      The United States, which is the alleged customer at issue in the Complaint, has a variety of tools and options to ensure that it receives competitive pricing and terms.

8.      DOJ's claims fail because the NSA has not issued a request for proposals for OPTIMAL DECISION and has not revealed the final terms of that request, making any harm speculative. DOJ has failed to establish any anticompetitive effect in any relevant market because entry by new market participants and/or expansion by existing market participants will be timely, likely, and sufficient to undo an such effects.

9.      DOJ's claims are barred, in whole or in part, because Defendants' conduct is protected under the Noerr-Pennington doctrine and under the Constitution of the United States.

10.     To the extent not set forth above, DOJ's claims are barred, in whole or in part, because it is precluded and/or preempted by federal oversight of the conduct at issue and/or immune from scrutiny.

11.     Booz Allen's acquisition of EverWatch will be procompetitive.  The transaction will result in overwhelming merger-specific efficiencies, cost synergies and other procompetitive effects that will benefit the government and other customers.

12.     The injunctive relief that DOJ seeks is inconsistent with the public interest and the equities favor consummation of the Transaction.


Dated this 22nd day of July, 2022.

Respectfully submitted,

/s/ Todd Stenerson_____

Todd M. Stenerson (Bar No. 14194)
Ryan A. Shores (admitted *pro hac vice*)
Matt Modell (admitted *pro hac vice*)
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
todd.stenerson@shearman.com
ryan.shores@shearman.com
matt.modell@shearman.com

Susan Loeb (admitted *pro hac vice*)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
susan.loeb@shearman.com

*Attorneys for Defendants Booz Allen Hamilton Holding Corp.
and Booz Allen Hamilton Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2022, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, and served one copy, by ECF to counsel of record in this matter.

*/s/ Todd Stenerson*

Todd M. Stenerson (Bar No. 14194)
Shearman & Sterling LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
todd.stenerson@shearman.com