## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

*Plaintiff*,

vs.

BOOZ ALLEN HAMILTON HOLDING
CORPORATION, *et al.*,

*Defendants*.

Case No. 1:22-cv-01603-CCB

**DEFENDANTS' RESPONSE TO
PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

    I.     The Proposed Transaction..........................................................................4

          A.      The Proposed Transaction is—and always has been—designed to bring competition and efficiencies to billions of dollars of government procurements......................................................................................4

          B.      Booz Allen and EverWatch must compete independently before closing. ..................................................................................................6

    II.    OPTIMAL DECISION ...............................................................................7

          A.      The OD procurement has been delayed for years, and its timing is still unknown......................................................................................7

          B.      NSA exclusively controls the price and profit on OPTIMAL DECISION. ...............................................................................................8

    III.   The HSR Process and This Lawsuit...........................................................9

          A.      The parties attempted to remedy the Government's limited concern about the Proposed Transaction. ...............................................9

          B.      The parties made even more commitments to address the Government's concerns, but the Government will accept nothing less than total "abrogation."..........................................................10

ARGUMENT.......................................................................................................................11

    I.     The Government is unlikely to succeed on the merits. ......................................13

          A.      The rule of reason applies. ..................................................................13

          B.      The Government's theory that a single transaction with a single purchaser at a single moment in time is a relevant market fails as a matter of law and fact. ..........................................................................15

          C.      The Government has failed to show substantial anticompetitive effects...................................................................................................20

1.      The Government's incentives theory is legally unprecedented and baseless. .................................................................. 20

2.      The Government's incentives theory is irreconcilable with the actual incentives present here. .................................................. 22

3.      The Government cannot show "actual detrimental effects." ...... 24

D.      Even if the Government had showed anticompetitive effects, they are offset by procompetitive benefits that cannot be achieved through any other means. .......................................................................... 26

II.      The Government has not shown that it will suffer irreparable injury without a preliminary injunction. ......................................................................... 28

A.      The Government must show irreparable injury. .................................... 28

B.      The Government cannot show irreparable injury. ................................. 29

III.      Neither equity nor the public interest favors a preliminary injunction. ............... 30

CONCLUSION .................................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC,*
    1 F.4th 102 (2d Cir. 2021) ...................................................................3, 14, 26,

*A.D. Bedell Wholesale Co. v. Philip Morris, Inc.,*
    104 F. Supp. 2d 501 (W.D. Pa. 2000), *aff'd,* 263 F.3d 239 (3d Cir. 2001) ......................25, 26

*Accident, Injury & Rehabilitation, PC v. Azar,*
    943 F.3d 195 (4th Cir. 2019) .............................................................................11

*Am. Tobacco Co. v. United States,*
    328 U.S. 781 (1946).........................................................................................20

*Appalachian Coals v. United States,*
    288 U.S. 344 (1933).........................................................................................28

*United States ex rel. Blaum v. Triad Isotopes, Inc.,*
    104 F. Supp. 3d 901 (N.D. Ill. 2015) ..................................................................16

*California ex rel Harris v. Safeway, Inc.,*
    651 F.3d 1118 (9th Cir. 2011) (en banc) ..............................................................15

*City of New York v. Grp. Health Inc.,*
    No. 06-cv-13122, 2010 WL 2132246 (S.D.N.Y. May 11, 2010) ..........................17

*De Beers Consol. Mines v. United States,*
    325 U.S. 212 (1945).........................................................................................28

*Di Biase v. SPX Corp.,*
    872 F.3d 224 (4th Cir. 2017) .............................................................................29

*Dubon Miranda v. Barr,*
    463 F. Supp. 3d 632 (D. Md. 2020) (Blake, J.) ..............................................12, 30

*FTC v. Actavis,*
    570 U.S. 136 (2013).....................................................................................14, 15

*Gen. Dynamics Corp. v. United States,*
    563 U.S. 478 (2011).......................................................................................3, 22

*Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.,*
    960 F. Supp. 701 (S.D.N.Y. 1997) (Sotomayor, J.).............................................17

*Havoco of America, Ltd. v. Shell Oil Co.,* 626 F.2d 549 (7th Cir. 1980) .........................16, 19, 26

*Hester v. French*,
985 F.3d 165 (2d Cir. 2021)................................................................12

*Int'l Logistics Grp., Ltd. v. Chrysler Corp.*,
No. 85-cv-73005, 1988 WL 106905 (E.D. Mich. Apr. 8, 1988) ............................17

*Int'l Travel Arrangers v. NWA, Inc.*,
991 F.2d 1389 (8th Cir. 1993) ................................................................20

*Janvey v. Romero*,
883 F.3d 406 (4th Cir. 2018) ................................................................25

*Kennedy v. Fresenius Med. Care N. Am.*,
No. 11-cv-3738, 2012 WL 4378165 (D. Md. Sept. 24, 2012) (Blake, J.) ..............11

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)................................................................13

*Lockheed Martin Corp. v. Boeing Co.*,
314 F. Supp. 2d 1198 (M.D. Fla. 2004)................................................................17

*Marshall v. Roderick*,
No. 16-cv-814, 2016 WL 3181759 (D. Md. June 8, 2016) (Blake, J.)..................12

*In re Microsoft Corp. Antitrust Litig.*,
333 F.3d 517 (4th Cir. 2003) ................................................................ *passim*

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)................................................................2

*Moultrie v. Nat'l Women's Soccer League, LLC*,
541 F. Supp. 3d 1171 (D. Or. 2021) ................................................................26

*Nat'l Collegiate Athletic Ass'n v. Alston*,
141 S. Ct. 2141 (2021)................................................................14

*Nat'l Credit Reporting Ass'n, Inc. v. Equifax, Inc.*,
2008 WL 4457781 (D. Md. Sept. 30, 2008) ................................................................32

*Neptun Light, Inc. v. City of Chicago*,
No. 17-cv-8343, 2018 WL 1794769 (N.D. Ill. Apr. 16, 2018)..................19

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
389 F.3d 973 (10th Cir. 2004) (*en banc*) ................................................................12

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018)................................................................ *passim*

*Omnicare, Inc. v. UnitedHealth Group, Inc.*,
    594 F. Supp.2d 945 (N.D. Ill. Jan. 16, 2009)...................................................20, 26

*Orlando v. CFS Bancorp, Inc.*,
    No. 2:13-cv-261, 2013 WL 5797624 (N.D. Ind. Oct. 28, 2013) ............................31

*Pan Am. World Airways, Inc. v. Boyd*,
    207 F. Supp. 152 (D.D.C. 1962) ...........................................................................30

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) .................................................................................12

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)...................................................................................17

*SH Franchising, LLC v. Newlands Homecare, LLC*,
    18-cv-2104, 2019 WL 356658 (D. Md. Jan. 29, 2019) (Blake, J.)...................12, 29

*Smalley & Co. v. Emerson & Cuming, Inc.*,
    13 F.3d 366 (10th Cir. 1993) .................................................................................17

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021) .................................................................................31

*Stigar v. Dough Dough, Inc.*,
    No. 2:18-cv-00244-SAB, 17 (E.D. Wash. Mar. 8, 2019) .......................................14

*Tango Transport, L.L.C. v. Transport Int'l Pool, Inc.*,
    478 F. App'x 72 (5th Cir. 2012) .............................................................................30

*Taylor v. Freeman*,
    34 F.3d 266 (4th Cir. 1994) ...................................................................................12

*Therapearl, LLC v. Rapid Air Ltd.*,
    No. 13-cv-2792, 2014 WL 4794905 (D. Md. Sept. 25, 2014) (Blake, J.) .................15, 16, 18

*Thomas v. FireRock Prods., LLC*,
    40 F. Supp. 3d 783 (N.D. Miss. 2014)...................................................................30

*Triple M Roofing Corp. v. Tremco, Inc.*,
    753 F.2d 242 (2d Cir. 1985)..............................................................................16, 19

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016)..........................................................................15, 18, 24

*United States v. Culbro Corp.*,
    436 F. Supp. 746 (S.D.N.Y. 1977) .........................................................................31

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005)..................................................................20

*United States v. Flakeboard Dynamicsboard Am. Ltd.*,
    2015 WL 12656838 (N.D. Cal. Feb. 2, 2015) ..............................................20, 21

