**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| vs. | Case No. 1:22-cv-01603-CCB |
| BOOZ ALLEN HAMILTON INC., *et al.*, | |
| *Defendants*. | |

**<u>DEFENDANTS' PRE-HEARING BRIEF</u>**

# Table of Contents

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................5

ARGUMENT ....................................................................................................................10

    I.     DOJ's case fails on the merits..................................................................10

          A.    DOJ's case fails as a matter of law because it has not identified a valid economic market. ...............................................................11

          B.    DOJ has failed to show any anticompetitive effects, much less substantial ones. .......................................................................17

          C.    Even if the Proposed Transaction had any anticompetitive effects, its procompetitive benefits far outweigh any anticompetitive effects. ...........22

          D.    DOJ has not shown that Booz Allen could obtain the same procompetitive benefits, for the same price, through substantially less restrictive means. ...............................................................25

    II.    The Proposed Consent Judgment resolves any possible concern about the Proposed Transaction while preserving its procompetitive benefits. ...................27

    III.   DOJ has not—and cannot—show that it will suffer concrete, imminent, and irreparable injury without a preliminary injunction...............................................31

    IV.   Neither equity nor the public interest favors DOJ's requested relief....................31

    V.    The Court should enter final judgment in Defendants' favor. ..............................32

CONCLUSION...................................................................................................................34

# TABLE OF AUTHORITIES

*CASES*                                                                 **Pages**

*Abcor Corp. v. AM Int'l., Inc.*,
   916 F.2d 924 (4th Cir. 1990) ................................................................... 13

*Berlyn Inc. v. The Gazette Newspapers, Inc.*,
   73 F. App'x 576 (4th Cir. 2003) ............................................................... 11

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1954) ................................................................................. 33

*City of New York v. Grp. Health Inc.*,
   2010 WL 2132246 (S.D.N.Y. May 11, 2010) ........................................... 16

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ........................................... 2, 11, 17, 22

*FTC. v. H.J. Heinz Co.*,
   246 F.3d 708 (D.C. Cir. 2001) ........................................................... 23, 33

*FTC v. Alliant Techsystems Inc.*,
   808 F. Supp. 9 (D.D.C. 1992) .................................................................. 13

*FTC v. Penn State Hershey Med. Ctr.*,
   838 F.3d 327 (3d Cir. 2016) .................................................................... 17

*Gen. Dynamics Corp. v. United States*,
   563 U.S. 478 (2011) ................................................................................. 18

*Havoco of Am., Ltd. v. Shell Oil Co.*,
   626 F.2d 549 (7th Cir. 1980) ................................................................... 13

*It's My Party, Inc. v. Live Nation, Inc.*,
   811 F.3d 676 (4th Cir. 2016) ......................................................... 11, 12, 16

*Kennedy v. Fresenius Med. Care N. Am.*,
   2012 WL 4378165 (D. Md. Sept. 24, 2012) (Blake, J.) ............................. 10

*Leegin Creative Leather Prods, Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ................................................................................. 10

*In re Microsoft Corp. Antitrust Litig.*,
   333 F.3d 517 (4th Cir. 2003) .............................................................. 10, 31

*NCAA v. Alston*,
  141 S. Ct. 2141 (2021) ...................................................................................Passim

*In re NCAA Grant-In-Aid Cap Antitrust Litig.*,
  958 F.3d 1239 (9th Cir. 2020) .................................................................... 25

*Ohio v. Am. Express*,
  138 S. Ct. 2274 (2018) ........................................................................... 10, 11

*Oksanen v. Page Memorial Hosp.*,
  945 F.2d 696 (4th Cir. 1991) ....................................................................... 16

*Orlando v. CFS Bancorp, Inc.*,
  2013 WL 5797624 (N.D. Ind. Oct. 28, 2013) ............................................. 31

*Peraton, Inc. v. Raytheon Co.*,
  2017 WL 11501665 (E.D. Va. Nov. 7, 2017) .............................................. 30

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
  104 F.3d 811 (6th Cir. 1997) ....................................................................... 22

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) .................................................................. 11, 16

*SH Franchising, LLC v. Newlands Homecare, LLC*,
  2019 WL 356658 (D. Md. Jan. 29, 2019) ................................................... 31

*Siegler v. Sorrento Therapeutics, Inc.*,
  2019 WL 581719 (S.D. Cal. Feb. 13, 2019) ............................................... 12

*State v. Saint Francis Hosp.*,
  2000 WL 1804194 (S.D.N.Y. June 30, 2000) ............................................. 30

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  988 F.3d 690 (4th Cir. 2021) ....................................................................... 32

*Therapearl, LLC v. Rapid Air Ltd.*,
  2014 WL 4794905 (D. Md. Sept. 25, 2014) .......................................... 11, 13

*Triple M Roofing Corp. v. Tremco, Inc.*,
  753 F.2d 242 (2d Cir. 1985) ........................................................................ 13

*United States ex rel. Blaum v. Triad Isotopes, Inc.*,
  104 F. Supp. 3d 901 (N.D. Ill. 2015) .......................................................... 13

*United States v. Cont'l Can Co.*,
  378 U.S. 441 (1964) ..................................................................................... 12

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ................................................................. 11

*United States v. Stone Canyon Indus. Holdings, LLC*,
   No. 1:21-cv-01067 (D.D.C. Apr. 22, 2021)...............................................29

*United States v. United Techs. Corp.*,
   No. 1:20-cv-00824 (D.D.C. Mar. 26, 2020) ......................................29, 30

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ................................................................. 19

*Viamedia v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020) ......................................................... 22

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   2022 WL 595156 (E.D. Va. Feb. 24, 2022) ........................................... 12

*Zunum Aero, Inc. v. Boeing Co.*
2022 WL 2116678 (W.D. Wash. June 13, 2022) ...................................... 12

**STATUTES**

15 U.S.C. § 18........................................................................... 33

## INTRODUCTION

The United States Department of Justice ("DOJ") hastily filed this case based on a series of flawed assumptions regarding Booz Allen's proposed purchase of EverWatch (the "Proposed Transaction"). DOJ initially denounced Defendants' Purchase Agreement as a "scheme" to monopolize a small government procurement ("OD") that "only prompt action by this Court can stop." ECF No. 29-1 at 1. DOJ now admits there was no such "scheme." ECF No. 100 at 12 n.16 ("This is not what the United States argues."). DOJ also demanded "prompt" judicial action, claiming that the OD Request for Proposals ("RFP") was "imminent," the RFP's content was set, and only Defendants could compete, meaning Defendants' Proposed Transaction is a "merger to monopoly." *See* ECF No. 29-1 at 1. But in reality, NSA's witnesses testified ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████. Given these realities, the notion that the government faces imminent risk of irreparable harm defies reason.[1]

---

[1] Due to DOJ's discovery violations, Defendants were forced to re-depose two key NSA witnesses today. During one of those depositions this afternoon, the NSA witness testified ████████████████████████

████████████████████████████████████████████

██████████████████ad Defendants not taken this deposition, they would not have known these facts, because DOJ did not produce ███████████████ ████████ documents. Nor did DOJ update their interrogatory responses. Nor did DOJ give Defendants' counsel in advance of this deposition a courtesy heads up this might be happening. They hid the ball. Defendants plan to address these new developments in a forthcoming letter but do not have time to change their previously written pre-hearing brief to account for these developments.

As the evidence shows, Booz Allen paid ████████ for EverWatch to enhance innovation and to compete more effectively for over a dozen procurements across multiple government agencies valued at billions of dollars, challenging entrenched incumbents at NSA and elsewhere. Booz Allen did not pay ████████ to "monopolize" a small, five-year, NSA contract worth less than ████████ in annual profits. That would make no sense. Given the Proposed Transaction's *benefits* to competition across numerous government contracts and the lack of any realistic harm to competition on OD, it is hardly surprising that NSA has expressed *no concern* with this merger. Ex. B at 207:2–9 ██████████████████████ As one NSA witness noted ██████████████████████████████████████ █████████████████████████████. Ex. D at 26:16–25; 31:20–23.

