**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br> v. <br>BOOZ ALLEN HAMILTON HOLDING<br>CORPORATION, *et al.*,<br><br>    Defendants. | Case No.: 1:22-cv-01603-CCB<br>Filed: September 9, 2022 |

**PLAINTIFF'S PRE-HEARING BRIEF**

**(REDACTED VERSION)[1]**

---

[1] This Memorandum of Law is being publicly filed and has been redacted to remove information designated as Confidential under the Protective Order in this case.  *See* Protective Order (ECF 71, July 18, 2022).  An unredacted version will be filed under seal along with a motion to seal will be filed separately.

# <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ................................................................................................................ 1

**ARGUMENT** ....................................................................................................................... 2

  **I.**    **The United States Is Likely to Succeed on the Merits** ........................................ 2

    A.   The Merger Agreement is an Unreasonable Restraint of Trade ........................... 2

        1.   *The relevant market is signals intelligence modeling and simulation services under the OPTIMAL DECISION contract* ................................................................................ 4

        2.   *Booz Allen and EverWatch expect that they are only bidders for OPTIMAL DECISION, and, therefore, that their Merger Agreement would result in a merger to monopoly* .............................. 8

        3.   *The Merger Agreement has resulted and is likely to result in anticompetitive effects, including reduced incentives to compete* ................................................ 13

        4.   *The reduced incentive to compete is likely to result in other anticompetitive effects, including increased price and diminished quality* ......................................... 15

    B.   There Are No Significant Countervailing Competitive Effects ........................... 19

  **II.**   **The United States Would be Irreparably Harmed Absent a Preliminary Injunction** ........ 22

  **III.**  **The Balance of Equities and Public Interest Favor a Preliminary Injunction** ................... 25

  **IV.**  **Defendants' Proposed Order Would Not Restore the Competitive Intensity that Would Occur Absent the Merger Agreement** ........................................................................ 25

  **CONCLUSION** ................................................................................................................... 28

## Table of Authorities

## Cases

*Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017) ............................ 24

*Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)................................................ 4, 5

*Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 600 F. Supp. 1326, 1332 (E.D. Mich. 1985) ............................................................................................................................ 24

*De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)............................... 24

*F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001) ........................................ 26, 28

*F.T.C. v. Swedish Match N. Am. Inc.*, 131 F. Supp. 2d 151, 173 (D.D.C. 2000).................... 26

*Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) ................................................ 28

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 65 (D.D.C. 1998)..................................... 28

*Glen Holly Ent., Inc. v. Tektronix Inc.*, 352 F.3d 367, 373 (9th Cir. 2003) ........................ 26

*Grumman Corp. v. LTV Corp.*, 527 F. Supp. 86, 89-90 (E.D.N.Y. 1981)............................. 7, 8

*Marathon Oil Co. v. Mobil Corp.*, 530 F. Supp. 315, 320 (N.D. Ohio 1981)......................... 27

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018)................................................. 3, 22

*Therapearl LLC v. Rapid Aid Ltd.*, No. CCB-13-2792, 2014 U.S. Dist. LEXIS 135851, at *20 (D. Md. Sept. 25, 2014)............................................................................................................ 4

*Tower Air, Inc. v. Fed. Exp. Corp.*, 956 F. Supp. 270, 281 (E.D.N.Y. 1996)........................... 6

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 70 (D.D.C. 2017)................................. 14, 28

*United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980).......... 26, 27

*United States v. First Nat. Bank & Tr. Co. of Lexington*, 376 U.S. 665, 671-672 (1964) ............ 3

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 82 (D.D.C. 2011) ............................. 28

*United States v. Rockford Memorial Corp.*, 898 F.2d 1278, 1283.................................... 3, 9

## Statutes

15 U.S.C. § 1 ...................................................................................................................... 2

## INTRODUCTION

Defendants' anticompetitive Merger Agreement warrants immediate injunctive relief under Section 1 of the Sherman Act. At the preliminary-injunction hearing, the evidence will show the following: (1) Booz Allen saw the chance to guarantee a win for OPTIMAL DECISION, the successor contract to MASON III, for which it had been the long-time incumbent; (2) buying EverWatch would guarantee that win and eliminate a credible competitor in other intelligence contracts[1]; (3) Booz Allen, knowing *for years* that EverWatch was likely to be its only competitor, bought EverWatch instead of competing, eliminating that threat; (4) EverWatch recognized that Booz Allen would improve its chances of winning OPTIMAL DECISION by buying EverWatch—indeed, that was part of the rationale for the acquisition[2]; and (5) Defendants *now* have reduced incentives to compete, as exemplified by various machinations to avoid antitrust scrutiny and to maximize profits—coordinating on possibly " █████████ " OPTIMAL DECISION, propping up another company to "prime" the contract even though it lacks the capabilities to do so, and " ████████████ "[3] instead of digging deep to present the United States their most competitive bids. As one gleeful Booz Allen employee put it: ████████████████

████████████████████████████████ .[4]

The following evidence, and the public's interest in ensuring that fair competition (and not a merger-to-monopoly) is preserved, is sufficient to show that the United States is likely to succeed

---

[1] BAH_DOJ_00054086 at -094 (noting that acquiring EverWatch would █████████████████

████████████████████████████████ ).

[2] EW-LIT-0030928 ( █████████████████████████████████████████████

████████████████████████████ ").

[3] EW-CID-0000421.

[4] BAH_DOJ_00033314.

on the merits.   Accordingly, the United States respectfully requests that this Court enjoin Defendants from further implementing the Merger Agreement by temporarily suspending it.

## ARGUMENT

All four elements required for a preliminary injunction are met here: (1) the plaintiff is likely to succeed on the merits; (2) competition for the OPTIMAL DECISION contract is likely to suffer irreparable harm in the absence of preliminary relief;[5] (3) the balance of equities tips in the United States' favor; and (4) an injunction is in the public interest. *See generally* Pl.'s Mem. in Supp. of Prelim. Inj. Mot. ("Mot.") (ECF 29-1, July 7, 2022); Pl.'s Reply Br. In Supp. of Prelim. Inj. Mot. ("Reply Br.") (ECF 100, Aug. 12, 2022).[6]  The following discussion establishes that United States is entitled to relief.

## I.   The United States Is Likely to Succeed on the Merits

### A.   The Merger Agreement is an Unreasonable Restraint of Trade

The anticompetitive effect of the agreement between Booz Allen and EverWatch is obvious, as evidence at the hearing will demonstrate and as deposition testimony and document discovery has already confirmed.  *See* Mot. 23-26; Reply Br. 5-6.  Booz Allen and EverWatch agreed to merge, even though they are (and knew they are) the only two bidders for the OPTIMAL DECISION[7] contract.  *See* Ex. 1, BAH_DOJ_00033314 (March 16, 2022 email from Booz Allen manager overseeing the preparation of Booz Allen's bid, bragging that ███████████████████

████████).  The reduced incentives to compete against each other's merger partner in this

---

[5] As discussed in the United States' briefing on its Motion for a Preliminary Injunction, there is a presumption of irreparable harm for claims brought under 15 U.S.C. § 1 ("Section 1") brought by the United States.

