**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA,

*Plaintiff*,

vs.                                                                    Case No. 1:22-cv-01603-CCB

BOOZ ALLEN HAMILTON INC., *et al.*,

*Defendants*.

**<u>DEFENDANTS' POST-HEARING BRIEF</u>**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT ......................................................................................................................4

    I.      DOJ's one-changed-incentive theory fails as a matter of law and fact...................4

    II.     DOJ has not identified a valid economic market and cannot show market power...................................................................................................................8

    III.   DOJ has not identified "direct evidence" of anticompetitive effects....................14

    IV.   The procompetitive benefits outweigh any anticompetitive effect, and they cannot be achieved through substantially less restrictive means. ..........................16

    V.     Defendants' Proposed Order resolves any possible competitive concern. ............20

    VI.   The Court should enter judgment in Defendants' favor. .......................................23

CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                    **Page(s)**

*Berlyn Inc. v. The Gazette Newspapers, Inc.*,
   73 F. App'x 576 (4th Cir. 2003) ..........................................................24

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)..........................................................................24

*City of New York v. Grp. Health Inc.*,
   No. 06-cv-13122, 2010 WL 2132246 (S.D.N.Y. May 11, 2010) ...........................9

*Continental Airlines, Inc. v. United Airlines, Inc.*,
   277 F.3d 499 (4th Cir. 2002) ............................................................4, 5

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
   363 F.3d 761 (8th Cir. 2004) ...............................................................3

*Dickson v. Microsoft Corp.*,
   309 F.3d 139 (4th Cir. 2002) ...................................................4, 12, 16

*FTC v. H.J. Heinz Co.*,
   246 F.3d 708 (D.C. Cir. 2001) ............................................................24

*FTC v. Penn State Hershey Med. Ctr.*,
   838 F.3d 327 (3d Cir. 2016).........................................................11, 12

*Gen. Dynamics Corp. v. United States*,
   563 U.S. 478 (2011)...........................................................................6

*Havoco of Am., Ltd. v. Shell Oil Co.*,
   626 F.2d 549 (7th Cir. 1980) ..............................................................12

*In re Illumina, Inc.*,
   No. 9401 (FTC Sept. 9, 2022),.....................................................5, 6, 20

*It's My Party, Inc. v. LiveNation, Inc.*,
   811 F.3d 676 (4th Cir. 2016) ............................................................8, 9

*Lockheed Martin Corp. v. Boeing Co.*,
   390 F. Supp. 2d 1073 (M.D. Fla. 2005).................................................12

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021)..................................................................19, 20

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018)..................................................................8, 14

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)...................................................................................9, 11

*Triple M Roofing Corp. v. Tremco, Inc.*,
   753 F.2d 242 (2d Cir. 1985)........................................................................................12

*United States ex rel. Blaum v. Triad Isotopes, Inc.*,
   104 F. Supp. 3d 901 (N.D. Ill. 2015) .........................................................................12

*United States v. AT&T, Inc.*,
   916 F.3d 1029 (D.C. Cir. 2019) .................................................................................20

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956).....................................................................................................8

*United States v. Raytheon*,
   No. 1:97-cv-02397 (D.D.C.) .......................................................................................21

*United States v. UnitedHealth Grp. Inc.*,
   1:22-cv-00481 (D.D.C. Sept. 21, 2022), ECF No. 138.........................................5, 14

## STATUTES

Clayton Act § 7 ...........................................................................................3, 5, 24, 25

Sherman Act § 1................................................................................................ *passim*

## SECONDARY SOURCES

Am. Bar Ass'n, Antitrust Law Developments,
   (9th ed. 2022) ............................................................................................................17

**INTRODUCTION**

Three months ago, the Department of Justice ("DOJ") filed a Complaint alleging that Booz Allen "decided to stop competing with Everwatch" for the National Security Agency's ("NSA") OPTIMAL DECISION ("OD") procurement "and instead chose to buy the company." ECF No. 1 ¶ 3. Even though NSA has expressed no concern with the merger, DOJ went so far as to call the merger a "scheme" to monopolize OD that "must be blocked" to avoid great harm to "NSA—and the Americans that it defends." ECF No. 29-1 at 1; ECF No. 1 ¶ 6. When asked about these allegations, NSA's Dr. S., a 40-year agency veteran, recognized them for what they are— "rhetoric." Dr. S. Dep. Tr., Ex. F at 169:4–13. But that rhetoric is divorced from reality. The extensive record now makes clear that DOJ has not come close to establishing a violation of antitrust law.

As NSA witnesses confirmed, OD is a "relatively small" NSA procurement, Kevin Y., Ex. B at 22:13–14, worth less than $17 million in maximum potential profits over five years. Booz Allen's $440 million merger is not about OD. It is about providing innovative solutions and improving competition for a wide array of procurements worth billions of dollars, many of which are currently dominated by larger entrenched incumbents. Dotson, Ex. C at 15:12–25, 16:6–18, 37:1–18; DX 18, Ex G at 16–17.[1] Nevertheless, DOJ asks this Court to kill the merger agreement, and thwart the competition it would bring, over a misguided concern about OD alone. When it comes to protecting competition, DOJ's lawsuit has it exactly backwards.

DOJ's speculation regarding Booz Allen and EverWatch's intentions and conduct as to OD was wrong. The evidence shows that both companies are vigorously competing for OD—and for

---

[1] Any temporal connection between the merger and the release of the OD RFP was coincidental, resulting from three years of successive delays by NSA. *See* Response to Interrogatory No. 3, Ex. H; Dr. S., Ex. A at 121.

good reason. Presenting quality bids is essential to safeguarding their reputations with NSA, their subcontractor teams, and their employees. Further, the employees on the respective capture teams could lose compensation and even their jobs if their team does not win. These employees are also dedicated to NSA's mission and understand the work they perform supporting that mission is "a privilege." Robertson, Ex. C at 73:24–25, 80:20–21, 87:22–25.

In contrast to Defendants' abundant, credible, and concrete evidence of competition, DOJ has nothing more than a theory. DOJ collected nearly 28,000 documents from Defendants, took dozens of hours of depositions, and participated in a two-day evidentiary hearing. Yet, all DOJ points to in support of its theory is a handful of communications from lower-level employees immediately following the transaction's announcement. *See* Chicu, Ex. B at 92:5–9. These employees were not involved in the transaction, were understandably surprised by its announcement, and immediately asked for direction from their superiors.[2] The advice they got was to continue competing "full steam ahead." Cooper, Ex. C at 53:6–9; *see also* Robertson, Ex. C at 84:16–24. And they have done just that.

