# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

      Plaintiff,

               v.

BOOZ ALLEN HAMILTON HOLDING
CORPORATION, *et al.*,

      Defendants.

Case No.: 1:22-cv-01603-CCB
Filed: September 23, 2022

# THE UNITED STATES' POST-HEARING BRIEF
# IN SUPPORT OF A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**...................................................................................................... 1

**ARGUMENT** ............................................................................................................. 4

    **I.**   **The United States Is Likely to show That the Merger Agreement unreasonably restrains Trade in OD Services** ............................................................................. 5

      **A.**   **The Relevant Antitrust Market is OD Services**.......................................... 5

        *1.*   *A Government Procurement Contract Can Correspond to an Antitrust Product Market* ........................................................................................................... 5

        *2.*   *Real-World Evidence and Economic Analysis Supports the United States' Proffered Market Definition* .......................................................................................... 6

        *3.*   *Defendants' Criticisms of the Product Market Are Meritless* .................... 8

      **B.**   **The Defendants Likely Have a Monopoly in OD Services** ........................ 9

      **C.**   **The Merger Agreement Reduces Defendants' Incentives to Compete** .................. 11

      **D.**   **Defendants' Monopoly Will Likely Lead to Increases in Price and Decreases in Quality for OD Services** ................................................................................ 12

      **E.**   **Reputation Would Not Prevent Booz Allen from Taking Advantage of Its Future Monopoly Position in OD Services** .................................................................. 15

      **F.**   **Defendants Fail to Rebut the Evidence of Harm to Competition** ........................... 18

        *1.*   *Defendants Fail to Prove Any Procompetitive Effects* ............................... 18

        *2.*   *Less Anticompetitive Means Exist to Achieve Any Purported Efficiencies* ............... 20

    **II.**   **THE COURT SHOULD PRESERVE COMPETITION FOR THE OPTIMAL DECISION CONTRACT BY ENTERING THE UNITED STATES' PROPOSED PRELIMINARY INJUNCTION** ............................................................................ 21

    **III.**   **THE COURT SHOULD NOT CONVERT THE PRELIMINARY INJUNCTION HEARING INTO A FULL TRIAL ON THE MERITS** ................................................... 24

**CONCLUSION** ......................................................................................................... 25

# **TABLE OF AUTHORITIES**

## **Cases**

*aaiPharma, Inc. v. Thompson,* 296 F.3d 227 (4th Cir. 2002)........................................................ 25

*Berry v. Bean*, 796 F.2d 713(4th Cir. 1986) .................................................................................. 25

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ....................................................... 6, 7, 25

*Chi. Prof'l Sports Ltd. P'ship v. NBA*, 754 F. Supp. 1336 (N.D. Ill. 1991) ................................ 20

*Citizen Pub'l'g v. United States*, 394 U.S. 131 (1969) ................................................................ 11

*FTC v. Alliant Techsystems, Inc.* 808 F. Supp. 9 (D.D.C. 1992)................................................... 5

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ......................................................... 23, 25

*FTC v. Hackensack Meridian Health, Inc.*, 30 F. 4th 160 (3d Cir. 2022) .................................... 8

*FTC v Peabody Energy Corp.,* 492 F. Supp. 3d 885 (E.D. Mo. 2020)........................................ 17

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) .......................................... 20

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ............................................................ 6

*FTC v. Swedish Match N. Am. Inc.*, 131 F. Supp. 2d 151 (D.D.C. 2000) .................................. 23

*Gen. Dynamics Corp. v. United States*, 563 U.S. 478 (2011)..................................................... 16

*Nat'l Collegiate Athletic Assoc. v. Alston*, 141 S. Ct. 2141 (2021) ........................................... 21

*N. Sec. Co. v. United States*, 193 U.S. 197 (1904)........................................................................ 4

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ........................................................................ 5

*Polygram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005).................................................. 20

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015) ......................................................................................................................................... 4

*Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994).......................................................................... 20

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) .................................................... 2

*United States v. Anthem, Inc.*, 855 F.3d 345 .............................................................................. 25

*United States v. AT&T Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018)............................................... 20

*United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412 (S.D.N.Y. 1980) ................ 23

*United States v. Continental Can Co.*, 378 U.S. 441 (1964) ........................................................ 6

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ...................................................... 3, 10

*United States v. Rockford Mem'l Corp.*, 898 F.2d 1278 (7th Cir. 1990)...................................... 1

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................... 21, 23

## **Statutes**

15 U.S.C. § 1 .................................................................................................................................. 4

## INTRODUCTION

The United States has met its burden to show that Defendants' Merger Agreement will likely result in substantial and irreparable harm to competition to provide signals intelligence ("SIGINT") modeling and simulation services under the OPTIMAL DECISION contract (collectively, "OD" or "OD Services"). Defendants' agreement reflects a likely merger to monopoly in OD Services that dramatically reduces Booz Allen's and EverWatch's incentives to make their best possible offers on pricing and quality. This reduced competition will likely harm the National Security Agency ("NSA"). With the bid deadline fast approaching, a preliminary injunction is necessary to restore the Defendants' incentives to compete independently, without certainty of shared future benefits.[1]

The employees responsible for winning OD for each Defendant immediately understood that the merger meant the end to true competition. Their contemporaneous documents— excited utterances—make it plain:

- When the Merger Agreement was announced, ███████████████████████████████████████████████ Plaintiff's Ex. ("PX") 26. In an equally candid email to an NSA employee,  PX-22 at -314.

- A week later, ███████████████████████ PX-18 at -589 ███ ). They also discussed that ███████████ *Id.* 

- The following week, even *after* antitrust training about this very transaction, ███ PX-27 at -

---

[1] Competition relies heavily on independent incentives and uncertain outcomes. When multiple companies independently vie for work, each expects that if it wins it will enjoy all of the benefits of that victory to the exclusion of its competitors. And so each is incentivized to bid aggressively to maximize the chance it will win. In contrast, companies that plan to merge lack an incentive to compete against each other because any decrease in price (or increase in quality) they offer would cut into the expected profits of the merged firm.

426.  The ███████████  responded: ███████████████████████
PX-27 at -500.

At the hearing, Defendants tried to recharacterize or minimize the statements in these documents, but the admissions speak for themselves.[2]

Defendants' attempts to distract from the obvious harm a merger to monopoly causes lack merit.  Defendants claim they would not submit anything less than competitive bids because of their reputations—but evidence demonstrated that Booz Allen's professed concerns about its reputation have not stopped it from raising price or lowering quality to NSA when permitted to do so by a lack of competition.  (And in any event, reputation is not a criterion for awarding defense contracts.).  Defendants suggest that the harm to competition would be limited in duration, but the evidence shows the likely harmful effects will last for the term of the five-year OD contract, if not longer.  Defendants claim that the Merger Agreement creates speculative "revenue synergies"—but Defendants did not demonstrate how such "synergies" would relate to OD Services, that they are verifiable, or how they would in any way benefit competition.

