## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| vs. | Case No. 1:22-cv-01603-CCB |
| BOOZ ALLEN HAMILTON INC., *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR AN INJUNCTION PENDING APPEAL

## INTRODUCTION

Last week, this Court denied the Department of Justice's ("DOJ's") preliminary-injunction motion in a comprehensive, 27-page decision, concluding that DOJ failed to meet its evidentiary burden to justify the extraordinary relief it sought. ECF No. 223 ("Op."). After an extensive evaluation of the documentary record, the expert evidence, and the credibility of the witnesses, the Court found that DOJ could not get past even the "initial step" of the relevant antitrust analysis, Op. at 9, and failed to satisfy *any* element necessary for injunctive relief, *id.* at 25–27. As a result, the Court permitted "defendants the ability to merge on their own terms, if they so choose." *Id.* at 27. Defendants did just that—closing their transaction the morning of October 14.[1]

After the transaction closed, DOJ filed yet another motion for injunctive relief. ECF No. 226-1 ("Mot."). In fact, DOJ now appears to seek three injunctions. DOJ (1) wants the Court to block the transaction from closing for 14 days so that DOJ *can decide* whether it wants to appeal, (2) *if* it decides to appeal, DOJ wants the Court to prevent the transaction from closing pending appeal, and (3) if the transaction had already closed—it has—DOJ "requests an order directing Defendants to hold all assets separate." Mot. 2. None of these requests are proper.

As to DOJ's first two requests, "[i]t is well established that an appeal of the denial of an injunction to prohibit an act is rendered moot by the happening of the act." *HCI Techs., Inc. v. Avaya, Inc.*, 241 F. App'x 115, 120 (4th Cir. 2007); *see also Winston v. Fed. Bureau of Prisons*, No. 10-cv-2192, 2011 WL 3664416, at *2 (E.D.N.C. Aug 18, 2011) ("A request for an injunction

---

[1] As a result of the October 14, 2022 consummation of the transactions contemplated by the Stock Purchase Agreement, dated March 15, 2022, by and among Booz Allen Hamilton Inc., a Delaware corporation ("Booz Allen"), EverWatch Corp., a Delaware corporation ("EverWatch"), and EC Defense Holdings, LLC a Delaware limited liability company, EverWatch is now wholly owned subsidiary of Booz Allen. Similarly, Analysis, Computing & Engineering Solutions, Inc., which is a subsidiary of EverWatch, is now an indirect wholly owned subsidiary of Booz Allen. Appropriate substitutions of counsel will be made in the near future.

to prohibit an act is rendered moot by the happening of the act.").[2] Here, the relevant act—closing the transaction—occurred before DOJ filed its motion, rendering DOJ's requests to halt closing moot.[3]

As to the third request, DOJ is tellingly vague on what it means by "an order directing Defendants to hold all assets separate" after closing. Mot. at 2. But what is clear is that DOJ's complaint rests solely on a narrow, quickly fading competitive concern: the impending bids for NSA's OPTIMAL DECISION contract. *E.g.*, Op. at 1. That "alleged window" of concern "is rapidly closing." *Id.* at 26. Bids for OPTIMAL DECISION are due in just weeks. Moreover, as the Court found, Booz Allen committed to "entic[e] competition even after the Proposed Transaction closes" by "submit[ting] separate bids, stick[ing] with those bids, implement[ing] firewalls between the two bidding teams, and creat[ing] financial incentives for the wining team." *Id.* at 14 & n.19. Booz Allen has taken the necessary steps to abide by these commitments, ensuring that Booz Allen's and EverWatch's bid teams are held separate for the OPTIMAL DECISION bid process.[4]

---

[2] It is true "that a motion for preliminary injunction filed *before* the act to be enjoined has occurred, and subsequently intended to restore the status quo once it has been disturbed, is not moot." *Di Biase v. SPX Corp.*, 872 F.3d 224, 231–32 (4th Cir. 2017) (emphasis added). But, again, DOJ filed its motion *after* the transaction had closed.

[3] DOJ's rationale for its first request makes no sense. DOJ says that it needs the 14-day injunction so that it can obtain the Solicitor General's permission to appeal. Mot. at 2. But DOJ does not need the Solicitor General's permission to file a protective notice of appeal, which is what DOJ did just a few weeks ago after losing in *United States v. U.S. Sugar Corp. See* Letter, No. 21-cv-01644 (D. Del. Sept. 28, 2022), ECF No. 252 (DOJ notifying the court that the Solicitor General had authorized an appeal two days *after* filing the notice of appeal). Nor does DOJ explain why the "heavy artillery" of a preliminary injunction is warranted just so DOJ can ruminate on its options. *See In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 530 (4th Cir. 2003).

[4] During closing arguments, the Court asked DOJ whether, if it lost on the merits, DOJ even wanted the relief provided for in Defendants' proposed order, including the hold-separate provisions. Ex. A, Closing Tr. at 11:3–11. DOJ was ambivalent. *Id.* at 12:1–3 ("[T]he United States would not be pushing for [those provisions].").