*United States v. Gillette Co.*,
    828 F. Supp. 78 (D.D.C. 1993)..................................................................28

*United States v. Lehman Bros. Holdings, Inc.*,
    1:98-cv-00796 (D.D.C. 1998)....................................................................32

*United States v. Raytheon*,
    No. 97-cv-02397 ........................................................................................32

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)..................................................................................28

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)......................................................................20

## Other Authorities

Black's Law Dictionary (11th ed. 2019)..........................................................30

# INTRODUCTION

In its preliminary-injunction motion, the United States Department of Justice (the "Government") claims that Booz Allen hatched a "scheme" to buy EverWatch for ███████ (the "Proposed Transaction") to eliminate competition for a single, forthcoming procurement—OPTIMAL DECISION ("OD"). ECF No. 29-1 ("Mot.") at 1. According to the Government, the moment the parties signed their acquisition agreement, ECF No. 29-14 (the "Agreement"), they had violated Section 1 of the Sherman Act because they had lessened "incentives" to compete for OD. *Id.* To counteract these supposed "incentives," the Government demands unprecedented relief: a complete "abrogation" of the Agreement. *Id.* at 31. That requested relief is an overreach that would effectively pocket veto the Proposed Transaction and render any future proceedings moot. The Government's arguments in support of its request are factually inaccurate and legally baseless.

The Government's narrative is not only inaccurate—it makes no sense. As the Government elsewhere acknowledges, the potential revenues from the OD contract are a fraction of the ███ ████ that Booz Allen paid for EverWatch. *Id.* at 21. As a matter of basic math, the Government's suggestion that the Proposed Transaction is a "scheme" to buy off competition for OD is bizarre.

The truth makes much more sense. As the Government's own "investigative file" shows,[1] Booz Allen agreed to buy EverWatch because, together, the companies can better compete for *more than a dozen government contracts* potentially worth *billions of dollars*, many of which are now dominated by entrenched incumbents. Together, the parties can offer the intelligence community innovative solutions to meet evolving and dangerous threats from foreign enemies.

---

[1] The Government's "investigative file" includes the evidence collected prior to filing suit, including internal contemporaneous Booz Allen presentations describing the purpose of the Proposed Transaction.

Thus, far from threatening a "reduction in competition," *id.* at 4, the Proposed Transaction will enhance competition, quicken innovation, and support our national security.

The Government's legal theories are just as imaginative and overreaching as its factual narrative. The Government's entire argument in its Motion is that the Agreement violates Section 1. But to establish an agreement in restraint of trade under Section 1, the Government must prove that Defendants entered a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).[2] The Government alleges no such agreement.

Nor could it: consistent with the Hart-Scott-Rodino ("HSR") Act, the merging parties are legally obligated to remain and act as separate entities before closing their deal. Indeed, an entire body of law governs pre-closing conduct (often called "gun-jumping" rules), and the Government does not allege that any of it has been violated. Instead, the Government attempts an end run around that body of law and asks this Court to hold that the mere act of entering into an acquisition agreement is itself a Section 1 violation. The Government cites no precedent for such an extraordinary theory. There is none.[3]

The Government's novel Section 1 theory rests entirely on the idea that signing the Agreement alone damped the parties' "incentives" to compete. But no court has held that "incentives" alone, without some anticompetitive *agreement* or *action*, could violate Section 1. In any event, the evidence and common-sense show that the Government has the incentives here

---

[2] The textbook examples of such agreements are agreements between competitors to fix prices, allocate customers, and rig bids.

[3] Relatedly, the Government's entire "merger-to-monopoly" theory, Compl. ¶ 15, is fatally flawed because it rests on a highly gerrymandered "market" limited to a single transaction with a single purchaser at a single moment in time. Courts have repeatedly and regularly rejected attempts to conflate a *transaction* with a *market*.

backwards. Booz Allen and EverWatch have every incentive to compete aggressively regardless of the Agreement.

*First*, "[g]overnment contractors—especially cutting-edge defense contractors . . . are repeat players . . . . [who] have strong incentive to behave rather than risk missing out on the next multibillion-dollar defense contract." *Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 491 (2011). That is certainly true here: the parties are highly incentivized to provide the best deal possible so they can get the *next* contract with NSA or another agency. The value of those future opportunities dwarf OD. It would be senseless for them to put their reputation at risk by making a less-than-competitive offer on this small contract.

*Second*, signing the Agreement does not ensure that the deal will close. Like most deals, this one is subject to various contractual closing conditions and the need for regulatory approval, which the Government is steadfastly opposing. The parties cannot rely on the Proposed Transaction closing and must instead move forward aggressively on their OD bids.

*Third*, the bid-team employees for each company have invested significant effort in preparing bids for OD and face professional and financial loss (to say nothing of morale) from losing it. They would not stop competing—and possibly risk losing bonuses or even their jobs—because of the *possibility* that, at some point, they might be part of the same company.

*Fourth*, NSA has significant control over OD, how much it costs, and whether to issue any "profit" at all. This is not a private market where a company can propose whatever price it chooses. Federal regulations provide NSA with an impressive array of tools to control the cost and price of OD. In all, the Government's novel "incentives" theory—even if actionable under the Sherman Act—is at odds with reality.

Perhaps most troubling of all is the relief the Government requests: abrogation of the Agreement. Although disguised as "*preliminary*" relief, an injunction requiring abrogation would kill the deal. Not only is this type of mandatory injunction highly disfavored by courts, but it is out of step with how the Government itself has, for decades, approached remedies to pre-closing concerns. The Government has long allowed acquisitions to close subject to straightforward fixes, like firewalls and the like, to ancillary issues so that the parties can proceed with the benefits of the transaction as whole. *See infra* at 32. That is exactly what the parties proposed to the Government here when they committed to, among other things, ensure the respective OD procurement teams remain separate through the conclusion of the bidding. ECF No. 49-1. The parties remain willing to agree to this type of standard relief *under Court order*. They just want to close their deal, so they can begin their joint innovation and compete for contracts *other* than OD.

This Court should deny the Government's unprecedented and overreaching Motion for a Preliminary injunction.[4]

## BACKGROUND

I.     **The Proposed Transaction**

   A.     **The Proposed Transaction is—and always has been—designed to bring competition and efficiencies to billions of dollars of government procurements.**

On March 15, 2022, Booz Allen entered into a Stock Purchase Agreement to acquire EverWatch (the "Proposed Transaction") for roughly ███████ *See* Agreement. Booz Allen has approximately 30,000 employees and $8.4 billion in annual revenue. It is well-known and has

---

[4] Although the Complaint asserts claims both under Section 1 of the Sherman Act and Section 7 of the Clayton Act, the Government denies that it is seeking any relief under Section 7 in its Motion, instead attempting to jam a Section 7 merger challenge into a "preliminary" proceeding under Section 1. Mot. at 4 n.5. Labels aside, the Government makes the same, singular claim (that the Proposed Transaction cannot stand because of OD) and ultimately seeks the same relief (kill the Agreement) under both provisions. *See* Compl. at 19–20. Because the Government's claim is fundamentally flawed, the Court should also enter final judgment against the Government.

a lengthy track record of providing outstanding personnel and mission oversight, including to NSA's signals-intelligence operations.[5] EverWatch is a recent startup with approximately █████████████████████████ in annual revenue. ECF No. 29-11 at 4. Its engineers and coders have strong capabilities in areas such as cloud computing, migration, and software development. ECF No. 29-10 at 1.

The Proposed Transaction aims to combine the complementary skills and assets of the two companies. As Booz Allen's contemporaneous documents reflect, the Proposed Transaction would █████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████

The Proposed Transaction would also allow Booz Allen to compete more effectively for a wide array of defense/intelligence procurement opportunities worth billions of dollars. ████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

[5] *See* BOOZ ALLEN HAMILTON, ABOUT BOOZ ALLEN: OVERVIEW (2022), https://www.boozallen.com/content/dam/boozallen_site/esg/pdf/slick_sheet/booz-allen-hamilton-fact-sheet.pdf .

███████████████████████████████████████████████████ Each of those revenue

opportunities greatly exceeds OD.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ The Proposed Transaction would thus be disruptive and create more aggressive

competition, not less, and would create better offerings, enhance innovation, and improve overall

quality of service. Finally, it would create significant synergies, estimated by Booz Allen ████████

███████████████████████████████████ *Id.* at 17.