Even though discovery has hollowed out its case, DOJ has nevertheless charged ahead. As DOJ's economist, Dr. Chicu, describes it, DOJ's theory is now nothing more than this: ██ ████████████████████████████████████████████ ██████████████████████ Ex. E at 9. But "[t]heorizing about conceivable impairments of competition does not, of course, *prove that any such impairment has occurred or is likely*." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 207 (4th Cir. 2002) (emphasis added).[2] Establishing a § 1 violation requires, *inter alia*, DOJ to show that competitive "harm is not only possible but likely and significant." *Id.* at 206. DOJ has no such proof.

DOJ and Dr. Chicu have ignored *all countervailing incentives* for Booz Allen and EverWatch to compete aggressively for OD *regardless of the Agreement*. These incentives include uncertainty around whether the deal will close and the importance of the parties' reputations with NSA and the federal government (and compliance with applicable federal acquisition regulations),

---

[2] Internal quotation marks, citations, and alterations have been omitted throughout.

with whom they have an ongoing relationship. Given the countervailing incentives to compete aggressively, and NSA's power and regulatory control of the bidding process, there is simply nothing to be gained and a lot to lose if Defendants tried to treat NSA unfairly on OD. Likely for these reasons, Dr. Chicu offers no opinion that ██████████████████████████ ████████ Ex. F at 208:20–209:2.

Apart from DOJ's myopic theorizing, DOJ has *no evidence* that Defendants changed anything about their conduct around OD or are likely to do so. Defendants collectively turned over 28,000 documents, and DOJ deposed ten of Defendants' employees involved in the Proposed Transaction and OD. After all that, it appears that in a case supposedly about "firm-level" incentives, the most DOJ could come up with are a handful of documents from lower-level employees working on OD (and firewalled off from the Proposed Transaction) in the aftermath of the Proposed Transaction's announcement expressing uncertainty about what the Proposed Transaction meant for OD. *See* Ex. E ¶¶ 46–49. ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████.[3] That makes sense. For the OD capture-team employees, their jobs and livelihood depend on winning OD. *See* Ex. G at 147:4–7 (testifying that ██████████████████████████████████ "). Indeed, even Dr. Chicu could only cite these ██████████████████████████████

---

[3] Ex. G at 118:9–12 ████████████████████████████████████ ████████████ ; *id.* at 125:20–126:07; Ex. H at 240:1–241:7 ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Ex. I at 221:1–222:1 ██████████████████████████████████ ████████████████████████████████████████ *id.* at 228:4–12.

3

████████████████████████████████████████████████████ Ex. E ¶ 46. But identifying one incentive that could, alone, reduce competition does not show a Sherman Act violation. Rather, DOJ must show that, when the Court considers all of the parties' incentives and actual conduct, anticompetitive effects are actually *likely*. There is no such evidence.

Finally, DOJ's proposed market definition, on which its "merger to monopoly" and "incentive" claims are based, has no foundation in law or economics. DOJ's rationale for structuring an economic market around a single transaction, with a single consumer, at a single point in time has always come down to a claim about NSA's idiosyncratic preferences. The law has always prohibited such maneuvers as legally and economically baseless. If a single customer's preferences as to a particular transaction gave rise to a "market," then every transaction would itself be a market. The evidentiary and economic reality is that dozens of firms provide modeling-and-simulation services to dozens of government agencies on dozens of procurements every year. And the NSA witness whose declaration DOJ proffered in support of its supposed market, *see* ECF No. 29-3, instead testified that ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ Ex. B at 196:16–22.

There is no evidentiary basis to support DOJ's theoretical concern with the Proposed Transaction. But even if there were, it would not support DOJ's extreme remedy—killing the deal. As this Court well knows, DOJ has backed away from the language associated with its proposed remedy. DOJ initially asked this Court to "abrogate" the Agreement, ECF No. 29-1 at 3, but DOJ has now sheepishly attempted to rephrase "abrogation" as a mere "temporary suspension" to mask the extraordinary nature of its request. ECF No. 100 at 2. Semantics aside, DOJ wants this Court to void the Agreement. DOJ's suggestion that Defendants might somehow come together again to

revive their Agreement months or a year down the road reveals just how little DOJ understands about a complex merger agreement and the economics underlying its request.

Although DOJ's case is meritless, if the Court is inclined to grant some relief, it should enter Defendants' Proposed Consent Judgment. It structurally guarantees robust continued competition; it is modeled off of consent judgments DOJ has previously agreed to; and it preserves the procompetitive benefits inherent in the Proposed Transaction.

## BACKGROUND

*The Parties.* Booz Allen is a 108-year-old consulting firm with extensive analytics, digital, engineering, and cyber experience with approximately 30,000 employees and $8.4 billion in annual revenue.[4] The U.S. government is by far Booz Allen's largest and most important client— making up over 95% of Booz Allen's revenue. Booz Allen has a longstanding relationship with NSA, supporting NSA's mission to combat threats to national security. Ex. D at 177:2–23; Ex. A at 19:7–13.

Although Booz Allen has had success in obtaining procurement opportunities with NSA's ███████ group, it has struggled to win opportunities with NSA's ███████ group away from larger firms like Lockheed Martin. *See* Ex. J at 78; Ex. K at 218:12–219:12; 220:16–221:22.

EverWatch—████████████████████████████████ ████—has important and complementary software-development skills, ███████████ ████████████████████████ ECF No. 29-10 at 1; ECF No. 29-11 at 4. At the same time, EverWatch's upside is limited because EverWatch is too small to compete for large contracts against much larger entrenched incumbents but is no longer qualified to bid as a

---

[4] *Available at* https://www.boozallen.com/content/dam/boozallen_site/esg/pdf/slick_sheet/booz-allen-hamilton-fact-sheet.pdf.

small business. *Compare* Ex. L at 60:7–61:25 (███████████████████████████

████████████████████████████████████████████████

████████████████ with *id.* at 139:16–141:15 (█████████████████████████

██████████████████████████████████

   ***The Proposed Transaction.*** In March 2022, Booz Allen agreed to acquire EverWatch for

approximately ███████. *See* ECF No. 29-14.[5] ████████████████████████████

████████████████████████████████, Booz Allen believed that EverWatch's

technological and other assets would allow Booz Allen to compete more effectively for numerous

government opportunities, within and outside NSA. Ex. M at 600–03. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ *Id.; see also* Ex. K at 220:21–221:12. One specific example is

████████████████████████████████████████████████

████.[6] *See* Ex. M at 593. Indeed, shortly after the Proposed Transaction was announced, ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ Ex. BB.

---

[5] The Agreement provides that the closing is contingent on the satisfaction or waiver of a comprehensive package of conditions, including requirements that ███████████████████

████████████████████████████████████████████████

████████████████████ ECF No. 29-14 §§ 9.01–9.02.

[6] OD is mentioned in some of the materials leading up to the Proposed Transaction, which is hardly surprising. But there is *no* evidence that the Proposed Transaction was *motivated by* OD. Nor would that make sense: Booz Allen paid ███████ to acquire EverWatch; OD is worth (at best) less than ███████ in profit.

NSA has made clear that it needs innovative solutions and technological advancement to support its mission. Ex. B at 65:17–22. And NSA recognizes that one way for companies to accelerate their capabilities faster than they could alone is through buying other companies. *Id.* at 67:10–15.

**Optimal Decision.** OD is the follow-on procurement to a series of NSA contracts known as MASON I, II, and III, all of which involve providing modeling-and-simulation services on NSA's systems. Modeling and simulation involves the " █████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████ Ex. B at 24:12–16. This is not unique to NSA but is a █████████████ ████████████████████████████████████████████ *Id.* at 25:2–3; 192:19–193:18.

OD is expected to be a " █████████████████████ ." Ex. D at 26:16–25; 31:20–23). At present, it is expected to be structured ███████████████████████████████████████████ ████████ *Id.* at 150:23–25. Booz Allen could only earn a maximum of ███████████████████ ████████████████████████████████████████ OD is thus worth a fraction of either the other government opportunities Defendants expect to pursue ██████████████████████ ) or the Proposed Transaction's value █████████████ ).