[6] A longer recitation of the legal standards and case law applicable to the United States' preliminary injunction motion and this Court's authority to issue relief are contained therein.  For the Court's convenience, the United States does not repeat these citations here.

[7] The OPTIMAL DECISION contract is often referred to as "OD" in deposition testimony and exhibits.

situation are evident.  *See infra* 13-19; *see also, e.g.*, Ex. 2, BAH_DOJ_00047180 (Mar. 16, 2022 email from Booz Allen manager overseeing the preparation of Booz Allen's bid, stating: "█████████████████████████████████████████████████").  This merger-to-monopoly violates Section 1 of the Sherman Act.  *See United States v. Rockford Memorial Corp.*, 898 F.2d 1278, 1283 (noting that Section 1 of the Sherman Act "prevent[s] transactions likely to reduce competition substantially.").

Regardless of whether the Court's application of the rule of reason relies on a detailed market analysis or the abbreviated "quick look" analysis that applies to plainly anticompetitive restraints, the evidence will show that the Merger Agreement violated Section 1 of the Sherman Act.[8]  *See* Mot. 16-17.[9]  Under the detailed market analysis, a plaintiff can meet its burden of demonstrating Defendants' Merger Agreement unreasonably restrains competition substantially by *either* (1) direct "proof of actual detrimental effects,"[10] *or* (2) indirect proof of anticompetitive effects, including evidence of market power, such as market share in a relevant market, "plus some evidence that the challenged restraint harms competition."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citations omitted).  The United States easily meets each burden here.

---

[8]  *See United States v. First Nat. Bank & Tr. Co. of Lexington*, 376 U.S. 665, 671-672 (1964) ("[W]here merging companies are major competitive factors in a relevant market, the elimination of significant competition between them, by merger or consolidation, itself constitutes a violation of § 1 of the Sherman Act.").

[9] The United States will not focus on the "quick look" analysis as the evidence for it is subsumed by the full rule-of-reason analysis.  The legal standards for a "quick look" analysis are explained in Plaintiff's prior briefing.  *See* Mot. 16-17.

[10]  As discussed *infra*, the Merger Agreement's adverse effect on pricing and quality satisfies the actual-detrimental-effects prong.

    1.    *The relevant market is signals intelligence modeling and simulation services under the OPTIMAL DECISION contract[11]*

The evidence will show that the relevant product market is signals intelligence modeling and simulation services under the OPTIMAL DECISION contract. *See also* Mot. 20-22; Reply Br. 6-11. As the Supreme Court—and this Court—has explained, a product market is defined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Therapearl LLC v. Rapid Aid Ltd.*, No. CCB-13-2792, 2014 U.S. Dist. LEXIS 135851, at \*20 (D. Md. Sept. 25, 2014) (Blake, J.) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)); *see also* Horizontal Merger Guidelines § 4.1 ("[A] relevant product market consists of a group of substitute products," which includes a product of one merging firm that competes against a product of the other merging firm). The contours of a product market are determined by examining, *inter alia*, a product's "peculiar characteristics and uses," "specialized vendors," and "distinct customers." *Brown Shoe  Co.*, 370 U.S. at 325. And, within any broad product market, there may be submarkets that themselves constitute potential relevant markets.

Here, the evidence will show that services that the United States' National Security Agency ("NSA") will acquire through OPTIMAL DECISION—signals intelligence modeling and simulation—have unique characteristics and uses, one distinct customer, and specialized vendors. Below is a summary of some of the evidence collected thus far that corroborates the United States' relevant market allegations:

- The services sought under OPTIMAL DECISION require specialized knowledge of signals intelligence (known as "SIGINT"), which is core to NSA's mission. *See, e.g.*, Jack S. (Aug. 23, 2022) ("Jack S. Dep.") 139:7-18 (OPTIMAL DECISION seeks domain

---

[11] The relevant geographic market is the United States. *See* Deposition of ▮▮▮▮ (Aug. 16, 2022) (" ▮ Dep.") 89:13-16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ); *see generally* Pls.' Prelim. Inj. Mot., Ex. A. ("Dunshee Decl.") (ECF 29-3, July 7, 2022).

knowledge "unique to NSA");.Ex. 3, (USDOJ-011-00003941 at -943, -982-86) (draft "Labor Category Description" for OPTIMAL DECISION including six categories of "SIGINT Specialists" and "SIGINT Technical Analysts" in "Non-Common Labor Categories"); Deposition of ███████████ 122:3-15 ███████████ ; Deposition of Kevin Y. (Aug. 18, 2022) ("Kevin Y. Dep.") Dep. 201:9-11 (NSA contracts can have unique labor categories).

- These services are not general modeling and simulation services that any number of companies could provide. *See, e.g.*, Deposition of ███████████ (Aug. 22, 2022) (" ███████ Dep.") 121:13-122:3 ███████████████████████████████████████ ).

- Potential prime contractors must be specialized. They must have personnel with experience and knowledge of signals intelligence, and any of their employees working on this contract must hold a top-secret security clearance. *See* ███████ Dep. 121:13-122:3: (" ███████████████████████ ); Deposition of Jack S. Dep. 124:1-5 (nearly all the domain knowledge required for OPTIMAL DECISION is highly classified); Deposition of ███████ (Aug. 19, 2022) (" ███████ Dep.") 82:17-23 ███████ ███████████ ); "Dunshee Decl. ¶ 10 ("The contractor individuals needed to perform on OPTIMALDECISION will be required to possess skills in SIGINT modeling and simulation and hold a Top Secret security clearance.").

- There is only one customer for these services: the United States government. And the primary (if not only) customer for these services is NSA.[12] Although other government agencies may use these services, those agencies typically obtain these services through NSA. Dunshee Decl. ¶¶ 3, 5, 11.

- Within NSA, the OPTIMAL DECISION RFP is the only contracting vehicle for enterprise-level signals intelligence modeling and simulation services.[13]

- As Defendants have admitted, prior to the development of OPTIMAL DECISION, the only such contracting vehicle at NSA was MASON III. *See, e.g.*, Deposition of ███████ (Aug. 18, 2022) (" ███████ Dep.") 80:21-81:1 (Q: ███████████████████████████████████████ ); ███████ Dep. 33:3-21 (under MASON III, ███████

---

[12] Deposition of ███████ Aug. 22, 2022) (" ███████ Dep.") 46:2-17 ███████████████████████████

[13] Dunshee Decl. ¶¶ 4-5, 11; Deposition of Diane Dunshee Aug. 18, 2022) ("Dunshee Dep.") Dep. 194:18-195:11, 196:16-20, 197:7-9. *See also* ███████ Dep. 126:24-127:3 (not aware of any other contract vehicle at NSA to obtain these services).