Without any actual evidence, DOJ is left with its in-house economist's speculation. Dr. Chicu's opinion rests *entirely* on a supposed "directional" change to *one* competitive incentive. Chicu, Ex. B at 95:8–11, 105:14–106:3. Dr. Chicu did not even attempt to quantify the magnitude of that change, whether it would be material, whether acting on it would be profitable, or how it weighed against the overwhelming counterincentives to bid aggressively. As Defendants' expert, Dr. Bailey, explained, Dr. Chicu's refusal to weigh the relevant incentives makes no sense, and his

---

[2] It is telling how hard DOJ fought to manipulate the record to feed its narrative, "strenuously oppos[ing]" the admission of a complete chat discussion, Ex. A at 7:9, and arguing that the Court should accept DOJ's interpretation of a hearsay-filled email without any foundation, *see* Pre-Hearing Conference, Ex. I at 22:1–23:9.

refusal to consider profitability renders his "analysis" economically meaningless. Bailey, Ex. D at 25:7–13. Additionally, Dr. Chicu did not analyze whether any remedy would be sufficient to counter the harm created by this one changed incentive, including DOJ's proposed remedy. Chicu Dep. Tr., Ex. J at 241:16–242:14. Courts reject experts, like Dr. Chicu, who offer their speculative say-so as valid economic analysis.[3] But even if not excluded, Dr. Chicu's unsupported theorizing deserves no weight.

In the end, whatever DOJ's concern, any risk is undisputedly small and fleeting. The entire premise of DOJ's preliminary-injunction motion was that the "critical period of competition" for this small NSA procurement was the window between the RFP's release (which occurred on September 14) and the submission of bids. *See* ECF No. 29-1 at 10 (referring to this 45-day window). To kill Defendants' $440 million deal over this small, short-term concern would violate basic principles of equity and would harm, not preserve, competition overall.[4]

This Court should deny DOJ's preliminary-injunction motion and enter final judgment for Defendants. No further proceedings are necessary for this Court to conclude that DOJ cannot prove an antitrust market, anticompetitive effects, or any element of an antitrust claim, whether under Sherman Act § 1 or Clayton Act § 7. Alternatively, should the Court feel an order is needed to ensure Defendants comply with their previously expressed commitments and already existing incentives, Defendants respectfully request that the Court enter the Proposed Order (Ex. E).

---

[3] *See, e.g.*, *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004) (excluding expert economist's testimony because it failed to "incorporate all aspects of the economic reality").

[4] To the extent DOJ contends that Defendants will not be prejudiced by waiting to close until after bids are submitted or OD is awarded, that is obviously incorrect. NSA may extend the timeline for many reasons, and time is of the essence with this transaction.

## ARGUMENT

DOJ cannot meet its burden under the rule of reason to show a Sherman Act § 1 violation. First, DOJ's theory fails as a matter of law and fact because establishing a directional change in a single incentive taken in isolation proves nothing, much less an antitrust violation. Second, DOJ's proposed "market" is a made-for-litigation construct, divorced from law or economics. Third, DOJ has not shown that *any* anticompetitive effects are likely, much less ones that are *substantial*. Fourth, any potential anticompetitive effects are outweighed by the transaction's procompetitive benefits, and DOJ has not established a substantially less-restrictive alternative.

## I.      DOJ's one-changed-incentive theory fails as a matter of law and fact.

DOJ's theory is that, if an agreement theoretically lessens one competitive incentive, the Sherman Act is breached. Neither DOJ nor its expert did anything to determine the strength of that changed incentive, its magnitude, whether countervailing incentives outweigh the changed incentive, or whether acting on the incentive is profitable. Chicu, Ex. B at 75:7–21, 95:8–11, 96:11–16, 96:20–97:10, 98:6–15, 98:18–20, 110:6–7. DOJ focuses only on what the agreement changed. *See id.* at 75:7–21, 76:9–12. The law requires much more.

"Theorizing about conceivable impairments of competition does not, of course, prove that any such impairment has occurred or is likely, or much less is substantial in magnitude." *Dickson v. Microsoft Corp.*, 309 F.3d 139, 207 (4th Cir. 2002). To establish a Sherman Act § 1 violation, the plaintiff must show that anticompetitive "harm is not only possible but likely and significant." *Id.* at 206. For example, in *Continental Airlines, Inc. v. United Airlines, Inc.*, the Fourth Circuit reversed a district court's grant of summary judgment for a Sherman Act § 1 plaintiff. 277 F.3d 499 (4th Cir. 2002). Although the agreement at issue had the *potential* to harm customers by restricting Continental's carry-on service, the Fourth Circuit concluded the plaintiff had not

established that the agreement "*actually* restrained trade, *i.e.*, whether the program *actually* restricted Continental's carry-on service." *Id.* at 515 (emphasis added).[5]

This is not just the law under Sherman Act § 1. It is the law under Clayton Act § 7 too, and thus is fatal to DOJ's entire case. Earlier this week, a district court rejected a similar merger challenge from DOJ predicated on changed "incentives." Op., *United States v. UnitedHealth Grp. Inc.*, 1:22-cv-00481 (D.D.C. Sept. 21, 2022), ECF No. 138. Among other things, DOJ alleged that the merger would give the combined firm "the ability and incentive" to use certain confidential information to harm competition. *Id.* at 15, 31. In relevant part, the court held that "the central problem with [DOJ's] claim is that it rests on speculation rather than real-world evidence." *Id.* at 33. The court concluded that, given stronger countervailing incentives, DOJ had failed to show likely *action* because of the changed incentive. *Id.*

> [T]he Court finds[] that United's incentives are not nearly as one-sided as the Government suggests. To be sure, the evidence did establish that United has an incentive to arm UHC with valuable insights about its health insurance rivals. But the evidence also established that United has incentives to protect its external customers' (including its rival payers') claims data and CSI—incentives that are embodied in United's firewall policies and customer contracts. The question, then, is which set of incentives is most likely to drive United's post-acquisition behavior. . . . The Court finds, based on all the evidence presented at trial, that United's incentives to protect external customers' data outweigh its incentive to "misuse" that data.

*Id.* at 39. Of particular note for this case, the court there held that it had to "consider the financial and reputational costs to United if it were to breach or water down its firewall policies." *Id.* at 44.

That case is remarkably recent and relevant—and it is not alone. Just a few weeks ago, an antitrust administrative law judge ("ALJ") rejected a Clayton Act § 7 merger challenge brought by the FTC under a theory similar to DOJ's here. Decision at 168, *In re Illumina, Inc.*, No. 9401 (FTC

---

[5] Internal quotation marks, alterations, and citations have been omitted from quotations throughout.

Sept. 9, 2022).[6] The ALJ rejected the FTC's suggestion that it only had to prove that the defendant had an "incentive" and an "ability" to cause an anticompetitive effect to meet its *prima facie* burden. *Id.* The ALJ emphasized that the government had failed to "sufficiently account for [certain] counterincentives." *Id.* at 174. These included reputational backlash and the fact that Illumina's executives had testified under oath that they would comply with contractual provisions (such as informational firewalls) limiting its ability to act on the purported incentives. *Id.* at 180–84. The ALJ concluded that "[a]t most, [the government] has demonstrated that it is possible" anticompetitive effects might arise, and that is not enough. *Id.* at 178.