Defendants also claim that NSA's "buyer power" and federal acquisition regulations would negate any anticompetitive effect from the Merger Agreement.  That theory—which, if accepted, would effectively immunize defense mergers against antitrust scrutiny—is belied by Booz Allen's historical dealings with NSA and by other testimony, documents, and evidence.  Contractors have numerous levers to adjust the price and quality of their bids and to offer inferior bids when they do not face a competitive threat.  DoD and NSA witnesses testified that their agencies likely get better prices and quality when there is competition.  And effectively immunizing DoD contractors from the antitrust laws would run contrary to Supreme Court

---

[2] *See United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 70 (D.D.C. 2017) ("The Court is more persuaded by the contemporaneous email exchanges than by the in-court attempts to explain or disavow those documented exchanges.").

precedent providing that competition merits protection even in regulated markets.  *See, e.g.*, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 328 (1963).

The Court should find that the United States likely will succeed on the merits of its claim that the Defendants' Merger Agreement violated Section 1 of the Sherman Act and it has satisfied all other requirements for a preliminary injunction.  The Court can partially restore the independent competitive incentives of Booz Allen and EverWatch by temporarily suspending the Defendants' merger agreement—the relief the United States sought in its preliminary injunction motion—to create uncertainty about the ultimate outcome.

Although fully suspending the Defendants' merger agreement is the most effective remedy under the circumstances, the issuance of the RFP allowed the United States to propose an alternative, more narrowly targeted structural remedy that focuses on the critical period of competition for OD.  *See* Post-Hearing Br. (ECF 200, Sept. 14, 2022), Ex. 01.  This alternative remedy would prohibit Defendants from merging until 90 days after the OD bids are due and allow either Defendant to walk away from (or renegotiate) the deal during that time.  While potentially less effective than the United States' earlier request for relief, such an order would restore actual competition for the bid.

Unlike Defendants' inadequate counter-proposal, the United States' structural remedies are simple and easily administrable.  They do not depend on behavioral remedies like firewalls that run counter to the companies' firm-wide economic incentives.  The narrower, alternative proposed order leaves intact the vast majority of the Merger Agreement (including any supposed revenue synergies from the deal), and permits Defendants to consummate the merger 90 days after the OD bids are due, if both Defendants so choose.

Defendants' deeply flawed alternative would allow Defendants to consummate the merger immediately and would guarantee that the post-merger Booz Allen will be the winner of the OD contract. Defendants' promised behavioral modifications (firewalls and vague promises with respect to bid team members) do not restore firm-level incentives and the uncertainty necessary to cause the companies to *independently* compete. They would not cure Defendants' antitrust violation. *See St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 793 (9th Cir. 2015) (rejecting separate bargaining units as a cure to a merger). Defendants thus effectively ask the Court to solve their antitrust problem by blessing the type of "trust" arrangement that the antitrust laws condemn. *See N. Sec. Co. v. United States*, 193 U.S. 197, 326-27 (1904).

For all of these reasons, and as shown below, the Court should protect competition by entering the United States' proposed injunction.

## ARGUMENT

As set forth below, the evidence at the hearing confirmed that the United States is likely to show that Defendants' Merger Agreement unreasonably restrains trade in signals intelligence modeling and simulation services by creating a monopoly in OD Services, and the equitable factors for a preliminary injunction are all met. The Court should accordingly enter the United States' proposed preliminary injunction, and reject Defendants' inadequate proposal that fails to restore independent competition in OD Services. Additionally, although a full trial on the merits of the United States' claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, would not be necessary if one the United States' proposed orders were entered, the United States otherwise opposes consolidation of the preliminary injunction hearing with trial on the merits.

4

I.    **THE UNITED STATES IS LIKELY TO SHOW THAT THE MERGER AGREEMENT UNREASONABLY RESTRAINS TRADE IN OD SERVICES**

Under the rule of reason,[3] the United States can meet its burden of demonstrating Defendants' Merger Agreement unreasonably restrains competition substantially by *either* (1) direct "proof of actual detrimental effects," *or* (2) indirect proof of anticompetitive effects, including evidence of market power, such as market share in a relevant market, "plus some evidence that the challenged restraint harms competition." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citations omitted). The discussion below focuses on indirect proof, but the agreement's adverse effect on pricing and quality also satisfies as direct proof. *Infra* at 9-11.

A.    **The Relevant Antitrust Market is OD Services**

1.    *A Government Procurement Contract Can Correspond to an Antitrust Product Market*

The facts here are strikingly similar to *FTC v. Alliant Techsystems, Inc.*, where the court recognized a market for the purchase of tank ammunition for which the U.S. Army was "the sole domestic customer" and the Army was seeking a single supplier under a five-year, "winner-take-all" competitive bid. 808 F. Supp. 9, 11 (D.D.C. 1992). That court preliminarily enjoined a merger of two ammunition suppliers that would have led to "no competition" for the five-year contract and a "complete monopoly over the relevant domestic market." *Id.* at 11-12. As the United States previously showed, a long line of cases recognizes that products sought under single-transaction defense procurements can qualify as a relevant market.[4] Defendants' incorrect claim that OD services provided under NSA's single OD contract procurement cannot be a

---

[3] The United States rests on its prior submissions and the hearing record to show why the merger to monopoly for OD services is unlawful under the "quick look" approach. *See* Pl.'s Mot. for Prelim. Inj. (ECF 29 & 61), at 16-17; Pl.'s Reply Br. (ECF 100), at 5-6; Pl.'s Pre-Hearing Br. (ECF 175) at 3.

[4] ECF 29 at 20-23 (citing cases); *see* 9/15P (Chicu) 62:4-7 ("Horizontal Merger Guidelines acknowledge that a market may be as narrow as a single product and that it may involve sales to only a single customer").

relevant market as a matter of law would have this Court ignore the Supreme Court's instruction

that market definition should "not . . . be used to obscure competition but to 'recognize

competition where, in fact, competition exists.'" *United States v. Continental Can Co.*, 378 U.S.

441, 453 (1964) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962)).