What DOJ really appears to be seeking under the guise of an order to hold "all assets separate" is an *unwinding* of the now-consummated transaction pending appeal. Such extraordinary, unprecedented relief would *undo* the *status quo*, severely prejudice Booz Allen, and undermine competition. Defendants introduced unrebutted evidence at the hearing that delays in closing had already caused EverWatch to lose employees and injured the value of the deal. Op. at 26 ("EverWatch employees have been left in limbo wondering what the future holds; some opted to leave rather than waiting to see the merger through."). The further uncertainty engendered by DOJ's proposed unwinding would likely cause *additional* employee departures. Moreover, such an order would harm competition by prohibiting Booz Allen from competing together with acquired EverWatch employees for deals much larger than OPTIMAL DECISION—some of which are happening right now. Op. at 13 ("OPTIMAL DECISION is just a fraction of the NSA's contracting work; there are billions of dollars at stake in the industry. The Proposed Acquisition could allow EverWatch and Booz Allen to more effectively compete with Raytheon, Lockheed Martin, and other entrenched incumbents for more lucrative contracts."). Booz Allen is aware of no precedent that would support unwinding the transaction as preliminary relief pending an appeal, much less to facilitate DOJ's decision of whether to file an appeal. *See Bank of N.Y. Co., Inc. v. Ne. Bancorp, Inc.*, 9 F.3d 1065, 1067 (2d Cir. 1993) (holding that rescinding a merger was "not an appropriate preliminary remedy"); *United States v. Am. Tech. Indust., Inc.*, No. 73-cv-246, 1974 WL 823, at *8 (M.D. Pa Jan. 8, 1974) (rejecting DOJ's preliminary-injunction request that would have unwound an already consummated merger).

DOJ is not entitled to an injunction of any stripe. This Court already ruled that DOJ has not met any of the elements required for a preliminary injunction. Nor was it a particularly close call. After hundreds of pages of briefing and a fulsome, two-day evidentiary hearing, the Court

held that DOJ failed to establish *either* a properly defined, relevant market *or* any likely substantial anticompetitive effects. In attempting to justify its "likelihood of success on appeal," DOJ attempts to pass off the Court's findings as raising significant "legal issues that will be reviewed de novo on appeal." Mot. at 4; *see also id.* (calling the Court's market-definition finding a "legal determination"). But under Fourth Circuit caselaw, the Court's market *and* effects determinations are *factual* and thus, subject to deferential clear-error review. *E.g.*, *United States v. Carilion Health Sys.*, 892 F.2d 1042, at *2 (4th Cir. 1989) (unpub. table decision) ("The district court's determination of the product and geographic markets and the effect on competition of the merger is therefore subject to reversal only if clearly erroneous.").

If DOJ decides to appeal, it will come nowhere close to meeting that clear-error standard. In a case where DOJ has offered an ever-shifting array of arguments to thwart the transaction, it is perhaps not surprising that DOJ's motion retreats from its prior arguments and evidence. For example, DOJ no longer claims direct evidence of anticompetitive effects. Further, as the Court knows, DOJ relied heavily on DOJ economist Dr. Chicu and his purported hypothetical-monopolist analysis, which the Court rejected, and his single-incentive effects theory, which the Court held "suffers from tunnel vision." Op. at 12. DOJ's current motion does not even bother to *mention* Dr. Chicu or his analyses. Indeed, even though DOJ centered its entire case on a single-incentive theory, the word "incentives" appears only once (in passing) in DOJ's entire motion. Mot. at 8.

Instead, DOJ's now tries to reframe its case around "structural evidence." Mot. at 9. But DOJ's supposed structural theory rests on a "government-contracts-are-special" market argument (Mot. at 6) that DOJ expressly disclaimed during closing argument (Ex. A, Closing Tr. at 16:5–16) and that, in any event, the Court rejected as factually unsupported. DOJ also insists that it is

entitled to a "presumption" of economic effects based on market-share alone. Mot. at 4. But that argument rests on DOJ's failed market definition and is rebutted by Supreme Court precedent. Finally, DOJ's apparent suggestion that an increase in market power (which does not exist here anyway) alone is a "substantial adverse effect on the competitive process" (Mot. at 8) is foreclosed by the same Supreme Court precedent DOJ relied on throughout this case: *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284–85 (2018). For these reasons and others discussed below, DOJ cannot establish a likelihood of success on the merits, nor any other element necessary to justify its requested relief.

Just weeks ago, after losing its merger challenge in *United States v. U.S. Sugar Corp.*, DOJ tried a similar gambit, seeking both a 14-day injunction and an injunction pending appeal. The district court denied DOJ's request, explaining that "the Government continues to try to obtain via delay what it could not obtain on the merits." Order at 1, *U.S. Sugar Corp.*, 21-cv-1644 (D. Del. Sept. 28, 2022), ECF No. 253. This Court should reject DOJ's attempt to do the same here.