## B.      Booz Allen and EverWatch must compete independently before closing.

Signing the Agreement was merely one step in the acquisition process, but it was far from

the only one. No acquisition is guaranteed to close, and *all merger agreements* are inherently

uncertain. This one is no exception. For example, the Agreement contains numerous conditions

that must be satisfied before the Transaction can be consummated. Agreement Article IX.[6] And,

of course, the parties must obtain antitrust approval before the deal can close.

In the period between signing the Agreement and closing, Booz Allen and EverWatch

remain separate entities and compete independently. This is required by law—namely, the "gun-

jumping" rules—and ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████ The Government's Motion says nothing as to these

legal and contractual demands.

## II.    OPTIMAL DECISION

### A.    The OD procurement has been delayed for years, and its timing is still unknown.

NSA has procured modeling and simulation services related to signals-intelligence

networks for two decades, beginning with MASON I in 2002, then MASON II in 2007, and then

MASON III in 2014. Ex. A. at 9. Booz Allen won each of these contracts—outcompeting

competitors like █████████████████████████████████.—because of

Booz Allen's "technically superior and demonstrated [] deeper understanding of [such] modeling

and simulation." ECF No. 29-3 ¶ 4; *see* Ex. A at 9. OD is an anticipated future procurement to

provide NSA with modeling and simulation services related to signals-intelligence networks. ECF

No. 29-3 ¶ 3. NSA estimates that OD will generate approximately ██████████████

████████████████████████. *Id.*

Booz Allen and EverWatch originally expected NSA to issue the Request for Proposals

("RFP") for OD roughly three years ago, in late 2019. Ex. B at 32 (████████████████

████████. But, after repeated delays from NSA, it is unknown when NSA plans to release the

final RFP or what the precise contours of OD will be. It is expected to involve, at a minimum, a

continuation of the modeling and simulation services Booz Allen has been providing for two

decades under the MASON contracts.

Likewise, it is unknown who will ultimately submit bids in response to the RFP. In October

2020, NSA identified 178 companies whose capabilities "correspond[ed] to work anticipated on"

OD. ECF No. 29-3 ¶ 6. Fourteen companies subsequently expressed "an interest in being the prime

contractor." *Id.* At present, only Booz Allen and EverWatch have submitted letters of intent to submit bids to be the prime contractor, *id.* ¶ 7, but a letter of intent is not a prerequisite to submitting a bid.[7] Ultimately, it will be NSA's prerogative to choose its preferred prime contractor. Ex. D at 1.

### B. NSA exclusively controls the price and profit on OPTIMAL DECISION.

Although there is uncertainty around timing and competition for OD, there is no question that NSA substantially controls the price *and* the profit for this contract. NSA has specified that OD will be a ▮▮▮▮▮▮▮▮▮▮ contract. Ex. D at 1. The "cost" is what it costs the contractor to supply the contracted services to NSA. The "profit" consists entirely of the "award fee," which is (a) a base amount (which may be zero) fixed at the inception of the contract and (b) an award amount, based upon *NSA*'s evaluation, sufficient to provide motivation for excellence in contract performance. Federal Acquisition Regulations ("FAR") § 16.305. Under this structure, *NSA has total discretion to determine the fee.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. D at 32.

Further, if the winning contractor underperforms, NSA may elect not to pay an award fee at all. The contractor is prohibited from earning an award fee if its overall ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. F.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. D at 22.[8] This clause allows NSA to make an "equitable downward adjustment of the fixed fee" if the selected contractor provides "less than 90 percent of the level of effort specified for the base period or any optional

---

[7] The prime contractor is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ ECF

No. 29-14 at 24:18–25.

[8] As was the case with one of OD's predecessor contract, MASON II.

period exercised." 48 C.F.R. § 1552.211-73(c). Finally, NSA may also require the bidder █████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████. Ex. D at 20. If a contractor falsely certifies this data, NSA is entitled to recovery of any overpayment, plus interest, plus penalties. FAR § 15.407-1. In these ways, NSA has broad discretion over the pricing and quality for OD.

## III. The HSR Process and This Lawsuit

### A. The parties attempted to remedy the Government's limited concern about the Proposed Transaction.

After entering the Agreement, Booz Allen and EverWatch made the requisite filings under the HSR Act for the Government to conduct its antitrust review of the Proposed Transaction. ECF No. 29-6. As discussed above, and as the documents provided to the Government show, the Proposed Transaction's purpose is to make Booz Allen a more viable competitor for numerous opportunities across multiple government agencies worth billions of dollars. *See, e.g.*, Ex. A. The Government did not express any concern with the Proposed Transaction as it relates to these other opportunities. Nor did the Government deny that the Proposed Transaction would bring needed competition and enhanced service across many procurements, benefitting NSA and other agencies.

Instead, the Government myopically focused on a single NSA bid—the long-delayed OD procurement. In response, Defendants explained the various steps they had taken to ensure vigorous competition for OD. And they reaffirmed that each intends to submit a separate bid to be OD's prime contractor. ECF No. 23-1 at 9; Ex. E.

When the Government remained unsatisfied, Booz Allen and EverWatch made *additional* offers to remedy any concerns. EverWatch proposed that █████████████████████ ████████████████ replace it as prime contractor, while moving EverWatch to a subcontractor role. *See* ECF No. 23-1 at 12–15; Ex. C. It did this ██████████████████████████



████████████████ Ex. C. Under this proposal, EverWatch would no longer have controlled its bid; ██████ would have taken on that role. ██████████████████████ ██████████████ that, like EverWatch, ████████████████████████ ████████████████████████████████████ *Id*. According to one witness, ████████████████████████████ to prime the OD contract itself. ECF No. 29-13 at 61:1–4.

EverWatch also "████████████████████████████████ ████████████████████████████████████████ ████████████████ Ex C. The Government has since inexplicably labeled this effort to address the Government's concerns as improper collusion. ECF No. 39-1 at 7.[9]

## B.  The parties made *even more* commitments to address the Government's concerns, but the Government will accept nothing less than total "abrogation."

The Government then filed this case, challenging the Proposed Transaction under Section 1 of the Sherman Act and Section 7 of the Clayton Act. The Complaint claims the parties' Agreement allegedly created "incentives" for Booz Allen and EverWatch to compete less vigorously for the forthcoming RFP. Even though the Government's investigative file is replete with references to the purpose of the Proposed Transaction—enhancing competition across *numerous* procurements—the Government's Complaint omits reference to any procurement but OD. ECF No. 1 ("Compl."). Because of this lone forthcoming, and relatively small, procurement, the Government demands that the Agreement must be immediately "abrogated." Mot. at 39.

After the suit was filed, Booz Allen and EverWatch have continued their efforts to understand and address the Government's concerns. At the outset of these post-Complaint

---

[9] After the Government rejected EverWatch's settlement proposal, Booz Allen considered if a scenario where neither company bid on OD would satisfy the Government. This idea was never implemented. Nonetheless, the Government labels this contemplated remedy, too, as nefarious.

discussions, the Government confirmed that it has no concern with the Proposed Transaction other than OD. ECF No. 39-4. To address the OD-specific concerns, Booz Allen and EverWatch made a variety of additional commitments. For example, Booz Allen and EverWatch voluntarily (1) ceased all joint integration activities under the Agreement, (2) continued to ensure the parties' respective and separate procurement teams do not have access to each other's OD-related information, (3) eliminated Booz Allen's access to EverWatch's "data room" of due-diligence materials, and (4) committed to not withdraw either of the parties' separate bids for the forthcoming OD procurement at any time, even after closing. ECF No. 49-1. These commitments, as discussed below, are similar to those *the Government* has adopted for decades to resolve similar competitive concerns, including as part of consent decrees.

Unfortunately, the Government has rejected these commitments out of hand, insisting that nothing less than "abrogating" the Agreement will do. Mot. at 31.

## ARGUMENT

A preliminary injunction is an "extraordinary" remedy, "granted only sparingly and in limited circumstances." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003).[10] Accordingly, the Government must make a "*clear showing*" that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without a preliminary injunction, (3) the balance of equities favor a preliminary injunction, and (4) an injunction is in the public interest. *Kennedy v. Fresenius Med. Care N. Am.*, No. 11-cv-3738, 2012 WL 4378165, at *2 (D. Md. Sept. 24, 2012) (Blake, J.); *see also Accident, Injury & Rehabilitation, PC v. Azar*, 943 F.3d 195, 201 (4th Cir. 2019).[11] "All four of these requirements must be established independently before injunctive relief

---

[10] Internal quotation marks, alterations, and citations have been omitted from quotations throughout.