At this point, according to NSA witness testimony, ████████████████████████████ ████████████████████████ . NSA was expected to release the RFP ████████████████████ ███ . ECF No. 93-3 at 32 (referring to OD as "MASON IV"). But NSA has repeatedly delayed the RFP, instead choosing to extend the duration of the existing contract (MASON III) with Booz Allen. Ex. N at 4–6 ██████████████████████████████████████████████████ ████████████████████████████████████████████ ). ████████████████████████████ ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. *Id.* If past is prologue, there is nothing to suggest that schedule

will hold. As one NSA employee colorfully put it: ████████████████████████████████

████████████████████████████████████████████████████ Ex.

C at 100:11–100:19; *see also id.* at 86:17–6:22 ████████████████████

████████████████████████████████████████████████████

████████████████████; Ex. A at 34:4–35:25 (stating

████████████████████

The RFP's content is likewise in flux, and ██████████████████████████████.

*See, e.g.,* Ex. B at 44:5–9; 167:22–168:19; 212:6–213:20. These changes could alter the

competitive landscape. Ex. A at 117:16–118:8 (███████████████████████████████

████████████████████████████████ In the words of one NSA witness, ██████████████

██████████ Ex. C at 131:13–14. Another stated, ████████████████████████████████

██████████████████████ Ex. A at 47:11–21.

Finally, the ultimate *competition* for OD is unknown. At this point, Booz Allen and

EverWatch both plan to submit bids for OD, whenever the RFP is released. Although it is unclear

if other firms will bid, as one NSA witness put it, ████████████████████████████████████

████████████████████████ Ex. C at 67:14–67:20; Ex. A at 37:15–18 (stating other companies

could submit bids to OD).

Indeed, in October 2020, NSA identified 178 companies with the likely capability to

service OD, ECF No. 29-3 ¶ 6; *see also* Ex. C at 64:10–64:16, and 15 companies expressed an

interest in bidding. Ex. R. Further, ███████████████████████████████████████████



██████████████████████████████████████████. Ex. S at 52:6–53:16 ████

███████████████████████████████████████████████████████

██████████████████████████████████ Ex. R; Ex. A at 57:8–58:6 (████████

███████████████████████████████████████████████

Although Booz Allen and EverWatch are the only firms that ███████████████

████████ Ex. U at 4529, a letter of intent is not a prerequisite to submitting a bid. Ex. A at

37:12–18; 72:21–73:3. A competitor can still emerge and bid for OD, depending on the actual

contents of the yet-to-be-issued final RFP. *See* Ex. H at 142:16–143:8; Ex. V at 87:13–25; Ex. K

at 179:9–19 ████████████████████████████████████████████████████

███████████████████████████████████████████").

   ***The Proposed Transaction and OD.*** As the timelines of OD and the Proposed Transaction

show, the OD RFP's timing (continuously delayed ████████ and *still* not out) and the Proposed

Transaction have nothing to do with each other—any relationship is pure happenstance. Booz

Allen's decision to pursue EverWatch was made at the senior-most levels of the company earlier

this year and was driven by a company-wide strategy to improve innovation and compete more

aggressively for ██████████████ in procurements across the government. Wholly apart from this

strategic initiative, earlier this year, a set of operational employees were continuing to prepare for

OD, a small, often-delayed procurement worth about ████████ in annual profit (in this case, award

fee) over five years.[7]

   The disconnect between these initiatives is demonstrated by the documents DOJ now relies

on, ███████████████████████████████████████████████████████████

---

[7] Additionally, as the current incumbent, with decades of experience with NSA, Booz Allen's
capture team determined it was already likely to win OD.



. For example, DOJ has relied heavily on a

Ex. W.

ECF No. 93-8. Both Booz Allen and EverWatch made clear that it would be "business as usual" on OD. Ex. K at 163:15–164:2; *see also supra* n.3.

As of today, Booz Allen and EverWatch remain separate entities, continue to compete separately, and plan to submit separate bids for OD once the RFP is released. Ex. I at 255:2–9

## ARGUMENT

A preliminary injunction is an "extraordinary" remedy, "granted only sparingly and in limited circumstances." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003). To obtain one here, DOJ must make a "*clear showing*" that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without a preliminary injunction, (3) the balance of equities favors a preliminary injunction, and (4) an injunction is in the public interest. *E.g.*, *Kennedy v. Fresenius Med. Care N. Am.*, No. 11-cv-3738, 2012 WL 4378165, at *2 (D. Md. Sept. 24, 2012) (Blake, J.). Here, DOJ has failed to establish any one of these factors, much less all four.

## I.      DOJ's case fails on the merits.

DOJ seeks a preliminary injunction under Section 1 of the Sherman Act, which prohibits only "*unreasonable* restraints" of trade. *Ohio v. Am. Express*, 138 S. Ct. 2274, 2283 (2018). The "accepted standard for testing" a § 1 claim is the rule of reason. *Leegin Creative Leather Prods.*,

*Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).[8] Under the rule of reason, DOJ must first establish (1) a relevant economic market and (2) that the Agreement has or will likely have a "substantial anticompetitive effect" in that economic market. *Am. Express*, 138 S. Ct. at 2284; *Dickson*, 309 F.3d at 206 (holding that the plaintiff must show that "harm is not only possible but likely and significant"). If DOJ demonstrates that substantial anticompetitive effects in a relevant market are likely, the burden shifts to Defendants to show that the Agreement has procompetitive benefits that outweigh any anticompetitive effects. *Am. Express*, 138 S. Ct. at 2284. The burden then shifts back to DOJ to show that the same benefits could be achieved for the same cost in a substantially less restrictive way. *See id.*; *NCAA v. Alston*, 141 S. Ct. 2141, 2160–61 (2021).

### A. DOJ's case fails as a matter of law because it has not identified a valid economic market.

"Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Am. Express*, 138 S. Ct. at 2285. The failure to establish the relevant market is dispositive.[9] *See id.*; *Therapearl, LLC v. Rapid Air Ltd.*, No. 13-cv-2792, 2014 WL 4794905, at *7 (D. Md. Sept. 25, 2014) (Blake, J.).

The relevant product market includes the product at issue along with other products "reasonably interchangeable by consumers for the same purpose." *United States v. E.I. du Pont de*

---

[8] When DOJ filed its preliminary-injunction motion—claiming the Agreement was a "scheme" to buy-off competition for OD—it asked this Court to apply the rarely-used "quick-look" standard instead. ECF No. 29-1 at 16. But in its reply brief, DOJ abandoned its allegation of a "scheme," ECF No. 100 at 12 n.16, and gave short-shrift to the quick-look standard, *id.* at 5. In any event, for the reasons outlined in Defendants' Response Brief, any suggestion that the quick-look standard applies here is absurd. *See* ECF No. 93 at 13–15. The Agreement is a far cry from a "profit-pooling" arrangement, if DOJ even continues to make that allegation. *See* ECF No. 93 at 13–15; *see also* Ex. Z ¶¶ 46–47 ██████████████████████████████████████ ).

[9] Although DOJ's preliminary-injunction motion is limited to § 1, ECF No. 29-1 at 4 n.5, DOJ's failure to establish a relevant market is also fatal to its § 7 claim, and thus DOJ's entire case. *Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 584 (4th Cir. 2003).

*Nemours & Co.*, 351 U.S. 377, 395 (1956); *accord It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016). Importantly, "[t]he test for a relevant market is not commodities reasonably interchangeable by *a particular plaintiff*, but commodities reasonably interchangeable *by consumers* for the same purposes." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (emphasis added); *see also It's My Party*, 811 F.3d at 683 (4th Cir. 2016) (rejecting attempt to define a relevant market around consumers' stated preferences rather than the interchangeability of product characteristics). Products need not be *fungible* to be in the same product market. *United States v. Cont'l Can Co.*, 378 U.S. 441, 449 (1964); *accord In re Zetia (Ezetimibe) Antitrust Litig.*, --- F. Supp. 3d ---, 2022 WL 595156, at *3 (E.D. Va. Feb. 24, 2022).