████████████████████████████████████████████████████████████████████

███ ).[14]

Throughout this litigation, Defendants have fundamentally misconstrued this relevant market, arguing at times that a relevant market cannot be limited to a single contract or a single purchaser or a single moment in time. *See, e.g.*, Defs.' Opp'n Br. ("Opp'n") (ECF 90, July 29, 2022), at 15. But in the defense industry, product markets are regularly defined based on specific products sold to particular U.S. government agencies through contracting vehicles like RFPs. *See* Mot. 20-23 (citing *Tower Air, Inc. v. Fed. Exp. Corp.*, 956 F. Supp. 270, 281 (E.D.N.Y. 1996), *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1055 (9th Cir. 1983), and *Grumman Corp. v. LTV Corp.*, 527 F. Supp. 86, 89-90 (E.D.N.Y. 1981)); *see also* Reply Br. 7-8. Indeed, Defendants themselves have previously recognized this distinction.[15] Nor does it make any difference, as a matter of law, that the RFP is still in draft form. Evidence will show that NSA expects to release the RFP imminently,[16] and that the services in the final RFP are the same as the

---

[14] Relatedly, the evidence will show that this relevant market satisfies the "hypothetical monopolist" test. *See* Reply Br. 10-11. Defendants have previously suggested that prime bidders do not actually have the ability to "impose at least a small but significant and non-transitory increase in price ('SSNIP')" on the relevant services, on the basis that the OPTIMAL DECISION RFP is a cost-plus-award-fee contract, that it contains an Independent Governmental Cost Estimate, and that it contains a "Level of Effort" clause. That argument is belied by the deposition testimony and documents produced in advance of this hearing. As described *infra* 15-19, the evidence will show that prime bidders have significant flexibility with respect to both quality and price in their proposals. And, the ability of the merged firm to decrease quality or increase price would be "non-transitory" here: the OPTIMAL DECISION contract is a five-year contract. *See* Dunshee Decl. ¶ 3.

[15] *See* Opp'n, Ex. A, at 11 ████████████████████████ " that ████████████████████████████████████████████████████ and █████████████████████████████████████████ ); *see also* Opp'n 16 n.14 (conceding that the court in *Tower Air* "explained that a single government contract *could* be a relevant market," and that such a market was at issue in *Northrop*).

[16] *See* Dunshee Dep. 99: 6-15 ████████████████████████ █████████████████████████████████████████████████ ████████████████████████

services that were contemplated in the draft RFP that was released to Booz Allen and EverWatch in May 2021.[17]

There is no reasonable substitute for these services, which are critical to NSA.  As explained *supra*, the relevant services necessarily require experience with and knowledge of signals intelligence, and very few vendors can satisfy those requirements.  In any event, as a matter of law, NSA's preferences—as the primary customer—defines the relevant market as signals intelligence modeling and simulation services.  *See Grumman Corp.*, 527 F. Supp. at 89-90 (concluding that the Navy, as the consumer of carrier-suitable aircraft, defines the relevant market for such).  *See also* Reply Br. 9 n.10.

Nor is another extension of the MASON III contract a reasonable substitute for signals intelligence modeling and simulation services under OPTIMAL DECISION.  Delays in the issuance of OPTIMAL DECISION risk the loss of key employees.  Dunshee Decl. ¶ 10.  And if NSA were to negotiate another extension of MASON III, it would be forced to negotiate solely with Booz Allen, a monopolist with the ability to increase prices and costs to NSA.  NSA has already extended MASON III several times—and for each extension, Booz Allen faced no competition and raised prices.  ███████ Dep. 228:15-19; Kevin Y. Dep. 98:5-8, 98:22-25; Deposition of Diane Dunshee (Aug. 18, 2022) ("Dunshee Dep.") 123:4-8 ("████████████████

████████████████████████████████████████████

███████████████████").  Booz Allen plans to increase prices again if the MASON contract

---

[17] The Booz Allen and EverWatch bid teams are well aware of the scope of the draft RFP for OPTIMAL DECISION, and both have made personnel and strategic decisions based on assumptions of what the final RFP would look like.  *See, e.g.*, ███████ Dep. 18:18-22, 50:10-52:2; ███████ Dep. 23:18-24.  Accordingly, both the methodology for determining a product market and the facts already disclosed to defendants in draft RFPs, demonstrate that any changes to the precise terms of the final OPTIMAL DECISION RFP or contract have no material bearing on the United States' alleged product-market definition.

is extended.  *See* BAH_DOJ_00041446 (Jan. 10, 2022 email from Booz Allen Vice President,

stating: "████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.").

For all of the foregoing reasons, the relevant product market is signals intelligence

modeling and simulation services provided under OPTIMAL DECISION.

2. *Booz Allen and EverWatch expect[18] that they are only bidders for OPTIMAL DECISION, and, therefore, that their Merger Agreement would result in a merger to monopoly*

As the only competitors for OPTIMAL DECISION, Booz Allen and EverWatch "have 100

percent share of the relevant market . . . [which] clearly demonstrates the market power of the

combined firm."  *See* Mot. 26-27; *see also United States v. Rockford Mem'l Corp.*, 898 F.2d 1278,

1282-85 (7th Cir. 1990) (affirming district court decision that found that proposed merger violated

Section 1 because combined market between 64-72% created a presumption of illegality).  For

over twenty years, Booz Allen has won and held every iteration of NSA's MASON contract, the

predecessor contract to OPTIMAL DECISION.  *See* Dunshee Dep. 117:17-119:4.  Now, Booz

Allen faces only a single competitor for OPTIMAL DECISION:  EverWatch.[19]  Under the terms

of Defendants' Merger Agreement, if the merger were consummated, Booz Allen will have a

monopoly on those services regardless of who wins OPTIMAL DECISION.

Deposition testimony and documentary evidence (which covers several years) corroborate

---

[18] Booz Allen and EverWatch have known, for years, that they were each other's only competition for the OPTIMAL DECISION contract.  *See e.g.*, ████ Dep. 62 17-19, 63:4-5 (testifying that EverWatch was Booz Allen's only confirmed competition); *id.* 82:5-83:1; 138:9-13; EW-LIT-0007745 (████████████████████████████████████████████ ); ██████ Dep. 131: 8-14 (same); ████████████ Dep. 133:3-7 ████████████████████████████████████████ ).

[19] *See* Dunshee Declaration, ¶¶ 6-7 (NSA only received letters of intent to prime from Booz Allen and EverWatch); Dunshee Dep. 169:20-170:22.

that each Defendant anticipated that the other would be the only bidders for OPTIMAL DECISION.

- For instance, in September 2019, EverWatch's Capture Manager for OPTIMAL DECISION emailed EverWatch's leadership team to let them know that "█████████████████████████████████████" █████████ Dep. 97:2-13. Confident that EverWatch was Booz Allen's only competition for OPTIMAL DECISION, EverWatch's Capture Manager even told NSA in the fall of 2019 that EverWatch was now NSA's "███████████████████████████████████████ ████████" █████████ Dep. 159:6-21 (discussing and quoting EW-LIT-0028510).