As these cases hold, antitrust law is not concerned with the *possibility* that anticompetitive effects might arise from one *theoretical* changed incentive, without consideration of the magnitude of the supposed changed incentive and whether counterincentives make *acting* on it unlikely. Here, those counterincentives include:

- Reputation with the Government Client: Booz Allen is one of NSA's top industry partners. Dunshee, Ex. A at 82:5–14. As Booz Allen's Executive Vice President, Judi Dotson, explained: "reputation matters. Reputation translates into past performance, which is often a part of the evaluation for future opportunities." Dotson, Ex. C at 13:1–3. EverWatch's Brian Cooper echoed the same. Cooper, Ex. C at 51:19 ("In our market, you know, credibility and reputation is everything.").[7] Submitting a deficient bid on OD would harm these contractors' reputation and ability to gain *much larger* government contracts. Dotson, Ex. C at 12:24–13:3; Cooper, Ex. C at 51:16–52:1; Catrambone, Ex. C at 110:15–23; Bailey, Ex. D at 26:1–12.

- Reputation with Teaming Partners: Teaming with subcontractors is a standard feature of this industry. If EverWatch chooses not to compete for OD, its "ability to build teams in the future would be very challenging. People don't want to be on teams that have the potential of folding." Cooper, Ex. C at 51:22–24; *see also* Catrambone, Ex. C at 109:24–110:3, 110:8–11.

- The Importance of the Mission: There are roughly 80 Booz Allen personnel currently servicing MASON III—and Booz Allen's personnel have been providing these quality services to NSA for decades. *See* Dr. S., Ex. A at 119:19–21 (testifying that Booz Allen has "been an effective mission partner"). "[E]very one of them views this as a privilege to be part of this mission.

---

[6] *Available at* https://www.ftc.gov/system/files/ftc_gov/pdf/D09401InitialDecisionPublic.pdf.

[7] "Government contractors—especially cutting-edge defense contractors" "are repeat players" with a "strong incentive to behave rather than risk missing out on the next multibillion-dollar defense contract." *Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 491 (2011).

And every one of them wants to make sure that we secure the follow-on work for the long-term." Robertson, Ex. C at 80:20–23. It would "rock their world" to lose this contract and the ability to work alongside NSA colleagues, as they have been doing for years. Robertson, Ex. C at 80:4–16.

- <u>Individual Reputational Concerns:</u> Becky Robertson testified that she has developed a reputation with the government over the last 27 years. Robertson, Ex. C at 79:17–24. And she explained that, if Booz Allen submitted a lackluster bid for OD, "it would be very damaging to my reputation," and "if I did anything to shake that type of reputation, I might as well retire." *Id.*

- <u>Job-Security and Financial Incentives:</u> The lower-level individuals working on the capture teams have strong *personal* incentives to submit aggressive bids. Amanda Gosnell testified that, if Booz Allen loses, she has "to find a new job." Gosnell Dep. Tr., Ex. K at 147:4–7. And EverWatch employees risk losing financial bonuses if they do not win OD. Cooper, Ex. C at 52:6–11.

- <u>Bidder Uncertainty:</u> No one knows whether others will bid for OD. Although only Booz Allen and EverWatch submitted letters of intent, such letters are not required to bid, and "dark-horse" bids do occasionally happen. Catrambone, Ex. C at 138:14–24 (testifying that EverWatch lost STEELBOW to a dark-horse bidder); Robertson, Ex. C at 82:22–23 ("We rarely get confirmation on who all the competitors are any given competitive bid."). Thus, Booz Allen "always" "assume[s] there are multiple other competitors." Robertson, Ex. C at 82:15–19; *see also* Cooper, Ex. C at 47:23–49:10 (explaining changes to the RFP that could attract additional bidders); Dunshee, Ex. A at 94:11–18.

Any valid "incentives" theory, moreover, would have to account for the magnitude of the purported incentive to compete less aggressively—something DOJ did not do. *See* Bailey, Ex. D at 10:20–25 (explaining that Dr. Chicu failed to measure or consider the magnitude of the changed incentive). That magnitude is significantly diminished here by the tiny "upside" to acting on the incentive. OD is a "relatively small" contract. Kevin Y., Ex. B at 22:13–14; *see* Robertson, Ex. C at 69:24–70:2. As Dr. Bailey testified and explained, it would make no economic sense to act on such a small financial incentive, when doing so could cost Defendants tens of millions of dollars in profits from much larger procurements. Bailey, Ex. D at 17:4–5, 18:17–23, 19:2–11.

Simply showing a directional lessening of a single competitive incentive is not enough. DOJ needed to show that substantial anticompetitive effects are *likely*, meaning that it needed to show that *conduct* was likely, meaning that it needed to consider the *net* effect of *all* relevant

incentives by balancing their relative strength. As Dr. Chicu admitted, "an incentive is just the first step along the way to evaluating whether or not there's an effect." Chicu, Ex. B at 85:17–18. DOJ did not even start down that road.

## II.    DOJ has not identified a valid economic market and cannot show market power.

A valid Section 1 claim requires a properly defined, relevant product market. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition."). The relevant product market includes those products "reasonably interchangeable by consumers for the same purpose." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

As the evidence has shown, the "product" here is modeling and simulation. Dunshee, Ex. A at 46:23–24. This is a standard "systems engineering technique to develop a mathematical or a computer science instantiation of a particular part of a system, and it allows you to make architecture, design, and trade-off decisions." Dunshee, Ex. A at 36:14–17; *see also* Dr. S., Ex. A at 106:3–5 ("We develop mathematical models in order to come up with more insightful solutions."). It "is a broad tool," Dunshee, Ex. A at 97:2, used "throughout industry and the federal government," Dr. S., Ex. A at 106:20–21. In fact, there are *dozens* of modeling and simulation contracts across the federal government performed by numerous contractors. Bailey, Ex. D at 35:2–7.