2.  *Real-World Evidence and Economic Analysis Supports the United States' Proffered Market Definition*

OD Services have the "practical indicia" of a product market. *Brown Shoe*, 370 U.S. at

325; *see FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 118 (D.D.C. 2016) ("Courts routinely rely on

the *Brown Shoe* factors to define the relevant product market."). No other products or services

are "reasonabl[y] interchange[able]" with OD Services. *Brown Shoe*, 370 U.S. at 325.[5]

*First*, OD Services have "peculiar characteristics and uses." *Id.* NSA has only one

contract for these specialized services at any given time. *See* 9/15A (Dunshee) 37:20-22, 40:9-

23; PX-43 at -422 (EverWatch "white paper" identifying MASON III as the ███████████

███████████ "Domain knowledge" in SIGINT is "crucial" for the provision of these

services. 9/15A (Jack S.) 107:5-20, 108:24-109:21. NSA cannot replace OD Services with

another kind of service. *See* 9/15A (Dunshee) 70:18-71:3; Deposition of ███████████ (Aug.

18, 2022) ("███████████") 80:16-81:1; 9/15P (Chicu) 64:4-17; PX-38 at ¶ 24.

*Second*, OD Services have a "distinct customer." *Brown Shoe*, 370 U.S. at 325. NSA has

a distinctive mission to "provide foreign signals intelligence to policy makers and war fighters."

9/15A (Dunshee) 35:16-17:4. NSA executes that mission on behalf of the "key decision-

makers" in the U.S. government. 9/15A (Jack S.) 105:18-24; *see also* 9/15A (Dunshee) 36:1-4

(NSA director is "the functional manager for SIGINT for the U.S. Government"). The record

---

[5] The evidence also confirms that the relevant geographic market is the United States. NSA is a U.S. government agency, that must procure OD Services in the United States. 9/15P (Chicu) 61:11-18. NSA does not purchase from foreign suppliers. 9/15A (Dunshee) 55:8-16.

contains no evidence of any other customer for SIGINT-related modeling and simulation services.  PX-38 at ¶ 23.

*Third*, OD Services are offered by "specialized vendors." *Brown Shoe*, 370 U.S. at 325. The contractor must have a "top secret SCI clearance." 9/15A (Dunshee) 55:12-16; *see also* Deposition of ████████████ (Aug. 19, 2022) ("████████████") 82:17-23.  Contractors must also have extensive "customer-specific," "agency-specific," and "problem-specific" knowledge. 9/15A (Jack S.) 106:21-107:21.  These domain-knowledge requirements are express in the OD request for proposal ("RFP").  *See* PX-47 at -069-070, -081-113 (bid proposals must identify non-common labor categories, including SIGINT specialists, in their proposals); 9/15A (Jack S.) 111:16-18, 112:13-24.  The "most crucial part" of the selection process will be evaluating that domain knowledge.  *Id.* at 114:16-21, 113:21-114:15; *see also* PX-47 at -039-044 (vendor must "understand, perform and manage the work effort to meet [OD] Hypothetical Scenarios").

*Fourth*, there is "industry recognition" of OD Services as a distinct market. *Brown Shoe*, 370 U.S. at 325. *See, e.g.*, Deposition of ████████████ of ██████ (Aug. 22, 2022) ("███████████") 121:13-122:3 ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████.

Defendants' ordinary-course documents show that they viewed the relevant market as SIGINT modeling and simulation services—not modeling and simulation services generally.  PX-04 at -069 (████████████████████████████████████████); PX-06 at -636 (████████████████████████████████████████████

████████████████████████████████████).

Economic evidence offered by the United States' expert, Dr. Mark Chicu, confirms that OD Services are a relevant market.  *See* 9/15P (Chicu) 61:4-10; PX-38 at ¶¶ 22-26.  Dr. Chicu confirmed that OD Services made sense as a candidate product market, in part, because NSA is a "targeted customer" under the Horizontal Merger Guidelines, as shown by (1) how NSA obtains bids and then negotiates pricing for OD Services, (2) NSA's specific requirements, and (3) the absence of other customers for OD Services.  9/15P (Chicu) 62:1-23, 119:20-120:18.  Dr. Chicu then applied the well-accepted "hypothetical monopolist test" and determined that because the services are essential to NSA and there are no good alternatives to NSA, a hypothetical monopolist would likely "exercise market power in a meaningful way in that market."  *Id.* at 62:24-64:17.  *See FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 167 (3d Cir. 2022) ("[C]ourts . . . frequently use the hypothetical monopolist test to determine the relevant market.").[6]

3.   *Defendants' Criticisms of the Product Market Are Meritless*

Defendants suggest that the existence of other modeling and simulation-related contracts, and other signals intelligence-related contracts, means that the OD Services market is overly narrow.[7]  But they would have the Court ignore the dispositive evidence that NSA (and only NSA) demands modeling and simulation services with SIGINT-related domain knowledge.  *See supra* at 6-7.  Defendants' own expert, Dr. Bailey, does not dispute that NSA "views the product

---

[6] The hypothetical monopolist test looks at whether it would be profitable for a *hypothetical* firm to raise price in a *candidate market*, not at whether *Defendants* would find it profitable, *across their entire companies*, to actually raise prices.  PX-38 at ¶ 20.  The Horizontal Merger Guidelines provide that qualitative information can be used to conduct the test when that is what is available.  9/15P (Chicu) 63:22-64:3, 97:18-98:2.

[7] Defendants' expert Dr. Bailey admitted that she was not familiar with the details of any of the services provided in those other contracts.  9/16P (Bailey) 71:17-21.  She did not deny that NSA lacks substitutes for SIGINT modeling and simulation services.  *Id.* at 70:3-11.

that satisfies its need for the OD contract to be limited to signals intelligence modeling and simulation services." 9/16P (Bailey) 70:3-11.

Defendants have offered no evidence in support of any other market definition. Tellingly, Dr. Bailey admitted that she did not attempt to define a relevant market. *Id.* at 68:6-9. Defendants characterized OD Services as a mere "IT service," 9/15A (Defs.' Opening Statement) 24:4-12, but provided no evidence that NSA would likely switch from *SIGINT* modeling and simulation services to any other IT service.