## ARGUMENT

To obtain an injunction pending appeal,[5] DOJ must show that (1) it is likely to succeed on appeal, (2) it will suffer irreparable injury without the injunction, (3) the balance of equities favors the injunction, and (4) the injunction is in the public interest. *See, e.g.*, *Par Pharms., Inc. v. TWI Pharms., Inc.*, No. 11-cv-2466, 2014 WL 3956024, at *1 (D. Md. Aug. 12, 2014) (Blake, J.). This is a "heavy burden." *St. Agnes Hosp. of the City of Baltimore, Inc. v. Riddick*, 751 F. Supp. 75, 78 (D. Md. 1990).[6]

---

[5] Because DOJ's requests to block the transaction are moot, this section focuses on the remaining request to unwind the transaction pending appeal. Although, to be clear, DOJ cannot meet the preliminary-injunction factors for *any* injunction.

[6] It is true that this Court has granted an injunction pending appeal after denying a preliminary injunction. *Par Pharms.*, 2014 WL 3956024, at *6. That case involved "a close call" in which the

The burden is heavier still given the nature of DOJ's request. Because the transaction has already closed, DOJ's requested injunction does not seek to prohibit future conduct to preserve the *status quo*. Rather, it seeks to require the parties to take an affirmative action to unwind their consummated transaction. That type of preliminary injunction is, "in any circumstance[] disfavored, and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994); *accord SH Franchising, LLC v. Newlands Homecare, LLC*, 18-cv-2104, 2019 WL 356658, at *2 (D. Md. Jan. 29, 2019) (Blake, J.).

Given the factual findings the Court has already made in denying DOJ's preliminary-injunction motion, DOJ cannot justify its requested relief here.

## I.    DOJ is unlikely to succeed on the merits of an appeal.

On appeal—should DOJ actually pursue one—the Fourth Circuit will review this Court's decision denying DOJ's preliminary-injunction request for an abuse of discretion. *MicroStrategy Inc. v. Motorola, Inc*., 245 F.3d 335, 339 (4th Cir. 2001). And it will specifically review this Court's findings that DOJ failed to establish a properly defined, relevant market or establish likely substantial anticompetitive effects for clear error. *Carilion Health Sys.*, 892 F.2d 1042, at *2; *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442 (4th Cir. 2011) ("[M]arket definition is a question of fact."). Given these deferential standards, DOJ is *even less likely* to succeed on appeal than it was before this Court.[7]

---

core question was subject to *de novo* review. *Id.* at *2. This case involves neither. Further, that case involved the unique risk of allowing a potentially patent-violating drug to hit the market during the appeal. *Id.* at *3. No similar circumstances are present here.

[7] Importantly, even if DOJ could show that this Court clearly erred in its market and effects findings, DOJ would *still* need to grapple with the next two steps of the rule of reason, which the Court did not reach given DOJ's failure at the first step. Op. at 9.

A. *DOJ is unlikely to succeed in overturning this Court's market findings on appeal.*

To succeed on its Sherman Act § 1 claim, DOJ had to establish a properly defined, relevant product market. *Am. Express Co.*, 138 S. Ct. at 2285.[8] The relevant product market includes those products "reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

Here, DOJ proposed a market limited to a single contract bid (OPTIMAL DECISION), with a single customer (NSA), at a single "snapshot" in time. Op. at 20–21, 21 n.31. This was, as the Court held, a transparent attempt by DOJ to "gerrymander its way to victory without due regard for market realities." *Id.* at 19 (quoting *It's My Party, Inc. v. LiveNation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016)).

As this Court recognized, and DOJ does not dispute, courts have frequently rejected "relevant market definitions based on a single contract." Op. at 23. But importantly, this Court did not reject DOJ's theory on a legal holding that a single-transaction market may never be valid. *Id.* Rather, it did so based on a series of *factual findings* leading to the inescapable conclusion that the product market here is broader than OPTIMAL DECISION. As the Court found, modeling-and-simulation services—the product at issue—"are not unique to the NSA." *Id.* at 19 (also rejecting the idea that modeling-and-simulation services have "peculiar characteristics"). Instead, modeling-and-simulation is "simply a 'systems engineering technique,'" applied to "computer networks all over the United States." *Id.* The fact that "NSA uses modeling and simulation services in a specific environment (signals intelligence) does not mean that NSA's application of these services

_____

[8] DOJ previously urged this Court to apply a quick-look analysis, which this Court properly denied. Op. at 7. DOJ no longer pursues this argument.

constitutes a unique market." *Id.* at 24. That conclusion was bolstered by the fact that NSA dropped signals-intelligence experience as a key requirement for OPTIMAL DECISION bids. *Id.* at 22.

This Court further concluded that NSA's preferences could not justify narrowing the market definition to OPTIMAL DECISION. Op. at 22 (citing *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) (en banc)). Put differently, the antitrust laws do "not cater to the preferences of a single consumer" and "[t]he court need not help the NSA find its perfect match." Op. at 21–22. Indeed, even DOJ acknowledges as much in its motion. *See* Mot. at 6.