[11] The Government claims that, because it is the Government, it should not have to show irreparable injury to obtain a preliminary injunction. Mot. at 29. As discussed below, that is wrong. *See infra* at 21–22.

can be granted." *Marshall v. Roderick*, No. 16-cv-814, 2016 WL 3181759, at *1 (D. Md. June 8, 2016) (Blake, J.). This is a heavy burden. Here, however, the burden is even heavier because of the disfavored relief the Government seeks.

*First*, the Government seeks to upend the *status quo,* not preserve it. The *status quo* is that Booz Allen has agreed to purchase EverWatch, and the parties continue to operate separately consistent with the Agreement's express terms and standard "gun-jumping" rules until closing. *See generally Pashby v. Delia,* 709 F.3d 307, 319–20 (4th Cir. 2013) (describing *status quo*). That remains the state of play unless and until the Proposed Transaction closes. Here, however, the Government expressly seeks to abrogate the Agreement, which would not maintain the *status quo* but upend it. This amounts to a "mandatory" preliminary injunction. *Microsoft Corp. Antitrust Litig.*, 333 F.3d at 526. Mandatory injunctions are "in any circumstance disfavored, and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994); *accord SH Franchising, LLC v. Newlands Homecare, LLC*, 18-cv-2104, 2019 WL 356658, at *2 (D. Md. Jan. 29, 2019) (Blake, J.). To obtain one, the Government must meet a "heightened standard" showing that unusual "exigencies" justify such exceptional relief. *Dubon Miranda v. Barr*, 463 F. Supp. 3d 632, 651–52 (D. Md. 2020) (Blake, J.), *rev'd on other grounds* 34 F.4th 338 (4th Cir. 2022).[12]

*Second*, abrogation would kill the Proposed Transaction and therefore is permanent relief masquerading as a preliminary injunction. Such requests are also disfavored. *See Hester v. French*, 985 F.3d 165, 176 n. 39 (2d Cir. 2021) (requiring a heightened showing "where the injunction being sought will provide the movant with substantially all the relief sought and that relief cannot

---

[12] Because any injury resulting from a mandatory preliminary injunction "is a *judicially* inflicted injury," courts are "particularly hesitant to grant an injunction altering the status quo." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975, 977 (10th Cir. 2004) (*en banc*) (emphasis added).

be undone even if the defendant prevails at a trial on the merit"). A mandatory preliminary injunction is justified only to *enable* the Court to enter ultimate relief, but here, the Government's abrogation request would *disable* that ability—the preliminary injunction would operate as a pocket veto and the case would be moot long before the Government's proposed trial date. *See Microsoft Corp. Antitrust Litig.*, 333 F.3d at 526.

The Government cannot meet its burden under any standard but particularly the heightened standard applicable here.

## I. The Government is unlikely to succeed on the merits.

### A. The rule of reason applies.

Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). For many years, the rule of reason has been the "accepted standard for testing" a § 1 claim. *Id.* Under this methodology, the Government "has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). If it makes this showing, the burden shifts to Defendants to show a procompetitive rationale. *Id.* If Defendants make that showing, the burden shifts back to the Government to show "the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

Unable to satisfy this presumptively valid antitrust test, the Government asks the Court to apply the seldom-used "quick-look" (or "inherently suspect") analysis. Mot. at 16. In other words, the Government wants this Court to eliminate (1) the Government's burden to define a valid economic market and (2) show anticompetitive effects in that market—burdens it cannot meet here. *See 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 115 (2d Cir. 2021). Courts have frequently (and appropriately) rejected the Government's requests to shirk its burden through such shortcuts.

*See, e.g.*, *id.* at 116 (rejecting a similar request by the FTC to apply quick-look analysis). This Court should too.

A quick-look approach "is appropriate only where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *FTC v. Actavis*, 570 U.S. 136, 159 (2013) (rejecting quick-look analysis). That means, as the Government itself has recognized, this "rare" standard is *not* appropriate where the agreement "may indeed provide procompetitive benefits and promote interbrand competition." DOJ Corrected Statement of Interest at 17, *Stigar v. Dough Dough, Inc.*, No. 2:18-cv-00244 (E.D. Wash. Mar. 8, 2019), ECF No. 34; *see 1-800 Contacts*, 1 F.4th at 115 ("[I]f an arrangement might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition, more than a 'quick look' is required."). Moreover, this standard is limited to situations where the judiciary has "amassed considerable experience with the type of restraint at issue and can predict with confidence that it would be invalidated in all or almost all instances." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2156 (2021).

Everything about this case is the *opposite* of a quick-look case. Here, the Government seeks to (1) establish a novel rule—with far-reaching implications—that Section 1 is violated the moment potential competitors sign an acquisition agreement because of allegedly reduced "incentives" to compete aggressively and (2) "abrogate" an Agreement that the Government does not (and cannot) dispute will bring needed competition, better service, and efficiencies *across multiple, far more significant opportunities*.

Indeed, the Government's sole argument for its quick-look analysis is that the Agreement is somehow an illegal "*de facto* profit-pooling agreement." Mot. at 17. For this, the Government relies on a 54-year-old decision—since superseded by statute—where the Supreme Court

condemned a 25-year agreement, entered into by two separate corporate entities, not to compete, to fix prices, *and* to pool profits. *Id.* (citing *Citizen Pub. Co. v. United States*, 394 U.S. 131, 134 (1969)). Put differently, the parties in *Citizen Publishing* had effectively formed a decades-long cartel. Unsurprisingly, no court has ever relied on *Citizen Publishing* for the proposition that the mere signing of a merger agreement between competitors is an illegal "profit pool" that *ipso facto* violates Section 1. Anyone with even the most "rudimentary understanding of economics" would recognize that an acquisition agreement is not an illegal agreement to fix prices or pool profits. *See Actavis*, 570 U.S. at 136.[13] Yet, under the Government's flawed logic, *most* horizontal merger agreements would be suspect.

This Court should reject the Government's attempt to shoehorn this case into a quick-look analysis. The Government must instead satisfy the rule of reason.

**B. The Government's theory that a single transaction with a single purchaser at a single moment in time is a relevant market fails as a matter of law and fact.**

To prevail under the rule of reason, the Government must establish a properly defined, relevant economic market. This market must encompass "the area of effective competition." *Am. Express*, 138 S. Ct. at 2285; *see Therapearl, LLC v. Rapid Air Ltd.*, No. 13-cv-2792, 2014 WL 4794905, at *7 (D. Md. Sept. 25, 2014) (Blake, J.) (explaining cross-elasticity of demand). Properly defining an economic market is critical because "[w]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Am. Express*, 138 S. Ct. at 2285. For this reason, the failure to allege a properly defined economic market is fatal to a rule-of-reason Section 1 claim. *See id.*; *Therapearl*, 2014 WL 4794905, at *7 (dismissing antitrust claim for failure to establish a relevant product market).

---

[13] In fact, courts have refused to apply quick-look analysis to *actual* profit-pooling agreements that fall short of *Citizen Publishing*'s levels of egregiousness. *California ex rel Harris v. Safeway, Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011) (en banc) (refusing to apply quick look to an agreement between competitors to share revenues during a labor dispute).

Here, the Government claims the market is limited to the end of the bidding process for OD. Compl. ¶ 31. This proposed market is thus narrowed to a single consumer (NSA), a single transaction (OD), at a single snapshot in time (the final bidding stage). The Government has triply gerrymandered the economic market all to support its "merger to monopoly" theory. *See* Compl. ¶ 15. If the real market is any broader than the final stages of the OD procurement, then the Government's theory collapses—it is undisputed that the market includes over a dozen competitors other than Booz Allen and EverWatch, nothing close to a monopoly.