Here, DOJ—which has decided to challenge the Proposed Transaction solely because of its purported impact on the OD bidding process—conveniently alleges that the relevant market is "the sale of signals intelligence modeling and simulation services to NSA through the OPTIMAL DECISION contract." ECF No. 1 ¶ 30. Or, as Dr. Chicu puts it, ███████████████  ████████ Ex. E ¶ 14. This triply gerrymandered market—limited to a single transaction (OD), with a single consumer (NSA), at a single moment in time (the bidding process)—fails as a matter of law.

First, DOJ's alleged market does not exist. As discussed above, the OD RFP, which will define the services at issue, has not yet been released, and its contents are unknown. *See supra* at 1. This is "fatal" to DOJ's case—"[i]f there is no extant product market, then it necessarily follows that there is no viable anti-trust claim." *Siegler v. Sorrento Therapeutics, Inc.*, No. 3:18-cv-01681, 2019 WL 581719, at *12 (S.D. Cal. Feb. 13, 2019). Even if a product is alleged to be in "development," if it does not yet exist, a product market cannot be structured around it. *Zunum Aero, Inc. v. Boeing Co.*, 21-cv-0896, 2022 WL 2116678, at *1, 9 (W.D. Wash. June 13, 2022).

Second, although DOJ's proposed "OD services" market "suits the needs of plaintiff[]," it "casts sound economics aside." *It's My Party*, 811 F.3d at 683. DOJ's approach is "akin to defining a market to include tennis players who have won more than three Olympic gold medals and finding that only Venus and Serena Williams fit the bill." *Id.* As the Fourth Circuit has recently explained, "[n]o party can expect to gerrymander its way to an antitrust victory without due regard for market realities." *Id.*

Courts—including this one—have rejected single-transaction markets as impermissibly narrow. *See, e.g.*, *Therapearl*, 2014 WL 4794905, at *7 (Blake, J.). This principle applies equally to the government-contract setting. *See, e.g.*, *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir. 1980); *Triple M Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242 (2d Cir. 1985); *United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 924–25 (N.D. Ill. 2015). To hold otherwise would turn every contract into its own market and turn antitrust law into nothing more than a business tort—something the Fourth Circuit has long rejected. *E.g.*, *Abcor Corp. v. AM Int'l., Inc.*, 916 F.2d 924, 931 (4th Cir. 1990). Again, § 1 only prohibits *substantial* restraints on trade; an effect on a single contract does not cut it. *See Havoco*, 626 F.3d at 558 ("[T]here must be some allegation of a harmful effect on a more generalized market than [a single contract with a single government agency].").

Only a handful of district courts have *ever* endorsed single-transaction markets. Those rare cases are readily distinguished. Those contracts were not service contracts, like OD, where the "product" is primarily providing staffing for various projects and tasks. Further, the products at issue in those cases were so unusual that only the U.S. government would—or legally *could*—buy the product and only needed one contract to do so—things like tank ammunition, *FTC v. Alliant Techsystems Inc.*, 808 F. Supp. 9, 11 (D.D.C. 1992), or as DOJ postulates, a "nuclear warship."

ECF No. 100 at 7. Modeling-and-simulation services—which, as one NSA witness explained, simply involves providing staff to " ███████████████████████████████████ ███████████████████████████████████████████████████████," Ex. B at 24:12–16—are not unique to the U.S. government, much less NSA. Nor do they bear any resemblance to building a nuclear warship.

The evidence is undisputed that modeling-and-simulation services are purchased by numerous entities in addition to NSA (including private firms and other government agencies) *and* that numerous entities aside from Booz Allen and EverWatch provide such services. *See, e.g.*, Ex. Y. For example, ███████████████████████████████████████ ████████████████████████████████. Ex. Z ¶ 21; Ex. AA. Public records show that, since 2020 alone, 11 U.S. agencies (other than NSA) issued modeling-and-simulation contracts to 32 companies. Ex. Z. And where a firm does not have employees capable of performing these services, it can hire them or form teams with them— ████████████████████ Ex. I at 51:17–52:1.

DOJ suggests that "signals intelligence" modeling-and-simulation services are somehow a "specialized" and distinct service. ECF No. 100 at 8. But the evidence shows there is nothing about modeling-and-simulation for a signals-intelligence network that justifies making OD a market of one. Diane Dunshee—the NSA witness that DOJ relied on for its purported "market"— testified that ███████████████████████████████████████ ████████████████████████████████." Ex. B at 192:19–193:18. She explained ███████████████████████████████████████████████ ████████████████████████████████. Ex. B at 24:17–

14

25:6.[10] She also testified ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████.” Ex. B at 197:16–198:21.

Further, NSA has ██████████████████████████████████████

██████████████████████████████.” Ex. C at 114:1–115:16; *see also id.* at

117:18–21 (████████████████████████████████████████████

█████████████████████████████████ And one NSA employee

testified as to ██████████████████████████████████████████

███████” Ex. B at 212:20–22. This too rebuts DOJ's suggestion that there is something

"specialized" about modeling and simulation in the signals space that would justify making it a

separate and singular "market." ECF No. 100 at 10. Although DOJ has repeatedly tried to obscure

OD's content with a national-security gloss, the evidence reveals something far more ordinary. *See*

Ex. I at 34:3–34:5 (█████████████████████████████████████████

Of course, modeling-and-simulation services must always be *applied to* a particular

environment—here, that environment is NSA. But applying a service to a particular customer's

environment, and according to that customer's demands, happens all the time—whether in

modeling and simulation or painting someone's house.[11] But no one would say "painting Sally

---

[10] ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Ex. B at 24:17–25:6.

[11] In fact, the NSA witness ██████████████████████████████████

████████████████████████ Ex. C at 73:18–74:16. This leads to one of two conclusions. Either the fact

that the modeling and simulation will be done on NSA's systems is not a defining product

Jones's bungalow at 123 Main Street" is an economic "market." In the same way, it makes no sense to say that applying a ubiquitous service—modeling and simulation—to NSA's domain is its own economic "market."

The law comports with common sense. As the *en banc* Fourth Circuit explained, the plaintiff's "preference alone does not justify excluding other [products] from the relevant market definition." *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) (explaining further that a "narrow market definition" structured around the plaintiff's preference "violate[d] a fundamental tenet of antitrust law"); *see also It's My Party*, 811 F.3d at 683 (rejecting attempt to define a relevant market around consumers' stated preferences alone). Simply, "the preferences of a single purchaser cannot define a product market." *City of New York v. Grp. Health Inc.*, No. 06-cv-13122, 2010 WL 2132246, at *4 (S.D.N.Y. May 11, 2010); *see* ECF No. 93 at 16–18 (collecting cases rejecting such attempts).[12] DOJ cannot properly structure a relevant product market around NSA's idiosyncrasies.

Nor can DOJ's proffered economic expert, Dr. Chicu, rescue DOJ's faulty market definition. Dr. Chicu draws the boundaries of his market so narrowly that it "████████ ████████████████████████████████████████ Ex. Z ¶ 18 (emphasis added). Dr. Chicu purported to support his ██████████" market with his own variation of the hypothetical

---

characteristic—████████████—or it is *such* an important product characteristic, that only Booz Allen can offer it. If it is the former, DOJ's market is wrong. If it is the latter, then the EverWatch acquisition does not matter; Booz Allen would be buying a firm that does not compete in DOJ's alleged market.