- And after discovering that EverWatch was preparing a bid for OPTIMAL DECISION, in November 2019, Booz Allen's bid team prepared a "Black Hat" "███████████████████████████████" for OPTIMAL DECISION. Ex. 4, BAH_DOJ_00048628 at -640. That team identified EverWatch as Booz Allen's only competitor; the team also eliminated ████████ and ████████ as potential competitors, noting that █████ is ████████████████████" *Id.*[20] Booz Allen expressed concerned about its competitor EverWatch—which it knew had hired former Booz Allen employees who had worked on the MASON contracts, *see* Ex.5, BAH_DOJ_00041605 at -606 ("██████████████████████████████████████ ████████"); Ex. 6, BAH_DOJ_00018260 at -276 (May 26, 2021 presentation noting that █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████").

- Similarly, in April 2021, EverWatch performed a "Black Hat" analysis for OPTIMAL DECISION in which EverWatch identified only Booz Allen as its competitor. EW-LIT-0012629 (EverWatch's Capture Manager circulating Black Hat analysis "██████████████████████████████████").

The fact that Booz Allen and EverWatch were each other's sole competition was also well-known to the Booz Allen and EverWatch management as they began to discuss the possibility of the acquisition in December 2021.  *See* Deposition of ████████████████ (Aug. 19, 2022)

---

[20]  *See also* Ex. 5, BAH_DOJ_00041605 at -606 (██████████████████████████████ █████████████████████████████████████████████████████████ ██████████████████); BAH_DOJ_00018260 at -265 (same); BAH_DOJ_00019066 at -071 (same as of April 2022); ██████████ Dep. 82:8-12 (███████████████████████████ ████████████████████████████████████).  Around the same time, fall of 2019, EverWatch reached the same conclusion. *See* Ex. 6, EW-LIT-0007745 ████████████████████████ ████████████████████ Dep.131:8-14 (same).



( ███████ Dep.") 39:4-17 ██████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████; In fact, it was part of EverWatch's initial pitch strategy to

demonstrate that ███████████████████████████████████████

██████████ EW-LIT-0030928 & -30928 (attachment to email showing "Pwin" of ██% for

OPTIMAL DECISION).[21]

Still, to this day, Defendants cannot identify any other competitors for OPTIMAL

DECISION.[22]  That is because there are none.

By the very nature of the proposal preparation process, there can be no "dark horse" entrant

to this market.  It takes many months, or even years, to assemble a team and develop the technology

necessary[23] to launch a competitive bid.  *See e.g.,* ██████ Dep. 163:6-13 ████████████

█████████████████████████████████████████████████████

██████████); ██████ Dep. 45:5-13 (noting EverWatch's " █████████████

██████████" for its OPTIMAL DECISION bid); ██████ Dep. 100:18-25 (█████████

█████████████████████████████████████████████████████).

Booz Allen itself has been preparing to bid for OPTIMAL DECISION from the time when

Booz Allen was awarded the MASON III contract in 2014.  *See* ██████ Dep. 43:6-44:4.

EverWatch, too, has been preparing for years.  *See* ██████ Dep. 29:20-25 (EverWatch started

its pursuit of OD ██████); *id.* 33:16-34:10 (Everwatch's OD Capture Manager has spent

---

[21] In November 2019, EverWatch calculated its pWin against Booz Allen was ██%.  *See* ██████ Dep. 141:1-6; 142:17-21; 146:4-6.

[22] ██████ Dep. 133:3-7; Dotson Tr. 72:15-73:1 (noting ██████████████████████████████████████████████).

[23] *See* Ex. 4, BAH_DOJ_00048628 at -633 (Nov. 24, 2019 presentation ██████████████████████").



*id.* 34:3-5

; *id.* 6-10

.  Preparing a successful bid requires signing dozens of (usually exclusive) teaming agreements with subcontractors.  *See, e.g.,*            Dep. 43:5-8 (                                                        ).

NSA has already *twice* surveyed the industry for potential bidders for OPTIMAL DECISION.  *See* Dunshee Decl. ¶ 6 (noting that NSA sent out a market survey in October 2020 and sought letters of intent to bid in October 2021).  And only Booz Allen and EverWatch indicated they would bid.

Despite no evidence to the contrary, Defendants likely will still argue that there could still be a new entrant.  But that is nothing more than a pipe dream, as Booz Allen's own ordinary-course documents confirm.[24]  Even if—years ago—Booz Allen believed that            (they are the same company) or            could bid,[25] the evidence will show that Booz Allen does not believe so today.[26]  That belief is correct: neither            nor            intend to bid on

---

[24] *See, e.g.,* Ex. 8, BAH_DOJ_00013589 (March 22, 2022 Booz Allen email stating:

[25]            Dep. 75:19-76:6 (

); *id.* 78:13-79 (Booz Allen manager "

")
[26] *See*            Dep. 135:2-138:13 & BAH_DOJ_00033314

); *id.* 138:20-139:13 & BAH_DOJ_00047180 ("

"); *id.* 142:14-134:4 and 143:16-145:21 & Ex. 9, BAH_DOJ_00047426, Ex. 10, BAH_DOJ_0047500; Ex 11, BAH_DOJ_00047338, Ex. 12, BAH_DOJ_00047315, and Ex. 13, BAH_DOJ_0004733 (testimony concerning chat messages in which Booz Allen manager stated: "

OPTIMAL DECISION. ███████ Dep. 100:20-101:5 (In the summer of 2019 ███████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████ *See*

███████ Dep. 106:24-107:16; 126:7-22. ██████████████████

████████████████████████████ *Id.* 126:7-22.  Nor can a

company that provides "general" modeling and simulation services come in and do this kind of

work.  *See supra* 5.

Relatedly, EverWatch's last ditch (and apparently abandoned) attempt to swap roles with

███████ demonstrates sheer implausibility of a new entrant suddenly appearing.[27]  *See*

Deposition of Thomas ██████ (Aug. 19, 2022) ("███ Dep.") 53:7-14 ("████████████

██████████████████████████████████████

███████████").  And that the evidence supports the conclusion that EverWatch only propped

up ██████████ as a potential prime contractor to avoid antitrust scrutiny over the Merger

Agreement. ██████████ has not primed a contract of this scale and would need to rely on ███

████████████████████████ in order to submit a competitive bid.  Ex. 14

EW-CID-0000440 (June 7, 2022 email from ██████ providing a list of items that ██████████

██████████████████████████████████████

████████████████████").  Notably, EverWatch has not actually followed up with ███

_____

██████████████████████████████████████████ ").

[27] ██████ Dep. 238:15-19; *id.* 242:6-14 (████████████████████████████████████████

█████ ).

██████ about executing the prime swap.  *See* ██████ Dep. 95:4-15.

3. *The Merger Agreement has resulted and is likely to result in anticompetitive effects, including reduced incentives to compete*

At the preliminary injunction hearing, the evidence will show that the Merger Agreement has changed—and will continue to change—incentives of Booz Allen and EverWatch unless it temporarily suspended pending a trial on the merits.  *See* Mot.  23-27; Reply Br. 11-14.