DOJ asks this Court to hold that application of this "broad tool" to just one customer (NSA) in one network environment (NSA's domain) under one contract (OD) is itself an antitrust "market." Although this proposed market "suits the needs of plaintiff[]," it "casts sound economics aside." *It's My Party, Inc. v. LiveNation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016). DOJ's approach is "akin to defining a market to include tennis players who have won more than three Olympic

gold medals and finding that only Venus and Serena Williams fit the bill." *Id.* But "[n]o party can expect to gerrymander its way to an antitrust victory without due regard for market realities." *Id.*

Much of DOJ's market "evidence" boils down to the unremarkable facts that NSA needs modeling-and-simulation services from a third-party contractor, and it only acquires those services through one contract—OD.[8] But from an antitrust market perspective, that is all meaningless. *Every customer* that acquires modeling-and-simulation services from a contractor does so presumably because it has decided such services are critical to its mission, it cannot go without those services, and there were no other service that could meet its needs. This is precisely why court after court has held that a market cannot be structured around a single customer's preferences or needs. *E.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997); *It's My Party*, 811 F.3d at 683 (rejecting attempt to define a relevant market around consumers' stated preferences rather than the interchangeability of product characteristics); *City of New York v. Grp. Health Inc.,* No. 06-cv-13122, 2010 WL 2132246, at *4 (S.D.N.Y. May 11, 2010) ("[T]he preferences of a single purchaser cannot define a product market."). Not even DOJ suggests (at least out loud) that each of the thousands of modeling-and-simulation services contracts across our economy is a "market"—but that is the logical result of DOJ's reasoning.

DOJ also appears to suggest (with no evidence or analysis) that modeling and simulation *on a network involving signals-intelligence data* is so different or unique that it is a "market" unto itself. ECF No. 29-1 at 21–22. But as EverWatch's technical lead explained, application of

---

[8] For example, in support of DOJ's contrived market, Dr. Chicu insisted that (1) "NSA is the private customer of OPTIMAL DECISION services," Chicu, Ex. B at 62:18–19, (2) "NSA has no good alternative to OPTIMAL DECISION services" in part because "it cannot develop these products in-house," *id.* at 64:10–13, (3) "OPTIMAL DECISION services are critical to NSA and its mission and that NSA . . . cannot go without these services for even a short period of time," *id.* at 64:6–9, and (4) the focus should be on "the specific needs of NSA for OPTIMAL DECISION services," *id.* at 64:18–65:5.

modeling-and-simulation techniques to the signals-intelligence environment is not especially difficult or unique. Catrambone, Ex. C at 104:14–18 (calling it "fairly easy"). In fact, at the direction of Dr. S., NSA specifically chose to cut the "SIGINT Technical Specialist" as one of the handful of required "key personnel" who would be the focus of NSA's source selection process. *See* Dr. S., Ex. A at 126:20–127:16, 127:24–128:16. The source selection committee itself is focused on modeling and simulation: the "technical" people on the OD source selection committee were chosen precisely "[b]ecause they're subject matter experts in modeling and simulation." Dunshee, Ex. A at 57:10–11.

At most, DOJ's evidence shows that "you need to have domain knowledge in order to be effective *when doing modeling*." Dr. S., Ex. A at 107:9–12 (emphasis added). But, again, that truism applies to every domain.[9] Moreover, Dr. S. used "domain knowledge" as a proxy for his personal wish-list for the ideal company to win the OD procurement. For example, he said his desired "domain knowledge" included not just "the SIGINT portion," but also "experience with missions and systems," relationships with those in the NSA who steward the data, and even knowledge of "networks outside of NSA." Dr. S., Ex. A at 108:25–109:8, 114:8–16, 128:23–129:9. These preferences are so granular they include familiarity with a specific information-distribution software. Dr. S., Ex. A at 114:7–15. In other words, as the ultimate customer of OD services, Dr. S. understandably preferred a contractor with "infinite knowledge":

---

[9] Dr. S.'s story from his graduate-school days proves the point. While in graduate school, he did some modeling of the Metro subway system. Dr. S., Ex. A at 108:1–2. To do that work effectively, he needed some domain knowledge: "you need to know something about subway systems, fare card collection, what kind of data you got, what kind of data you weren't able to receive." Dr. S., Ex. A at 108:14–16. The fact that a graduate student was able to model the Metro system by applying accepted engineering techniques with relevant data from the Metro environment shows that modeling and simulation is a standard, widely used, interchangeable engineering technique that is readily applicable to *any domain* based on underlying relevant data.

> [W]hat I want the winning bidder to have is knowledge about everything that goes on at NSA, infinite knowledge on the tools available, knowledge all of our customers have. So I want them to know everything. I recognize it's a little unrealistic, but my hopes are always abundant.

Dr. S., Ex. A at 129:12–21.

Although it is understandable that Dr. S. would want the perfect candidate, from a market-definition perspective, the issue is "reasonable interchangeability," not *ideal fit*.

> Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. A person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible.

*Queen City*, 124 F.3d at 437. Indeed, it is quite telling that, if Dr. S.'s concept of "domain knowledge" were the defining feature of the "market," it would be a market with just one competitor: Booz Allen. *See* Dr. S., Ex. A at 130–31. EverWatch would not even be in the relevant market. *See* Catrambone, Ex. C at 104:22 (EverWatch has "very little experience" modeling signals-intelligence data). Dr. S. even made clear that, if Booz Allen loses the OD procurement, he wanted Booz Allen to stay aboard for at least six months to train whoever won the contract on this "domain knowledge" because only Booz Allen has such knowledge. Dr. S., Ex. A at 131:22–24. Dr. S.'s "hopes" do not logically or legally define an antitrust "market."

Dr. Chicu's relevant-market analysis fares no better. As Dr. Bailey explained, Dr. Chicu did not put "forth an analysis to have a testable hypothesis" in support of his market; instead, he assumed his conclusion. Bailey, Ex. D at 32:11–16. Nor did Dr. Chicu even attempt to apply any of the standard economic tools in a reliable or meaningful way. For example, he purported to do an analysis "consistent" with a hypothetical-monopolist test. PX 38, Ex. L ¶ 26; Chicu, Ex. B at 105:10–13. But that test asks whether a firm could *profitably* impose a small but significant non-transitory increase in price in the proposed market. *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d

327, 344 (3d Cir. 2016). Yet Dr. Chicu admits he did not consider whether any price increase was *profitable*. Chicu, Ex. B at 106:7–8. As Dr. Bailey explained, this is a fatal flaw: "the price increase that you're looking at in those tests has to be a profitable one. And simply observing that price went up tells you nothing about whether that price increase was profitable or not. At the core of those tests is whether that price increase is profitable or not." Bailey, Ex. D at 31:5–9.[10]

Courts have repeatedly rejected single-transaction markets, including in the government-procurement setting, as impermissibly narrow—and for good reason. *See, e.g.*, *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir. 1980); *Triple M Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242 (2d Cir. 1985); *United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 924–25 (N.D. Ill. 2015). As Dr. Bailey explained, "if you define the relevant product market too narrowly, what you're essentially doing is presupposing anticompetitive harm where there is, in fact, none." Bailey, Ex. D at 28:14–16. That is precisely what DOJ has done here.