### B.    Defendants Likely Have a Monopoly in OD Services

The evidence showed that Booz Allen and EverWatch are (and have long known they are) the only likely bidders for the OD contract.  NSA made repeated efforts to increase competition for this contract, and attempted to solicit interest from a larger number of firms. 9/15A (Dunshee) 48:22-50.  But only Booz Allen and EverWatch have ever submitted a letter of intent to prime.  9/15A (Dunshee) 51:4-12.  Diane Dunshee—NSA's senior acquisition executive with 34 years of agency experience—testified that although she had overseen hundreds of support services contracts for NSA, she had *never* seen a company submit a bid after declining to submit a letter of intent to prime.  9/15A (Dunshee) 34:24-35:3; 53:4-53:9.[8]  As a result, one of the two merging firms will likely win the OD contract so the merging firms have a combined 100% share of the OD Services market.  *See* 9/15P (Chicu) 72:18-23.[9]

---

[8] Brian Cooper of EverWatch, who has far less information about NSA's contracts than Ms. Dunshee, testified that he believed a firm called BigBear bid on a project called SONIC TITAN after not submitting an intent to prime letter.  9/16A Cooper 50:2-15.  But this is misleading.
                                                                            *Id.*
          ████ at 147:15-16. ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
                              *See* Post-Hearing Br., Ex. 02 (EW-LIT-0043890).  In any event, it is undisputed that "dark horse" bidders are extremely rare.

[9] Designated testimony from the OD contracting officer (Scott W.) does not outweigh this evidence.  As Ms. Dunshee  testified, only the evaluation team headed by Dr. S, composed of

Defendants' ordinary-course documents confirm that they have each long known that they were the only likely bidders. *See, e.g.*, PX-26 (



); PX-08 at -745 (

); PX-06 at -629 (

); PX-34 at -142 (

).[10]  Defendants recognized that other conceivable competitors were not likely to bid. *See, e.g.*, PX-02 at -230

).[11]

Despite this, at the hearing, Defendants speculated vaguely that some company might emerge as a "dark horse" bidder.  This is contrary to NSA's experience and expectations and belied by Defendants' contemporaneous documents.  A serious bidder would have to spend months assembling a large team within the industry, generating market chatter.  Deposition of

(Aug. 19, 2022)                    163:6-13;                    100:18-26; PX-38 at ¶ 33.[12]

The evidence also shows that there are significant barriers to entry for OPTIMAL DECISION at this late post-RFP stage.  For instance, the subcontractor with whom EverWatch sought to switch places told EverWatch's president that to do so would requires a delay in the

---

subject matter experts in modeling and simulation, is qualified to judge the capability of companies to perform the work.  9/15A (Dunshee) 56:19-60:25.  Individuals in the contracting office, including Scott W., are not qualified to make that judgment.  *Id.* at 60:17-25.

[10] *See also* PX-04 at -071; PX-35 at -510; PX-40.

[11] *See also* PX-17 at -872; PX-20 at -337; PX-23 at -056; PX-4 at -070-71.

[12] Even if a new bidder somehow emerged, this would be a 3-to-2 merger rather than a 2-to-1 merger, still likely warranting a presumption of anticompetitive effects.  *See Phila. Nat'l Bank*, 374 U.S. at 363, 364 (30% share "presents [] threat" of undue concentration); *Anthem*, 855 F.3d at 367 (combined market share of 64-78% would "raise an overwhelming presumption of anticompetitive effect"); *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1282-83 (7th Cir. 1990) (proposed merger violated Section 1 with combined market share between 64-72%).

release of the RFP of at least 3 months, modification of dozens of teaming agreements, and

access to EverWatch's work product that had been developed over the course of years.  *See* PX-

31 at -440.

### C.    The Merger Agreement Reduces Defendants' Incentives to Compete

As Booz Allen's CFO told investors before the United States brought this lawsuit, Booz

Allen was "███████" that the deal with EverWatch would close.  ███████████████████  This

meant that Defendants' incentives to compete were reduced as soon as the Merger Agreement

was announced.  *See* 9/15P (Chicu) 59:25-60:17.  Defendants' expert admitted this litigation has

increased some of those incentives.  *See* 9/16P (Bailey) 46:13-47:12.  But without this

litigation—and without the United States' proposed preliminary injunction—those incentives to

compete will go down once again.

Defendants know that if this Court does not order relief, the OD contract will ultimately

be held by Booz Allen—no matter which company submits the "winning" bid.  Both companies,

therefore, have less firm-level incentives to submit their highest quality, lowest cost proposal.

*See* 9/15P (Chicu) 92:5-9; *see also Citizens Publ'g v. United States*, 394 U.S. 131 (1969)

(Section 1 violation where an agreement made an anticompetitive change to incentives).  Higher

bids will likely result in a greater award fee pool, and, ultimately, greater potential profits to

Booz Allen.  *See* 9/15A (Dunshee) 47:15-17; 9/15P (Kevin Y.) 19:4-20:9.  Likewise,

compromising on quality (such as by offering lower quality staffing or fewer hours of service for

no reduction in price) would benefit Booz Allen's bottom line at NSA's expense.  *See infra* at

13-14.

These changed incentives are real and concrete. They were immediately recognized by

the Booz Allen and EverWatch capture managers, acting in their official capacities, after the

merger was announced on March 16. PX-26 at -180; PX-22 at -314; ███████ 134:18-138:8 (Booz Allen); PX-07 at -421 (EverWatch).

Two weeks later (and after Booz Allen's antitrust training), those incentives had not changed.  On March 31, ██████████████████████████████████████████ ███████████████████████████ PX-27; *see also* ███████ 143:16-145:19. The ██ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████[13] PX-27 at -315; *see also* ███████ 143:16-145:19.

Indeed, the EverWatch executives in charge of EverWatch's business operations have little incentive to win this contract.  They know that they have a big payday ahead of them if the merger is consummated, regardless of whether EverWatch were to win the bid.  EverWatch ██████████████████████ admitted that ██ will work for Booz Allen, with which ██ has signed a retention agreement worth millions, and ██ will "personally gain a substantial amount of money" paid out from ██ phantom stock options in an EverWatch subsidiary if this deal closes.  9/16A (Cooper) 63:15-64:24.

### D.    Defendants' Monopoly Will Likely Lead to Increases in Price and Decreases in Quality for OD Services

The OD contract is a "best value" contract, meaning that the decision to award a contract is based on both cost and non-cost factors (i.e., quality).  *See* PX-01 at -038-39.  Defendants' merger to monopoly and their reduced incentives to compete are likely to result in both increased prices and reduced quality for NSA.  DoD agencies, such as NSA, typically get the "best" price

---

[13] ███████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████

and quality when there is competition in its procurements.  9/15P (Tenaglia) 45:16-45:19, 51:7-25; *see also* PX-36 (listing the benefits of competition to DoD).  Competition for defense procurements is also "critical" for national security, including by providing DoD with "more than one source that [it] can rely on."  9/15P (Tenaglia) 52:1-53:1.  Defendants assert that NSA has so much control over the acquisition process that competition is effectively impossible.  This argument for effective immunity is contrary to law.  *See supra* at 2-3.