Finally, the Court rejected Dr. Chicu's testimony, primarily centered around a hypothetical-monopolist test, aimed at supporting DOJ's market. *See* Op. at 25 (holding that Dr. Chicu's "test has limited use"). The core question under a hypothetical-monopolist test is whether a hypothetical monopolist could profitably increase prices in a given market. *Id.* But "Dr. Chicu never analyzed the *profitability* of any rate increase" and "Dr. Chicu looked solely at rate increases on an *actual contract*, not those of a *hypothetical* monopolist." *Id.* Notably, DOJ does not challenge these findings, and it has abandoned its expert, never mentioning him once in its motion. Instead, DOJ makes two principal arguments. Both are waived, and neither is persuasive.

First, DOJ selectively quotes part of one sentence from a longer footnote in the Court's opinion: "it is likely only Booz Allen and EverWatch will submit a bid" for OPTIMAL DECISION. Mot. at 1 (citing Op. at 21 n.31). According to DOJ, this footnote reference constitutes a "factual finding" that alone is "enough to justify the market the United States proposed" and "[r]equiring more only serves to obscure rather than illuminate competition and competitive effects." Mot. at 5. But DOJ never previously argued that the likelihood of two bidders for OPTIMAL DECISION proves its alleged single-transaction market. Instead, DOJ put forward *other* factual and economic evidence at the hearing to support its market (which this Court

rejected). Accordingly, any such argument is waived. *See, e.g.*, *Arakas v. Comm'r*, 983 F.3d 83, 104–05 (4th Cir. 2020).

In any event, DOJ's newfound market argument is wrong. DOJ effectively suggests that what it calls the "substantial adverse effect" (*i.e.,* the alleged reduction of bidders for a single contract) necessarily defines the market (*i.e.,* as limited to that single contract). Mot. at 8. That is backwards. As a Supreme Court case on which DOJ relies makes plain: "[w]ithout a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Am. Express*, 138 S. Ct. at 2285. The *first* task is to define the market; *then*, "the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 290 (4th Cir. 2012); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002); *Oksanen*, 945 F.2d at 708.

As described above, this Court conducted a detailed analysis of the facts and economic evidence and found that any market for modeling and simulation services is much broader than just one contract for those services (OPTIMAL DECISION). DOJ's myopic focus on the fact that only two companies may bid for OPTIMAL DECISION only speaks to one *part* of that broader market, which (to use DOJ's own words) "serves to obscure rather than illuminate competition and competitive effects" in the market as a whole. *See* Mot. at 5. Indeed, as this Court recognized, caselaw is clear that there "'must be some allegation of a harmful effect on a more generalized market than [a single contracting party].'" Op. at 23 (quoting *Havoco of Am. Ltd. v. Shell Oil Co.*, 626 F.2d 549, 558 (7th Cir. 1980)). That is hardly surprising. If it were otherwise, "then whoever wins OPTIMAL DECISION could hypothetically have a monopoly" and "'the mere fact that one party bid successfully against another party for [the] contract would be equivalent to an

anticompetitive effect.'" *Id.* (quoting *Havoco*, 626 F.2d at 558). That would prove too much, as the Court recognized. *Id.* DOJ does not even address, much less refute, that logical conclusion.

It is also telling that DOJ does not quote the *entirety* of what the Court said about likely OPTIMAL DECISION bidders. In full, footnote 31 reads:

> The Government[] curates its market based on a moment suspended in time. With only a few weeks left until the bidding deadline, it is likely only Booz Allen and EverWatch will submit a bid. But a snapshot at the finish line says nothing about the competitors running the race initially.

Op. at 21 n.31. In other words, by focusing on one point in time, DOJ has obscured the overall competitive set and ignored basic economics. *See* Op. at 21 ("Although Booz Allen or EverWatch likely have the best shot at checking these aspirational boxes, the record reflects others could do the job."). DOJ never cited any case, including in its present motion, that defines an antitrust market limited *only* to bidders left at the end of a procurement process for a single contract. Nor would such a snapshot-in-time market make any sense.[9] At bottom, DOJ's argument reflects a continued "tunnel vision" that looks nowhere but OPTIMAL DECISION and in fact, only the very end of the OPTIMAL DECISION procurement process. *See* Op. at 12.

Second, DOJ now argues that, because OPTIMAL DECISION is a government contract, it somehow justifies conflating that single transaction with an economic market. Mot. at 1; *see also id.* at 5 (referring to "the special context of this case where the entire government (through NSA) obtains SIGINT modeling and simulation services in one contract"); *id.* at 6 ("And, particularly in the government-contract context, courts have recognized that particular needs, and particular competitions for those needs, justify defining markets around the competitions for such

---

[9] Many markets are characterized by bidding on contracts for a commodity or service, and it may very well be that only two competitors end up at the finish line for any given opportunity. But that does not mean the "market" should be limited to such a contract or that courts should ignore that competition for the contract includes, at a minimum, *all* those who were part of the race.

government contracts."); *id.* at 6 n. 6 (distinguishing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) because it did "not involve a government contract"). But DOJ told this Court the opposite during closing arguments.