Courts—including this one—have rejected single-transaction markets as impermissibly narrow. *See, e.g.*, *Therapearl*, 2014 WL 4794905, at *7 (Blake, J.). This principle applies equally to the government-contract setting. *See, e.g.*, *Triple M Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242 (2d Cir. 1985) (rejecting single-government-contract market); *United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 924–25 (N.D. Ill. 2015) (same). For example, in *Havoco of America, Ltd. v. Shell Oil Co.*, the Seventh Circuit rejected an attempt to define the market in a Section 1 case to "a single [government] contract with a single purchaser" as too narrow, explaining that "there must be some allegation of a harmful effect on a more generalized market." 626 F.2d 549, 558 (7th Cir. 1980).[14]

Nonetheless, the Government claims that because NSA will impose some specific requirements related to "simulation and modeling" services in the yet-to-be-issued RFP, OD alone is a "market." *See* Compl. ¶ 34. But, under the Government's logic, every RFP—in which customers state their individual preferences for the products or services they wish to procure—is

---

[14] The Government's cited authorities on this issue are unpersuasive. *See* Mot. at 20–21. *Grumman Corp. v. LTV Corp.*, 527 F. Supp. 86, 89 (E.D.N.Y. 1981) and *Compact v. Metro. Gov't of Nashville & Davidson Cty.*, 594 F. Supp. 1567, 1571 (M.D. Tenn. 1984) did not involve *single-transaction* markets. *Tower Air, Inc. v. Fed. Exp. Corp.*, 956 F. Supp. 270, 281–82 (E.D.N.Y. 1996) explained that a single government contract *could* be a relevant market but then did not determine whether it was. And in *Northrop Corp. v. McDonnell Douglas Corp*, 705 F.2d 1030, 1055 (9th Cir. 1983), the parties did not dispute the relevant market.

a "market." The law says otherwise. "[T]he preferences of a single purchaser cannot define a product market." *City of New York v. Grp. Health Inc.*, No. 06-cv-13122, 2010 WL 2132246, at *4 (S.D.N.Y. May 11, 2010); *see Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) ("The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but commodities reasonably interchangeable by consumers for the same purposes."); *Int'l Logistics Grp., Ltd. v. Chrysler Corp.*, No. 85-cv-73005, 1988 WL 106905, at *7 (E.D. Mich. Apr. 8, 1988) (rejecting attempt to structure the relevant market around the U.S. government's specialized needs and explaining that "it is always possible to find *one* consumer who will behave differently from the norm"); *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.) (explaining that, although a consumer may choose "Pepsi because she prefers the taste, or NBC because she prefers 'Friends,' . . . Pepsi is one of many sodas, and NBC is just another television network").[15]

For example, in *Group Health Inc.*, the City of New York challenged a merger between two health insurers, claiming that they had monopolized the market for "low-cost health care" being provided as part of the City's health-insurance program. 2010 WL 2132246, at *3–4 (S.D.N.Y. May 11, 2010). The court concluded that this proposed market was improperly defined by the City's needs, policy preferences, and purchasing constraints. *Id.* at *4–5. As the court explained: "the law is . . . clear that the preferences of a single purchaser cannot define a product market." *Id.* at *4. "Because the City has defined the relevant market solely with regard to its own

---

[15] Nor are the "[p]urchasing constraints on a single consumer," including those of a government agency, sufficient to narrow the market to a single transaction. *See Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366, 368 (10th Cir. 1993); *accord Lockheed Martin Corp. v. Boeing Co.*, 314 F. Supp. 2d 1198, 1229 (M.D. Fla. 2004).

preferences as a purchaser of health insurance, its market definition is inadequate as a matter of law." *Id.* at *5. So too here.

As this Court has previously held, a valid economic market must include those products that are reasonably interchangeable for another. *See Therapearl*, 2014 WL 4794905, at *7. Yet, the Government's own submissions show that a market defined solely around OD excludes reasonably interchangeable services and personnel. First, even though Booz Allen has been the sole prime contractor for the contracts preceding OD (MASON I, II, and III), the Government's NSA declarant still considered more than 100 companies to be capable of servicing OD. ECF No. 29-3 ¶ 6. The same declarant also asserts that "[a] significant delay [in issuing OD's RFP] likely would result in a loss of skilled contractor individuals to other projects." ECF No. 29-3 ¶ 10. Put differently, the personnel needed for OD could instead be used for other government projects. Both these obvious facts reveal the implausibility of a market limited to OD alone. *See Therapearl*, 2014 WL 4794905, at *8 (rejecting single-transaction market in part for failing to justify the exclusion of potential substitute products).

The Government's proposed market would also fail under the Government's own "hypothetical monopolist test." *See* 2010 Horizontal Merger Guidelines § 4.1.1 ("Merger Guidelines"); *United States v. Am. Express Co.*, 838 F.3d 179, 198–99 (2d Cir. 2016).[16] Under that test, a proposed market is only valid if a hypothetical monopolist could *profitably* impose a small but significant and non-transitory increase in price in the proposed market. *See Am. Express Co.*, 838 F.3d at 198–99. The Government's proposed market fails this test for the following reasons.

Federal regulations—including the FAR—require the NSA to consider the bidder's "past performance" and "the prices at which same or similar items have previously been sold." *See* FAR

---

[16] Although its motion makes no mention of this test, the Government's Complaint relies on it. Compl. ¶ 34.

§§ 15.305(a)(2)(i), 15.404-1b(1). This means that Booz Allen's prior contracts with NSA limit its pricing freedom in OD. Similarly, if Booz Allen or EverWatch's proposal were overpriced or failed to meet NSA's expectations, it would impair their ability to obtain future NSA projects. In this way, a hypothetical monopolist could not *profitably* impose a small but significant and non-transitory price increase in a market limited to OD. *See* Merger Guidelines § 4.1.1 n.4 (noting the test can consider whether "the merging firms sell products outside the candidate market that significantly affect their pricing incentives for products in the candidate market"). The market is thus broader than the Government claims.

But even if a valid economic market could be limited to a single transaction related to a single customer, the Government goes even further and tries to limit the market to a single snapshot in time. There is no justification for that limitation. As the Government's own filings recognize, *at least 14 companies indicated initial interest in being named prime contractor on this procurement*. ECF No. 29-3 ¶ 6. Even if Booz Allen and EverWatch end up being the only companies to submit bids at the finish line, that does *not* mean they were the only companies running the race. There is simply no basis to limit the "market" to the moment right before the winner is declared.

At bottom, what the Government "takes issue with is not a lack of competition in a *market*, but a lack of competition with respect to one *customer* and one *contract*." *Neptun Light, Inc. v. City of Chicago*, No. 17-cv-8343, 2018 WL 1794769, at *4 (N.D. Ill. Apr. 16, 2018). That is not enough. "[T]here must be some allegation of a harmful effect on a more generalized market than a single purchaser and a single contract." *Id.* Otherwise, *every* transaction becomes a market.[17]

---

[17] Were the Court to endorse the Government's theory, it would be inviting antitrust suits from every failed bidder for every government bid. If every government contract is an economic "market," every successful bidder is a monopolist. That is one reason courts reject single-transaction markets. *E.g., Havoco*, 626 F.2d at 558; *Triple M*, 753 F.2d at 246.

**C.    The Government has failed to show substantial anticompetitive effects.**

The Government's case also fails because it cannot show "a substantial anticompetitive effect" that harmed consumers in an economic market. *Am. Express*, 138 S. Ct. at 2284.

**1.    The Government's incentives theory is legally unprecedented and baseless.**

The Government's theory is that the Agreement's mere existence incentivizes Defendants to compete less vigorously for OD and thus, violates Section 1 of the Sherman Act. As discussed below, this is factually false. But even if it were not, the mere *incentive* to do something anticompetitive does not violate Section 1.[18] Indeed, there is an ever-present economic incentive for competitors to fix prices and share the resulting supracompetitive profits. But companies do not do so because it is a crime. 15 U.S.C. § 1. Instead, an actual *agreement to restrain trade* is required to violate Section 1. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) (explaining that an "agreement" requires "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement"). It is unsurprising, then, that the Government cites *no* case where Section 1 has been used to abrogate a merger agreement between competitors pre-closing because of "incentives" alone.[19]

A fundamental flaw in the Government's argument is that the law already authorizes the Government to obtain remedies if Booz Allen and EverWatch engage in unlawful pre-close coordinated conduct—also known as "gun jumping." *See generally United States v. Flakeboard*

---

[18] *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) and *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) are not to the contrary. *See* Mot. at 24. In considering the coercive effects of an exclusive-dealing arrangement, the courts in those cases explained that the short-term or at-will nature of the agreement was offset by the economic incentive to maintain the agreement. *Dentsply*, 399 F.3d at 193–94; *ZF Meritor*, 696 F.3d at 286–87. They have nothing to do with the Government's theory here. Their relation to this case begins and ends with the use of the phrase "economic incentive."