[12] In an oft-cited antitrust case, the Third Circuit rejected a plaintiff's argument that the relevant market should be limited to Domino's approved pizza ingredients and supplies because they were *contractually obligated* to use such products. *Queen City*, 124 F.3d at 437–38. Rather, it held that a court must look beyond a particular plaintiff to "consumers in general" when determining whether other products are reasonably interchangeable. *Id.*

monopolist test.[13] Under this test, "if a hypothetical monopolist could impose a small but significant non-transitory increase in price ('SSNIP') in the proposed market, the market is properly defined. If, however, consumers would respond to a SSNIP by purchasing the product from outside the proposed market, thereby making the SSNIP unprofitable, the proposed market definition is too narrow." *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016). Yet, Dr. Chicu never actually analyzed whether a price increase by Booz Allen would be *possible*—given the government regulations discussed below—or whether such price increase could be *profitable*—as required by hypothetical monopolist analysis. *See* Ex. E; *see also* Ex. X at 55:13–18 ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ Because DOJ has defined a legally and economically invalid market, its case fails.

### B. DOJ has failed to show any anticompetitive effects, much less substantial ones.

DOJ has no evidence to support likely anticompetitive effects. There are no documents reflecting a change in the price, quality, or substance of the parties' likely bids. Instead, DOJ's claim to effects rests on (1) a theory, grounded in Dr. Chicu's opinion, that there is some "incentive" to compete less aggressively, Ex. E ¶¶ 38–42, and (2) a handful of emails immediately following the announcement of the Proposed Transaction that, according to Dr. Chicu, show a "recognition" of the incentive, *Id.* ¶¶ 46–49. Neither shows "harm that is not only possible but likely and significant." *Dickson,* 309 F.3d at 206.

---

[13] In fact, Chicu did not do a hypothetical-monopolist analysis as it is defined under the DOJ's own guidelines; indeed, he did no prospective quantitative analysis at all. *See* Ex. F at 169:1–4 ████████████████████████████████████████████████████████████ ); *see also id.* at 170:21–22 ████████████████████████████████████████████████████████████

**1. DOJ's incentive theory does not support likely anticompetitive effects.**

DOJ's theory is based on one "directional" shift in incentives—nothing else. Ex. F at 210:14–18 ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████ As Dr. Chicu put it, the incentive to compete became, in some unquantified way, less than it was before the Agreement was signed. Ex. E at 9. But for multiple reasons, one incentive—viewed in isolation—does not mean anticompetitive conduct or effects are likely here.

<u>First</u>, Dr. Chicu did not consider (or opine on) ████████████████████████████ ████████ Again, DOJ must show that substantial anticompetitive effects are *likely*. With that context in mind, a shift in an incentive only matters if it changes the *net* calculus and thus makes it likely that someone would act on that incentive. If someone is offered $1 to jump in a shark tank, that $1 increases the person's incentive, but only marginally and not sufficiently to induce action. Or, as Defendants' economic expert, Dr. Bailey, put it:



Ex. Z ¶ 9. So too here: even if the prospect of the Proposed Transaction had some, unquantified effect on Defendants' overall incentives, there is *no* indication that it could outweigh the countervailing incentives to compete aggressively that Dr. Chicu and DOJ ignore.

18

As the Supreme Court has explained, defense contractors—like Defendants—are "repeat players" with the federal government; they "have a strong incentive to behave rather than risk missing out on the next multibillion-dollar defense contract." *Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 491 (2011); *see also* Ex. D at 177:13–15 ████████████████████████████████ ████████████████████████████ NSA witnesses confirmed that a firm's reputation is important to its ability to obtain future contracts. *See* Ex. B at 126:20–127:3. As EverWatch's CEO put it: ████████████████████████████████████████████████████████████████ ████████████████████████████ Ex. L at 112:21–24.

Defendants simply would not undertake the reputational risk of offering an inflated price or inferior service on OD, particularly given how little is at stake. The OD contract is small: the total profit *possible* on OD is just ██████████████████████. That means, as Defendants' expert (Dr. Bailey) showed, the incremental gain that Booz Allen or EverWatch could achieve by "overcharging" NSA is tiny—████████████████. Ex. Z ¶ 40. Even if that "overcharge" could be achieved in the face of all the tools at NSA's disposal, it is implausible to think that Booz Allen or EverWatch would risk their reputations for so little possible gain.

Moreover, as the evidence makes clear, those who will craft the OD bids (whenever the RFP comes out) are personally incentivized to win for their respective teams. For example, █ ████████████████████████████████████████████████████ Ex. L. at 214:10– 15. On the other hand, one Booz Allen witness testified that ██████████████████████ █ *See* Ex. G at 147:4–7.

Finally, neither Booz Allen nor EverWatch can assume the Proposed Transaction will close. The Agreement has several closing conditions that must be met. *See* ECF No. 93 at 22–23 (describing closing conditions). It is well known that complex deals fall apart for all sorts of

reasons. Accordingly, each Defendant has the incentive to proceed under the assumption that the agreement will not close.

Second, the supposedly incentivized action—higher prices or lower quality in the OD bids—is not realistic given NSA's buying power and the regulatory and contracting tools at its disposal. "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue," including "the significance of regulation." *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004). Here, NSA has many tools to control competition, ensure it receives a fair price, and obtain the highest quality. *See generally* Ex. Z ¶¶ 6–7 (discussing the regulatory requirements and NSA tools to manage bids).

For example, the NSA bid process here apparently will include ███████████████



████████████████████████ Ex. D at 54:19–56:5. Moreover, under federal regulations, NSA *cannot* award OD unless it certifies that the winning bid offers "a fair and reasonable price." Ex. B at 40:8–19. NSA also apparently intends to use a "██████████████" structure. Ex. D at 150:23–25. ███████████████████ ███████████ *Id.* ████████████████████ ████████████████████████████ ███████████ Ex. B at 54:4–15. Thus, NSA is able to *continuously* ensure that it is incentivizing and obtaining high-quality services under OD.

Finally, NSA does not have to accept a "bad" bid, as DOJ seems to suggest. NSA can negotiate a better price with an existing bidder. Ex. B at 105:4–21. NSA also can reopen the bidding process and change aspects of the RFP to encourage more bidders. For example, at present,

████████████████████████████████████

████████████████████. Ex. R. ████████████████████████████████████

████████████████████ Ex. A at 117:16–118:8.

Thus, even if the Agreement did somehow change one of Defendants' incentives, and even if that change were material, considering NSA's available tools and the regulatory environment, there is no reason to think that any anticompetitive effect is likely.

**2.   DOJ's handful of documents do not show likely anticompetitive effects.**

Although DOJ's theory is based on a supposed "firm" or "corporate"-level incentive, Ex. F at 233:19–22, DOJ apparently will rest its case on a handful of emails and messages from lower-level, capture-team employees immediately following the Proposed Transaction's announcement. But there is no evidence that any *action* was taken to change any bids, the bidding approach, or the preparation for OD. And no such action is likely because, as *every* employee testified, they have been instructed by corporate leadership to proceed with "business as usual." *See supra* at n.3.

For example, as discussed above, *supra* at 10, DOJ relies heavily on the "stand down" email from EverWatch capture-team employee ████████████████ the day after the Proposed Transaction was announced. ECF No. 29-1 at 2–3. But as discovery revealed, after receiving guidance from company leadership, ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ECF No. 93-8.

Likewise, Dr. Chicu has previously cited an email from a member of Booz Allen's capture team, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *See* Ex. E ¶ 47; *see also* Ex. CC. But Gosnell testified that ████████████████████████ ████████████████████████████████████████████████████████████.

 Ex. G
at 125:20–126:07. █████████████████████████████████████████████

█████████████████████████████████████████ *Id.* at 118:9–12; *see also id.* at 126:07 ("█
████████████████████████████████████████████

In total, the evidence is overwhelming and undisputed that, in the weeks and months following the Proposed Transaction's announcement, Booz Allen and EverWatch leadership firmly told their employees that they needed to proceed "business as usual" and compete vigorously for OD. That is exactly what they have been doing. *E.g.*, Ex. H at 240:1–241:7; Ex. I at 221:1–222:1; *id.* at 228:4–12. This is perhaps why Dr. Chicu could merely cite these documents for the proposition that some employees ████████████████████████████████████ ██████████████████████████████████████. Ex. E ¶¶ 46–49. These documents do not meet DOJ's burden of showing likely anticompetitive effects.[14]

### C. Even if the Proposed Transaction had any anticompetitive effects, its procompetitive benefits far outweigh any anticompetitive effects.