These changed incentives are highlighted by the actions of Booz Allen's and EverWatch's managers in charge of their respective bid teams.  For instance, on March 16, 2022—the same day the Merger Agreement was publicly announced—Booz Allen's bid manager wrote to another employee: "█████████████████████████████████████████████████████████████ ██████ "  Ex. 1, BAH_DOJ_00033314 (█████████████████████████████████████████ ███████████████████████████).  Also that day, she wrote to someone else: "███████████ ████████████████████████████████████████████████████████████████████████████ ███ ").  BAH_DOJ_00047180.  Meanwhile, EverWatch's bid manager told a teammate to "██████ ██████ " Ex. 15, EW-CID-0000421 (Mar. 16, 2022 email).[28]

Any attempt by Defendants to excuse and marginalize this evidence is unavailing.  *See United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 70 (D.D.C. 2017) ("The Court is more persuaded by the contemporaneous email exchanges than by the in-court attempts to explain or disavow those documented exchanges.").  Defendants' employees simply blurted out the truth.  While "antitrust training" on "gun jumping training" might discourage employees from writing down such a candid truth, such training cannot reverse these incentives.

---

[28] An EverWatch manager also stated: "████████████████████████████████████████████████ ████████████████████████████ "  *See* Opp'n, Ex. G.  But that statement implicitly recognizes that, if the deal were to close, EverWatch would not "████████ ██████████████ "  And, of course, it says nothing about the impact ono the bid terms relative to the world without the proposed transaction.

Indeed, *two weeks after* completing antitrust training, Booz Allen's bid manager told another employee: "████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████" ████ Dep. 144:13-

145:1 (discussing   BAH_DOJ_00047426,   BAH_DOJ_0047500;   BAH_DOJ_00047338,

BAH_DOJ_00047315, and BAH_DOJ_0004733).  *See also* BAH_DOJ_00019879 (Apr. 11, 2022

email from Mr. ████████████████████████████████████████████

████).  *See also* ████████ Dep. 280:3-6 (████████████████████████

████████████████████████████████████████████████████████

████████████████████").

Still many weeks and months later, EverWatch and Booz Allen considered the possibility

of pulling bids and ████████ the OPTIMAL DECISION contract.[29]  Indeed, Booz Allen's

Executive Vice President ████████ wrote to EverWatch on June 10, 2022, through an

intermediary, "████████████████████████████████████████████████

████████████████" Ex. 16, EW-CID-0000450.  An EverWatch board director responded that

EverWatch would discuss "████████████████████████████████████████

████████████████" *Id.*  *See also* Reply Br. 13-14.  As discussed *supra*, and because it

*knows* Booz Allen is its only competitor, EverWatch manufactured one "████████████████" in

propping up Red Alpha to prime as discussed above.  Such machinations exemplify Booz Allen

and EverWatch's power over competition and the bidding process and underscore the need for this

Court to grant injunctive relief.

---

[29]  Defendants referred to this as "good-faith compromise," Opp'n 13, but this so-called
"compromise" would eliminate *all* bids for an important national-security contract.

Notwithstanding this evidence, Defendants may suggest that their incentives would not change because there is always uncertainty over the closing of a deal.  Again, evidence demonstrates that that is simply not true.  For instance, in an earnings call shortly after the proposed merger was announced, Booz Allen's Chief Financial Officer told its investors that Booz Allen "███████████████████████████████████████████████████████."  *See* ████████ Dep. 136:1-8.

Where there is meaningful competition, firms have to offer a competitive price (or quality) that strikes a balance between beating competition and maximizing profits.  The Merger Agreement, however, eliminates the need to offer a competitive price, leaving the firm to pursue profit maximization without a constraint.  This is exemplified by Booz Allen's negotiations for each iteration of the MASON contract which, as discussed *supra*, resulted in repeated increases in price.  Without the relief granted here, Booz Allen, as the heir apparent to OPTIMAL DECISION, will be guided only by unconstrained profit maximization when bidding on the OPTIMAL DECISION.  Accordingly, the Merger Agreement has—and will—effect the marketplace for signals intelligence modeling and simulation at great expense to NSA, the United States, and the American taxpayer.

4.  *The reduced incentive to compete is likely to result in other anticompetitive effects, including increased price and diminished quality*

The evidence will likely show price and quality effects resulting from Defendants' reduced incentives.  *See* Mot. 3, 25-27; Reply Br. 11, 13, 19 n.23.

The OPTIMAL DECISION contract is a "best value" contract, meaning that the decision to award a contract is based on both cost and non-cost factors (i.e., quality).  *See* Dep't of Def. Source Selection Procedures § 3.9.  As a result, NSA will compare both cost and quality factors between two competitive proposals.  Defendants may argue (incorrectly) that the "NSA controls

the price," *see* Opp'n 24 (claiming that "NSA possesses a power array of tools that impact pricing"), because OPTIMAL DECISION is a cost-plus-award-fee contract that contains an Independent Governmental Cost Estimate and a "Level of Effort" clause.[30]   But the evidence will demonstrate the opposite:  that bidders have considerable flexibility in putting together a proposal.

In particular, the evidence will show that, for such contracts:

- **The bidder chooses and selects its subcontracting teammates, which affects cost.**  *See, e.g.,* ███████████ Dep. 112:20-114:3 █████████ ████████████████████████████████████████████████████████ ███████████ ); Kevin Y. Dep Tr. 207:2-7; 209:16-22; 210:1-5; ████████ Dep. 210:7- 211:9, 165:2-166:14; ████████ Dep. 114:4-115:2.

- **The bidder decides how to allocate labor hours between itself and its subcontracting teammates, which affects cost.** *See, e.g.,*; ████████ Dep. 114:4- 115:2 ████████████████████████████████████████████████████████ ███████████ ); *see also id.* 139:2-140:19; ████████ Dep. 210:7-211:9; Kevin Y. Dep Tr. 209:4-5.

- **The bidder makes its own staffing decisions and decides how to "blend" its internal labor categories to map onto the labor categories set forth in the RFP.** *See, e.g.,* Kevin Y. Dep Tr. 200:4-7, 201:25-202:6; 203:2-12; 203:20-24; ████████████ ████████████████████████████████ ).

- **The bidder decides which accounting methodology to use, which affects cost.** *See, e.g.*, Kevin Y. Dep Tr. 208:15-19.

- **The bidder has flexibility with respect to indirect labor rates, such as deciding which fringe benefits packages (such as medical benefits) to offer or which cost center to use.**  *See, e.g.*, Kevin Y. Dep Tr. 198:13-24, 197:18-22, 199:4-9, 198:1- 5; *see also* ████████ Dep. 70:10-18, 70:22-71:3, (████████████ ████████ ); ████████ Dep. 71:1-15 (

---

[30] Notably, even when an RFP contains an independent governmental cost estimate, bidders do not need to bid at that estimate.  *See, e.g.*, Dunshee Dep. 48:22-51:1; ████████ Dep. 88:15-18 ████████████████████████████

███████████████████████████████████████████████████

- **The bidder chooses how to allocate the "award fee" between itself and its subcontracting teammates, which could affect cost.** *See, e.g.,* Kevin Y. Dep. 212:1-13, 213:14-215:5, 214:9-12; ████████ Dep. 76:4-21.