DOJ also has not demonstrated that Booz Allen or EverWatch have market power, a necessary predicate to establishing that an anticompetitive effect is sufficiently substantial to trigger the Sherman Act.[11] Putting aside DOJ's failure to define a relevant market in which to judge market power, "market power is the power to force a purchaser to do something that he would not do in a competitive market." *Dickson*, 309 F.3d at 207 n.17. Here, the evidence proves that neither Booz Allen nor EverWatch can force NSA to do something it does not want. By law, NSA is not even allowed to accept a bid unless it independently determines that it is "fair and reasonable." Dunshee, Ex. A at 81:11–15. NSA sets the contents of the RFP and controls the independent cost

---

[10] Dr. Chicu's analysis is also flawed because it was based on an actual contract rather than a *hypothetical* monopolist. *See Penn State*, 838 F.3d at 344.

[11] Indeed, DOJ's proposed market is likely too narrow to even accommodate a market-power analysis. *See Lockheed Martin Corp. v. Boeing Co.*, 390 F. Supp. 2d 1073, 1080 (M.D. Fla. 2005).

estimate—the "ICE." *Id.* at 81:8–10. NSA is an experienced and sophisticated negotiator. Kevin Y., Ex. B at 41:13–15. And as the only purchaser for OD—and the holder of billions of dollars in future contracts—NSA has enormous "buyer power." Bailey, Ex. D at 26:4–12. NSA also conducts a robust analysis where it vets the bidder's proposed costs and compares them against data collected from other government agencies. Kevin Y., Ex. B at 8:19–9:4. NSA determines every six months what profit—*if any*—the OD contractor will receive. Dunshee, Ex. A at 81:23–82:4. In sum, NSA has an arsenal of tools to neutralize any possible anticompetitive effect. *See* Cooper, Ex. C at 50:16–51:27.[12]

But this Court need not take Defendants' word for it. A peer-reviewed academic article from Stanford economists studied this question. That article found "that procurement costs are not higher when there is one bidder versus multiple bidders." *See* Bailey, Ex. D at 26:23–27:2. As Dr. Bailey explained, the article concluded that, for many of the reasons discussed above, even in single-bidder situations, firms were unable to "exercis[e] any market power." Bailey, Ex. D at 27:6–11. That is consistent with the "natural experiment" here—the initial extension on MASON III in 2019. Bailey, Ex. D at 21:4–23. If Dr. Chicu's theory were right, the labor rates for that initial extension should have been "much higher." Bailey, Ex. D at 23:13–16. Instead, given its long-term relationship and dependence on NSA, Booz Allen agreed to a "no-cost" extension.[13]

---

[12] Dr. Chicu purported to calculate market power based on Booz Allen and EverWatch's guesstimate of their "PWin," which he conveniently added up to "100%." Chicu, Ex. B at 72. But using subjective estimates of the likelihood of winning to calculate market power is economically novel and unsound. Bailey, Ex. D at 37:1–3 ("It just doesn't make any sense . . . . It's not anything that I've ever seen done before.").

[13] Dr. Chicu suggested subsequent MASON III extensions two and three years later, when NSA upped the labor rates in light of skyrocketing inflation and demand for IT professionals, was somehow reflective of Booz Allen's "market power." Chicu, Ex. B at 81:22–83:6. As Dr. Bailey explained, that is economic nonsense. Bailey, Ex. D at 36:6–37:3. These rates were driven by market demand and rising costs to Booz Allen, not "market power." Bailey, Ex. D at 24:19, 25:1–

Robertson, Ex. C at 72–73; *see* Op. at 37, *UnitedHealth Grp.*, 1:22-cv-00481 (explaining usefulness of natural experiments).

## III.    DOJ has not identified "direct evidence" of anticompetitive effects.

In its opening statement, DOJ told the Court it would present "actual direct evidence" of anticompetitive effects, pointing to its favorite handful of emails and chats "immediately following the merger announcement" from Defendants' lower-level employees. Ex. A at 16–17. But "[d]irect evidence of anticompetitive effects would be proof of actual detrimental effects [on competition], such as reduced output, increased prices, or decreased quality in the relevant market." *Am. Express*, 138 S. Ct. at 2284. In the context of this case, "direct evidence" would mean documents or testimony showing that Defendants plan to increase their price or reduce the quality of their OD bid because of the merger agreement. As the hearing made clear, DOJ has no such evidence.

The handful of emails and chats on which DOJ relies are at best evidence of *initial confusion* and *speculation* by some lower-level employees about the impact of the transaction following its announcement. In total, DOJ points to: (1) an "LOL" email from Booz Allen's Amanda Gosnell the afternoon the transaction was announced, PX 22, Ex. M; (2) a portion of a chat chain between Gosnell and a colleague, in part speculating about how hard *EverWatch* will compete for OD in light of the announced transaction, *see* DX 51, Ex. N; and (3) an email the morning the deal was announced from EverWatch's Dan Catrambone responding to a subcontractor's inquiry about OD, telling the subcontractor to "stand down" until Catrambone could get more information from his superiors, PX 07, Ex. O. Putting aside DOJ's

---

10; *see also* Dr. S., Ex. A at 123:15–16 ("I'm not surprised that anybody's labor rates have been going up over the past few years.").

mischaracterization and selective quotation of these limited documents,[14] the critical and undisputed point is that, recognizing *all* the incentives at play, *see supra* at 2–8, lower-level employees continued pursuing OD aggressively pursuant to the explicit direction of their superiors. So, there is no anticompetitive effect, much less "direct evidence" of such an effect.

For example, Amanda Gosnell testified that "our leadership made it very clear to us that [EverWatch was] still the competition and we were to treat them as the competition. So nothing changed from that perspective." Gosnell Dep. Tr., Ex. K at 114:13–16; *see also id.* at 118:9–11, 118:15–17, 148:21–22. Becky Robertson, Gosnell's boss, even held a meeting with OD capture team members just "to underscore with everyone that it is business as usual on MASON III and OPTIMAL DECISION." Robertson, Ex. C at 84:18–19.

Likewise, EverWatch's Dan Catrambone testified that: "within a day or two, we received clear communications from our leadership that . . . we were moving forward with our bid; we still intend to bid and win the work." Catrambone, Ex. C at 111:9–13; *id.* at 111:17–18 (leadership said to "continue pushing the team hard to come up with the best proposal we can to win"). Consistent with this testimony, Catrambone sent an email to the same subcontractor on March 23, a week after the supposed "stand down" email, making clear that ████████████████████████ ████████████████. Brian Cooper, Catrambone's boss, likewise testified: "I made it very clear . . . it's business as usual." Cooper, Ex. C at 53:4. That is consistent with an email he sent on March 16, the day of the transaction's announcement, stating: ████████████████████████ ████████████████████████

---

[14] For example, DOJ "strenuously oppose[d]" (Ex. A at 7:9) the admission of the final portion of the Gosnell chat chain discussed above, PX 27, Ex. S (partial chat chain), where Gosnell states: █ ████████████████████████████████████████████ ████████████████ DX 51, Ex. N (complete chat chain). In fact, Robertson did make clear it was full steam ahead. *E.g.,* Robertson, Ex. C at 84:18–19.