Even more important, the evidence overwhelmingly shows that Defendants have considerable room to compete on both quality and price, for the following reasons.

**Contract staffing:**  The most important task facing the contractor is providing the workers, and it is entirely up to the contractor to decide how to do that.  The contractor can choose between its own in-house personnel, subcontractors, and contingent hires.  9/15A (Dunshee) 58:20-59:7; 9/15P (Kevin Y.) 10:7-9; 10:21-11:1.  The contractor decides both which subcontractors will be used and the allocation of hours between itself and its subcontractors.  9/15P (Kevin Y.) 12:8-18.  Among its own workers, the contractor has considerable flexibility in choosing which of its in-house workers to offer, as the contractor itself determines how to match its internal labor categories to the government's requirements.  9/15P (Kevin Y.) 11:2-12; 14:19-15:2; *see also* PX-47 at -023-24, -056.  As the skills of the workers are the primary determinant of quality for a services contract like OD, and labor is the primary driver of cost, this gives the contractor great flexibility in terms of both quality and price.  9/15A (Dunshee) 58:13-19; 9/15P (Kevin Y.) 16:22-17:25.  Labor decisions contribute to variations in the final proposal cost, which may vary as high as 30%.  9/15P (Kevin Y.) 13:14-18.; *see* PX-04 at -071.

This conclusion does not change even though the OD RFP includes an Independent Government Cost Estimate (or "ICE").  The government calculates costs in this way to help with

budgeting and to provide contractors with some guidance on the size of the contract.  9/15A
(Dunshee) 62:4-12, 78:16-21.  Contrary to the Defendants' assertions, it is neither a price cap nor
a price floor.  Booz Allen and EverWatch are free to propose above or below the ICE, without
penalty.  *Id.* at 62:16-23; *see also* PX-41 at -374 ("████████████████████████████
████████████████████████████████████████");  PX-4 at -072
("████████████████████████████████████████████████████████████
████████████████████████████████████").  Booz Allen has had no hesitation
demanding payment far in excess of the ICE when it faces no competition.  For the sole-source
contract JUNGLE PRINCE, NSA ultimately paid the labor rates demanded by Booz Allen,
which were about ██████ above the ICE proposed by NSA.  9/15A (Dunshee) 69:15-70:15;
9/15P (Chicu) Direct 80:8-23.  And Booz Allen expects EverWatch will ████████
████████████████████████████████.  *See* PX-19 at -276; 9/16A (Robertson)
92:2-11.

    **Quality:**  The companies will also compete for OD in terms of technical ability and
project management approach.  The prime contractor develops the approaches and presents them
in its proposal.  *See, e.g.*, Deposition of ██████████ (Aug. 22, 2022) 172:10-15; 9/15P (Kevin
Y.) 12:19-13:6.  Booz Allen believes that its own technical ability is "████."  *See* PX-29 at -
633.  A bidder may devise innovative ways to address the issues outlined in the RFP or provide
innovative and efficient management services.  PX-38 at ¶ 51.  When facing a low-cost
competitor (including EverWatch on OD), Booz Allen's Officer in Charge for OD testified that it
is "doubly important" that Booz Allen offer the best management and technical approaches.  *Id.*

    **Price:**  Booz Allen and EverWatch have many other ways to adjust pricing to win the OD
contract.  They can share the NSA award fee with their subcontractors, which will reduce the

cost to NSA.  9/15A (Dunshee) 66:21-67:4; 9/15P (Kevin Y.) 20:10-21:4; ████████████

71:1-15 (████████████████████████████████████████████████████

████████████████████████████████████).  They can reduce or waive the optional

3% fee on other direct costs.  9/15A (Dunshee) 67:5-17.  They can shift the work between

internal business units, which may have different cost structures, affecting the cost to NSA.

9/15P (Kevin Y.) 18:1-21; 9/15A (Dunshee) 61:16-21.  The companies can offer lower

escalation rates—the periodic cost adjustment for labor rates—to lower NSA's costs.  9/15A

(Dunshee) 64:19-65:5; Deposition of ████████████ (Aug. 17, 2022). 113:4-114:3.  As two

NSA witnesses testified, they have *never* seen two different bids come in at the same price.  *See*

9/15A (Dunshee) 65:14-18; 9/15P (Kevin Y.) 9:5-22.

Here, NSA will likely have no choice but to accept one of the Defendants' two bids

irrespective of quality or cost.[14]

### E.    Reputation Would Not Prevent Booz Allen from Taking Advantage of Its Future Monopoly Position in OD Services

Defendants have repeatedly invoked an amorphous concept of "reputation," asserting that

a desire to preserve their reputations at NSA will prevent them from submitting less competitive

bids for OD.  But "reputation" is not one of the evaluation criteria for defense contracts.  9/15P

---

[14] NSA has no meaningful alternative to proceeding with the OD award.  NSA must either extend MASON III and award it to Booz Allen or award OD to one of the Defendants—which, after the merger is consummated, will be Booz Allen.  *See* 9/15A (Dunshee) 70:18-71:14.  Nor can it make OD a small-business set aside, which would require NSA to go back to the drawing board at significant delay, and might result in an award that fails to provide the needed services. *See* 9/15A (Jack S.) Direct 117:12-118:5 (anticipating "it would take greater than three and a half years to restructure the contract and go out and do another bid" and noting that a small-business set aside was used for MASON III and "[t]he company that was . . . selected after that . . . defaulted on the contract").  And any long-term extension of MASON III in lieu of the OD contract will lead to increased prices.  *See* PX-21 at -446 (noting a planned increase in labor rates from MASON III to OD); 9/15A (Dunshee) 44:4-23 (noting that labor rates have increased for each negotiated extension of MASON III).

(Tenaglia) 47:3-11; PX-47 at -006-025 (OD proposal evaluation criteria do not list "reputation").

Indeed, EverWatch's OD capture manager testified that ███████████████████████

██████████████████████████████████████████ 128:4-12.  Past performance

often is one of the criteria, but as the phrase suggests, this criterion relates to performance of a

contract, not bidding for it.  9/15A (Dunshee) 54:19-24.  In any event, past performance is not a

criterion for the OD contract.  *See generally* PX-47 at -006-025.