> THE COURT: Okay. So you're not relying on an argument that when it's the government that's involved in a single contract, that should be treated differently from another consumer or purchaser that might be involved in a single contract?
>
> MR. OWEN: That's right, Your Honor. The United States is not relying on the specifics that it is the government involved or that it is simply the single contract. The United States is relying on the practical indicia from *Brown Shoe*, the fact that there are no other services that are a substitute for these services. It just so happens that they're acquired only through the OPTIMAL DECISION contract.

Ex. A, Closing Tr. at 16:5–16. DOJ cannot switch positions on appeal and adopt a position it expressly repudiated. *See, e.g.*, *Hilao v. Estate of Marcos*, 393 F.3d 987, 993 (9th Cir. 2004) ("A party . . . is bound by concessions made in its brief or at oral argument."); *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) (holding the defendant was bound by statements made in a brief).

More fundamentally, there is nothing about government contracts that would justify a different standard for establishing the relevant market. Certainly, DOJ has offered no valid reason to do so. To the contrary, courts have frequently rejected single-transaction markets involving government contracts for the same reasons that courts have rejected single-transaction markets not involving government contracts. *See, e.g.*, *Havoco*, 626 F.2d at 558; *Triple M. Roofing Corp. v. Tremco, Inc.*, 753 F.2d 242, 246 (2d Cir. 1985); *United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 925 (N.D. Ill. 2015); *City of New York v. Grp. Health Inc.*, No. 06-cv-13122, 2010 WL 2132246, at *4 (S.D.N.Y. May 11, 2010).[10]

---

[10] DOJ cites the same government-contracting cases related to military technology and weaponry that it relied on previously. *See* Mot. at 6–7. But this Court found those cases factually distinguishable. *See* Op. at 24 ("And while there remains a broader market for ammunition generally, the weapons and vehicles at issue in those cases are much more individually distinctive than modeling and simulation services."). DOJ does not even attempt to challenge the Court's

Seeking a more favorable appellate standard, DOJ tries to cast the question as "[w]hether it is proper to define a market around a substantial government contract," claiming it is a "substantial *legal* question." Mot. at 1 (emphasis added); *see also id.* at 4 (claiming the Court reached a "[l]egal [d]etermination on [m]arket [d]efinition"). But this Court was clear that it was "not suggest[ing] a single contract can never be a relevant market." Op. at 23. Rather, the Court found the evidence in this case did not support a market structured around OPTIMAL DECISION. Accordingly, the Fourth Circuit will apply clear-error review—not *de novo* review. DOJ has offered no good reason to doubt this Court's factual findings and cannot establish clear error on appeal.

For all these reasons, DOJ will not succeed in overturning this Court's careful market analysis.

B. *DOJ cannot show on appeal that the Court clearly erred in determining that the transaction is not likely to cause substantial anticompetitive effects.*

Even if DOJ had established a relevant market, it would still have needed to establish that the acquisition agreement was likely to have a substantial anticompetitive effect in that market. That is "no slight burden." Op. at 9 (quoting *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021)). As the Supreme Court has held, and DOJ itself repeatedly has advocated, an antitrust plaintiff can show anticompetitive effects through direct evidence or indirect evidence. *Am. Express*, 138 S. Ct. at 2284.

Direct evidence is proof of "'actual detrimental effects on competition.'" Op. at 9; *see generally Am. Express Co.*, 138 S. Ct. at 2284. Throughout the case, DOJ told this Court that it had such evidence. *See* Opening Arg. 16:20–21 ("[T]he United States will also show actual direct

findings (much less demonstrate they are clearly erroneous), nor does it attempt to explain why the Court's reasoning was erroneous.

evidence [of anticompetitive effects].”). Yet, now, DOJ no longer argues that it has direct evidence of anticompetitive effects. This makes sense. As this Court explained, “even armed with targeted discovery, the Government has found nothing beyond informal chats and emails from lower-level employees surprised to learn about the deal.” Op. at 11. The Court properly considered these communications as “simply represent[ing] excitement and uncertainty” in the immediate aftermath of the Proposed Acquisition’s announcement, which was “unsurprising” considering that they “were not told about the transaction in advance.” *Id.* at 10. Critically, “[n]o message explicitly expresse[d] an intent to submit a less competitive bid.” *Id.* at 10 n.16. To the contrary, this Court found that the message from the management of both companies to lower-level employees was clear—each company and team was to compete independently and aggressively for OPTIMAL DECISION. *Id.* at 10 n.16, 11. After weighing all the evidence, this Court concluded that there was no reason to conclude that Defendants “intend to give the NSA anything less than their best proposal.” *Id.* at 11.

DOJ also had the opportunity to show anticompetitive effects through indirect evidence, which requires “proof of market power plus some evidence that the challenged restraint harms competition.” *Am. Express*, 138 S. Ct. at 2284. As an initial matter, DOJ cannot show market power because it failed to define a proper antitrust market in which to assess whether market power exists. Moreover, “market power is the power to force a purchaser to do something that he would not do in a competitive market.” *Dickson*, 309 F.3d at 207 n.17. But, as this Court found, NSA has robust tools to neutralize any attempt to force it to take a bad deal. Op. at 18.