[19] In fact, the few courts to have considered it have rejected attempts to use Section 1 to challenge a merger agreement at all. *See Omnicare, Inc. v. UnitedHealth Group, Inc.*, 594 F. Supp.2d 945, 962 (N.D. Ill. Jan. 16, 2009) (rejecting argument that a merger agreement constituted a Section 1 violation); *Int'l Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389, 1397–98 (8th Cir. 1993) (suggesting that, under Supreme Court precedent, entities that have agreed to merge but have yet to do so are *incapable* of committing a Section 1 violation).

*Am. Ltd.,* No. 3:14-cv-04949, 2015 WL 12656838 (N.D. Cal. Feb. 2, 2015) (consent decree requiring an antitrust compliance program and preventing parties from undertaking certain pre-close conduct with a prospective merger partner). As the Government has acknowledged, "[t]he [HSR Act's] waiting period seeks to ensure that the parties to a proposed transaction are preserved as independent entities while the reviewing agency . . . investigates the transaction and determines whether to challenge it." Compl. ¶ 3, *id.* (N.D. Cal. Nov. 7, 2014), ECF No. 1. The HSR Act's prohibition on gun jumping is self-executing.[20]

Here, the Government does not and cannot allege that Defendants have engaged in any gun-jumping activity. *See* Compl. To the contrary, Booz Allen and EverWatch have committed to protections above and beyond the best practices the Government itself has agreed were sufficient in other merger cases.[21] The Government's contention that the mere existence of a merger agreement can be anticompetitive upends this carefully calibrated regime in favor of an unbounded prosecutorial tool.

---

[20] Press Release, Dep't Just., QUALCOMM AND FLARION CHARGED WITH ILLEGAL PREMERGER COORDINATION (Apr. 13 2006), *available at* https://www.justice.gov/archive/opa/pr/2006/April/06_at_220.html (explaining that "merging parties must continue to operate independently until the end of the premerger waiting period"); *Suspensory Effects of Merger Notifications and Gun Jumping - Note by the United States* (Nov. 27, 2018) ("OECD Report"), *available at* https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competition-fora/gun-jumping_united_states.pdf ("Firms that fail to observe the statutory waiting period—for example, by beginning to coordinate business activities prior to consummation of their merger—may be liable for gun-jumping.")

[21] DOJ has entered several consent decrees with parties it alleges have violated the gun jumping laws. In multiple decrees over the past several years, the DOJ has enumerated activities that are acceptable for merging parties to undertake pre-close, not least of which is allowing merger agreements themselves to exist. These consent decree provisions draw stark contrast with the notion of "abrogation" which would needlessly destroy several, lawful terms in the parties' Agreement. *See, e.g.*, *Flakeboard Am. Ltd.*, 2015 WL 12656838 (consent decree allowing parties to, going forward, enter merger agreements that require the counterparty to continue operating in the ordinary course, refuse to engage in conduct that would create a material adverse change in the value of the target or any assets, conduct or participate in reasonable due diligence).

2.	**The Government's incentives theory is irreconcilable with the actual incentives present here.**

Even if "incentives" alone could violate Section 1, the Government has the incentives backwards, ignoring the many incentives for Defendants to compete vigorously for OD regardless of the Proposed Transaction.

*First,* at the firm level, Booz Allen and EverWatch have every incentive to provide NSA with the best offer possible regardless of whether there are other bidders. In the government-contracting business, reputation is critical. Booz Allen has been offering important services to the U.S. government for nearly a century and performed work broadly in the cyber sector for decades. Booz Allen has a decades-long partnership with NSA, has serviced numerous NSA projects, and hopes to service more NSA contracts in the future, the revenues from which are worth billions of dollars. The best-case revenues from OD are a small fraction of that.[22] Booz Allen would not put its reputation and these revenues at risk over any contract—let alone one relatively minor contract—by offering a bad deal.[23] Nor would EverWatch risk upsetting its ▮▮▮ customer, NSA. ECF No. 35-5 at 6. As the Supreme Court has recognized, "[g]overnment contractors—especially cutting-edge defense contractors . . . are repeat players . . . . [who] have strong incentive to behave rather than risk missing out on the next multibillion-dollar defense contract." *Gen. Dynamics*, 563 U.S. at 491.

*Second*, neither Booz Allen nor EverWatch can count on the Proposed Transaction closing. Obviously, the Proposed Transaction must receive antitrust clearance—something the Government is actively and aggressively opposing. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[22] Further, as the Government concedes, Booz Allen's only thinks EverWatch has a ▮▮▮ of winning OD. Compl. ¶ 46. The idea that it would pay ▮▮▮▮▮ now just to lock up a ▮▮▮▮▮ contract that it thinks it will win anyway is absurd.

[23] Because Booz Allen has been servicing OD's predecessor contracts for two decades, it would be easy for NSA to spot a bad deal.

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ In large mergers-and-acquisition

transactions, including this one, there is inherent uncertainty until the deal is closed. The

Government's Motion ignores this uncertainty.

*Third,* the actual Booz Allen and EverWatch employees who are preparing their respective

company's bid are highly incentivized to win OD. As to Booz Allen, these employees have been

working on NSA projects side-by-side with NSA personnel for decades on the predecessor

contracts to OD. They have spent a significant amount of time, energy, and resources to prepare a

strong and competitive bid. The idea that these employees would give anything less than their very

best is unsubstantiated and, frankly, offensive. There is similarly no evidence that EverWatch

employees are individually incentivized not to compete. To the contrary, the members of the bid

team will receive sizable bonuses if they win. The Government's theory ignores the incentives of

the *individuals* who will actually put the OD bids together.

More fundamentally, the Government's incentives theory ignores the realities of a highly

regulated and structured government procurement process that effectively imposes guardrails on a

contractor's proposal. As discussed above, OD is a ████████████████ contract. Thus, under the

FAR, bidders are required to submit their expected costs to staff the contract as part of their

proposal. Unlike other kinds of contracts (like Firm Fixed Prices contracts), profit cannot be built

into the costs that can be recovered, which include, for example, the salary to be paid the employee,

the cost of providing employee benefits, and firm overhead. Additionally, the contract personnel

proposed for the contract are submitted in response to "Labor Categories," which are defined by

NSA and indicate the qualifications and experience desired by the agency.

During the period of performance, NSA will reimburse the winning contractor only for the costs incurred to perform the contract. Profit paid to the contractor, if any, is determined at NSA's discretion based on factors related to performance. The award fee on OD is expected to be anywhere from ███████ of the total cost to perform the work. Further, NSA can exercise control over the quality of the services provided under OD. As discussed *supra*, ████████████ ████████████████████████████████████████████ And, through a standard level-of-effort clause, the NSA likely would be able to retroactively reduce any award fee if it determines that Booz Allen or EverWatch provided less than 90% of the level of effort required under the contract. 48 C.F.R. § 1552.211-73(c). Contrary to the Government's suggestion, NSA possesses a powerful array of tools that impact pricing and quality and Booz Allen and EverWatch are contractually unable to simply charge whatever price they want.[24]

### 3. The Government cannot show "actual detrimental effects."

The Government's supposed "actual detrimental effects," Mot. at 17, are illusory. Actual detrimental effects include "reduced output, increased prices, or decreased quality in the relevant market." *Am. Express*, 138 S. Ct. at 2284. None of that is present here. Instead, the Government offers a handful of emails taken out of context, and one clause of the Agreement that is no longer operative.

*First*, the Government points to an email-exchange between an EverWatch subcontractor and an EverWatch employee, in which the subcontractor asks if the Proposed Transaction would impact the OD bid. The employee responded:

---

[24] In fact, the Government's own cited case recognizes that "the Federal Acquisition Regulations protect against anti-competitive conduct in government procurement." *Tower Air*, 956 F. Supp. at 281. Also, notably, although the Government relies heavily on a declaration from NSA in its Motion, that declaration is most notable for what it does *not* say. NSA does not say that it opposes the Proposed Transaction, nor does it contest the numerous procompetitive benefits Defendants have identified.