Under Section 1, the Court can consider a broad array of procompetitive benefits. As a leading treatise explains, "[c]ourts have recognized a wide range of justifications for restraints,"

---

[14] As the above shows, there is no "direct" evidence of likely anticompetitive effects. *AmEx*, 138 S.Ct. at 2285. Nor is there "indirect" evidence, which is proof of market power plus evidence that the challenged restraint harms competition. *Id.* As an initial matter, a predicate to showing "market power" is a valid market. For the reasons above, "OD services" is not a valid market. Further, "market power is the power to force a purchaser to do something that he would not do in a competitive market." *Dickson*, 309 F.3d at 207 n.17; *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 817 (6th Cir. 1997). Given NSA's buyer and regulatory power, Defendants have no power to force NSA to do anything. Finally, there are low barriers to entry to in any contrived "OD services" market. The evidence is overwhelming that many firms are capable of performing "OD services." *See supra* at 13–19. To the extent DOJ suggests firms are not able to bid on OD because of the *timing* of the RFP, that timing is highly uncertain and, in any event, completely in the control of NSA. *Id.*

including "justifications based on increasing output, creating operating efficiencies, making a new product available, enhancing product or service quality, widening consumer choice, and other factors." ABA, ANTITRUST LAW DEVELOPMENTS (EIGHTH), 8 Edition, Chapter 1 Restraints of Trade (collecting cases); *e.g.*, *Viamedia v. Comcast Corp.*, 951 F.3d 429, 478 (7th Cir. 2020) ("The procompetitive benefits typically recognized in antitrust law include evidence of higher output, improved product quality, energetic market penetration, successful research and development, cost-reducing innovations, and the like."). These benefits are precisely what Booz Allen's proposed acquisition of EverWatch will provide to NSA and other government agencies, and they offset any alleged anticompetitive effects of the Proposed Transaction.[15]

The Proposed Transaction will enable Booz Allen to compete more aggressively for numerous NSA and other contract opportunities beyond OD, as well as challenge the small set of four entrenched incumbents ████████████████████████████████ ████████████████████ who currently dominate competition for NSA's largest IT and systems development contracts. That will increase consumer choice and enhance innovation. Over the past decade, Booz Allen has been unable to completely threaten these larger incumbents on NSA IT capabilities contracts together █████████████████████. *See* Ex. M at 600–03. Booz Allen ultimately recognized that, to better compete for these contracts, it "██████████████ ████████████████████████████████████████████ Ex. DD at 48:4–7. Booz

---

[15] DOJ's preliminary-injunction request is based *solely* on § 1 of the Sherman Act, not § 7 of the Clayton Act. ECF No. 29-1 at 4 n.5. Nevertheless, recognizing that it cannot satisfy the § 1 standard, DOJ attempts to import concepts that courts have applied to mergers under § 7—namely, the concepts of "verifiable" and "merger-specific" synergies. *See* ECF No. 100 at 15 (citing, for example, *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 721 (D.C. Cir. 2001) (Section 7 merger challenge) and U.S. Dep't of Justice and Fed. Trade Comm'n Horizontal Merger Guidelines § 10 (2010)). These concepts do not apply under Section 1. Indeed, they are nowhere to be found in the very Section 1 cases that DOJ cites, *Alston*, 141 S. Ct. at 2160 and *Am. Ex.*, 138 S. Ct. at 2284, despite DOJ's misleading citations suggesting otherwise. *See* ECF No. 100 at 15–16.

Allen's proposed acquisition of EverWatch is one piece of Booz Allen's strategy for providing

NSA with a new and different value proposition for NSA's largest IT infrastructure contracts. As

further explained by Booz Allen's Chief Strategy Officer, together Booz Allen and EverWatch are

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████. *See* Ex. EE at 30:6-12;

*see also* Ex. M at 16–18.

The Proposed Transaction will also enhance competition for these and other government

contracts by allowing Booz Allen to scale up EverWatch's low-cost business model on Booz

Allen's larger platform. As the Government has repeatedly identified, Booz Allen has ████

███████████████████████████████████████. *See, e.g.*, ECF No. 29-1 at 8

███████████████████████████████████████████████████████████████████████

███████████████████████████; Ex. G at 54:16–18 (██████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████ But in arguing that Booz Allen's acquisition of EverWatch

would eliminate a low-cost competitor, the Government mischaracterizes the evidence. Booz

Allen's Chief Strategy Officer made clear during his deposition that the attraction of EverWatch's

low costs is "██████████████████████████████████████████████████████████

███████████████████████████████████████ Ex. EE at 44:14-16; *see*

*also* Ex. DD at 134:10–135:15 ("[████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████). In Booz Allen's post-closing integration planning documents,

███████████████████████████████████████████████████████. Ex. M at 25.

These procompetitive benefits, which will enable Booz Allen to compete more aggressively against entrenched incumbents for major NSA and other government agency contracts by offering greater innovation at lower cost, far outweigh the notional anticompetitive effects DOJ alleged. Indeed, DOJ has offered no evidence to refute these procompetitive benefits, and DOJ's witnesses have indicated their support for exactly these types of procompetitive changes. *See* Ex. B at 27:7–10 ████████████████████████████████ ████████████████████████████████████████████████ Ex. C at 164:22–165:5 ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████

### D. DOJ has not shown that Booz Allen could obtain the same procompetitive benefits, for the same price, through substantially less restrictive means.

If the plaintiff has shown anticompetitive effects and the defendant has shown procompetitive effects, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Alston*, 141 S. Ct. at 2160. This is a high burden. "Firms deserve substantial latitude to fashion agreements that serve legitimate business interests." *Id.* at 2163. And "courts should not second-guess degrees of reasonable necessity so that the lawfulness of conduct turns upon judgments of degrees of efficiency." *Id.* at 2161. After all, "a skilled lawyer will have little difficulty imagining possible less restrictive alternatives to most joint arrangements." *Id.* And false positives are "especially costly, because they chill the very procompetitive conduct the antitrust laws are designed to protect." *Id.* For these reasons, DOJ must establish "a significantly (not marginally) less restrictive means of achieving the same procompetitive benefits," *see id.* at 2164, "without

significantly increased cost." *In re NCAA Grant-In-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1260 (9th Cir. 2020), *aff'd* 141 S. Ct. 2141. It cannot do so.

As discussed above, the Proposed Transaction will allow Booz Allen to provide better services to NSA and other government agencies and allow Booz Allen to make more than a ▮▮▮ government procurement opportunities more competitive. Based on its detailed understanding of the market and after an exacting diligence process, Booz Allen concluded that the acquisition of EverWatch was Booz Allen's best chance for obtaining these procompetitive benefits and enhancing its ability to compete for NSA's largest contracts, as well as major contracts with other government agencies. Booz Allen's decision is precisely the sort of business judgment to which "antitrust courts must give [a] wide berth." *Alston*, 141 S. Ct. at 2163.

DOJ has offered no concrete evidence that Booz Allen can accomplish these benefits in any other way. Instead, DOJ simply speculates that Booz Allen could simply buy a different company or team with EverWatch to achieve the procompetitive benefits the Proposed Transaction will provide. ECF No. 100 at 16. DOJ's speculation belies reality.

First, as Booz Allen's Chief Strategy Officer put it: ▮▮▮▮▮ Ex. EE at 152:22. The procompetitive benefits of the Proposed Transaction hinge on the speed with which the acquisition can be accomplished because of the need to prepare for upcoming RFPs. Second, there must be a cultural and strategic fit. Companies like EverWatch are not widgets on a store shelf. Booz Allen "▮▮▮▮▮▮▮▮▮▮." Ex. EE at 27:18–19 (emphasis added). Many companies simply will not match Booz Allen's culture and strategic vision, as EverWatch does.[16]

---

[16] In fact, Booz Allen considered several potential acquisition targets before deciding to purchase EverWatch. Ex. DD at 141:22–142:3 ("As we went through the analysis we looked at others. Wave Strike was mentioned earlier, we looked at them.").