Thus, Booz Allen and EverWatch have the ability to directly influence and change the cost (and quality) to NSA for this type of contract.

Booz Allen's history with the MASON III contract is further evidence that this is not some mere possibility but rather a likely outcome. The MASON III contract initially expired in 2019; but Booz Allen has continued to provide services for MASON III through a series of contract extensions with NSA. Booz Allen had no competition for those contract extensions. ████████ Dep. 228:15-19. Booz Allen obtained increased rates through those extensions—well aware that the increased price through those extensions "might impact" later cost estimates for the follow-on contract. *See* ████████ Dep. 108:22-110:8; Ex. 6, BAH_DOJ_00018260 at -270 (showing price increases); Deposition of Mark Chicu (Sept. 2, 2022) ("Chicu Dep.") 164:18-165:2 (discussing impact of extensions on "labor rates and other factors").

Defendants may also argue (incorrectly) that their ability to unilaterally increase price is constrained by "past performance" metrics and reputational incentives.[31] Opp'n 3, 18. But past performance is not a consideration for OPTIMAL DECISION—precisely to encourage

---

[31] To the extent that Defendants seek to elicit testimony or rely on evidence concerning Booz Allen's "reputation," such evidence is impermissible character evidence under FRE 404 and 405, and should be excluded as irrelevant under FRE 401 and 402. And even if relevant, such evidence should be excluded under FRE 403 given that its probative value (if any) is substantially outweighed by a danger of unfair prejudice and confusing the issues. "Past performance" is not an evaluation criterion for OPTIMAL DECISION; but even if it were, a company's reputation is not a consideration for past performance under the federal acquisition regulations. *See, e.g.*, Kevin Y. Tr. 147:2-6; Tenaglia Tr. 86:20-88:1, 90:7-20.

competition.[32]  And even if it were, it would be just *one* of many factors—such as cost, price, technical score, or oral presentations pertaining to an offeror's capability, work plans or approaches, staffing resources, transition plans, or sample task—that an agency may consider in determining which proposal would provide "best value."  FAR § 15.101 (Best value continuum); *see also id.* § 15.102(c) (Oral Presentations).  Also, profit—not reputation—is the key incentive here.  Defendants' Merger Agreement, which guarantees unrestrained price increases, changes *that* incentive for them.

The evidence will also show that the bidder has substantial flexibility with respect to the quality of the proposal.  For instance, the *bidder* decides what management and technology to put forward in a proposal.  *See, e.g.,* ▮▮▮ Dep. 172:10-15 (Q. "▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮"); Kevin Y. Dep. 209:16-22.  As a result, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"  ▮▮▮▮▮ Dep. 132:12-134:22.[33]

---

[32] An agency can, under certain circumstances, decide to not consider past performance.  *See, e.g.,* FAR §§ 15.101-2 & 15.304(c)(3)(iii).

[33] *See also* ▮▮▮▮▮ Dep. 177:22-178:18; Ex. 17, BAH_DOJ_00012759 (Oct. 26, 2020 email from ▮▮▮▮▮▮▮▮ to ▮▮▮▮▮▮, stating: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮); ▮▮▮▮▮ Dep. 111:20-112:2 (Q. "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮").

These non-cost factors can, in fact, determine which bidder will be awarded the contract. Dep't of Def. Source Selection Procedures 2022 § 3.9.2.  Booz Allen, for example, was selected for the MASON III award despite putting forward a bid with a higher cost.  And, for OPTIMAL DECISION, one of the major components of the evaluation criteria is performance in an oral presentation.  *See* Ex. 18, USDOJ-007-00000289 at -293 (OPTIMAL DECISION Proposal Evaluation Criteria); Ex. 19, USDOJ-002-00000001 at -18-22 (OPTIMAL DECISION Proposal Presentation Instructions).

B.   There Are No Significant Countervailing Competitive Effects

Thus far, Defendants have provided nothing but conclusory claims that this merger will result in "synergies."  *See* Defs.' Answer (ECF 82, July 7, 2022) at 38.  As set forth in the United States' separate motion seeking to preclude any evidence of "efficiencies" or pro-competitive effects, there is no evidence in the record that would support an argument that there are verifiable or merger-specific pro-competitive effects that would result from the Merger Agreement. *See also* Reply Br. 15.

Defendants' claims that the deal would enhance Booz Allen's ability to compete against Lead System Integrators ("LSI") like Lockheed Martin are unsupported. Opp'n 6.[34]  Defendants have failed to identify any meaningful cost savings.  *See, e.g.*, ███████ 156:3-11 (Q. "██████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████"); ██████ Dep. 47:8-47:14 ("█████████████████████████████████████████████████████████████████████████

_____

[34] *See* ██████ 34:10-16 ( ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████ ).

19

███████████████████████████████████████████" (emphasis added)).

Defendants' other claims are belied by the actual record as well. Instead of verified procompetitive efficiencies, Booz Allen identified *profit* synergies. ██████ Dep. 34:22-35:8

███████████████████████████████████████████████████████

██████████ Further, in December 2021, Booz Allen's management met for the first time with EverWatch's management regarding the possibility of an acquisition. Internally, Booz Allen identified three NSA contracts as key to the "█████████████████████████████████

███████████. Ex. 20, BAH_DOJ_00054086 at -094 (noting that acquiring EverWatch would "███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████); *see also* ██████ Dep. 34:22-35:15 (noting that a ████████████████

███████████████████████). Of those three contract opportunities, Booz Allen was the incumbent for OPTIMAL DECISION, *see* ██████ Dep. 39:8-17, and EverWatch had incumbency for ██████████ (another contract in which Booz Allen is competing against EverWatch) and ██████████ (a contract in which Booz Allen is currently a subcontractor). In other words, the pitch was simple: Booz Allen would rather guarantee itself another win on OPTIMAL DECISION, and it would significantly increase its chances of winning ████████████ and ██████████, than compete against EverWatch for those contracts.

Defendants have also admitted that some dis-synergies may result from the Merger Agreement. For instance, an internal Booz Allen presentation from Feb. 16, 2022 raised concerns that the merger would result in higher costs and therefore lower its competitive value—a phenomenon it described as ████████████ Ex. 21, BAH_DOJ_00006304 at -307. Even if Booz Allen were to help EverWatch grow, Defendants clearly know that Booz Allen might do

so at the expense of EverWatch's competitive advantage.

Further, any possible procompetitive effects are not merger-specific.  For instance, Booz Allen employees believe that Booz Allen and EverWatch may team together on ████████ — regardless of whether the merger is consummated.  *See, e.g.,* ██████ Dep. 214:1-4 (████████ ████████████████████████████████████████████████).

Accordingly, if there are any such procompetitive effects for other government contracts, they can be realized without allowing Booz Allen to acquire its only competitor for OPTIMAL DECISION.