As a result of these directives from management, the *only* evidence is that Booz Allen and EverWatch have continued to compete aggressively for OD regardless of the transaction. Even though Defendants produced nearly *28,000* documents, DOJ cannot point to a single one showing that either company's approach to the OD procurement has changed due to the transaction. And Defendants' executives testified credibly and repeatedly under oath that nothing will change. Judi Dotson of Booz Allen testified that nothing about the OD capture strategy has changed, that she was unaware of anyone trying to influence the bid because of the transaction, and that she would not allow that to happen. Dotson, Ex. C at 20:15–18, 21:18, 22:2. Likewise, Becky Robertson testified that Booz Allen's approach toward OD "has not changed at all." Robertson, Ex. C at 87:10. EverWatch's Brian Cooper and Dan Catrambone also testified that nothing has changed in their approach to OD because of the transaction. Cooper, Ex. C at 53:4–16 (nothing has changed, "it's full steam ahead"); *see also* Catrambone, Ex. C at 105:15–23, 113:11–20.[15]

Accordingly, the handful of emails and chats on which DOJ rests its case are not "direct evidence"—or *any* evidence—of anticompetitive effects.

## IV. The procompetitive benefits outweigh any anticompetitive effect, and they cannot be achieved through substantially less restrictive means.

Sherman Act § 1 caselaw "recognize[s] a wide range of justifications for restraints," including "justifications based on increasing output, creating operating efficiencies, making a new

---

[15] Even Dr. Chicu's and DOJ's treatment of these handful of documents shows their unimportance. DOJ told the Court in opening that these documents reflect "direct evidence that the Merger Agreement *has changed the incentives* of Booz Allen and EverWatch." Ex. A at 16:21–22 (emphasis added). Dr. Chicu similarly claims these documents show the ███████████████ ███████████████████████████, although not even he would say these documents from lower-level employees reflected any type of "*corporate*" incentive. Chicu, Ex. B at 113:10–114:6. In any event, this all makes clear that DOJ's entire case rests on some type of changed incentive without any *proof* of an actual or likely change in *action* leading to actual or likely anticompetitive *effects*. *See Dickson,* 309 F.3d at 207.

product available, enhancing product or service quality, widening consumer choice, and other factors." AM. BAR ASS'N, ANTITRUST LAW DEVELOPMENTS 74–75 (9th ed. 2022) (collecting cases). Here, combining Booz Allen's and EverWatch's complementary skills and assets would (1) enhance the quality of their offering to government clients and (2) increase the competitive choices available to government customers.

First, the transaction would bring together each company's complementary skills and assets, which will accelerate innovation and enable a better product offering to Booz Allen's government customers. Judi Dotson testified that, "[f]or Booz Allen's national cyber platform, EverWatch brings foundational capabilities, intellectual property and capital, and fills platform gaps with respect to cloud and analytics capabilities." Dotson, Ex. C. at 17:23–18:5; *see also* DX 36, Ex. R (explaining procompetitive benefits in depth). She further explained that "EverWatch brings strong capabilities and mission understanding in some areas where we may not have the same . . . . So together it's a great complement, and I feel like we can innovate and make a difference -- bring some different capabilities to the market." Dotson, Ex. C at 17:2–7. EverWatch's Brian Cooper likewise testified that, with the two companies' "capabilities combined, we offer a more rich solution for the mission customer." Cooper, Ex. C at 42:17–19.

Second, the transaction will enhance competition across many government procurements worth billions of dollars. The presentation made to Booz Allen's Board of Directors in March 2022 to gain approval for the acquisition—and explained by Judi Dotson at the hearing—identified more than a dozen opportunities worth billions of dollars that Booz Allen will be better positioned to win because of the acquisition. Dotson, Ex. C. at 16:2–19; DX 18, Ex. G at 17; *see also* Dotson, Ex. C at 18:6–12. With respect to EverWatch, Brian Cooper explained that the transaction was motivated by EverWatch's desire to "compet[e] on efforts . . . of larger magnitude." Cooper, Ex.

C at 42:9–10. Specifically, EverWatch wants to "compet[e] more openly against large businesses, such as [Lockheed Martin and Raytheon]." *Id.* at 43:4. But to do that, Cooper testified that EverWatch needed "a larger footprint of not only employees, but past performances, technologies, and capabilities to be perceived as really relevant in that space." *Id.* at 43:6–8.

To be clear, this is not just about these companies making more money, although there is nothing wrong with that. It is about increasing *competition* and customer *choice.* For example, witnesses from both companies testified that one motivating factor behind the transaction was so the combined firm could compete for ROADRALLY2, a large contract that has long been dominated by Lockheed Martin, a company many times larger than even Booz Allen. *See, e.g.*, Robertson, Ex. C at 81:20–21. Brian Cooper testified that the transaction would allow EverWatch to compete more effectively for ROADRALLY2 by giving them a larger "workforce and making sure that we would be credible delivering the resources they would need to take on an effort of that size." Cooper, Ex. C at 44:8–10. Booz Allen previously lost out to Lockheed Martin on ROADRALLY2's predecessor contract, and as Judi Dotson testified, without the acquisition, Booz Allen may not even bid for ROADRALLY2. Dotson, Ex. C at 27:11–28:2. In other words, without this transaction consumer choice likely will be reduced on a contract *much larger* than OD.[16]

DOJ offered no evidence or testimony refuting the procompetitive benefits identified by Booz Allen's and EverWatch's witnesses and documents. The record evidence satisfies Defendants' burden of showing procompetitive effects.

Nor can these procompetitive benefits be achieved through substantially less restrictive means. *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021). To satisfy this burden, it is not enough for

---

[16] ████████████████████████████████████████████████████████████
████████████████████████████████████████

a plaintiff to speculate some other alternative exists. "Firms deserve substantial latitude to fashion agreements that serve legitimate business interests." *Id.* at 2163. And "courts should not second-guess degrees of reasonable necessity." *Id.* at 2161.

At the hearing, DOJ offered no credible evidence on any alternative means by which Booz Allen could obtain the same procompetitive benefits. To the contrary, Judi Dotson explained why acquiring EverWatch is a better solution than trying to develop the same assets in-house. NSA faces new and rapidly evolving threats that require solutions *now*. *See* Dotson, Ex. C at 10:5–16. "It really comes down to speed and the need for innovation today to support the missions. So it would take us a long time to build what EverWatch has today." Dotson, Ex. C at 19:12–14.