Defendants have proffered no evidence showing what reputation means in the defense

contracting context or describing the consequences for earning a bad reputation.  While Booz

Allen has a reputation at NSA for being a hard bargainer, Booz Allen continues winning

contracts.  9/15P Transcript (Kevin Y.) 40:22-41:6.  And concern for its reputation did not

prevent Booz Allen from demanding labor rates far exceeding the ICE, as well as fees far above

those specified by NSA.  9/15A (Dunshee) 68:8-70:17.[15]

Regardless of supposed reputational concerns, Booz Allen has demonstrated its

willingness to significantly increase costs for the MASON III contract and its sole-source

extensions.  MASON III is a fixed-fee contract for which Booz Allen has negotiated for itself a

10% fixed fee on its labor costs—in other words, the statutory maximum fixed fee.  9/15P

(Kevin Y.) 40:10-21.  And Booz Allen has negotiated for itself—*when facing no competition*—a

significant increase in hourly labor rates.  As Dr. Chicu testified: "the experience on

MASON III . . . shows that when Booz Allen has not faced competition, the rates that NSA [was]

charged went up."  9/15P (Chicu) 81:20-24.  Hourly labor rates for MASON III, adjusted for

---

[15] In attempt to support the importance of reputational concerns, Dr. Bailey purported to weigh potential profit from anticompetitive pricing on OPTIMAL DECISION against potential profits from other procurements.  But she incorrectly conflated the OD award fee with profit, 9/16P (Bailey) 14:13-22, even though there is no evidence in the record on profit from OD or any other NSA contract, 9/15P (Chicu) 97:18-98:2.

inflation, increased 24 percent over a period of three years "once the original labor rates were no longer available." *See* 9/15P (Chicu) 81:20-83:6. [16] Dr. Chicu's chart speaks volumes about the potential for competitive harm as a result of the Merger Agreement:



---

[16] Dr. Bailey's criticisms of Dr. Chicu's analysis are baseless. She argues that Booz Allen faced no competition in April 2019, so the fact that Booz Allen did not obtain higher pricing at that time shows its inability to exercise monopoly power. 9/16P (Bailey) 21:4-23:16. But Dr. Bailey admits that the extension in April 2019 was a "no-cost extension[]" provided at "the same rates" as the original MASON III contract, 9/16P (Bailey) 22:5-18, and these no-cost extensions were short-term measures while Booz Allen and NSA negotiated a longer-term extension, 9/15A (Dunshee) 43:17-44:3. Dr. Bailey's analysis here therefore suffers from the same flaw as her analysis in *FTC v. Peabody Energy Corp.*, where the court found that she conducted "an event study without an underlying event," here without any change from a competitive situation to a non-competitive one. 492 F. Supp. 3d 865, 890 n.10 (E.D. Mo. 2020). Dr. Bailey also admits that Booz Allen's pricing for MASON III increased by the amounts that Dr. Chicu showed, but she argues that those price increases resulted from market-wide price increases—even though she admitted that these price increases *already account for inflation*, meaning that she nonsensically attempting to count for inflation *twice*. 9/16P (Bailey) 23:17-25:13 (mistakenly testifying that Dr. Chicu did not account for "the reality that costs are going up").

These increased labor rates have also boosted Booz Allen's fee pool, which is based on these negotiated rates.  For every additional dollar that Booz Allen demands for its labor, the fee pool increases, harming NSA.  *Id.*[17]

Similarly, neither Booz Allen's reputation nor the government's ICE constrained Booz Allen's bid for JUNGLE PRINCE, a sole-source contract where Booz Allen did not face any competition.  For that contract, NSA calculated the ICE for the average combined labor rate as $138.  Nevertheless, Booz Allen bid at an average labor rate of $179—about 30 percent above the ICE.  *See* 9/15P (Chicu) 80:8-23.  Regardless of its claimed concern for "reputation," Booz Allen has shown that it is able and willing to unilaterally demand significantly higher prices, to which NSA accedes.[18]

### F.    Defendants Fail to Rebut the Evidence of Harm to Competition

#### 1.    *Defendants Fail to Prove Any Procompetitive Effects*

Defendants' conclusory claims that procompetitive effects (or "efficiencies") will result from the consummated merger are unsupported.  In fact, the evidence demonstrates the opposite.  When Booz Allen and EverWatch's management teams met in December 2021, Booz Allen identified ████████████████████████████████████████████████████

████████████████████████.  *See* PX-30 at -090, -091.  Of those three contract opportunities, Booz Allen was ██████████████████, and EverWatch was ████████████████████████

---

[17] This is true for award fees as well, and regardless of whether or not a prime contractor's award is based on its performance during the course of the contract.  No matter what, the fee pool is determined at the time the contract is executed and is dependent on the negotiated costs.

[18] Defendants may argue that NSA determined those negotiated rates to be "fair and reasonable," which is the cost evaluation process that is used for sole source procurements.  But NSA's determination that a rate is "fair and reasonable" does not mean that the price offered by Booz Allen is the "best" rate or even a competitive rate.  *See, e.g.,* 9/15P (Tenaglia) 44:20-45:19, 51:7-25.  Further, NSA's determination of whether a price is "fair and reasonable" depends on information from the offeror.  *See* 9/15P (Kevin Y.) 39:13-40:9.

███████████████████████████████████████████████████████████

████████████████████████████████. *See* 9/16A (Dotson) Cross 32:20-33:12; 27:14;

PX-30, at -096.  In other words, the pitch was simple:  Booz Allen preferred to buy EverWatch

to guarantee itself another win on OD and increase its chances of winning ███████████  and

███████████████, rather than compete against EverWatch for those contracts.  *See also* PX-44

(███████████████████████████████████████████████████████████

████████████████████████████████████.

 The likely anticompetitive effects of the Merger Agreement on Defendants' competition

for the OD contract outweigh any speculative efficiencies that Defendants claim.  Defendants'

expert did not even attempt to analyze, much less support Booz Allen's claimed efficiencies.  *See*

9/16P (Bailey) 72:12-14; 9/15P (Chicu) 84:8-15.  And other witnesses rebutted those claimed

efficiencies, 9/15A (Dunshee) 102:25-103:3 (agreeing that there is nothing "unique to

EverWatch" that would "allow Booz Allen to compete" for new opportunities; 9/15P (Chicu)

83:12-84:11 (testifying that Defendants' claimed efficiencies are not verifiable).

 Speculation that Booz Allen would win different contracts (*see* 9/16A (Dotson) 16:2-

17:7) does not relate to competition in the relevant market for OD Services (*see* 9/15P

(Chicu) 83:12-84:11; PX-38 at ¶ 63), so such claimed efficiencies should not be credited.  Courts

do not validate a restraint of trade based on "some unrelated benefits to competition in another

market."  *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994).