Nor has DOJ shown that anticompetitive “harm is not only possible but likely and significant.” *Dickson*, 309 F.3d at 206. DOJ’s primary “evidence” of such harm came from its economist, Dr. Chicu, who opined that the acquisition agreement had lessened Defendants’

incentive to compete for OPTIMAL DECISION because, supposedly, Booz Allen would win no matter what. But as Dr. Chicu conceded at the hearing, "an incentive is just the first step along the way to evaluating whether or not there's an effect." Op. at 13. The problem is that Dr. Chicu never got past that first step. Rather, as this Court found, his analysis "ignore[d] countervailing incentives that protect and sustain competition." *Id.* at 12.

As the Court held, "Booz Allen has strong countervailing incentives to maintain a competitive bid," including (1) Booz Allen's need to maintain "a sterling reputation" to obtain future government contracts, (2) the ease with which "NSA would know if Booz Allen over-charged or under-performed on OPTIMAL DECISION" given the long track record, (3) the risk of losing "*billions* in future contracts," and (4) the "trivial" upside to behaving anticompetitively in the OPTIMAL DECISION bids. Op. at 13–15; *see also Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 491 (2011) ("Government contractors—especially cutting-edge defense contractors . . . are repeat players . . . [with] a strong incentive to behave rather than risk missing out on the next multibillion-dollar defense contract.").

Further, the Court concluded that Booz Allen's prior dealings, and particularly its initial extension of the MASON III contract at no cost, disproved DOJ's theory of anticompetitive harm. Op. at 15–16. As this Court explained, "[i]f the Government were correct about Booz Allen's incentives to increase prices, the company would have seized this opportunity to raise the cost or decrease the quality of their services." *Id.* at 15. But that did not happen. Rather, as Defendants' expert Dr. Bailey testified—and as this Court credited—Booz Allen's rates actually "*decreased*" during this time. *Id.*

DOJ does not really challenge any of these numerous, carefully considered, factual findings. Instead, DOJ simply argues that this Court should have *presumed* anticompetitive effects

because of Defendants' supposed market power. Mot. at 4 (discussing an alleged "structural presumption" of anticompetitive effect). Indeed, at some points DOJ appears to go even further, suggesting that increased market power alone is conclusive, regardless of whether it is likely to cause any anticompetitive effects. Mot. at 8 ("But it is the merger's significant enhancement of market power . . . not what might be accomplished with that power, that represents the substantial adverse effect on the competitive process."). DOJ is wrong for several reasons.

First, DOJ's own logic depends on its ability to establish market power. But as discussed above, DOJ never did so, largely because it never established a properly defined, relevant market. DOJ's market-power analysis also was faulty. Dr. Chicu purported to calculate market power based on Booz Allen's and EverWatch's guesstimate of their "PWin," which he conveniently added up to "100%." *See* Defendants' Post-Hearing Br., ECF No. 216 at 13 n.12. But as Dr. Bailey explained, using subjective estimates of the likelihood of winning to calculate market power is economically novel and unsound. *Id.*

Second, there is no "structural presumption" in a Sherman Act § 1 case under the rule of reason, and certainly any increase in market power is not itself proof of anticompetitive effects under the § 1 standard. As the Supreme Court explained in *American Express*, a § 1 plaintiff proceeding with indirect evidence—like DOJ—must show "proof of market power *plus* some evidence that the challenged restraint harms competition." *Am. Express*, 138 S. Ct. at 2284 (emphasis added).[11] The two cases *American Express* cited for this proposition drive the point

---

[11] Setting aside its now-abandoned quick-look argument, DOJ repeatedly urged this Court to apply *American Express*' rule-of-reason standard, DOJ's Pre-Hearing Br., ECF No. 175 at 3 & DOJ's Post-Hearing Br., ECF No. 219 at 5, which this Court did, Op. at 8–9. But now, DOJ is effectively asking this Court to ignore *American Express*. Instead, DOJ has now shifted its attention to a so-called structural presumption that, at most, DOJ only obliquely referenced in its prior arguments. This is a transparent attempt to elude this Court's factual findings and the latest in DOJ's ever-shifting legal theories.

home. *See Spanish Broad. Sys. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004) ("[M]arket power alone cannot be sufficient to show the potential for genuine adverse effects on competition."); *Tops Mkts, Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97 (2d Cir. 1998) ("Market power, while necessary to show adverse effect indirectly, alone is insufficient."). In short: "A demonstration of market power alone is not sufficient; plaintiffs must also show that the challenged practice is likely to harm competition." *In re McCormick & Co.*, 217 F. Supp. 3d 124, 137 (D.D.C. 2016).

In arguing to the contrary, DOJ cites four cases (Mot. at 7–8), none of which are persuasive and two of which actively undermine DOJ's point.[12]

In *United States v. First National Bank & Trust Co. of Lexington*, the Supreme Court held that, "where merging companies are major competitive factors in a relevant market, the elimination of significant competition between them, by merger or consolidation, itself constitutes a violation of § 1 the Sherman Act." 376 U.S. 665, 671–72 (1964). But as the Seventh Circuit recognized in *United States v. Rockford Memorial Corp.*, a case DOJ relies on, *First National* has since been abrogated by later Supreme Court decisions clarifying that increases in market share through horizontal mergers are not presumed to be illegal under § 1—actual anticompetitive effects are required. 898 F.2d 1278, 1283 (7th Cir. 1990) (referring to *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979) and *Copperweld Corp. v. Indep. Tube Co.*, 467 U.S. 752 (1984)).