ECF No. 29-4. In an effort to manufacture a smoking gun, the Government states that this email exchange shows that EverWatch's employee "realized [that] vigorous competition . . . would be undesirable . . . so he actively took steps consistent with EverWatch's reduced incentive to compete aggressively." Mot. at 18. But a benign statement by an uninformed employee to put pencils down until he could learn more is hardly remarkable, much less anticompetitive. Further, the facts immediately following the Agreement also confirm a commitment to competition. As the Government knows (but did not disclose to this Court), just days after the Agreement, EverWatch told its team members it was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. G.

*Second*, the Government attempts to conjure evidence of anticompetitive effects from Defendants' efforts to *accommodate the Government* during settlement discussions aimed at avoiding this litigation. For example, to address the Government's concerns, Booz Allen suggested ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ECF No. 29-5 (emphasis added), and EverWatch suggested that perhaps it could hand off the prime-contractor role to a different company.[25] These good-faith efforts at compromise were neither "audacious" nor "ominous." Mot. at 3. And efforts by private parties to resolve the Government's concerns without resorting to a lawsuit should not be condemned as evidence of anticompetitive animus. *See Janvey v. Romero*, 883 F.3d 406, 415 (4th Cir. 2018) ("The law encourages voluntary settlement of disputes.").[26] In any event, neither proposal was implemented.

---

[25] The suggestion that an internal brainstorming discussion regarding what was effectively a pre-suit settlement offer would be better had ▮▮▮▮ is similarly unremarkable. *See* Mot. at 3; ECF No. 29-5.

[26] In fact, Defendants' attempts to settle their disputes with the Government are likely exempt from antitrust liability under the *Noerr-Pennington* doctrine, which protects the First Amendment right to petition the government. *A.D.*

*Third*, the Government points to ██████████████████████████████████████ ███████████████████████████████████████████████████████ Such clauses—like clauses requiring sellers to continue paying employees, remitting their taxes, and keeping up physical facilities—are common in merger agreements. *See Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 594 F. Supp. 2d 945, 963–64 (N.D. Ill. 2009). The Government itself has confirmed: "In the time between concluding the merger agreement and closing the merger, the buyer has a widely recognised [sic] legitimate interest to preserve the asset value of the target." OECD Report ¶ 69. Accordingly, "[b]uyers can be granted veto rights regarding certain acts which allow them a certain amount of effective control over the target." *Id.*

In any event, Booz Allen executed a waiver of ████████ as it relates to OD to resolve the Government's concern. ECF No. 49-1. So, this too is irrelevant. *Omnicare*, 594 F. Supp. 2d at 962–64 (rejecting a Section 1 challenge to an almost identical merger-agreement provision in part because a subsequent letter clarified that the challenged provision did not apply to the relevant context).[27]

**D.** **Even if the Government had showed anticompetitive effects, they are offset by procompetitive benefits that cannot be achieved through any other means.**

Procompetitive benefits include improving competition, enhancing service, and stimulating innovation. *Moultrie v. Nat'l Women's Soccer League, LLC*, 541 F. Supp. 3d 1171, 1181 (D. Or. 2021). Here, as discussed above, Booz Allen and EverWatch have complementary skills. Through the Proposed Transaction, Booz Allen will increase its technical capabilities

---

*Bedell Wholesale Co. v. Philip Morris, Inc.,* 104 F. Supp. 2d 501, 506 (W.D. Pa. 2000), *aff'd*, 263 F.3d 239 (3d Cir. 2001).

[27] Even if the Government could eventually show that the OD bids were higher, this alone would be insufficient to state a Section 1 claim. A price increase to a single transaction is not enough; a plaintiff must show a detrimental effect *on an economic market* as a whole. *1-800 Contacts*, 1 F.4th at n.11 ("[S]howing that a price for certain keywords dropped is not direct evidence of the effect on the *market as a whole*."); *Havoco*, 626 F.2d at 558 ("[T]here must be some allegation of a harmful effect on a more generalized market.").

(particularly in cloud computing and migration as well as software development). Indeed, Booz Allen pursued the Proposed Transaction following discussions with government leadership to acquire and develop nimble and innovative solutions. This will immediately yield improved services to government agencies like NSA, including in OD itself.

Moreover, OD is but one part of how NSA and other national-security agencies accomplish their signals-intelligence mission. They also rely on numerous, far larger, contracts that have long been dominated by entrenched firms like Lockheed Martin and Raytheon (which are, each, four to six times larger than Booz Allen). The purpose and effect of the Proposed Transaction is to make Booz Allen more competitive for these larger opportunities. In fact, Booz Allen has identified *fourteen* such opportunities, collectively worth *billions* of dollars. The value of these opportunities—and the value to the market of making them more competitive—dwarf OD. These procurements—not the relatively small OD procurement—are the driving force behind the Proposed Transaction.

The Government does not really dispute these benefits, but its myopic focus on the supposed incentives in OD has caused it to miss the forest for the trees. Once other related opportunities are considered, it is undisputed that the procompetitive benefits of the Proposed Transaction greatly exceed any plausible anticompetitive effects relating to OD.

Nor are there any less restrictive means that could achieve these benefits. The Government says in its Motion that Booz Allen could just buy someone else. Mot. at 27. But the Government does not even suggest *the same procompetitive benefits* can be achieved by purchasing someone else—or who that "someone else" is. The benefits are unique to the Proposed Transaction. The Government's suggestion to the contrary is sheer speculation and insufficient to meet its burden of demonstrating a less-restrictive alternative.

## II.    The Government has not shown that it will suffer irreparable injury without a preliminary injunction.

### A.    The Government must show irreparable injury.

Seeking yet another shortcut, the Government argues that, because it is the Government, it need not show irreparable injury. It is mistaken. For support, the Government cites a case where the court held that the *Federal Trade Commission* did not need to show irreparable injury to obtain a preliminary injunction. Mot. at 29 (citing *In re Sanctuary Belize Litig.*, 409 F. Supp. 3d 380 (D. Md. 2019)). But that is because the statute authorizing the FTC to seek a preliminary injunction expressly eliminates the irreparable-injury requirement. 15 U.S.C. § 53(b).[28] The same cannot be said of the statute authorizing *the DOJ* to seek injunctive relief. *United States v. Gillette Co.*, 828 F. Supp. 78, 80 (D.D.C. 1993) (holding that, because the DOJ, rather than the FTC, brought a merger challenge, the court would apply the "fundamental four-part preliminary injunction standard").

The Government also argues that 15 U.S.C. § 4 obviates the need for it to show irreparable injury. Mot. at 29. This argument is inconsistent with Supreme Court precedent (which the Government fails to mention, much less address). Although Congress can alter the traditional standard for equitable relief, it must do so clearly. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[W]e do not lightly assume that Congress has intended to depart from established principles [of equitable relief]."). And rather than alter traditional equitable principles, the Supreme Court has long held that § 4 is governed by the same principles that apply to any claim for equitable relief. *Appalachian Coals v. United States*, 288 U.S. 344, 377–78 (1933); *De Beers Consol. Mines v. United States*, 325 U.S. 212, 218–19 (1945). Indeed, although it ultimately did

---

[28] Specifically, the statute lists every factor *but* irreparable injury.

not need to resolve the issue, in *United States v. Microsoft Corp.*, the D.C. Circuit expressed skepticism of the Government's argument here for the same reasons. 147 F.3d 935, 943 (D.C. Cir. 1998). Requiring the Government to show irreparable injury is also consistent with the extraordinary nature of its requested relief. *See also In re Microsoft*, 333 F.3d at 530 (explaining that the irreparable-injury requirement works "to limit the deployment of the heavy artillery of preliminary injunctive relief").

**B.     The Government cannot show irreparable injury.**

The Government must show that it is "suffering actual and imminent harm, not just a mere possibility" and that such harm "is truly irreparable." *SH Franchising, LLC*, 2019 WL 356658, at *5 (Blake, J.). It has failed to do so.

For the reasons discussed above, the Government has not shown that *any harm* is likely to occur in this case, much less immediate or irreparable harm.[29] Further, the Government's alleged harm is too speculative to support a preliminary injunction. The Government's entire theory rests on the idea that the Agreement's very existence creates a definitive change in Defendants' downstream economic incentives. But the Government has offered no evidence that Defendants *agreed with one another* to engage in anticompetitive conduct or that any anticompetitive conduct will ever occur. To the contrary, the rational incentives are for Booz Allen and EverWatch to compete vigorously. Not to mention, the Government's theory rests on the idea that there will be only two bidders for OD (Booz Allen and EverWatch). As discussed above, this is far from certain. *See supra* at 6. The Government's claimed harm is, at best, "a mere possibility," insufficient to justify a preliminary injunction. *SH Franchising, LLC*, 2019 WL 356658, at *5 (Blake, J.).