<u>Third</u>, DOJ grossly underestimates the complexity of teaming and ignores that teaming is limited to one-time procurement events. Teaming is a delicate dance where discussions start ██████████████████████████████████████████████████████████████████ ███████████████████████████████████████████. Ex. H at 100:9–12. By definition, teaming is structured around single opportunities. As a result, teaming does not incentivize the necessary investment to bring transformational procompetitive benefits across *numerous* transactions. DOJ's suggested alternatives are the exact sort of lawyer "second-guess[ing]" that the Supreme Court said is impermissible. *Alston,* 141 S. Ct. at 2160.

## II. The Proposed Consent Judgment resolves any possible concern about the Proposed Transaction while preserving its procompetitive benefits.

For the reason above, DOJ cannot satisfy the § 1 standard. Nevertheless, Defendants' main goal is to close their Proposed Transaction and capture the procompetitive benefits that will allow Booz Allen to offer enhanced services to the government and compete more effectively for more than a dozen procurement opportunities *other* than OD. Accordingly—as Defendants offered to DOJ—Defendants are willing to enter a Proposed Consent Judgment. *See* Ex. FF.

DOJ has identified a narrow concern: that the Proposed Transaction supposedly lessens a corporate-level incentive to compete vigorously for OD. *See* Ex. F at 80:3–5. DOJ's concern is also transient. ████████████████████████████████████. ECF No. 29-3 ¶ 9. According to DOJ's PI motion and NSA's head of procurements, this is the ████████████ ████████████ *Id.*; *see* ECF No. 29-1 at 30. Put differently, DOJ's concerns boil down to a ██ day window for a single, government opportunity.

Defendants' Proposed Consent Judgment strikes the right balance, resolving any possible concerns regarding OD while maintaining the undisputed procompetitive benefits that the Proposed Transaction offers. Specifically, the Proposed Consent Judgment would:

- Require the Booz Allen and EverWatch teams to remain structurally separate and independent competitors for OD. Ex. FF at 3.

- Ensure that decision-making authority for OD is vested solely with the independent, autonomous "capture" teams (the teams compiling the bids), so there is no need for approval from Booz Allen "corporate"—*i.e.*, management-level employees in the company. *Id.* at 3–4.

- Guarantee that each individual OD "capture" team will be sufficiently funded and staffed and will have autonomy from the rest of Booz Allen to determine the best bid. *Id.* at 3.

- Establish financial bonuses to the members of the winning capture team, financially incentivizing them to compete aggressively. *Id.* at 4.

- Guarantee that Booz Allen would stand by any bid ultimately chosen by NSA.

- Establish an antitrust compliance officer to ensure that the terms of the proposed consent judgment are met. *Id.* at 4.

Collectively, these provisions ensure that, even if Booz Allen's "corporate" or management-level employees had the incentive to compete less vigorously for OD to make more "profit"—something that the evidence does not support—they have no *ability* to act on that incentive.[17]

For decades, DOJ has used similar provisions to those in the Proposed Consent Judgment to resolve short-term concerns like those it identifies here. *United States v. Raytheon* presents a strikingly similar situation. No. 1:97-cv-02397 (D.D.C.). There, DOJ challenged Raytheon's decision to purchase Hughes Aircraft. In part, DOJ was concerned that Raytheon and Hughes were expected to be the only bidders for a yet-to-be-released Army request for proposal (the FOTT program). Compl. ¶ 28, *id.* (Oct. 16, 1997).[18] DOJ expressed concern that "[i]t would be very difficult for another firm to successfully enter the [bidding] competition at this stage" and that the

---

[17] Notably, Dr. Chicu testified that ██████████████████████████████████ ██████████████████████ *See* Ex. F at 94:20–97:1. The Proposed Consent judgment would eliminate that ability.

[18] Technically, the bidders were expected to be Hughes and a Lockheed Martin joint venture, but Raytheon had a 60% interest in the joint venture.

merger would "eliminate the aggressive competition that would otherwise exist between these independent teams."[19]

DOJ settled the case with a consent judgment substantially identical to the one Defendants propose here. As DOJ explained to the court in that case:

> [T]he proposed Final Judgment requires that Raytheon establish firewalls to preserve the independence of the Hughes team competing for the FOTT program ("Hughes FOTT Team") from the RTIS/Lockheed Martin FOTT joint venture (RTIS FOTT Team). The firewall provisions prohibit the flow of information between the two teams and between either team and any other employee of Raytheon. The Proposed Final Judgment requires Raytheon to delegate to the head of RTIS Missile Systems Division the sole discretion to determine all matters relating to RTIS FOTT Team's bid and to create economic incentives for the RTIS FOTT Team members to ensure all reasonable efforts will be made to submit a competitive bid for the FOTT Program . . . .The United States is satisfied that the proposed relief will prevent the acquisition from having anticompetitive effects.[20]

Since *Raytheon*, DOJ has continued to approve transactions on the basis that similar provisions are effective at guaranteeing independent competition. *See, e.g.*, Asset Preservation and Hold Separate Stipulation and Order at 13–14, *United States v. United Techs. Corp.*, No. 1:20-cv-00824 (D.D.C. Mar. 26, 2020) (protecting key personnel from reassignment or transfer and requiring defendant to appoint personnel with "complete responsibility" for the business line at issue); Hold Separate Order, *United States v. BSA. S.A.*, No. 1:21-cv-02976 (D.D.C. Nov. 15, 2021), ECF No. 3; Hold Separate Order, *United States v. Stone Canyon Indus. Holdings, LLC*, No. 1:21-cv-01067 (D.D.C. Apr. 22, 2021), ECF No. 4.[21] For example, in a recent defense-industry case, similar hold-separate provisions, firewalls, and other tools found in the Proposed Consent

---

[19] Competitive Impact Statement, *U.S. v. Raytheon, General Motors, and HE Holdings*, No. 1:97CV02397 (D.D.C. Oct. 22, 1997), https://www.justice.gov/atr/case-document/competitive-impact-statement-177.

[20] *Supra* at n.19.

[21] *Available at* https://www.justice.gov/archive/opa/pr/1997/October97/415at.html.

Judgement were utilized by DOJ to ensure "that the level of competition for the design, development, production, and sale of Optical Systems that existed between Defendants prior to the Transaction" was maintained for the pendency of the five-month divestiture period.[22] Asset Preservation and Hold Separate Stipulation and Order at 9, *United States v. United Techs. Corp.*, No. 1:20-cv-00824 (D.D.C. Mar. 26, 2020), ECF No. 2-1. DOJ has offered no plausible explanation as to why the Proposed Consent Judgment would not likewise ensure here that the Booz Allen and EverWatch bid teams remain "independent" and "uninfluenced" by senior management and that "the level of competition . . . that existed between Defendants prior to the Transaction is maintained." *Id.* at 9. [23]

The Proposed Consent Judgment resolves any concern DOJ could have about the Proposed Transaction's impact on OD. But DOJ refuses to take "yes" for an answer. Instead, DOJ insists that this Court rip up the parties' Agreement as a "preliminary" measure. DOJ's suggestion that, at some point months or a year from now, Defendants could somehow tape the Agreement back together is at best naïve. *See* Ex. Z ¶ 42 (███████████████████████████████████████ ███████████████████████████)[24] In short, DOJ's requested outcome throws the proverbial

---

[22] The hold separate period lasted from March 31, 2020 (the date of consummation of the transaction at issue) until the divestiture of the Optical Systems business unit was completed on September 1, 2020. *Available at* https://www.satellitetoday.com/business/2020/09/02/amergint-closes-on-acquisition-of-raytheon-technologies-space-based-optics-business/.