Moreover, even if Defendants do put forward evidence of pro-competitive effects, any such efficiencies could "could be reasonably achieved through less anticompetitive means."  *Am. Express Co.*, 138 S. Ct. at 2284.  Booz Allen could have acquired a different company—rather than its only competitor for OPTIMAL DECISION.  Booz Allen could also team with EverWatch, *see supra* 21, or develop its own in-house capabilities by investing in personnel or technology, *see* Mot. 27; Reply Br. 16-17.

Simply put, Booz Allen's "if you can't beat them, acquire them" approach to EverWatch is anticompetitive—not efficient.  Defendants have completely failed to put forward any specific or verifiable evidence supporting their claim that the merger would produce offsetting procompetitive effects like "improving competition, enhancing service, and stimulating innovation."  Opp'n 26-27.

Finally, Booz Allen may suggest that OPTIMAL DECISION represents a small contract for them and that they bought EverWatch for other reasons.  Whether or not that is true, that defense is irrelevant.  First, this clearly is not a *de-minimus* situation (nor is there a *de-minimus* exception to the antitrust laws if it were).  OPTIMAL DECISION represents a contract worth more than $100 million over five years and involves important national security capabilities.  Second,

although Booz Allen is a massive company, EverWatch is not.  One year of revenue from OPTIMAL DECISION would account for a substantial portion of percent of EverWatch's 2021 revenues.  Securing OPTIMAL DECISION would be substantial for EverWatch and thus, in the absence of the transaction, provide them a strong incentive to compete aggressively to win the award. Finally, even if Booz Allen wanted to buy EverWatch for other reasons, those reasons would not excuse the loss of competition that is likely to result if this deal is not suspended.

## II.     The United States Would be Irreparably Harmed Absent a Preliminary Injunction

The United States is requesting a temporary suspension of the Merger Agreement until there is resolution following a full trial on the merits, which will restore pre-Merger Agreement competition for OPTIMAL DECISION.[35]   Anything less than suspension of the Merger Agreement (or outright termination), which would permit either Booz Allen and EverWatch the opportunity to abandon the merger without breaching the Merger Agreement and to continue to bid on OPTIMAL DECISION independently, will not suffice to stop the ongoing harm. Defendants have reduced incentives to compete *now* even while they continue to advance the merger process: continuing the process of integration planning, making offers employment related to the merger, transferring funds or establishing escrow accounts, obtaining financing, and notifying subcontractors, vendors, suppliers, or customers.  Defendants, in other words, are assembling their proposed final bids for the OPTIMAL DECISION contract with the expectation that the merger may go forward.  Without a suspension of the Merger Agreement, NSA faces a

---

[35] Defendants may make much ado about the change in nomenclature between "abrogation," Mot. 31, and our current use of the phrase "temporary suspension" and suggest that the United States is backtracking.  It is not.  The United States seeks a preliminary injunction to restore the pre-Merger Agreement competitive landscape between Defendants. *See* Reply Br. 19-20.

Hobson's choice: It will either have to choose award OPTIMAL DECISION to an anticompetitive bid or delay the release of the final OPTIMAL DECISION RFP at great cost.

Defendants may argue that a temporary suspension will "kill" Booz Allen's proposed acquisition of EverWatch.  But that makes no sense. "If the merger makes economic sense now, [Defendants] have offered no reason why it would not do so later."  *FTC v. H.J. Heinz*, 116 F. Supp. 2d 190, 201, n.9 (D.D.C. 2000). A preliminary injunction is the only way to end the continuing harm to competition created by the Merger Agreement.  The OPTIMAL DECISION RFP will be released imminently, and Defendants will be preparing their bids.  If Defendants put forward bids while their incentives are significantly reduced, full relief will be impossible.  *See* Mot. 30-31 (citing *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 600 F. Supp. 1326, 1332 (E.D. Mich. 1985) ("If preliminary relief is not awarded and the merger is subsequently found to be unlawful, it would be extremely difficult, if at all possible, to remedy effectively the unlawful merger.").  For the reasons explained in more detail below, any other remedies that Defendants may propose—such as enacting a firewall between the bidding teams of the two companies or providing personal bonus incentives to winning bid team members—are not structural remedies that can restore these reduced incentives.  Defendants must be enjoined from taking *any* actions in furtherance of the Merger Agreement until there has been a full trial on the merits.

Suspending the Merger Agreement is well within the ambit of this Court's authority.  Indeed, "[t]he proper remedy for a section 1 violation based on an agreement to restrain trade is to set the offending agreement aside.  From the standpoint of preliminary injunctive relief, "that would mean ordering [defendants] not to implement . . . their . . . agreements." *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017). *See De Beers Consol. Mines v. United*

*States*, 325 U.S. 212, 220 (1945) ("A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally.").

     *1.  Delaying the release of the final RFP would not prevent irreparable harm*

NSA is unable to further delay the release of the final RFP without irreparable harm.  *See supra* 7.  NSA has tried multiple times to seek more prime contractors to no avail.  *See supra* 11.  That is because the barriers to entry are extremely high for a new entrant to meaningfully compete.  *See supra* 5.

     *2.  Extending the current MASON III contract would not prevent irreparable harm*

Extending the MASON III does not avoid this irreparable harm: it guarantees it.  NSA would merely be extending Booz Allen's monopoly over the MASON III contract, giving Booz Allen yet another opportunity to increase prices well beyond NSA's pre-negotiation objective.[36] *See supra* 7-8.

     *3.  Only a preliminary injunction pending a full trial on the merits will avoid irreparable harm*

Because MASON III expires in March 2023, and it will take months to fully bring the winner of OPTIMAL DECISION on board, NSA must issue the RFP in the near future or else be forced to extend MASON III.  Failure to issue the RFP would endanger NSA's ability to acquire critical signals intelligence modeling and simulation services.  Under these circumstances, NSA must either negotiate with Booz Allen alone to extend MASON III or negotiate with either Booz Allen or EverWatch—who plan to merge—to receive these services.  Delaying the RFP or extending MASON III does not avoid either scenario.  A preliminary injunction of the Merger Agreement, by contrast, guarantees that NSA will be able to negotiate with two, independent

---

[36] *See* Chicu Decl. ¶ 57 ("[I]n an extension of the MASON III contract for one year, Booz Allen was able to negotiate a total cost 5.6% above NSA's pre-negotiation objective . . . .").

competitors and receive competitive bids for signals intelligence modeling and simulation services.  *See also* Mot. 29-33; Reply Br. 17-19.

### III.     The Balance of Equities and Public Interest Favor a Preliminary Injunction

Preservation of competition is the "central purpose of the antitrust laws, state and federal," and "vital to public interest,"  *Glen Holly Ent., Inc. v. Tektronix Inc.*, 352 F.3d 367, 373 (9th Cir. 2003); *F.T.C. v. Swedish Match N. Am. Inc.*, 131 F. Supp. 2d 151, 173 (D.D.C. 2000) ("There is a strong public interest in effective enforcement of the antitrust laws."), and is "not easily outweighed by private interests."  *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980).  Issuing a preliminary injunction here ensures that Booz Allen and EverWatch remain distinct and separate competitors, therefore preserving competition.  *See* Mot. 34-35; Reply Br. 20.