Dotson likewise explained why buying a different company is not a realistic alternative. Booz Allen considered several other acquisition targets. Dotson, Ex. C at 10:22–11:1. But Booz Allen determined that no other company could match EverWatch's "strategic alignment to [Booz Allen's] national cyber platform." *Id.* at 19:17–18.

Finally, Dotson explained why a "teaming agreement" with EverWatch would not accomplish the same benefits. "[T]eaming is very effective on individual opportunities, but what we're talking about is a long-term planning process and long-term strategy to build this business. And for that we need to think about investments, we need to think about leadership, and it only works when we're together." Dotson, Ex. C at 19:22–20:2.

"[A]ntitrust courts must give wide berth to business judgments before finding liability." *NCAA*, 141 S. Ct. at 2163. Here, there is no evidentiary basis to second guess that the transaction is the best way to achieve the procompetitive benefits of increased innovation and competition.[17]

---

[17] For the reasons above, DOJ cannot show it is likely to succeed on the merits. For many of the same reasons, DOJ cannot show the other preliminary-injunction prerequisites, either. *See* ECF No. 93 at 28–33; ECF No. 165 at 31–32.

## V.     Defendants' Proposed Order resolves any possible competitive concern.

The commitments Defendants have made to address DOJ's concerns also undermine DOJ's case.[18] *See, e.g.,* Decision at 197, *In re Illumina Grail*, No. 9401 (rejecting government claim in part because the merging parties' "Open Offer effectively constrains Illumina from acting on its asserted ability and incentive to harm Grail's alleged rivals"); *see also United States v. AT&T, Inc.*, 916 F.3d 1029, 1041–43 (D.C. Cir. 2019) (holding that merging parties' offer of "no-blackout" arbitration agreements undermined government's theory of harm). As Dr. Bailey explained, "economics is about efficient allocation of resources," so remedial measures should "address that competitive concern, but at the same time, you preserve the pro-competitive benefits that the transaction creates." Bailey, Ex. D at 37:9–14. Defendants' commitments embodied within the Proposed Order do just that.

The Proposed Order (Ex. E) establishes vertical firewalls (between the Booz Allen and EverWatch bid teams) and horizontal firewalls (between the independent bid teams and firm-level leadership). It ensures that decision-making authority for OD is vested solely with the independent bid teams. It guarantees that each bid team will be sufficiently funded and staffed. It creates new, financial bonuses to the members of the winning bid team, financially incentivizing them to compete aggressively. And it guarantees that Booz Allen would stand by any bid ultimately chosen by NSA. These provisions would resolve entirely DOJ's concerns, eliminating the *ability* to act on any anticompetitive incentives, even if such incentives existed.

---

[18] Defendants previously provided a "commitments letter" to DOJ and the Court, memorializing their agreement to (among other things) submit independent bids, establish firewalls, and support whatever bid NSA chose. ECF No. 49-1. Defendants then went further, offering to have commitments memorialized into a binding judgment—the Proposed Consent Judgment. *See* ECF No. 165-1. Since DOJ has refused this offer, Defendants have restyled the Proposed Consent Judgment as a Final Judgment and Order and removed references to DOJ's consent. *See* Ex. E.

These provisions are feasible to implement and enforce—and are consistent with what Defendants are already doing. At the hearing, Booz Allen's and EverWatch's witnesses consistently testified that they would implement its provisions and ensure they were followed. Dotson, Ex. C at 23:21–24:9; Cooper, Ex. C at 57:13–16; Robertson, Ex. C at 88:1–5, 88:7–11 ("We are a team of rule followers. We do work with the government. We live with many, many, many rules that change on a regular basis . . . we'll follow whatever direction we're given."). In fact, EverWatch has previously successfully implemented provisions like the ones contemplated here. Cooper, Ex. C at 53:17–23, 54:1–4.

For decades, DOJ has used similar provisions to resolve short-term concerns like those it identifies here. For example, as discussed in Defendants' pre-hearing brief, ECF No. 165 at 28–29, DOJ entered a substantively identical order in *United States v. Raytheon*, No. 1:97-cv-02397 (D.D.C.) to ensure that there was independent competition for an upcoming defense procurement.[19] DOJ in that case told the court that it was "satisfied that the proposed relief will prevent the acquisition from having anticompetitive effects."[20] And *Raytheon* is hardly alone. *See* ECF No. 165 at 28–30 (citing numerous examples over the last two decades).

It is true that the type of remedy proposed here (which DOJ calls "behavioral") is not a fit for all cases. As Dr. Bailey testified, in many cases, the anticompetitive concerns are so diffuse and entangled with the merger itself that a more drastic remedy is required. *See* Bailey, Ex. D at 38:18–21. But this case is different. DOJ has identified a concern that is narrow in several ways:

- **It is fleeting.** The 45-day bidding window is the "most critical window for competition." ECF No. 29-3 ¶ 9; *see* ECF No. 29-1 at 30. Here, that window opened on September 14. Dunshee, Ex. A at 42:3–9.

---

[19] *See* Competitive Impact Statement, *U.S. v. Raytheon*, No. 1:97-cv-02397 (D.D.C. Oct. 22, 1997), https://www.justice.gov/atr/case-document/competitive-impact-statement-177.

[20] *Id.*

- **It is isolated.** DOJ's theory rests on a single (supposedly) changed incentive. As Dr. Bailey said: "oftentimes some deals have a large number of issues and you're trying to solve ten things at once. This is one isolated incentive that we're trying to solve." Bailey, Ex. D at 39:4–7.

- **It is weak.** As discussed above, the magnitude of the supposedly changed incentive and the scope of the potential harm is tiny. Bailey, Ex. D at 39:8–14.

All in all, as Dr. Bailey explained: "[I]f a bid were . . . to be coming up over and over and over and over again, those are very hard to fix in a very targeted way because they are persistent. This is one contract and in this one [limited] window." Bailey, Ex. D at 38:22–39:1.

DOJ previously told this Court that, at the hearing, Dr. Chicu would explain "in more detail" why DOJ believes that Defendants' proposed remedy is insufficient. ECF No. 173 at 26. But, at the hearing, Dr. Chicu barely discussed Defendants' proposed remedy and offered *no* opinion as to any alternative remedy proposed by DOJ. Chicu, Ex. B at 87:8–15. The only meaningful evidence and analysis this Court heard at the hearing regarding Defendants' proposed remedy was from Dr. Bailey, who explained the various ways in which it makes economic sense, Bailey, Ex. D at 37:4–42:8, and from Defendants' witnesses, who made clear they would abide by any such order, *see supra* at 21.

In contrast to Defendants' tailored remedy, DOJ's latest proposed remedy is no remedy at all—it is simply a request to kill the deal. Under DOJ's latest proposed order, submitted on the eve of the hearing, Defendants would not be allowed to close until at least *2023* (assuming there are no further delays).[21] ECF No. 200. This deal cannot survive in limbo that long, and DOJ should not be permitted to simply run out the clock.