 Moreover, Booz Allen's unverified efficiencies claims come down to supposed revenue

increases.  *See* Defs,' Resp. to Pl.'s Mot. in Limine (ECF No. 186, Sept. 12, 2022) at 7; PX-15 at

-310; 9/16A (Dotson) 30:23-31:7 (estimated revenue synergies are "20 times larger than . . . cost

synergies" and that such revenue synergies are merely "additional revenue").[19]  But

"[m]aximizing revenues" or earning more profits "is not a defense under the Sherman Act."

*Chi. Prof'l Sports Ltd. P'ship v. NBA*, 754 F. Supp. 1336, 1359 (N.D. Ill. 1991); *see also*

*Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 38 (D.C. Cir. 2005) ("A restraint cannot be

justified solely on the ground that it increases the profitability of the enterprise that introduces

the new product."); PX-38 at ¶ 62.

Finally, Defendants do not and cannot contend that any efficiencies likely arise from the

merger *agreement* that is at issue at the preliminary injunction phase.  *See FTC v. Penn State*

*Hershey Med. Ctr.*, 838 F.3d 327, 353 (3d Cir. 2016) ("consider[ing] whether the *injunction,* not

the *merger*" is warranted, and explaining that "[a]ll of the [Defendants]' alleged benefits will still

be available upon consummation of the merger, even if we were to grant a[] [preliminary]

injunction").  Accordingly, there are no purported efficiencies to consider at this stage.

### 2. *Less Anticompetitive Means Exist to Achieve Any Purported Efficiencies*

In any event, Defendants' purported "procompetitive efficiencies could be reasonably

achieved through less anticompetitive means." *Nat'l Collegiate Athletic Assoc. v. Alston*, 141 S.

Ct. 2141, 2160 (2021).  For example, Booz Allen could enter a teaming agreement with

EverWatch, as it has for ▓▓▓▓▓▓▓▓▓▓.  9/16A (Cooper) 59:9-13.  Booz Allen could also

develop any necessary expertise in house; or it could engage in a less anticompetitive merger.

*See, e.g.* 9/15P (Chicu) 84:4-7 (Sept. 15, 2022 P.M.) (testifying that efficiencies are not merger-

specific); 9/16A (Dotson) 10:20-11:9, 19:9-25 (testifying that Booz Allen considered other

---

[19] *See also* ▓▓▓▓▓▓▓▓▓ 34:22-35:15 ▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓). In contrast, Defendants have claimed ▓▓▓▓

▓▓▓▓▓. *Id.* at 47:8-14. Defendants' claimed synergies are therefore not cognizable. *See*
*United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 191 n.17 (D.D.C. 2018) ("Putting aside the
revenue synergies, which, by their nature, are more uncertain" than claimed cost savings.).

options besides acquiring EverWatch, and did not do so because those options were not 

⬛"); PX-38 at ¶ 64.

## II.   THE COURT SHOULD PRESERVE COMPETITION FOR THE OPTIMAL DECISION CONTRACT BY ENTERING THE UNITED STATES' PROPOSED PRELIMINARY INJUNCTION

The United States established that the Merger Agreement likely violates Section 1 of the Sherman Act and therefore a preliminary injunction is necessary to protect competition. All of the equitable factors support the United States' requested injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Defendants' flawed alternative proposal substantially fails to restore the independent incentives of Booz Allen and EverWatch to bid on OD and would not do restore the genuine competition that existed before the parties agreed to merge.

**Equitable Factors.** The United States is "likely to suffer irreparable harm in the absence of preliminary relief." *Id.* Courts presume irreparable harm in Sherman Act cases brought by the United States. *See* Pl.'s Mem. (ECF 102, Aug. 12, 2022) at 17-18 & n.21 (citing authorities). Courts routinely enjoin mergers preliminarily in antitrust suits brought by the government. *See id.* at 20 & n.25. Moreover, the evidence here demonstrates a particular likelihood of irreparable harm: without the United States' proposed injunction, the OD procurement will proceed while the only bidders expect to merge,[20] which will likely result in lower-quality and higher-priced bids, harming NSA for at least the expected five-year term of the OD contract (and likely longer). *See supra* at 13-18 .

The United States continues to believe that fully suspending the Merger Agreement pending a later trial would be the most effective remedy. However, the issuance of the OD RFP before the hearing—which set a defined period of competition for OD—allowed the United

---

[20] Defendants failed to show any real doubt that their merger will close, other than the uncertainty caused by this litigation.

States to propose an alternative, narrowly targeted structural remedy. *See* ECF 200. The United States' revised proposal partially addresses the harms described above by not fully setting aside the merger agreement, but by giving either Defendant the right to walk away from their deal until 90 days after the bids are due on October 28. This would restore the Defendants' independent incentives to compete aggressively by protecting the ability of each firm to profit from winning the OD contract.[21] In particular, the United States' proposal would increase EverWatch's incentives to compete aggressively because, if it wins OD, its profits from doing so would reasonably allow it to negotiate a superior offer from either Booz Allen or another buyer. Booz Allen, recognizing EverWatch's newfound incentive, would itself face increased incentives to bid aggressively to preserve the deal and to secure the OD contract. The United States' revised proposal is easily administrable, self-executing, and limited in time. It would not require the supervision of the Court. And it would modify the merger agreement only to a limited extent, leaving the ultimate decision on whether to consummate the merger up to the Defendants.[22]

As for the remaining equitable factors, the "balance of equities" and "public interest" also favor the United States' proposed relief. *Winter*, 555 U.S. at 20. The "strong public interest in effective enforcement of the antitrust laws," *FTC v. Swedish Match N. Am. Inc.*, 131 F. Supp. 2d 151, 173 (D.D.C. 2000), is "not easily outweighed by private interests," *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980). Defendants' arguments that the merger would promote competition for other contracts in the long term are flawed, *see supra* at 18-20, and, even if credited, do not show that the merger needs to proceed immediately.

---

[21] The 90-day timeframe allows the OD competition to continue through NSA review process (including oral examinations of the bidders) and the OD award.

[22] The United States respectfully refers the Court to its prior letter in support of the revised preliminary injunction for a further explanation of why it is appropriate. *See* Post-Hearing Br. (ECF 200), Ex. 01.

*See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726-27 (D.C. Cir. 2001) ("If the merger makes economic sense now, the [defendants] have offered no reason why it would not do so later."). Furthermore, DoD—along with its intelligence agencies including NSA—favors competitive acquisition because it brings numerous benefits, including better prices paid by taxpayers, higher quality, and a stronger defense industrial basis that promotes national security. *See* 9/15P (Tenaglia 45:16-19, 50:16-53:1; PX-36; *see also* 9/15A (Dunshee) 73:23-74:1. Preliminary relief to restore) competition in the OD contract would promote this national security interest.