The only cited case possibly supporting DOJ's proposed presumption is *Rockford Memorial*, but the Seventh Circuit offered no rationale for the presumption discussed in that case,

---

[12] Apart from these cases, DOJ cites two cases from *over a centu*ry *ago* for the apparent proposition that increased market power is alone dispositive. Mot. at 8 (citing *United States v. Union Pac. R.R. Co.*, 226 U.S. 61, 88 (1912) and *N. Sec. Co. v. United States*, 193 U.S. 197, 327–28 (1904)). The general pronouncements that DOJ quotes from these completely dissimilar cases in no way support its argument. In any event, *modern* antitrust law refutes DOJ's claims.

and the Fourth Circuit has never even cited *Rockford Memorial*, much less adopted DOJ's structural presumption under § 1. In fact, *Rockford Memorial* disagreed with Fourth Circuit caselaw in reaching its conclusion. 898 F.2d at 1286. Most critically, recent Supreme Court § 1 caselaw plainly requires evidence of anticompetitive effects in addition to any structural evidence. *E.g.*, *Alston*, 141 S. Ct. at 2151; *Am. Express*, 138 S. Ct. at 2284; *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007). *Rockford Memorial* too made clear that the analysis does not end with market shares. *See* 898 F.2d at 1285–86.

DOJ's other two cited cases—*United States v. Visa USA, Inc.*, 344 F.3d 229 (2d Cir. 2003) and *Jien v. Perdue Farms, Inc.*, 19-cv-2521, 2020 WL 5544183 (D. Md. Sept. 16, 2020)—disprove its argument. As DOJ notes, (Mot. at 8) in *Visa*, the Second Circuit explained that "*market power* may be presumed if the defendant controls a large enough share of the relevant market." *Visa*, 344 F.3d at 239 (emphasis added). But, after concluding that the defendants had market power, the Second Circuit then considered whether there had actually been any anticompetitive effect. "[T]o sustain a challenge under § 1 of the Sherman Act, the government must prove that the defendants' conduct has adversely affected competition." *Id.* at 240.

Likewise, DOJ quotes *Jien* for the following proposition: "more than 90% of the poultry processing jobs in the United States . . . is on its face a large enough market share to plausibly suggests that they could have suppressed compensation in the relevant market." Mot. at 8 (quoting *Jien*, 2020 WL 5544183 at *12). But immediately after that, the court explained that "[h]aving found that the Amended Complaint plausibly alleged market power within the relevant market, the Court *must determine* whether Plaintiffs pled that the information sharing has *had an anticompetitive effect*." *Jien*, 2020 WL 5544183, at *12 (emphasis added).

Finally, DOJ fails to appreciate that, even if a "structural presumption" existed, it would be just that—a presumption, which can be overcome. Here, as discussed above, this Court concluded, based on all the evidence introduced during the two-day hearing, that various other factors—like reputational incentives, NSA's available tools, and the natural experiment of the MASON III extension—made substantial anticompetitive effects unlikely. DOJ does not even attempt to address the factual findings underlying that conclusion

For all these reasons, DOJ will not be able to show that this Court clearly erred in finding that DOJ had not introduced evidence establishing that the merger agreement was likely to create substantial anticompetitive effects.

## II.    DOJ has not satisfied the other elements necessary for an injunction pending appeal.

For the reasons above, DOJ has not shown a likelihood of success on the merits on appeal, and DOJ's motion must be denied for that reason alone. *See, e.g.*, *Marshall v. Roderick*, No. 16-cv-814, 2016 WL 3181759, at *1 (D. Md. June 8, 2016) (Blake, J.) ("All four of these requirements must be established independently before injunctive relief can be granted."). In addition, DOJ cannot establish the other requirements for an injunction.

*Irreparable Injury.* DOJ has not shown that it (or NSA) will suffer imminent, non-speculative, irreparable injury. *See SH Franchising, LLC*, 2019 WL 356658, at *5 (Blake, J.). Once again, DOJ primarily argues that, because it is the government, it need not establish irreparable injury. Mot. at 10 ("[I]rreparable harm is presumed in antitrust cases brought by the United States").[13] DOJ is wrong. The traditional equitable factors require a showing of irreparable injury before a preliminary injunction may be entered. Indeed, as the Fourth Circuit has explained, the

---

[13] DOJ's alleged presumption, even if legally valid, only arises "[o]nce likelihood of success on the merits of the case is established." Mot. at 12 n.10. As discussed above, DOJ cannot establish a likelihood of success on the merits.

irreparable-injury requirement works "to limit the deployment of the heavy artillery of preliminary injunctive relief" to situations where it is truly needed. *In re Microsoft*, 333 F.3d at 530.