---

[29] In any event, the Government's claimed harm is fundamentally monetary and thus, as a matter of law, not irreparable. *E.g.*, *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017); *SH Franchising*, 2019 WL 356658, at *5 (Blake, J.).

Finally, because the Government is seeking to upend the *status quo*, it must show special "exigencies" "sufficiently demanding" to justify the extra-extraordinary relief the Government seeks. *See Miranda*, 463 F. Supp. 3d at 644, 651–52 (Blake, J.). Against that legal backdrop, the at-best-uncertain and at-worst-nonexistent harm the Government claims is particularly deficient.

## III. Neither equity nor the public interest favors a preliminary injunction.

Equity does not favor the Government's request. Practically, the Government's requested "preliminary" injunction would be permanent. The Government asks this Court to "abrogate" the Agreement. To "abrogate" means "[t]o abolish . . . to annul or repeal." *See Abrogate*, *Black's Law Dictionary* (11th ed. 2019). And courts have always understood abrogation to be permanent. *See, e.g.*, *Pan Am. World Airways, Inc. v. Boyd*, 207 F. Supp. 152, 157 (D.D.C. 1962) (indicating that the abrogation of a contract meant to "terminate," "revoke," or "cancel"; *Tango Transport, L.L.C. v. Transport Int'l Pool, Inc.*, 478 F. App'x 72, 75 (5th Cir. 2012) (indicating that abrogating contractual terms meant those terms were completely eliminated); *Thomas v. FireRock Prods., LLC*, 40 F. Supp. 3d 783, 790 (N.D. Miss. 2014) (equating "abrogate" with "destroy").

The Government's Motion confirms this is the case. The Government argues that it has a problem "[a]s long as . . . the merger is on the table." Mot. at 30. The only way to take the Proposed Transaction off the table is by ripping up the Agreement—which is precisely what the Government is asking this Court to do. This would permanently destroy the months of work and millions of dollars Defendants have spent in negotiating and executing the Agreement. It also would eliminate all the benefits the Proposed Transaction will provide.

The Government's blithe suggestion that Defendants could always "renew their abrogated Merger Agreement if they so choose" demonstrates the Government's lack of understanding about how mergers and acquisitions function in practice. *See* Mot. at 31. These agreements are incredibly time sensitive and complex. Just like the value of a house changes with time and market conditions,

so too does the value of a company and a deal to buy that company.[30] It would be virtually impossible for Defendants to "renew" the Agreement at some later date (which could be next year given the Government's proposed trial schedule). Even in the unlikely event that they could, it would not be the same deal—the underlying terms would undoubtedly change. *See Orlando v. CFS Bancorp, Inc.*, No. 2:13-cv-261, 2013 WL 5797624, at *6 (N.D. Ind. Oct. 28, 2013) (denying a request to preliminarily enjoin a merger because "enjoining a complex and time sensitive transaction [would] at a minimum create uncertainty and delay [that] could jeopardize the transaction itself" and may prove "irreparable").

Moreover, abrogation is unnecessary to resolve the singular concern the Government has identified: ensuring competition related to the forthcoming OD procurement. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 720 (4th Cir. 2021) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."). On top of compliance with all the gun-jumping rules, Defendants have taken a number of *additional* steps to alleviate any possible concern. Defendants have (1) delayed closing for 90 days (unless the Court rules sooner), (2) ceased all joint integration activities under the Agreement, (3) continued to ensure the parties' respective and separate procurement teams do not have access to each other's OD-related information, (4) eliminated access to the "data room," and (5) committed to not withdraw either of the parties' separate bids for the forthcoming OD procurement at any time, even after closing. ECF No. 49-1.

Courts have regularly relied on these types of commitments to deny injunctive relief. *See United States v. Culbro Corp.*, 436 F. Supp. 746, 754–59 (S.D.N.Y. 1977) (rejecting the

---

[30] Ashutosh Bhagwat, Modes of Regulatory Enforcement & the Problem of Administrative Discretion, 50 Hastings L.J. 1275, 1296 (1999) ("Many mergers, especially ones involving publicly traded companies, are often extremely time-sensitive since changes in reported profits or stock prices are likely to unravel any deal over time.").

Government's requested injunction as overbroad where a "hold separate" agreement would do the trick); *Nat'l Credit Reporting Ass'n, Inc. v. Equifax, Inc.*, 2008 WL 4457781, at *2 (D. Md. Sept. 30, 2008) (denying preliminary injunction in antitrust merger case in part because the defendant had agreed to suspend the relevant agreement for 90 days). The Government has, for decades, itself relied on "firewalls" and complementary remedies to resolve similar competitive concerns. For example, in *United States v. Raytheon*, No. 97-cv-02397, the Government entered a consent decree with the merging parties requiring them to establish firewalls and preserve the independence of their respective teams competing for a forthcoming government procurement.[31] Yet, in a stark departure from this standard practice, the Government now insists on nothing less than complete "abrogation" of the parties' Agreement.[32]

The public interest also disfavors a preliminary injunction. As discussed above, the Proposed Transaction will provide immediate and wide-ranging benefits to NSA and other government agencies, which will in turn provide critical national-security benefits to the country. Booz Allen and EverWatch have complementary skill sets. Through the Proposed Transaction, Booz Allen will be able to provide better services to NSA than either Booz Allen or EverWatch can on their own. The Proposed Transaction will allow Booz Allen to better compete against larger, entrenched firms that dominate other contracts with NSA. This will save NSA (and the taxpayer) money and increase the quality of those mission-critical services. The Government's requested relief would needlessly deprive the public of these benefits.

---

[31] *See* Final Judgment Part V.I, *available at* https://www.justice.gov/atr/case-document/final-judgment-155; *see also* Competitive Impact Statement, *United States v. Lehman Bros. Holdings, Inc.*, 1:98-cv-00796 (D.D.C. 1998) (establishing firewalls to preserve competition between the merging parties in defense-contract context).

[32] The purpose of a mandatory preliminary injunction is to preserve the court's ability to enter ultimate relief. *Microsoft Corp. Antitrust Litig.*, 333 F.3d at 526. The fact that the Government's requested relief would do the opposite is yet another reason to deny it.

## CONCLUSION

For the foregoing reasons, this Court should deny the Government's Motion for a Preliminary Injunction.

*/s/ Todd M. Stenerson*

Todd M. Stenerson (Bar No. 14194)
David A. Higbee (Bar No. 30364)
Ryan A. Shores (admitted *pro hac vice*)
Adam B. Schwartz (Bar No. 30358)
Matt Modell (admitted *pro hac vice*)
Jacob M. Coate (Bar No. 30355)
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
todd.stenerson@shearman.com
david.higbee@shearman.com
ryan.shores@shearman.com
adam.schwartz@shearman.com
matt.modell@shearman.com
jacob.coate@shearman.com

Susan Loeb (admitted *pro hac vice*)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
susan.loeb@shearman.com

*Attorneys for Defendants Booz Allen Hamilton Holding Corp.*
*and Booz Allen Hamilton Inc.*

*/s/ Molly M. Barron*

Molly M. Barron (Bar No. 19151)
Amanda P. Reeves (admitted *pro hac vice*)
Marguerite M. Sullivan (admitted *pro hac vice*)
Anna M. Rathbun (admitted *pro hac vice*)
Christopher J. Brown (*pro hac vice* pending)

G. Charles Beller (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
molly.barron@lw.com
amanda.reeves@lw.com
marguerite.sullivan@lw.com
anna.rathbun@lw.com
chris.brown@lw.com
charlie.beller@lw.com

Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
Kelly S. Fayne (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
al.pfeiffer@lw.com
kelly.fayne@lw.com

*Attorneys for Defendants EverWatch Corp., EC Defense Holdings, LLC, and Analysis, Computing & Engineering Solutions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2022, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, and served one copy, by ECF to counsel of record in this matter.

*/s/ Todd M. Stenerson*

Todd M. Stenerson (Bar No. 14194)
Shearman & Sterling LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
todd.stenerson@shearman.com