[23] Indeed, courts often use firewalls even outside of the antitrust context, particularly to solve short-term problems. For example, in *Peraton, Inc. v. Raytheon Co.*, the court entered a preliminary injunction establishing a firewall between two defense contractors' information and enjoining Raytheon from using Peraton's confidential information to compete for two government contracts. No. 1:17-cv-979, 2017 WL 11501665 (E.D. Va. Nov. 7, 2017); *see also State v. Saint Francis Hosp.*, No. 98-cv-939, 2000 WL 1804194 (S.D.N.Y. June 30, 2000) (entering a consent judgment establishing an informational firewall regarding marketing, pricing, and negotiations).

[24] Even in the unlikely event that Defendants were able to renew their agreement, the underlying terms would undoubtably change. In other words, it would be an entirely *different* agreement.

$440 million baby out with the bathwater. Both equity and DOJ's own guidelines require a more precise approach. Antitrust Div., U.S. Dep't of Just., Merger Remedies Manual 2 (2020) ("Tailoring the remedy to address the violation is the best way to ensure that the relief obtained cures the competitive harm.").[25]

### III.   DOJ has not—and cannot—show that it will suffer concrete, imminent, and irreparable injury without a preliminary injunction.

Only the threat of imminent, concrete, and irreparable injury—combined with the court's confidence of the movant's assured victory—can justify the "heavy artillery" of a preliminary injunction. *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 530 (4th Cir. 2003). DOJ has halfheartedly argued that it need not show irreparable injury simply because it is DOJ. ECF No. 29-1 at 29–30. As explained in Defendants' Response, Supreme Court precedent says otherwise. ECF No. 93 at 28–29. DOJ must prove that it will suffer "actual and imminent harm, not just a mere possibility" and that such harm "is truly irreparable." *SH Franchising, LLC v. Newlands Homecare, LLC*, No. 18-cv-2104, 2019 WL 356658, at *5 (D. Md. Jan. 29, 2019) (Blake, J.). But, as discussed above, DOJ's alleged harm is entirely hypothetical; it offers no evidence showing that anticompetitive harm is anything more than a "mere possibility." Moreover, DOJ cannot show that any harm is "imminent." ███████████████████████████████████████████
███████████████████████████. Ex. C at 86:17–22.

DOJ's harm is hypothetical, distant, and insufficient to warrant a preliminary injunction.

### IV.   Neither equity nor the public interest favors DOJ's requested relief.

As discussed, DOJ's requested "preliminary" injunction is, practically speaking, permanent relief. It would be deeply inequitable to destroy the millions of dollars and months of

---

[25] *Available at* https://www.justice.gov/atr/page/file/1312416/download.

effort the parties have invested into the Proposed Transaction over DOJ's theoretical hunch. *See Orlando v. CFS Bancorp, Inc.*, No. 2:13-cv-261, 2013 WL 5797624, at *6 (N.D. Ind. Oct. 28, 2013) (denying a request to preliminarily enjoin a merger because "enjoining a complex and time sensitive transaction [would] at a minimum create uncertainty and delay [that] could jeopardize the transaction itself" and may prove "irreparable"). This is especially true considering that NSA—the sole consumer in DOJ's alleged market—█████████████████████████████████████ ███████. Moreover, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 720 (4th Cir. 2021). The Proposed Consent Judgment satisfies that test, while DOJ's requested remedy fails it.

The public interest also disfavors a preliminary injunction. As discussed above, the Proposed Transaction will provide immediate and wide-ranging benefits to NSA and other government agencies. It will also allow Booz Allen to better compete against larger, entrenched firms currently dominating other large NSA contracts. DOJ's requested relief will needlessly deprive NSA and the broader American public of these benefits.

**V.       The Court should enter final judgment in Defendants' favor.**

Defendants respectfully renew their request for the Court to resolve the merits of this case at the hearing. *See* ECF No. 73 ("As the factual evidence and legal issues are developed, however, it may be that a final order on the dispositive issues can be entered without a full trial."). This entire case, whether framed under Section 1 of the Sherman Act or Section 7 of the Clayton Act, turns on one issue: the allegation that the Proposed Transaction negatively impacts competition for OD. DOJ has never raised any other concern, and NSA has raised no concern about the Proposed Transaction *at all*. *Supra* at 2. At this point, Defendants have collectively produced over *28,000* documents related to the Proposed Transaction and OD. According to DOJ, these

documents—not NSA's—are the critical documents in the case. ECF No. 141 at 2. DOJ has also deposed 10 witnesses from Defendants; Defendants, in turn, have deposed five government witnesses and received at least some of NSA's relevant documents. Third-party discovery, including depositions, likewise has occurred. Discovery has cost Defendants *millions of dollars* and continuing with this case will not only cost Defendants, but third parties too.

Time is of the essence. Defendants have already extended the "outside date" of their transaction multiple times, with the latest into October. Ex. GG at 7:10–16. As with any major deal, every day that passes changes the value of the Proposed Transaction, and as counsel from EverWatch explained at a recent hearing, the delay has materially harmed its business and created uncertainty among employees. *Id.* at 7:17–8:19. There is no reason to perpetuate that harm. If this Court holds that (1) there is no relevant antitrust market limited to OD "services," (2) there is no likelihood of substantial anticompetitive harm as to OD services, *or* (3) Defendants' Proposed Consent Judgment should be implemented to remedy any harm, this case is over under both Section 1 of the Sherman Act *and* Section 7 of the Clayton Act.

Just like under Section 1 of the Sherman Act, any claim under Section 7 of the Clayton Act requires a relevant market. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 324 (1954) (the "[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act") (internal quotation marks and citation omitted). Moreover, like Section 1 of the Sherman Act, Section 7 of the Clayton Act requires likely and substantial anticompetitive effects. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001) (Section 7 of the Clayton Act "prohibits acquisitions, including mergers, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition.").

33

Finally, if this Court enters Defendants' Proposed Consent Judgment, then there is no need for any further proceedings. Consistent with prior consent judgments agreed to by DOJ, the proposed consent judgment here allows Defendants to close their Proposed Transaction while ensuring the same level of competition that existed previously.

## CONCLUSION

At the upcoming hearing, the evidence will show that DOJ is not entitled to a preliminary injunction and even if it is, the Proposed Consent Judgment is a more effective and less prejudicial alternative. Further, the problems in DOJ's case warrant final judgment in Defendants' favor following the hearing.

*/s/ Todd M. Stenerson*

Todd M. Stenerson (Bar No. 14194)
David A. Higbee (Bar No. 30364)
Ryan A. Shores (admitted *pro hac vice*)
Adam B. Schwartz (Bar No. 30358)
Matt Modell (admitted *pro hac vice*)
Jacob M. Coate (Bar No. 30355)
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
todd.stenerson@shearman.com
david.higbee@shearman.com
ryan.shores@shearman.com
adam.schwartz@shearman.com
matt.modell@shearman.com
jacob.coate@shearman.com

Susan Loeb (admitted *pro hac vice*)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
susan.loeb@shearman.com

*Attorneys for Defendants Booz Allen Hamilton Holding Corp.
and Booz Allen Hamilton Inc.*

*/s/ Molly M. Barron*

Molly M. Barron (Bar No. 19151)
Amanda P. Reeves (admitted *pro hac vice*)
Marguerite M. Sullivan (admitted *pro hac vice*)
Anna M. Rathbun (admitted *pro hac vice*)
Christopher J. Brown (*pro hac vice* pending)
G. Charles Beller (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
molly.barron@lw.com
amanda.reeves@lw.com
marguerite.sullivan@lw.com
anna.rathbun@lw.com
chris.brown@lw.com
charlie.beller@lw.com

Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
Kelly S. Fayne (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
al.pfeiffer@lw.com
kelly.fayne@lw.com

*Attorneys for Defendants EverWatch Corp., EC
Defense Holdings, LLC, and Analysis, Computing
& Engineering Solutions, Inc.*

35

**CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2022, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, and served one copy, by ECF to counsel of record in this matter.

*/s/ Todd M. Stenerson*

Todd M. Stenerson (Bar No. 14194)
Shearman & Sterling LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
todd.stenerson@shearman.com