In considering a preliminary injunction, "[t]he principal public equity in weighing in favor of . . . relief is the public interest in effective enforcement of the antitrust laws."  *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001).  Further, "[a]ny doubt concerning the necessity of the safeguarding of the public interest should be resolved by the granting of a preliminary injunction."  *Columbia Pictures Indus., Inc.*, 507 F. Supp. at 434 (granting United States' motion for a preliminary injunction on Section 1 a claim).  Preventing the elimination of an effective competitor "is sufficient to satisfy the public interest criterion."  *Marathon Oil Co. v. Mobil Corp.*, 530 F. Supp. 315, 320 (N.D. Ohio 1981).  Accordingly, Booz Allen's attempt to eliminate EverWatch as a meaningful competitor here is the exact scenario warranting injunctive relief.

### IV.     Defendants' Proposed Order Would Not Restore the Competitive Intensity that Would Occur Absent the Merger Agreement

Plaintiff seeks a simple solution to Defendants' attempt to combine the only two bidders for OPTIMAL DECISION on the cusp of bidding: to temporarily suspend the merger agreement

pending resolution following a full trial on the merits. *See* Pls.' Proposed Order (ECF. 29-17, July 7, 2022). This solution gives Defendants the ability to walk away from the Merger Agreement without triggering a breach-of-contract claim and to continue to bid on OPTIMAL DECISION, albeit independently. By contrast, Defendants have proposed a complex set of behavioral remedies that do not cure the competitive problem. Rather, Defendants' made-for-litigation proposal represents a flawed, regulatory solution that would allow the Defendants to close and guarantee Booz Allen with the spoils of OPTIMAL DECISION—among other things, everyone bidding on the contract under Defendants' proposal would know that. *See* Hearing Tr. 34:9-36:18; Ex. 22, (Defendants' Proposed Order).[37] As Plaintiff will explain in more detail at the forthcoming hearing, including through testimony from Dr. Mark Chicu, Defendants' Proposed Order fails to restore the "competitive intensity" that would exist but for the merger agreement and should be rejected. *See* United States v. Aetna Inc., 240 F. Supp. 3d 1, 60 (D.D.C. Jan. 23, 2017).[38]

The Supreme Court instructs that "[t]he relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'" *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (quoting *United States v. Du Pont & Co*., 366 U.S. 316, 326 (1961)). Courts routinely find behavioral promises, like Defendants' promises to construct and maintain separate bidding teams within the merged firm, inadequate to rebut the predicted anticompetitive effects of a merger. *See, e.g., F.T.C. v. H.J. Heinz Co.,* 246 F.3d 708, 721 (D.C. Cir. 2001) (viewing

---

[37] Defendants provided their Proposed Order to the Court during the hearing on August 30, 2022—after the close of fact discovery—which effectively precluded fact discovery as to their proposal. *See* Hearing Tr. 34:2-12.

[38] Defendants attempted to justify their Proposed Order by comparing it to other settlements the Antitrust Division has reached. Those earlier settlements—especially the Hold Separate agreements they contained—were designed to ensure the success of a divestiture remedy that was intended to replace lost competition, not to serve as the basis for what is at stake here—curing competitive harm.

behavioral promises with skepticism where merger reduces competition structurally); *United States v. H&R Block, Inc*., 833 F. Supp. 2d 36, 82 (D.D.C. 2011) (rejecting offer to freeze prices because, while there was "no reason to doubt that defendants would honor their promise, this type of guarantee cannot rebut a likelihood of anticompetitive effects in this case"); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 65 (D.D.C. 1998) ("Defendants' guarantees alone cannot cure the likely anti-competitive effects of the mergers.").

As explained above, Plaintiff will demonstrate through fact testimony, documents, and the expert testimony of Dr. Chicu, the merger agreement between Booz Allen and EverWatch, upon its signing, reduced the companies' economic incentives to compete to provide NSA with signals intelligence modeling and simulation support services in violation of Section 1 of the Sherman Act.  As discussed, Plaintiff has proposed a simple and effective solution: to temporarily suspend the merger agreement pending resolution following a full trial on the merits, restoring competition between Booz Allen and EverWatch.  *See generally* Pls.' Proposed Order.

By contrast, as mentioned, Defendants propose a complex, multi-part behavioral commitment.  *See* Ex. 22, (Defendants' Proposed Order).  But Defendants' Proposed Order does nothing to change the fundamental fact that if the merger agreement has not been suspended, the members of both bidding teams will know that Booz Allen will likely acquire the OPTIMAL DECISION contract no matter who wins the bid initially. Defendants have not offered a solution that would solve this fundamental problem.

Defendants' Proposed Order is also replete with other problematic elements, including that Defendants propose that Booz Allen rely on self-reporting by specified individuals that they are "not aware of any violation of the [Proposed] Order."  Ex. 22 (Defendants' Proposed Order)at 5. In short, Defendants' Proposed Order sets out to do something that would be very difficult if not

impossible—to artificially re-create meaningful competition by contract within a single merged company—and then misses the mark with insufficient incentives, vague language, and inadequate monitoring.

## **CONCLUSION**

For the reasons set forth above, and in the United States' Motion for a Preliminary Injunction and Memorandum of Law in Support, the Court should issue a Preliminary Injunction temporarily suspending Defendants' Merger Agreement pending a final trial on the merits.

Dated this 9th day of September, 2022.

Respectfully submitted,
**FOR PLAINTIFF UNITED STATES OF AMERICA**:

       _____/s/_____

Jay D. Owen
KEVIN QUIN (special admission)
JAY D. OWEN (special admission)
ALEXANDER ANDRESIAN (special admission)
ALEX COHEN (special admission)
MARTHA FITZGERALD (special admission)
KERRIE FREEBORN (special admission)
BRIAN HANNA (special admission)
NATALIE HAYES (special admission)
MIRANDA ISAACS (special admission)
STEVEN KRAMER (special admission)
ARIANNA MARKEL (special admission)
JONATHAN MINCER (special admission)
BENJAMIN RUDOFSKY (special admission)
BRYN WILLIAMS (special admission)
Trial Attorneys
United States Department of Justice
Antitrust Division
Defense, Industrials, and Aerospace Section
450 Fifth Street N.W., Suite 8700
Washington, DC 20530
Telephone: (202) 476-0251
Facsimile: (202) 514-9033
Email: Kevin.Quin@usdoj.gov
ARIANA WRIGHT ARNOLD
USDC Md Bar No. 23000
Assistant United States Attorney
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
Telephone: 410-209-4813
Facsimile: 410-962-2310
Email: Ariana.Arnold@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 9, 2022, I electronically filed the foregoing Pre-trial Brief using the CM/ECF system, and thereby served, via electronic filing, counsel of record for all parties.

_____/s/_____

Jay D. Owen (special admission)
Trial Attorney
United States Department of Justice
Antitrust Division