---

[21] Also troubling, DOJ touts that its proposed order would provide EverWatch with "walkaway" rights, which DOJ apparently hopes would allow EverWatch to be purchased by someone else. ECF No. 200 at 3–4. This is speculation. But, in any event, it would be inappropriate for DOJ to use antitrust suits to manipulate the market and try to arrange mergers it likes better.

There is no dispute the uncertainty and delay caused by DOJ's case has seriously injured EverWatch and the value of this deal. Indeed, every day that closing is delayed, EverWatch risks losing more employees on the front lines and in the back office. Further delay will only harm the company more, as Brian Cooper testified candidly:

> We've lost a lot of employees. We've lost direct labor. We've, you know, had challenges teaming. And, you know, overall it's damaged our ability to compete, you know, on things in the future with this litigation . . . . We've lost employees to commercial companies like Microsoft and Amazon and Salesforce, and we've lost employees to, you know, IC and DoD contractors within our own space . . . . We continue to lose back office staff, supporting, you know, finance, contracts, recruiting. You know, those are the growth engines of the company. We continue to lose technical expertise.

Cooper, Ex. C at 56:9–57:7. Judi Dotson too emphasized the risk of losing talented personnel because of the uncertainty and delay surrounding closing. Dotson, Ex. C at 22:20–23:13.

Put bluntly, EverWatch is struggling in the face of uncertainty, and Booz Allen's $440 million investment in a transaction with EverWatch is being put at risk with every day of further delay. There is simply no reason to continue to inflict this harm on Defendants—and kill their deal—over a fleeting concern that can be readily resolved by short-term solutions DOJ itself has repeatedly agreed to in the past.

## VI.   The Court should enter judgment in Defendants' favor.

As Defendants have argued from the outset, this case cries out for resolution on the merits now, and there is no need for a "full trial" later. *See* ECF No. 67 at 2; ECF No. 165 at 32–34; Ex. D at 79:3–17. The Court previously reserved judgment on that question until the evidence was in from the hearing. ECF No. 73 ("As the factual evidence and legal issues are developed, however, it may be that a final order on the dispositive issues can be entered without a full trial."). A final order can and should be entered now.

<u>First,</u> DOJ has only identified one competitive concern with this proposed merger—its impact on OD. *See generally* ECF No. 1 ¶¶ 30–37. DOJ did not allege some other market where the deal is substantially likely to lessen competition. And it did not allege any other conduct at issue. Its entire case rests on the simple question of whether the transaction will harm competition for OD, which DOJ has now thoroughly vetted. There is nothing else to discover about this bid. DOJ obtained nearly 28,000 documents from Defendants and hundreds more from third parties. DOJ took ten depositions. Each side utilized an expert who prepared a report. The record is more than sufficient to resolve this case now.

In a recent letter, DOJ indicated that, if this case is allowed to continue, DOJ would seek "further discovery on the potential impact of the Booz Allen-EverWatch merger on *other* contracts." ECF No. 200 at 4 n.5 (emphasis added). But it is too late for DOJ to amend its complaint. And DOJ's threatened fishing expedition is not a reason to keep this case open. To the contrary, it is all the more reason for swift resolution.

<u>Second</u>, DOJ's failure to establish its proposed relevant market or likely anticompetitive effects are as fatal to its Clayton Act § 7 claim as to its Sherman Act § 1 claim. *See Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576, 584 (4th Cir. 2003) (requiring relevant market in § 7 Clayton Act claim); *Brown Shoe Co. v. United States,* 370 U.S. 294, 324 (1962) (same); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001) (explaining that Clayton Act § 7 empowers antitrust enforcers "to weed out those mergers whose effect 'may be substantially to lessen competition' from those that enhance competition"). Under the cases discussed above, DOJ's theory of this case, based on a changed incentive, cannot satisfy either law. *See supra* at 4–8. And, if the Court were to enter Defendants' Proposed Order, it would resolve any competitive concern.

In fact, Defendants' Proposed Order is designed around consent judgments agreed to by DOJ *in Clayton Act § 7 cases*. *See supra* at 22 and ECF No. 165 at 27–31 (citing prior consent decrees).

Finally, the equities favor full resolution on the merits now. The practical reality is that the OD RFP has dropped, so the competitive event the DOJ is focused on is happening now. There will be nothing left to try in 2023. Meanwhile, EverWatch is struggling in the face of uncertainty and the value of Booz Allen's $440 million investment is in jeopardy. The facts are in, the law has been extensively briefed, and the relationship between the facts and law will be argued next week. There is no good reason to delay final judgment. If this Court holds that (1) there is no relevant antitrust market limited to OD services, *or* (2) there is no likelihood of substantial anticompetitive harm, *or* (3) Defendants' Proposed Order can remedy any harm, this case is over.

## CONCLUSION

This Court should reject DOJ's claims and enter final judgment in Defendants' favor or, if necessary, enter the Proposed Order attached as Exhibit E.

September 23, 2022

/s/ Todd M. Stenerson

Todd M. Stenerson (Bar No. 14194)
David A. Higbee (Bar No. 30364)
Ryan A. Shores (admitted *pro hac vice*)
Adam B. Schwartz (Bar No. 30358)
Matt Modell (admitted *pro hac vice*)
Jacob M. Coate (Bar No. 30355)
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
todd.stenerson@shearman.com
david.higbee@shearman.com
ryan.shores@shearman.com
adam.schwartz@shearman.com
matt.modell@shearman.com

jacob.coate@shearman.com

Susan Loeb (admitted *pro hac vice*)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
susan.loeb@shearman.com

*Attorneys for Defendants Booz Allen Hamilton Holding Corp.*
*and Booz Allen Hamilton Inc.*


*/s/ G. Charles Beller*

G. Charles Beller (Bar No. 30372)
Molly M. Barron (Bar No. 19151)
Amanda P. Reeves (admitted *pro hac vice*)
Marguerite M. Sullivan (admitted *pro hac vice*)
Anna M. Rathbun (admitted *pro hac vice*)
Christopher J. Brown (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-22001
charlie.beller@lw.com
molly.barron@lw.com
amanda.reeves@lw.com
marguerite.sullivan@lw.com
anna.rathbun@lw.com
chris.brown@lw.com

Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
Kelly S. Fayne (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
al.pfeiffer@lw.com
kelly.fayne@lw.com

26

*Attorneys for Defendants EverWatch Corp.,*
 *EC Defense Holdings, LLC, and*
*Analysis, Computing & Engineering Solutions, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2022, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, and served one copy, by ECF to counsel of record in this matter.

*/s/ Todd M. Stenerson*

Todd M. Stenerson (Bar No. 14194)
Shearman & Sterling LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
todd.stenerson@shearman.com