**Defendants' Inadequate Alternative.** Unlike the United States' proposal, Defendants' so-called "consent judgment" would not restore the incentives for each bidder to win. Their proposal never addresses the core concern—*independent* competition for OD. *See* Pl.'s Pre-Hearing Br. (ECF 175, Sept. 10, 2022) 25-26 (discussing walk-away rights). Defendants' proposal is "behavioral" rather than "structural," and thus fails to restore the Defendants' fundamental economic incentives to compete independently. *See id.* at 27-28.

Defendants make much of their proposed information firewalls, but the harm to competition caused by the merger agreement does not "require[] communication or coordination between the parties." 9/15P (Chicu) 84:22-23. Moreover, even if firewalls were in principle an appropriate remedy (which they are not), ███████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████.

Defendants' vague promise to provide some unspecified amount of "reasonable monetary bonuses," Defs.' Post-Hearing Br. (ECF 216, Sept. 23, 2022), Ex. E, is unexplained and does not restore firm-level incentives to deploy all necessary resources to compete, particularly because the executives overseeing the EverWatch bid team would receive Booz Allen stock that

would align their incentives with the firm's.  *See* PX-38 at ¶¶ 68-69.  What's more, Defendants'

compliance with their own proposal would require close ongoing scrutiny by this Court and the

United States.

### III.     THE COURT SHOULD NOT CONVERT THE PRELIMINARY INJUNCTION HEARING INTO A FULL TRIAL ON THE MERITS

Because the United States' proposed preliminary injunction would address the

competitive harm addressed by its Section 1 claim, if that injunction is entered, the United States

would not seek a full trial on that claim.  But if the Court declines to enter that injunction, the

United States should have the opportunity for full discovery and a trial on that claim.

Discovery and the hearing were focused on a limited set of issues raised by the Section 1

claim.  At the outset, the Court limited the scope of discovery.  *See* ECF 73 (order directing the

discovery schedule "toward a preliminary injunction hearing, ***not*** a full trial on the merits")

(emphasis added).[23]  Although the United States believes that the hearing record is sufficient to

show that the Merger Agreement is unlawful under Section 1, if there is any doubt, the United

States should have the opportunity to develop the evidence further.

Ruling on the merits against the United States without a timely "clear and unambiguous

notice" of consolidation of the hearing with the trial would be out of step with Fourth Circuit

practice.  *aaiPharma, Inc. v. Thompson,* 296 F.3d 227, 234 (4th Cir. 2002); *Berry v. Bean*, 796

F.2d 713, 719 (4th Cir. 1986).  Because the facts presented at a preliminary injunction hearing

often will not be sufficient to permit an informed determination of whether a final judgment is

appropriate, "a party addressing only issues of preliminary relief should not ordinarily be bound

---

[23] Within that framework, the parties sought limited discovery of each other and non-parties (party custodians limited to five from each side, non-party discovery generally limited to non-custodial collections), limited deposition to 8 per side, limited their presentation of the case to six hours each, limited the number of live witnesses to six each, and limited the number of exhibits to 40 (up to 50 with deposition designations).

by its abbreviated and only partially informed presentation of the merits." *Berry v. Bean,* 796

F.2d at 719.  Here, there was neither "clear and unambiguous" notice, nor a full opportunity for

the United States to discover and present its case—especially on the Section 7 claim.  Indeed,

neither party referenced Section 7 even *once* at the hearing until Defendants brought it up after

all of the evidence was presented. [24]

## **CONCLUSION**

The Court should enter the United States' proposed preliminary injunction, and should

deny Defendants' request for to convert the hearing into a trial on the merits.

---

[24] Adjudication of the Section 7 claim would also be premature absent satisfactory relief under Section 1.  Defendants acknowledge they "are different laws, enacted at different times, with different legal standards." ECF 186 at 2.  *See also Brown Shoe Co. v. United States*, 370 U.S. 294, 318 n.32 (1962) ("[Section 7] was intended to reach monopolies and trade restraints outside the scope of the Sherman Act").  A hearing or trial on the Section 7 claim would involve related but potentially different factual questions about the scope of the merger's effects—on which the United States has had minimal discovery—and the impact of any proposed "efficiencies."  *Cf. United States v. Anthem, Inc.*, 855 F.3d 345, 353 ("[I]t is not at all clear that [efficiencies offer a viable legal defense to illegality under Section 7.").  To the extent Defendants seek resolution of Section 7 claim because the United States cannot show the existence of relevant markets, that argument fails for the reasons stated above.  *See supra* at 5-8.

Nevertheless, if the Court is inclined to reach the merits of the Section 7 claim, the limited evidentiary record supports a finding that Defendants' merger is likely to "substantially lessen competition or tend to create a monopoly" for OD Services, and thus to be an illegal merger.  15 U.S.C. § 18; *see Anthem*, 855 F.3d at 349.  Under Section 7, a proposed merger "substantially" lessens competition if there is a "*reasonable probability*" that anticompetitive effects materialize from the merger. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713, 719 (D.C. Cir. 2001).  And if so found, it should be enjoined in its entirety.

Dated this 23rd day of September, 2022.

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA**:


_____/s/_____
Jay D. Owen
KEVIN QUIN (special admission)
JAY D. OWEN (special admission)
ALEXANDER ANDRESIAN (special admission)
ALEX COHEN (special admission)
MARTHA FITZGERALD (special admission)
KERRIE FREEBORN (special admission)
BRIAN HANNA (special admission)
NATALIE HAYES (special admission)
MIRANDA ISAACS (special admission)
STEVEN KRAMER (special admission)
ARIANNA MARKEL (special admission)
JONATHAN MINCER (special admission)
BENJAMIN RUDOFSKY (special admission)
BRYN WILLIAMS (special admission)
Trial Attorneys
United States Department of Justice
Antitrust Division
Defense, Industrials, and Aerospace Section
450 Fifth Street N.W., Suite 8700
Washington, DC 20530
Telephone: (202) 476-0251
Facsimile: (202) 514-9033
Email: Kevin.Quin@usdoj.gov


ARIANA WRIGHT ARNOLD
USDC Md Bar No. 23000
Assistant United States Attorney
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
Telephone: 410-209-4813
Facsimile: 410-962-2310
Email: Ariana.Arnold@usdoj.gov

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 23, 2022, I electronically filed the foregoing Post-Hearing Brief using the CM/ECF system, and thereby served, via electronic filing, counsel of record for all parties.

_____/s/_____

Jay D. Owen (special admission)
Trial Attorney
United States Department of Justice
Antitrust Division