Although Congress can alter the traditional standard, it must do so clearly. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[W]e do not lightly assume that Congress has intended to depart from established principles [of equitable relief]."). It has not done so here. DOJ is authorized to seek injunctive relief under 15 U.S.C. § 4. The Supreme Court has long held that § 4 is governed by the same principles that apply to any claim for equitable relief and that Congress did not intend for a different standard to apply. *Appalachian Coals v. United States*, 288 U.S. 344, 377–78 (1933); *De Beers Consol. Mines v. United States*, 325 U.S. 212, 218–19 (1945). Thus, as this Court and others have held, DOJ must establish irreparable injury to obtain an injunction. Op. at 26 n.35; *United States v. Gillette Co.*, 828 F. Supp. 78, 80 (D.D.C. 1993).

In this case, DOJ cannot do so. To the contrary, as this Court held, DOJ "failed to show likely or significant competitive harm" and "the fact the NSA may award OPTIMAL DECISION whenever it chooses means the harm is not necessarily imminent." Op. at 26. Unable to rebut those findings, DOJ instead argues that, after closing, "NSA would likely lose out on certain benefits of competition between Defendants for the OPTIMAL DECISION bid," and closing would allow "Booz Allen immediately to learn EverWatch's competitively-sensitive information." Mot. at 11. Putting aside that closing already has occurred, these arguments ignore that Booz Allen is implementing its prior commitments to ensure that competition for OPTIMAL DECISION will continue post-closing and that competitively sensitive information related to OPTIMAL DECISION is not shared between the fire-walled bid teams.

*Balance of the Equities and Public Interest.* The balance of equities and the public interest also disfavor a preliminary injunction. As this Court well knows, DOJ's *only* anticompetitive

concern in this case is related to the bids for OPTIMAL DECISION. Those bids will be submitted within *weeks*. DOJ's requested injunction—which could extend well into next year if it pursues an appeal—is completely out of proportion with the alleged competitive concern and defies the long-established principle that equitable relief must be carefully calibrated and must be no more burdensome on the defendant than necessary.[14] *E.g.*, *Mayor of Baltimore v. Azar*, 973 F.3d 258, 293 (4th Cir. 2020). This is particularly true given the commitments Defendants are carrying out to ensure competition for OPTIMAL DECISION continues post-closing.

DOJ's requested injunction also would harm competition—both on OPTIMAL DECISION and other procurements. Right now, Defendants are entering the final stages of preparation of their OPTIMAL DECISION bids. To require an unwinding of the deal for even 14 days—much less the longer injunction DOJ seeks—would by highly distracting at a critical time when the focus should entirely be on preparing the most competitive bids. More generally, it would create corporate whiplash and impair Booz Allen's and EverWatch's ability to "effectively compete with Raytheon, Lockheed Martin, and other entrenched incumbents for more lucrative contracts." *See* Op. at 13.

## CONCLUSION

DOJ cannot establish any element of the preliminary-injunction standard, much less all four. Its requested relief is an attempt to do through delay what it cannot do on the merits. This Court should deny DOJ's motion.


October 17, 2022                                    */s/ Todd M. Stenerson*

                                                    Todd M. Stenerson (Bar No. 14194)

---

[14] Although DOJ says it is open to an "expedited" appeal, that is cold comfort. Even with an expedited schedule, there is no doubt that it would take many months to get to a final decision on appeal.

David A. Higbee (Bar No. 30364)
Ryan A. Shores (admitted *pro hac vice*)
Adam B. Schwartz (Bar No. 30358)
Matt Modell (admitted *pro hac vice*)
Jacob M. Coate (Bar No. 30355)
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
todd.stenerson@shearman.com
david.higbee@shearman.com
ryan.shores@shearman.com
adam.schwartz@shearman.com
matt.modell@shearman.com
jacob.coate@shearman.com

Susan Loeb (admitted *pro hac vice*)
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
susan.loeb@shearman.com

*Attorneys for Defendants Booz Allen Hamilton Holding Corp.*
*and Booz Allen Hamilton Inc.*

*/s/ G. Charles Beller*

G. Charles Beller (Bar No. 30372)
Molly M. Barron (Bar No. 19151)
Amanda P. Reeves (admitted *pro hac vice*)
Marguerite M. Sullivan (admitted *pro hac vice*)
Anna M. Rathbun (admitted *pro hac vice*)
Christopher J. Brown (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-22001
charlie.beller@lw.com
molly.barron@lw.com
amanda.reeves@lw.com
marguerite.sullivan@lw.com

21

anna.rathbun@lw.com
chris.brown@lw.com

Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
Kelly S. Fayne (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
al.pfeiffer@lw.com
kelly.fayne@lw.com

*Attorneys for Defendant EC Defense Holdings, LLC,*
*EverWatch Corp., and*
*Analysis, Computing & Engineering Solutions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2022, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, and served one copy, by ECF to counsel of record in this matter.

*/s/ Todd M. Stenerson*

Todd M. Stenerson (Bar No. 14194)
Shearman & Sterling LLP
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
todd.stenerson@shearman.com